**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                                        :
In re:                                                  :        Chapter 7
                                                        :
CIL Limited,                                            :        Case No. 13-11272-JLG
                                                        :
                                    Debtor.             :
                                                        :
--------------------------------------------------------x
                                                        :
Salvatore LaMonica, as Chapter 7 Trustee                :
   For CIL Limited,                                      :
                                                        :        Adv. Proc. No. 14-02242-JLG
                                    Plaintiff,           :
                                                        :
v.                                                      :
                                                        :
CEVA Group PLC, CEVA Holdings LLC,                      :
CEVA Logistics Finance B.V.,                            :
Gareth Turner, and Mark Beith,                          :
                                                        :
                                    Defendants.          :
                                                        :
--------------------------------------------------------x


**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART,**
**DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT**


**A P P E A R A N C E S:**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:    David M. Zensky, Esq.
       Dean L. Chapman Jr., Esq.

*Counsel for Defendants CEVA Group Plc, CEVA*
*Holdings LLC, and CEVA Logistics Finance B.V.*

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York 10036
By:     Scott M. Berman, Esq.
        Christopher L. McCall, Esq.
        Eric Seiler, Esq.

*Attorneys for Defendants Gareth Turner and Mark Beith*


KASOWITZ, BENSON, TORRES LLP
1633 Broadway
New York, New York 10019
By:     Robert Novick, Esq.
        Howard W. Schub, Esq.

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:

## **Introduction**

In the spring of 2013, CIL Limited ("**CIL**" or the "**Debtor**"), the chapter 7 debtor herein,

was a holding company known as CEVA Logistics Limited, that was controlled by several

investment funds operated by Apollo (defined below).  Its sole asset was its direct and indirect

ownership of 100% of the equity of CEVA Group PLC ("**CEVA Group**"), a holding company

that controlled a number of operating entities comprising the CEVA Enterprise (defined below).

At that time, CIL's debt consisted of unsecured PIK Notes (defined below) totaling at least €103

million, while CEVA Group's secured and unsecured indebtedness totaled approximately €2.1

billion and €575 million, respectively.  In April 2013, CIL acquiesced to and participated in an

out-of-court restructuring and recapitalization of CEVA Group (the "**CEVA Restructuring**").

As a part of that restructuring transaction, CIL caused CEVA Group to issue new shares of its

stock (defined below as the "**CEVA Equity Transfer**") to a newly created entity (defined below

as "**CEVA Holdings**").  One consequence of that transfer was that CIL was left with a 00.01%

interest in CEVA Group.  The newly issued shares eventually were used to equitize a portion of

CEVA Group's indebtedness, including unsecured debt held by Apollo.  At the end of that

process, Apollo, which owned (through CIL) almost 100% of CEVA Group prior to the CEVA

Restructuring, was left with a 21% ownership interest in recapitalized CEVA Group.  For CIL,

the CEVA Restructuring transaction was overseen by its then directors, Gareth Turner

("**Turner**") and Mark Beith ("**Beith**," and collectively with Turner, the "**Directors**"), who were

advised by professionals in the United States and Cayman Islands.

1

CIL is a Cayman Islands exempted company.  After the CEVA Equity Transfer, but before all steps in the CEVA Restructuring were completed, on April 2, 2013, CEVA Logistics Limited changed its name to "CIL Limited" (i.e., the Debtor) and filed a petition commencing provisional liquidation proceedings in the Grand Court of the Cayman Islands.  Those proceedings are on-going.  A few weeks later, on April 22, 2013 (the "**Petition Date**") three Cayman-based PIK Noteholders (defined below) filed an involuntary petition under chapter 7 of the Bankruptcy Code against CIL in this Court.  On May 14, 2013, the Court entered an order for relief against CIL.

Salvatore LaMonica is the court-appointed chapter 7 trustee of the CIL estate (the "**Trustee**").  He contends that CIL's interest in the CEVA Group equity had value at the time of the CEVA Equity Transfer and that CIL received nothing in consideration for the loss of its ownership interest in CEVA Group.  He says that CIL was stripped of its interests in CEVA Group at the behest of Apollo, who allegedly conceived of and orchestrated the CEVA Restructuring, including the CEVA Equity Transfer, from its offices in New York City.  He maintains, in substance, that through the issuance of the new shares of CEVA Group, Apollo sought to enhance its ownership interest in CEVA Group by "leapfrogging" the PIK Noteholders in the CEVA capital structure.  Moreover, he maintains that to make matters worse, CEVA Group or one of its controlled subsidiaries is holding nearly €14 million of cash that belongs to CIL (the "**CIL Cash**") and has unjustifiably refused to return it to the Debtor's estate.  In this adversary proceeding, the Trustee seeks relief against the Directors, as well as CEVA Group, CEVA Holdings and a related company, CEVA Logistics Finance B.V. ("**CEVA Finance**," and collectively with CEVA Group and CEVA Holdings, the "**CEVA Defendants**," and with the Directors, the "**Defendants**").

Before the Court are motions by the CEVA Defendants and the Directors to dismiss miscellaneous counts of the Trustee's nineteen (19) Count amended complaint [ECF No. 21[1]] (the "**Amended Complaint**").[2]  The CEVA Defendants seek to dismiss certain of the Counts against all or some of them, pursuant to Rules 12(b)(2) and (6) of the Federal Rules of Civil Procedure.[3]  Turner seeks to dismiss certain of the Counts alleged against him pursuant to Rule 12(b)(6).  Beith has moved to dismiss all Counts asserted against him for lack of personal jurisdiction under Rule 12(b)(2), and has joined Turner's motion to dismiss.[4]  The Trustee opposes all of the motions.[5]  For the reasons discussed below, the Court grants in part, and denies in part, the motions.[6]

## **Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United

---

[1]    Citations to "ECF No. ___" refer to documents filed on the Court's electronic case filing docket in this adversary proceeding.  Documents filed on the electronic docket of other cases will designate the applicable case number before the "ECF No. ___."

[2]    Annexed hereto as "Appendix I" is a list of the counts alleged in the Amended Complaint, including the parties against whom the counts are alleged.

[3]    Fed. R. Civ. P. 12 is made applicable herein by Fed. R. Bankr. P. 7012.

[4]    The Directors jointly filed a motion to dismiss the Amended Complaint [ECF Nos. 26-27] (the "**Directors' MTD**"), and a reply memorandum of law [ECF No. 44] (the "**Directors' Reply**").  The CEVA Defendants jointly filed a motion to dismiss the Amended Complaint [ECF Nos. 32, 35] (the "**CEVA MTD**"), and a reply memorandum of law [ECF No. 48] (the "**CEVA Reply**").  The declarations that the Directors and CEVA Defendants submitted in support of their motions will be identified herein, as necessary.

[5]    The Trustee filed a memorandum of law in joint opposition to the Directors' MTD and CEVA MTD [ECF No. 39] (the "**Trustee's Opposition**").  The declarations that the Trustee submitted in support of his objections to the motions will be identified herein, as necessary.

[6]    Although the CEVA Defendants, Turner and Beith filed separate motions to dismiss, the Court will address all of the motions in this Memorandum Decision.

States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## Legal Standards and Scope of the Record

Rule 12(b)(2) provides for the dismissal of a defendant from a lawsuit based upon a lack of personal jurisdiction.  As such, its focus is on the contacts between the defendant and the forum.  As discussed below, in assessing the merits of a Rule 12(b)(2) motion, courts consider (i) whether the defendant has the requisite "minimum contacts" with the forum, and (ii) whether the exercise of jurisdiction over the defendant would be reasonable in the circumstances.  *See, e.g., Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).  It is well settled that in deciding Rule 12(b)(2) motions, courts may review materials beyond the pleadings, including affidavits and other written materials.  *See, e.g.*, *MacDermid v. Deiter,* 702 F.3d 725, 727 (2d Cir. 2012).  *See also Bensusan Restaurant Corp. v. King*, 937 F. Supp. 295, 298 (S.D.N.Y. 1996) (noting that "[m]atters outside the pleadings . . . may also be considered in resolving a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) without converting it into one for summary judgment."), *aff'd*, 126 F.3d 25 (2d Cir. 1997); *Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*, No. 10-cv-1777, 2011 WL 381612, at *3 (E.D.N.Y. 2011) ("In deciding a motion to dismiss for lack of personal jurisdiction, the Court may rely upon materials that are outside the pleading, including any affidavits submitted by the parties.") (citation omitted).  Beith and CEVA Finance have submitted declarations in support of their respective Rule 12(b)(2) motions.  *See* Declaration of Mark Beith in support of Motion to Dismiss [ECF No. 28] (the "**Beith Declaration**"); Declaration of Remco Van Der Pijl [ECF No. 38] (the "**Pijl Declaration**").  No one disputes that those materials should be included in the record of those motions.  The Court has relied on them in resolving the Rule 12(b)(2) motions.

4

Rule 12(b)(6) has a different focus.  It provides in relevant part:

(b) Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defense[] by motion . . . (6) failure to state a claim upon which relief can be granted . . .

Fed. R. Civ. P. 12(b)(6).  Thus, a Rule 12(b)(6) motion tests the legal sufficiency of a plaintiff's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007).  In resolving the Rule 12(b)(6) motions, the Court will "assess the legal feasibility of the complaint, not . . . assay the weight of evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (internal quotation marks omitted).  To overcome a motion to dismiss a complaint, the plaintiff must demonstrate that the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts employ a two-prong approach in assessing the merits of Rule 12(b)(6) motions.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir. 2013) (noting that *Iqbal* "creates a 'two-pronged approach' . . . based on '[t]wo working principles.'" (quoting *Iqbal,* 556 U.S. at 678-79)).  First, the court must "accept as true all of the factual allegations set out in the plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (quotation marks and citation omitted). *See also Boykin v. KeyCorp*, 521 F.3d 202, 204 (2d Cir. 2008) (stating that "[i]n reviewing a motion to dismiss, [the court] accept[s] the allegations in the complaint as true.") (citation omitted). Second, the court must determine if those well–pleaded factual allegations state a "plausible claim for relief."  *Iqbal*, 556 U.S. at 679.  To meet that standard, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* at 678; *see also Kaufman v. Time Warner*, 836 F.3d 137, 141

(2d Cir. 2016) (noting that the "plausibility" standard "asks for more than a sheer possibility that

a defendant has acted unlawfully" (quoting *Iqbal*, 556 U.S. at 678)) (internal quotations marks

omitted); *Twombly*, 550 U.S. at 555 (observing that "[f]actual allegations must be enough to

raise a right to relief above the speculative level . . . .") (citing 5 C. Wright & A. Miller, *Federal*

*Practice and Procedure* § 1216, at 235-36 (3d ed. 2004)). In approaching the second prong, the

"reviewing court [is required] to draw on its experience and common sense." *Iqbal*, 556 U.S. at

679.

In resolving the Rule 12(b)(6) motions, the Court is limited to the facts alleged in the

Amended Complaint, including (i) documents attached to or incorporated by reference in the

complaint; (ii) documents "integral" to or relied upon in the complaint, even if not attached or

incorporated by reference, and (iii) facts of which judicial notice may properly be taken under

Rule 201 of the Federal Rules of Evidence. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,

152-53 (2d Cir. 2002); *Brass v. Am Film Techs, Inc.*, 987 F.2d 142, 150 (2d Cir. 2002); *Cortec*

*Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (stating that "[w]here plaintiff

has actual notice of all the information in the movant's papers and has relied upon these

documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one

under Rule 56 is largely dissipated."). If materials beyond those are submitted in support of a

Rule 12(b)(6) motion, the Court must either exclude them, or convert the motion to one for

summary judgment under Fed. R. Civ. P. 56. *See* Rule 12(d) (If "matters outside the pleadings

are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one

for summary judgment under Rule 56.")). *See also Nakahata v. N.Y.-Presbyterian Healthcare*

*Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013) ("As indicated by the word '[must],' the conversion

of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court

considers matters outside the pleadings is strictly enforce[d] and mandatory.") (citing *Global

Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 155 (2d Cir. 2006)); *Roth v. Jennings*,

489 F.3d 499, 509 (2d Cir. 2007) ("In any event, a ruling on a motion for dismissal pursuant to

Rule 12(b)(6) is not an occasion for the court to make findings of fact.").

In addition to the Beith Declaration, the Directors submitted the Declarations of Michael

Crystal Q.C. [ECF No. 29] and Christopher L. McCall [ECF No. 30] in support of their motions

to dismiss. The McCall declaration included, as exhibits, nine (9) documents, or portions

thereof. The Directors have advised that for purposes of their motions to dismiss, it is not

necessary for the Court to consider any documents submitted by them, other than the Beith

Declaration, and that they are not requesting to convert their motions to dismiss into motions for

summary judgment. *See* Directors' MTD at 3 n.3.

In contrast, the CEVA Defendants submitted 22 documents in support of their motion to

dismiss (such documents, the "**CEVA Documents**"),[7] and they contend that the Court can

consider all of them in resolving their Rule 12(b)(6) motion. The Trustee did not annex any

documents to the Amended Complaint, but acknowledges that five of the CEVA Documents, and

a draft of another, are integral to the complaint and, as such, he agrees that they should be

included in the record of the motions. Those documents are:

- MS Report/Morgan Stanley Discussion Materials.[8]

---

[7]    Annexed hereto as "Appendix II" is a list of those documents. As set forth in Appendix II, most of those documents are exhibits to the Chapman Declaration or Supplemental Chapman Declaration, as those items are defined in Appendix II.

[8]    The Trustee contends that the multiple references in the Amended Complaint to the "MS Report" do not refer to the "final version" of the report, submitted by the CEVA Defendants as Exhibit C to the Chapman Declaration, but rather to an earlier version of the report. For that reason, the Trustee objects to the inclusion of the final version of the report in the record of CEVA's motion to dismiss. *See* Trustee's Opp'n at 19, 40-41. The Trustee included a

- E&Y Valuation Report, dated March 29, 2014 (Chapman Decl., Ex. D).

- Restructuring Agreement, dated April 1, 2013, by and among CEVA Group, CIL, Louis Cayman Second Holdco Limited, and CEVA Holdings (Chapman Decl., Ex. E).

- Pages F-61 and F-68 of the CEV A Investment Limited Amendment to Form F-1 Registration Statement, dated August 29, 2012 (Chapman Decl., Ex. F).

- CEVA Holdings 2012 Annual Report (Chapman Decl., Ex. I).

- Second Affidavit of Gareth Turner (Suppl. Chapman Decl., Ex. Q).

The CEVA Defendants contend that all of the remaining documents (the "**Contested CEVA Documents**") fall within one or more of the well settled exceptions to the general rule that in adjudicating Rule 12(b)(6) motions, courts do not look beyond the four corners of the complaint. *See* CEVA Reply at 11. They also contend that certain of those documents should be included in the record since they are part of a multi-step, fully integrated restructuring. *Id.* (citing *Liquidation Trust v. Daimler AG (In re Old CarCo LLC),* 435 B.R. 169, 183-85 (Bankr. S.D.N.Y. 2010) ("***CarCo I***")); *Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 454 B.R. 38, 46-47 (Bankr. S.D.N.Y. 2011) ("***CarCo II***"). The Trustee disputes those assertions.

The CEVA Defendants submitted six (6) of the CEVA Documents in support of their contention that the Court should dismiss Count 16 of the Amended Complaint. As discussed below, the Trustee has withdrawn Count 16 of the Amended Complaint, without prejudice. Accordingly, the Court will exclude those documents from the record of the motions.[9] As to the

---

copy of the version of the report that he relied on in drafting the Amended Complaint in his Opposition. The parties agree that any reference to the "MS Report" or the "Morgan Stanley Discussion Materials" will be to the version utilized by the Trustee in drafting the Amended Complaint.

[9]   Those documents are:

- Account System and Cash Pooling Agreement, dated June 9, 2006, between TNT Logistics Holdings B.V. and Bank Mendes Gans N.V. (*see* CEVA MTD at 61; Chapman Decl., Ex. K);

balance of the Contested CEVA Documents, and as explained below in Appendix III to this

Memorandum Decision (which Appendix is incorporated herein), the Court finds that the

following Contested CEVA Documents will be included in the record of the Rule 12(b)(6)

motions since they are either incorporated in the Amended Complaint or integral to the

allegations therein:

- CEVA Holdings 2013 Annual Report (Chapman Decl., Ex. G).

- CEVA Holdings 2014 Annual Report (Chapman Decl., Ex. A).

- Debt RSA (Chapman Decl., Ex. H).

- PIK Note Debt Instrument Agreement.[10]

- CIL Shareholder Resolution.

- CEVA Shareholder Resolution.

---

- Assignment Agreement, dated July 10, 2007, between CEVA Logistics Holdings B.V., CEVA Finance and Bank Mendes Gans N.V. (*see* CEVA MTD at 62; Chapman Decl., Ex. L);

- Logistics Cash Management Agreement, dated September 27, 2007 ("Logistics Cash Management Agreement") (*see* CEVA MTD at 62; Chapman Decl., Ex. M);

- Cash Pooling Agreement, dated November 28, 2008, between CEVA Finance, CEVA and Bank Mendes Gans N.V. (*see* CEVA Motion at 62; Chapman Decl., Ex. N);

- RBS Cash Pooling Agreement, dated November 5, 2008, by and among ABN AMRO Bank N.V. and CEVA Finance (*see* CEVA MTD at 62-63; Chapman Decl., Ex. O); and

- Amendment to RBS Cash Pooling Agreement, dated January 22, 2009, between ABN AMRO Bank N.V. and CEVA Finance (*see* CEVA MTD at 62-63; Chapman Decl., Ex. P).

[10]    The PIK Note Debt Instrument Agreement was not submitted by the CEVA Defendants as an exhibit to the Chapman Declaration or Supplemental Chapman Declaration; instead, it was previously filed on this Court's docket in the Debtor's main chapter 7 case, in connection with the Petitioning Creditors' Motion for the Appointment of a Trustee [Case No. 13-11272, ECF No. 7, Ex. E] and Allen Investment Management, LLC's Joinder to the Involuntary Petition [Case No. 13-11272, ECF No. 28, Ex. E].

In addition, the Court will take judicial notice of the Joint Stipulation for May 13, 2013.[11]

The remaining Contested CEVA Documents fall outside the scope of the record of the motions. This Court "is not obliged to convert a 12(b)(6) motion to one for summary judgment in every case in which a defendant seeks to rely on matters outside the complaint in support of a 12(b)(6) motion; it may, at its discretion, exclude the extraneous material and construe the motion as one under Rule 12(b)(6)." *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 450 (E.D.N.Y. 2007) (collecting cases). That is what the Court will do here. *See Trans–Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (noting that if a court chooses "to ignore supplementary materials submitted with the motion papers and determine the motion under the Rule 12(b)(6) standard, no conversion occurs and the supplementary materials do not become part of the record for purposes of the Rule 12(b)(6) motion."). *See also Rice v. Kawasaki Heavy Indus., Ltd.,* No. CV-07-4031, 2008 WL 4646184, at *3 (E.D.N.Y. Oct. 17, 2008) (exercising discretion and excluding "extraneous material submitted by the . . . defendants on their motion [to] decide their motion on the complaint alone" thereby declining to convert motion from one under Rule 12(b)(6) to a Rule 56 summary judgment motion).

## **Facts**

### **Background**

CIL is a Cayman Islands exempted company. (¶ 9).[12] Its creditors consist overwhelmingly, if not exclusively, of certain payment-in-kind notes (the "**PIK Noteholders**"

---

[11]    The Joint Stipulation for May 13, 2013 was not submitted by the CEVA Defendants as an exhibit to the Chapman Declaration or Supplemental Chapman Declaration; instead it was previously filed on this Court's docket in the Debtor's main chapter 7 case [Case No. 13-11272, ECF No. 28, Ex. A].

[12]    In the "Facts" section only, the parenthetical notation "(¶ ___)" refers to paragraphs in the Amended Complaint.

holding "**PIK Notes**") issued under a Debt Instrument Agreement, dated as of February 15, 2007, as amended and restated on June 2, 2008, among CIL, the Holders of Debt Instrument, and Credit Suisse, London Branch, as Administrative Agent.  (¶ 12).  The PIK Note Debt Instrument Agreement was entered into by CIL with the London branch of Credit Suisse, as Administrative Agent, with payments (when due) to be tendered in London.  *See* PIK Debt Instrument at 1-3. As of the Petition Date, the face amount of outstanding PIK Notes was approximately €103 million.  (¶¶ 12, 35).

Until the spring of 2013, CIL (at that time, known as "CEVA Logistics Limited") was a holding company that directly and indirectly, and through its wholly owned subsidiary, Louis Cayman Second Holdco ("**Louis Cayman**"), owned 100% of the shares of CEVA Group.  (¶¶ 1, 36).[13]  CEVA Group is an England and Wales public limited company that serves as a holding company for a number of operating companies which collectively conduct logistics and freight management business operations from approximately 1,000 locations in 160 countries, including the United States (collectively, the "**CEVA Enterprise**").  (¶¶ 1, 27, 37).  It has a business address in London, England (¶ 27), but maintains its corporate headquarters in Hoofddorp, the Netherlands.  *See* 2014 Annual Report, at 69, 78 (Chapman Decl., Ex. A).  At that time, CIL was owned and controlled by four funds (collectively, the "**Apollo Funds**")[14] under the control of private equity firm Apollo Global Management, LLC ("**Apollo Global**," and collectively with its subsidiaries, affiliates and managed entities, "**Apollo**").  (¶¶ 22, 33).  As of March 28, 2013, the

---

[13]    CIL owned all but one of those shares.  Louis Cayman owned the remaining share.  (¶ 36).

[14]    The Apollo Funds are: Apollo Management VI, L.P. ("**Apollo Management VI**"), a limited partnership formed under the laws of the state of Delaware; AP VI CEVA, a limited partnership formed under the laws of the Cayman Islands; AlpInvest Partners Beheer 2006, L.P. ("**AlpInvest**"), a limited partnership formed under the laws of the Cayman Islands; and AAA Guarantor Co-Invest VI (B), L.P. ("**AAA**"), a limited partnership formed under the laws of Guernsey.  (¶¶ 18-21).

Apollo Funds collectively owned 100% of CIL's 4.4 million Class B Shares and approximately 91.5% of CIL's 4 million Class A shares. (¶¶ 22, 33, 47). The Class B Shares were senior to the Class A Shares and carried a €200 per share liquidation preference, for an aggregate liquidation preference of approximately €880 million. (¶ 47). In addition, an Apollo-related entity managed the CEVA Enterprise. (¶¶ 2, 33). At all times relevant to this litigation, Turner and Beith were CIL's sole directors. (¶¶ 23, 24).

## CEVA Restructuring

The Trustee acknowledges that in early 2013, "CEVA [Group] faced financial challenges." (¶ 1). However he maintains that "those challenges were surmountable without extraordinary measures[,]" and that a critical fact is that "the value of CEVA [Group] substantially exceeded its debts" and, as such, "CIL's shares of CEVA [Group] had substantial value." *Id.* At that time, CEVA Group's capital structure included approximately €2.1 billion in "opco" first and second Lien secured debt, and approximately €575 million in unsecured debt. *See* Restructuring Term Sheet (Ex. A) to CIL RSA, at 3-5 (Chapman Decl., Ex. E). Three parties – the Apollo Funds, Capital Research Management L.P. and affiliated funds ("**CapRe**") and Franklin Advisers, Inc. and affiliated funds ("**Franklin**"), collectively owned more than 69.5 % of CEVA Group's Second Lien Debt and 83.5% of its Senior Unsecured Debt. *Id.* at 1. The Apollo Funds, in particular, held $295 million in the CEVA Group Second Lien debt. (¶ 2).

On April 1, 2013, CEVA Group, Louis Cayman, CEVA Holdings, and CIL entered into a Restructuring Agreement (the "**CIL RSA**"), pursuant to which, among other things, CIL authorized CEVA Group to issue new CEVA Group shares (the "**New CEVA Shares**") to CEVA Holdings LLC ("**CEVA Holdings**"), a newly formed Marshall Islands affiliate of Apollo (the

12

"**CEVA Equity Transfer**").  (¶ 108).[15]  CIL held the same number of shares before and after the

CEVA Equity Transfer.  However, as a consequence of that stock transfer, CEVA Holdings

gained a 99.99% ownership interest in CEVA Group, while CIL's ownership interest in CEVA

Group was reduced to 00.01%.  (¶¶ 108, 109).  The Trustee acknowledges that the Defendants'

purported objective in effectuating the CEVA Equity Transfer was eventually to use the New

CEVA Shares as currency for a debt-for-equity exchange with some of CEVA Group's creditors.

(¶ 111).  Indeed, on April 3, 2013, CEVA Group, the Apollo Funds, CapRe and Franklin entered

into a Restructuring Support Agreement (the "**Debt RSA**") pursuant to which they agreed to

support an exchange of €1.2 billion of CEVA Group debt for equity in CEVA Holdings (the

"**CEVA Debt Transfer**").  (¶ 119).  As of April 30, 2013, eight days after the Petition Date and

the imposition of the automatic stay, the CEVA Debt Transfer had not yet closed because the

deadline for accepting exchange offer tenders and voting was not due to occur until midnight that

evening.  (¶ 124).  According to the Trustee, the "CEVA Debt Transaction" closed on or about

May 2, 2013.  (¶ 125).  After the CEVA Debt Transfer closed, the Apollo Funds were left with a

21% ownership interest in restructured CEVA Group.  (¶ 112).  The Trustee contends that even

with that reduced percentage ownership interest in CEVA Group, "Apollo still came out ahead"

because it (i) continued owning a sizeable interest in a far more valuable and deleveraged CEVA

Enterprise, (ii) continued to retain board control of CEVA Group, (iii) maintained its lucrative

stream of management fees and (iv) obtained fees in connection with the restructuring

transactions.  (¶ 6).  He says that on the other hand, CIL was left with nothing but its litigation

claims.  (*Id.*).

---

[15]    CEVA Holdings, a Republic of Marshall Islands limited liability company, was formed on March 28, 2013, by
Apollo or at Apollo's directions.  (¶ 28).

**PIK Noteholders' Alleged Loss of Value**

The Trustee asserts that the CEVA Equity Transfer did not benefit CIL at all, because CEVA Holdings gave no consideration to CIL in return for its receipt of the New CEVA Shares (¶ 111), and because the transfer left CIL insolvent, stripped of its assets and hundreds of millions of dollars of value.  (¶¶ 3-4).  He contends that at the time of the CEVA Equity Transfer, CEVA Group had significant value, and that the Directors and Apollo knew as much.  As support, he points to a report that Morgan Stanley ("**MS**") prepared for Apollo, at Apollo's request, in late January 2013 (the "**MS Report**"), which he maintains shows that under several of MS's valuation methodologies, a sale of CEVA Group would likely pay a portion of the PIK Notes debt, and potentially all of it.  (¶ 72).  He also asserts that on two occasions in 2012, the Directors represented that CIL was solvent and that CIL's stock was extremely valuable.  First, in May and August 2012, the Directors filed, respectively, an SEC Form F-1 and SEC Form F-1A Amendment No. 1 to Form F-1 (collectively, the "**SEC Filings**") with the Securities Exchange Commission (the "**SEC**") in connection with CIL's potential sale of up to $400 million of additional CIL securities, and did not withdraw these filings until April 2013.  (¶¶ 6, 43).  He asserts that the SEC Filings expressly represented that CIL (and thus CEVA Group) was solvent by over $1 billion earlier in 2012.  (¶¶ 43, 44).  He also says that in mid-September 2012, the Directors formally resolved that CIL was highly solvent and CEVA Group's equity was extremely valuable.  (¶ 45).  More specifically, he maintains that CIL and certain of its shareholders were parties to a Shareholder Agreement dated November 4, 2006, that required CIL's board of directors (*i.e.*, Beith and Turner) to determine the fair market value per share of CIL's shares in a manner it deemed appropriate in good faith.  He says that at a September 12, 2012 CIL board meeting, the board, after consultation with CEVA Group's Executive

14

Committee, resolved that the CIL Class A Shares were valued at a price of €50/share. (¶¶ 45, 46). From that, he asserts that the implied value of the aggregate "Ordinary Shares" of CIL was almost €1.1 billion. (¶¶ 6, 47, 48).

## The Directors Allegedly Breach Their Fiduciary Duties

The Trustee contends that the CEVA Equity Transfer was not arms-length and was one-sided because Apollo devised and orchestrated the transfer from its New York headquarters for its benefit and to the detriment of the PIK Noteholders. (¶¶ 51, 110). He maintains that Apollo was able to do so because CIL and CEVA Group did not have conflict-free directors, and because, in any event, Apollo controlled CIL, the Directors, CEVA Group and CEVA Holdings. Both Directors allegedly were beholden to Apollo because each was employed by Apollo Global or an affiliate. (¶¶ 23, 24, 55). The Trustee also contends that Beith and Turner conducted business communications, including in their capacities as directors of CIL, through the email domain of "apollolp.com," and that with respect to matters relating to CIL and CEVA Group, both of them reported to and took direction from Stanley J. Parker, then a senior partner at Apollo, who also served as a director of CEVA Group. (¶¶ 17, 23, 24). Moreover, both allegedly were further conflicted because their personal assets were invested in the Apollo Funds that stood to benefit from the CEVA Equity Transfer because they owned CEVA Group debt and securities. (¶¶ 23, 24, 107, 110, 183). What's more, the Trustee says that by November 19, 2012, CIL, CEVA Group and Apollo were working together to formulate the transfers that would become the CEVA Equity Transfer and that through January 15, 2013, when the recapitalization/restructuring plans were well underway: (i) Turner simultaneously served as a director of both CIL and CEVA Group; (ii) CIL's Chief Financial Officer, Rubin McDougal ("**McDougal**") simultaneously served as Chief Financial Officer of one or more entities in the CEVA Enterprise; and (iii) CIL's

15

secretary, Dawn Wetherall ("**Wetherall**"), was simultaneously employed as Regional General Counsel - Northern Europe at CEVA Finance. (¶ 53). McDougal is a United States citizen and served as CIL's Chief Financial Officer through December 2012, if not later. (*Id.*). On or about January 15, 2013, McDougal and Wetherall each resigned from their positions at CIL, and Turner resigned as a director of CEVA Group. (¶ 55). However, Beith and Turner continued to serve as CIL's directors. The Trustee maintains that "[those] personnel maneuvers not only came far too late in the CEVA [Group] restructuring process to avoid tainting the restructuring, they failed to provide CIL with a critically needed independent fiduciary to manage its affairs. CIL remained under the exclusive control of employees of Apollo." (¶ 55).

The Trustee complains that the Directors breached their fiduciary duties to CIL and CIL's creditors by working in bad faith, and in concert with Apollo, to misappropriate CIL's assets. (¶ 4). To that end, he asserts, among other things, that (i) the Directors retained one of Apollo's regular outside counsel, Mintz, Levin, Cohn, Ferris, Govsky and Popeo P.C. ("**Mintz Levin**") to represent CIL in connection with the potential restructuring/recapitalization of CEVA Group, even though Mintz Levin was conflicted (¶ 50); (ii) CIL consulted with the Cayman Islands law firm of Walkers on matters relating to the Directors' fiduciary duties to CIL, while Walkers had an actual and disqualifying conflict because it was acting for CEVA Group with respect to the restructuring/recapitalization that eventually became the CEVA Equity Transfer (¶ 49); (iii) upon advice of counsel, the Directors treated an "*ad hoc*" call with CEVA Group's counsel as a CIL board meeting in order to create the appearance that they were independently evaluating the CEVA Equity Transfer when they in fact were not (¶ 56); (iv) retained the Appleby law firm in the Cayman Islands, as CIL's Cayman Islands counsel to assist with the restructuring of CIL, but in response to Appleby's advice that the Directors had a serious conflict of interest, did nothing

16

to cure their conflicts or to provide CIL with an independent director, officer or manager to exercise independent judgment with regard to the CEVA Equity Transfer (¶¶ 50, 59); and (v) took steps with their professionals to create sham evidence of having acted independently, when they had not.  (¶ 106).

**The Defendants Allegedly Concealed the CEVA Restructuring**

The Trustee asserts that the Directors knew that they would be facing significant liability for misappropriating CIL's assets for Apollo's benefit and that the CEVA Equity Transfer would be unwound if their wrongdoing was exposed.  (¶ 5).  He says that the Directors and Apollo took a number of steps in an effort to conceal their alleged wrongdoing and that the Directors deliberately employed secrecy and subterfuge for the specific purpose of hindering, delaying and defrauding CIL's creditors.  (¶ 4).  He maintains that the Directors allegedly concealed the equity transfer from the PIK Noteholders, even as CIL and its counsel were meeting with holders of CEVA Group debt and securities, and that not only were the PIK Noteholders denied an opportunity to participate in the negotiation of the CIL RSA, but that they were not informed about the transaction until after it had been executed.  (¶ 110).  He also claims that immediately after the CEVA Equity Transfer was completed, the Directors, at Apollo's behest, caused the Debtor's name to be changed from "CEVA Investments Limited" to "CIL Limited" (¶ 116) and, on April 2, 2013, caused "CIL Limited" to file a petition (the "**Cayman Islands Petition**") commencing provisional liquidation proceedings in the Cayman Islands (the "**Cayman Insolvency Proceedings**").  (¶ 117).  He says that the Defendants caused CIL to commence those proceedings for the expressed and sole purpose of hindering, delaying and defrauding the PIK Noteholders.  (¶¶ 14, 100-02, 117).  He also contends that to further ensure the secrecy of those proceedings, the Directors anonymized the underlying petition and supporting documents

by filing them under the name of "ABC Limited," with a redacted version of the Cayman Islands

Petition being placed on the publicly available Register of Writs.  (¶ 117).

Finally, he maintains that after determining that they would authorize CIL to effect the

CEVA Equity Transfer, but well in advance of the commencement of the Cayman Insolvency

Proceedings, the Directors, with Apollo's assistance, retained Ernst & Young ("**E&Y**") to

produce a report (the "**E&Y Report**") stating that CEVA Group's equity had no value.  (¶¶ 96,

97, 103).  The Trustee contends that the E&Y Report was wholly lacking in diligence and

independence, heavily influenced by Apollo's strategic design, and reverse-engineered to

frustrate the ability of CIL and its creditors to obtain relief for the wrongs allegedly committed

by the Defendants.  (¶ 5).  He alleges that, among other things, in reviewing drafts of the E&Y

Report, the Directors and CIL's professionals proposed modifications to the report in an effort to

show that the CEVA Group equity had no value (¶¶ 73-80), and that they instructed E&Y to use

an EBITDA multiple that was well below the median multiple for comparable companies.  (¶¶

88-91).  The final E&Y Report  concluded:  "it is our conclusion that there is no basis to expect

any equity value to CEVA [Group] for CIL in any available scenario." (¶ 87).  The Trustee

contends that "[t]he Directors deliberately and in bad faith abandoned their fiduciary duties to

CIL . . . [by] obtain[ing] the patently  unreliable E[&Y] Report, after controlling and

manipulating both the process of its creation and its  ultimate conclusion, only to advance their

individual interests of avoiding liability for their misconduct in causing the fraudulent transfer of

CIL's shares in CEVA [Group], and not for any legitimate business purpose."  (¶ 96).

### The Cayman Islands Insolvency Proceedings

On April 2, 2013, CIL filed a petition commencing the Cayman Islands Insolvency

Proceedings in the Grand Court of the Cayman Islands (the "**Cayman Court**").  (¶ 117).  On

May 31, 2013, those provisional liquidation proceedings were converted to Court-supervised official liquidation proceedings, and Messrs. Peter Anderson and Matthew Wright, who were the joint provisional liquidators in place as of the commencement of the proceedings, were appointed as joint official liquidators (the "**Joint Liquidators**" or "**JOLs**").  By order dated September 30, 2013, this Court (Peck, J.) approved an International Protocol among the Trustee and Joint Liquidators.  *See* Order Approving International Protocol Respecting the Administration of the Debtor's Estate [Case No. 13-11272, ECF No. 56].  A copy of the International Protocol is annexed as Exhibit A to that order.  The Cayman Court likewise sanctioned the International Protocol.

**The Involuntary Chapter 7 Case and Rule 2004 Discovery**

On April 22, 2013, three PIK Noteholders (the "**Petitioning Creditors**") filed an involuntary chapter 7 petition against CIL in this Court.  (¶¶ 3, 120).  All of the Petitioning Creditors—Cyrus Opportunities Master Fund II, Ltd., Cyrus Select Opportunities Master Fund, Ltd., and Cyrus Europe Master Fund, Ltd.—are Cayman Islands entities.  At a hearing on May 13, 2013, the Court granted the involuntary chapter 7 petition.  On May 14, 2013, the Court entered an order for relief.  (¶¶ 126-127).

Subsequently, on July 3, 2013, the Trustee filed a motion for an order allowing him to conduct discovery pursuant to Fed. R. Bankr. P. 2004, and on August 6, 2013, the Court granted that motion.[16]  Thereafter, the Trustee served document subpoenas on CEVA Group and Apollo seeking a wide variety of documents related to, among other things, the CEVA Restructuring, CEVA Group's assets and liabilities, and the CIL Cash.  On October 1, 2013, the

---

[16]    *See* Motion of the Trustee for an Order Pursuant to Bankruptcy Rule 2004 Directing the Production of Documents and the Taking of Depositions [Case No. 13-11272, ECF No. 37] and Order Signed on 8/6/2013 Permitting the Trustee to Conduct Rule 2004 Discovery [Case No. 13-11272, ECF No. 55].

Trustee served a subpoena on Houlihan Lokey ("**Houlihan**"), which had served as a financial

advisor to CEVA Group in connection with the CEVA Restructuring.  In total, CEVA Group,

Apollo, and Houlihan produced 57,840 documents totaling 372,310 pages in response to the

various subpoenas served on them.  The Trustee also served document subpoenas on, and

received productions from, the former directors of CIL, their legal advisors, MS, E&Y, and

perhaps others.

## The Adversary Proceeding

The Trustee originally commenced this adversary proceeding on December 8, 2014

through the filing of an eleven count complaint (the "**Original Complaint**") against the CEVA

Defendants and the Directors in the United States District Court for the Southern District of New

York.  *See* Case No. 14cv9671, ECF No. 1 (S.D.N.Y.).  Under the District Court's Amended

Standing Order of Reference Re: Title 11, M10-468, No. 12 Misc. 32 (S.D.N.Y. Jan. 31, 2012)

(Preska, C.J.), the District Court referred the proceeding to this Court (the "**Adversary**

**Proceeding**")[17] by Order dated December 16, 2014.  *See* Case No. 14cv9671, ECF No. 3

(S.D.N.Y.).  On February 13, 2015, the CEVA Defendants and the Directors filed separate

motions to dismiss many, but not all, of the claims asserted by the Trustee in the Original

Complaint.  *See* ECF Nos. 12-17; ECF Nos. 7-10.  In response, on March 31, 2015, the Trustee

filed the Amended Complaint against the Defendants.  *See* Adv. Proc. No. 14-02442, ECF No.

21.

The Amended Complaint consists of 19 claims for relief asserted against some or all of

the CEVA Defendants and/or the Directors.  To summarize, those claims consist of:

---

[17]   Upon referral, this Court opened an adversary proceeding numbered 14-02442.  *See* ECF No. 1-2.

A.  The Trustee's claims to avoid the CEVA Equity Transfer and/or recover the value
thereof: (i) as a fraudulent conveyance under state, federal and foreign law (Counts 1-
3); (ii) as having been effectuated in violation of the automatic stay of section 362 of
the Bankruptcy Code (Count 4); (iii) as an unauthorized post-petition transfer under
section 549 of the Bankruptcy Code (Count 5); and (iv) to compel the turnover of the
New CEVA Shares as estate property under section 542 of the Bankruptcy Code
(Count 6).

B.  The Trustee's claims to recover damages from the Directors and all or some of the
CEVA Defendants based upon: (i) the Directors' alleged breach of their fiduciary
duties (Counts 7 & 12); (ii) the CEVA Defendants' alleged aiding and abetting, or
otherwise assisting in, the breach of the fiduciary duties (Counts 8, 9 & 12).

C.  The Trustee's claims to recover damages from CEVA Holdings based upon its
alleged conversion of the New CEVA Shares (Count 10) or its alleged unjust
enrichment in retaining the CEVA Equity Transfer (Count 11).

D.  The Trustee's claims to recover from some or all of the CEVA Defendants: (i) the
CIL Cash (Counts 13 & 17); (ii) damages based upon their alleged conversion of the
CIL Cash (Count 14) or their alleged unjust enrichment in retaining the CIL Cash
(Count 15); and (iii) damages for the alleged breach of their agreement to pay the CIL
Cash to the Debtor (Count 16).

E.  To the extent the CEVA Equity Transfer is avoided as a fraudulent conveyance, the
Trustee seeks to disallow the claims of CEVA Group, CEVA Holdings and CEVA
Finance under section 502(d) of the Bankruptcy Code (Count 18).  The Trustee also
seeks to equitably subordinate the claims of all Defendants pursuant to section 510(c)
of the Bankruptcy Code (Count 19).

**The Motions to Dismiss**

None of the Defendants has answered the Amended Complaint.  Instead, the CEVA

Defendants and Directors have filed separate motions to dismiss all or select Counts of the

Amended Complaint.  The Trustee opposes both motions.

21

### *The CEVA Defendants' Motion to Dismiss*

Briefly, the CEVA Defendants contend that select Counts of the Amended Complaint

should be dismissed as to some or all of them named in those Counts, pursuant to Federal Rules

of Civil Procedure 12(b)(2) and/or 12(b)(6).  To that end, the CEVA Defendants assert:

> Counts 13-19 should be dismissed against CEVA Finance pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

> Counts 1, 2, and 3, alleging fraudulent transfer and avoidance under Sections 544(b), 548(a)(1)(A), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, should be dismissed because those claims allegedly seek the improper extraterritorial application of the Bankruptcy Code to an alleged transfer of an equity interest in a U.K. entity (CEVA Group) from a Cayman Island entity (CIL) to a Marshall Islands entity (CEVA Holdings).  Alternatively, they contend that principles of international comity dictate that the fraudulent transfer claims should be dismissed because the interests of the Cayman Islands in adjudicating this dispute far outweigh those of the United States.

> Counts 1, 2, 3, 5, 6, 10, 11, and 12 should all be dismissed pursuant Rule 12(b)(6) on the grounds that those Counts fail to state claims for relief because the Trustee has failed to plead factual allegations raising a plausible inference that CIL's equity interest in CEVA Group had value at the time of the CEVA Restructuring.

In addition, and in the alternative, they contend that the following claims should be

dismissed pursuant to Rule 12(b)(6):

> Count 6 (Turnover of CEVA equity) should be dismissed as to CEVA Holdings (only named defendant) on the ground that the shares issued to CEVA Holdings that the Trustee seeks to recover are not and never were property of the CIL estate.

> Count 10 (Conversion of CEVA equity) should be dismissed as to CEVA Holdings (only named defendant) because an intangible interest in property (such as equity ownership) cannot be the subject of a conversion claim, and in any event, CIL consented to the transfer.

> Count 12 (Aiding and Abetting Fraud under New York law) should be dismissed as to CEVA Group and CEVA Holdings (only named CEVA Defendants) because the Trustee has not pled any underlying "fraud," and to the extent the alleged fraudulent transfer is

the "fraud," neither New York law nor the Bankruptcy Code recognizes a claim for aiding and abetting a fraudulent transfer.

Count 13 (Turnover – CIL Cash) should be dismissed as to all CEVA Defendants because there is a dispute as to whether the CIL Cash is CIL's property.

Count 14 (Conversion of CIL Cash) should be dismissed as to all the CEVA Defendants because Dutch law does not recognize the tort of conversion; alternatively, if New York law is applicable, it should be dismissed as to CEVA Group and CEVA Holdings because they are not liable for the acts of CEVA Finance, their subsidiary.

Count 15 (Unjust Enrichment – CIL Cash) should be dismissed as to CEVA Group and CEVA Holdings, because they are not liable for the acts of CEVA Finance, their subsidiary.

Count 16 (Breach of Contract – CIL Cash) should be dismissed as to all CEVA Defendants because the Trustee has not alleged any of the elements of breach of contract.

Count 17 (Injunctive Relief) should be dismissed as to all CEVA Defendants because neither New York nor Dutch law recognizes any such cause of action.

Finally, the CEVA Defendants contend that Counts 14-17 should be dismissed against

CEVA Finance based on *forum non conveniens*.

### ***The Directors' Motions to Dismiss***

The Directors are named only in Counts 4, 7, 12, and 19 of the Amended Complaint.

Turner moves pursuant to Rule 12(b)(6) to dismiss Counts 4 (Violation of the Automatic Stay) and 12 (Conspiracy under Cayman Islands law/Aiding and abetting fraud under New York law) for failure to state a claim.  (As to the latter, Turner joins in the CEVA Defendants' assertion that the Trustee has failed to plead facts raising a plausible inference that CIL's equity interest in CEVA Group had value at the time of the CEVA Restructuring.)

Beith moves pursuant to Rule 12(b)(2) to dismiss the Amended Complaint in its entirety for lack of personal jurisdiction.  In addition, Beith joins Turner's Rule 12(b)(6) motion to dismiss Counts 4 and 12 of the Amended Complaint.

## **Summary of the Court's Resolution of the Motions**

After the motions were submitted, the Trustee agreed to:

(i) dismiss Count 6, without prejudice;

(ii) dismiss Count 12 – only to the extent of aiding and abetting fraud under NYS law, as to all named defendants, without prejudice;

(iii) dismiss Count 16, without prejudice; and

(iv) dismiss Count 17.

Accordingly, to the extent that they relate to those Counts, the motions are denied, as moot.  The

Court summarizes the resolution of the balance of the motions, as follows:

## **Rule 12(b)(2) Relief**

The Court lacks personal jurisdiction over Beith and CEVA Finance, and, as such all Counts alleged against Beith (Counts 4, 7, 12 & 19) and CEVA Finance (Counts 13-19) are dismissed, with leave to replead within 45 days of the entry of this Memorandum Decision.

## **Rule 12(b)(6) Relief**

The CEVA Equity Transfer that the Trustee seeks to avoid pursuant to sections 544, 548 and 550 of the Bankruptcy Code in Counts 1, 2 and 3 was a foreign transfer and those sections of the Bankruptcy Code do not apply extraterritorially. Moreover, by application of the principles of international comity, Cayman law is applicable to the resolution of the avoidance claims.  Accordingly, Counts 1, 2 and 3 are dismissed, with prejudice, except that the Trustee will be permitted to assert an intentional fraudulent transfer claim herein, under Cayman law, divorced of any aspect of the Bankruptcy Code.

The Trustee has alleged plausibly that CEVA Group was solvent at the time of the CEVA Restructuring, thus the CEVA Defendants' motion to dismiss Counts 1, 2, 3, 5, 6, 10, 11, and 12 on that basis is denied.

24

Turner's motion (i) to dismiss Count 4 (Violation of Automatic Stay) is granted; and (ii) to dismiss Count 12 (Conspiracy Cayman Islands law) is denied. Those rulings apply equally to Beith, as necessary.

The motion to dismiss Count 10 (Conversion of CEVA Equity) as against CEVA Holdings is granted, without leave to replead.

The motion to dismiss Count 13 (Turnover -- CIL Cash) as against all CEVA Defendants is denied.

The motion to dismiss Count 14 (Conversion -- CIL Cash) against all CEVA Defendants is granted, without leave to replead.

The motion to dismiss Count 15 (Unjust Enrichment -- CIL Cash) against CEVA and CEVA Holdings is granted, without leave to replead.

The motion to dismiss Counts 14-17 against CEVA Finance based on *forum non conveniens* is denied.

## Discussion

The Court will first address the Rule 12(b)(2) motions filed by Beith and CEVA Finance to dismiss the Amended Complaint for lack of personal jurisdiction over them. Federal Rule of Civil Procedure 12(b)(2) provides for the dismissal of a defendant in a lawsuit based upon a lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). To survive a 12(b)(2) motion, "a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant.") (citation omitted). "This prima facie showing [of jurisdiction] 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673

(2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *see also Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (stating that "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials"). In determining whether the plaintiff has met this burden, the court should construe all pleadings in the light most favorable to the plaintiff and resolve all factual disputes in the plaintiff's favor, *see Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009), but will not draw argumentative inferences in the plaintiff's favor, nor accept as true legal conclusions couched as a factual conclusion. *See In re Terrorist Attacks,* 714 F.3d at 673.

Rule 7004(f) provides that a bankruptcy court may exercise personal jurisdiction over a defendant properly served under Rule 7004, "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States." Fed. R. Bankr. P. 7004(f). Neither Beith nor CEVA Finance contests service of process. Accordingly, "the only remaining inquiry for [this Court] is whether exercising personal jurisdiction over [them] would be consistent with the Due Process Clause of the Fifth Amendment." *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) (citing *Enron Corp. v. Arora (In re Enron Corp.*), 316 B.R. 434, 440, 444-45 (Bankr. S.D.N.Y. 2004). That analysis has two components: (i) whether the defendants have the requisite "minimum contracts" with the relevant forum such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice," and (ii) whether the exercise of jurisdiction is reasonable in the circumstances. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted); *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987). In bankruptcy cases, the relevant forum is not a particular state, but the "United States at large." *See, e.g.*, *Cruisephone, Inc. v. Cruise Ships*

*Catering and Servs. N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002)

(citations omitted).  *Cf. Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) ("When a complaint

asserts federal jurisdiction, Rule 4 of the Federal Rules of Civil Procedure now extends the reach

of federal courts to impose jurisdiction over the person of all defendants against whom federal

law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of

the United States.") (internal quotation marks and citation omitted).

In examining whether a defendant has the requisite "minimum contacts" with the forum,

courts distinguish between "specific" and "general" personal jurisdiction.  *See In re Terrorist*

*Attacks,* 714 F.3d at 673 (citing *Metro. Life Ins. Co.*, 84 F.3d at 567-68).  Specific jurisdiction

depends on an affiliation between the forum and the underlying controversy, where the

controversy relates to or arises out of a defendant's contacts with the forum.  *See British Am. Ins.*

*v. Fullerton (In re British Am. Ins. Co., Ltd.)*, No. 11-03118, 2013 WL 1881712, at * 2 (Bankr.

S.D. Fla. April 30, 2013).  "For a State to exercise jurisdiction consistent with due process, the

defendant's suit-related conduct must create a substantial connection with the forum State."

*Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2d Cir. 2014).  In contrast, general or all-purpose

jurisdiction "is not related to the events giving rise to the suit, and thus, courts impose a more

stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's

'continuous and systematic general business contacts' with the forum at the time the initial

complaint was filed."  *In re Terrorist Attacks,* 714 F.3d at 674 (quoting *Helicopteros Nacionales*

*de Colombia, S.A.* 466 U.S. 408, 414-16 & n.9 (1984)); *see also Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("A court may assert general jurisdiction

over foreign (sister-state or foreign-country) corporations to hear any and all claims against them

when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." (quoting *Int'l Shoe*, 326 U.S. at 317)).

If the threshold "minimum contacts" is met, a court must then evaluate whether exercising personal jurisdiction over a defendant is "reasonable" based upon the following factors:  (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.  *See Asahi Metal Indus.*, 480 U.S. at 113 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980)); *see also N. Jersey Media Grp., Inc. v. Nunn*, No. 13-civ-1695, 2013 WL 5303816, at *4 (S.D.N.Y. Sept. 20, 2013) (same) (citations omitted).

Mark Beith and CEVA Finance contend that they are not subject to this Court's jurisdiction and that, as such, the Court must dismiss each of them from this lawsuit.  The Court considers those matters below.

## Mark Beith

Beith is a U.K. citizen who resides in London.  *See Beith Decl. ¶ 2.*  He has never maintained a residence in New York or owned real property here, and was employed by Apollo Management International LLP, based in its London office.  *Id. ¶¶ 3-5.*  The Trustee does not dispute that the Court lacks general personal jurisdiction over Beith.  *Cf. Sonera Holding, B.V. v. Cukurova Holdings A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (noting that "[t]he paradigm forum for general jurisdiction over an individual is the individual's domicile, his home."), *cert. denied*, 134 S. Ct. 2888 (2014).  Instead, the Trustee argues that the Court may exercise specific personal

28

jurisdiction over Beith because (i) Beith was physically present in the United States when he allegedly breached his fiduciary duties to CIL and allegedly conspired with the other Defendants to commit the CEVA Equity Transfer, and (ii) Beith utilized and controlled agents in the United States in furtherance of the alleged misconduct.  *See* Trustee's Opp'n at 78.

Turning first to Beith's activities in the United States, Beith concedes that in December 2012, he visited the U.S. "for a personal vacation," and that during his visit, he "spent a small amount of time working on CIL matters."  Beith Decl. ¶ 14.  However, he says that those matters "were, at best, only tangentially related" to his "April 1, 2013 decision, in [his] capacity as a CIL director, to authorize CEVA to issue new shares to CEVA Holdings."  *Id.* ¶ 16.[18]  The Trustee has a very different view of Beith's visit.  He maintains that Beith did much more that attend to "ministerial matters" during his visit to New York, and alleges in the Amended Complaint that while he was in the United States, Beith took the following actions in breach of his duties to CIL and in furtherance of his alleged misconduct:

- Working from New York headquarters, Beith finalized Appleby's retention as CIL's Cayman Islands counsel.  Am. Compl. ¶ 50.

- Beith allegedly addressed CIL's finances, including the CIL Cash, as follows: (i) exchanged emails regarding opening a CIL bank account with (a) CEVA personnel, (b) Mintz Levin and (c) Turner; (ii) communicated with CEVA personnel concerning the CIL Cash; and (iii) discussed the CIL Cash with a senior Apollo employee at an in-person meeting in New York.  *Id.* ¶ 129.

- Beith allegedly addressed matters relating to conflicts of interest, as follows: (i) Beith drafted correspondence to, and received correspondence from, an attorney regarding plans for McDougal's possible resignation as CFO (*id.* ¶ 54); (ii) on December 27, 2012, Paul Ricotta of Mintz Levin, acting for and reporting to Beith, conducted communications with Akin Gump Strauss Hauer & Feld LLP, CEVA Group's U.S. counsel, regarding the possible resignations of Turner from

---

[18]    Beith also denies that he was in the U.S. in January, February, March or April 2013, and asserts that he "did not visit the U.S. again until several months after the transaction at issue in the Amended Complaint took place."  Beith Decl. ¶¶ 17-18.

the board of CEVA and McDougal from CIL (*id.*); and (iii) on December 29, 2012, Beith requested and received advice from Mintz Levin about whether Wetherall should resign. *Id.*

- During the course of Beith's physical presence in the United States in December 2012, Beith met in person with Parker. *Id.* ¶ 25.[19]

The Trustee asserts that those facts demonstrate that Beith's conduct in the United States related to advancing Apollo's scheme, and, further, that such conduct included one of the most critical steps in advancing the alleged scheme: removing CIL's officers (i.e., Wetherall and McDougal) and leaving CIL solely under the management of Beith and Turner, alleged "senior" Apollo employees, so that there was no one to act as an "honest broker" and objectively evaluate whether the CEVA Equity Transfer was in the best interest of CIL and its creditors. *See* Trustee's Opp'n at 4-5. The Trustee notes that Beith suggests that his work in the United States should be ignored when considering whether the Court has personal jurisdiction over him because the "formal restructuring plan that would ultimately lead to the transaction at issue in this case was not proposed to Turner and me until late January or early February 2013, after I

---

[19]    Beith "categorically den[ies]" the Trustee's allegations that he breached his fiduciary duties or otherwise engaged in misconduct, and asserts that "[his] conduct was lawful and appropriate." Beith Decl. ¶ 12. He acknowledges that, while in the U.S. in December 2012, he engaged in the following activities:

- He exchanged emails with CEVA personnel, CIL's counsel at Mintz Levin, and Turner regarding the opening of a bank account in the U.K. for CIL, and had a telephone call with Turner regarding the same subject.

- He exchanged emails with Mintz Levin regarding the resignations of CIL's Chief Financial Officer, Rubin McDougal, and CIL's Secretary, Dawn Wetherall.

- He exchanged emails with CEVA personnel in an effort to obtain details regarding CIL's cash pooling arrangements with CEVA, and had one meeting with Michael Jupiter, an Apollo employee, during which we shared information and data regarding certain cash pooling arrangements.

- He met with Stan Parker of Apollo.

had returned to the U.K." Beith Decl. ¶ 13. The Trustee disputes that assertion and argues that Beith's actions in New York must be considered in the context of the restructuring transaction, particularly in light of Beith's admission that in late 2012, CEVA representatives advised him and Turner that CEVA was contemplating a transaction to address its balance sheet and equity issues. *See* Trustee's Opp'n at 80 (citing Beith Decl. ¶ 13). He maintains that the groundwork for the CEVA Equity Transfer was in progress before and during Beith's presence in the United States, and Beith was directly participating in it.[20] Thus, the Trustee asserts that while the "formal restructuring plan" for the CEVA Equity Transfer may not have been solidified until a few weeks after Beith's trip to New York, that does not negate the fact that Beith and others allegedly were conspiring and working diligently to effectuate the asset strip while Beith was in New York. *See* Trustee's Opp'n at 80.

According to the Trustee, those allegations are more than sufficient to establish personal jurisdiction over Beith when compared to other cases where courts have found a *prima facie*

---

[20]    To that end, the Amended Complaint alleges the following:

- On or about October 18, 2012, in anticipation of a restructuring transaction involving CEVA [Group], CIL obtained legal advice regarding its Directors' fiduciary duties from the Cayman law firm of Walkers. Am. Compl. ¶ 49.

- Also in October 2012, Turner and Beith requested one of Apollo's regular outside counsel, Mintz Levin in the United States, and also Appleby, to represent CIL in connection with the restructuring/recapitalization of CEVA Group. *Id.* ¶ 50.

- By November 19, 2012, CIL, CEVA [Group] and Apollo were working together to formulate the transfers that would become the CEVA Equity Transfer. *Id.* ¶ 53.

- Appleby was formally retained in late December 2012, when Beith, working in the New York Headquarters, finalized Appleby's retention. *Id.* ¶ 50.

- In late 2012, Beith failed to afford CIL with a critically needed independent fiduciary to manage its affairs. *Id.* ¶ 51.

The Court notes that the Trustee does not allege that Beith was in the United States in October or November 2012.

showing of personal jurisdiction based upon defendants' attendance at board meetings.  *Id.* at 81

(*citing Rusyniak v. Gensini*, 629 F. Supp. 2d 203 (N.D.N.Y. 2009) and *N.F.L. Ins. Ltd. By Lines

v. B&B Holdings, Inc.*, No. 91 CIV 8580, 1993 WL 78090, at *9 (S.D.N.Y. Mar. 18, 1993)).

However, those cases do not advance the Trustee's position.  In *Rusyniak*, the plaintiff alleged

that the foreign defendants, acting in their capacity as directors, attended at least two separate

board meetings in New York, at which they breached their duties by voting to take certain

tortious corporate action.  629 F. Supp. 2d at 229.  The Court found that those allegations were

sufficient to defeat a motion to dismiss for lack of personal jurisdiction.  *Id.*  Similarly, in *N.F.L.

Insurance*, the Court summarily concluded that the allegation that the director defendants held

meetings in New York and breached their fiduciary duties at such meetings, constituted *prima

facie* evidence of personal jurisdiction over those individual defendants.  1993 WL 78090, at *9.

In contrast, the Trustee's allegations in support of personal jurisdiction over Beith are based

upon Beith's singular, vacation visit to New York, not in his capacity as a director of CIL, and

not for a board meeting at which he allegedly committed any tortious acts.  As discussed below,

the limited actions he took relating to CIL matters during that visit were only tangentially related

to the CEVA restructuring transactions, and are insufficient for this Court to exercise specific

personal jurisdiction over Beith.

    First, the emails Beith exchanged regarding the opening of a CIL bank account have no

relationship to the underlying litigation, and the Trustee does not allege any.  Likewise, there are

no allegations in the Amended Complaint that Beith and Parker had discussed anything related to

the CEVA Group restructuring transaction during their in-person meeting.  Indeed, the Trustee

does not describe what Beith and Parker had discussed at their meeting.[21]  Lastly, the emails

---

[21]    In the Trustee's Opposition, the Trustee sought to conduct additional discovery to "ascertain the extent of
Beith's activities in the United States."  Trustee's Opp'n at 87.  As of the date of this Memorandum Decision,

Beith allegedly exchanged with CEVA Group personnel regarding the CIL Cash actually pertained to a "CIL/CEVA reimbursement agreement," not the CIL Cash. *See* emails dated 12/28/12 and 12/29/12 regarding CIL/CEVA reimbursement agreement (Novick Decl., Ex. M) [ECF No. 40-13]; *see also* Hr'g Tr. at 114:5-7 ("There are also e-mails about a reimbursement agreement between CEVA and CIL, because CEVA paid for some of CIL's expenses."). The Trustee does not allege anywhere in the Amended Complaint that there is any relationship between the CIL/CEVA reimbursement agreement and the CIL Cash. In sum, these actions taken by Beith in New York do not give rise to the causes of action asserted against him, and thus cannot form the basis of specific personal jurisdiction over him. *See British Am. Ins. Co. Ltd., v. Fullerton (In re British Am. Ins. Co., Ltd.)*, No. 09-35888, 2013 WL 188712, at *4 (Bankr. S.D. Fla. April 230, 2013) ("For this Court to exercise specific personal jurisdiction over [defendant], the cause of action against him must relate to or arise from his contacts with the United States.").

Beith's relevant contacts with the United States, upon which the Trustee seeks to assert personal jurisdiction, boil down to several emails Beith exchanged regarding the resignation of McDougal and Wetherall and finalizing Appleby's retention as CIL's Cayman counsel, and a meeting with Michael Jupiter that may have related to the CIL Cash, while on vacation in the United States four months prior to the CEVA restructuring transaction. Those acts do not rise to the level of "material elements" of the CEVA restructuring transaction, which, according to the Amended Complaint, involved multiple steps over an eight-month period. Moreover, it is not enough that the alleged conduct has some connection to the forum; the alleged conduct must

---

however, the parties have concluded discovery. *See* Letter dated June 9, 2016 [ECF No. 85] ("[W]e write to request a status conference to discuss the trial of this case now that the parties have substantially completed fact and expert discovery."). The Court thus assumes that the Trustee's request for additional discovery as to Beith's activities in the United States, for purposes of establishing personal jurisdiction, is now moot.

have a substantial connection.  *See Walden v. Fiore*, 134 S. Ct. at 1121.  While Beith's email

correspondence regarding the resignation of Wetherall and McDougal, and Appleby's retention,

are alleged to be related to the litigation, specific personal jurisdiction also requires a defendant

to "purposefully direct[] his activities toward the forum[.]"  *In re AstraZeneca Sec. Litig.*, 559 F.

Supp. 2d 453, 466-67 (S.D.N.Y. 2008) (citation omitted).  The Trustee does not contend that

Beith went to New York for the purpose of finalizing Appleby's retention and corresponding

with Mintz Levin regarding the resignations of Wetherall, McDougal and/or Turner.  Rather,

these email exchanges were only "incidental" to the pre-existing discussion regarding the

resignations and Appleby's retention.  *See, e.g.*, *Visual Footcare Tech., LLC v. CFS Allied*

*Health Educ., LLC*, No. 13 Civ. 4588, 2014 WL 772215, at *8 (S.D.N.Y. Feb. 21, 2014)

(explaining that individual defendant's three meetings in New York with the plaintiff were

"largely incidental" to the existing contractual relationship where defendant was traveling to

New York for other business, and thus concluding that there was no specific jurisdiction).  As to

Beith's alleged meeting with Jupiter, although the Court must accept as true the Trustee's

allegation that the meeting was regarding the CIL Cash,[22] the mere fact that the CIL Cash was

discussed in a meeting does not render that discussion or that meeting a tortious act.  The Trustee

does not allege that a decision was made, or that a transaction or other action was undertaken in

respect of the CIL Cash during that meeting.  *See id.* at *7 (finding lack of personal jurisdiction

over individual defendant who had thrice traveled to New York for meetings because "the record

discloses no concrete transactions that were conducted during these meetings.").  In short, it

cannot be said that simply by meeting with Jupiter regarding the CIL Cash and exchanging

limited emails during his vacation to the United States, that Beith had purposefully availed

---

[22]   According to Beith, that meeting was regarding certain cash pooling agreements, not the CIL Cash.

himself of the privileges and benefits of the forum such that he should reasonably anticipate being haled into court here. *See World-Wide Volkswagen Corp.,* 444 U.S. at 297.

It is settled that under New York law, a court "may exercise jurisdiction over a defendant who acted though an agent even if that defendant never physically entered New York." *In re Sumitomo Copper Litig.,* 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 469, 522 N.E.2d 40, 45, 527 N.Y.S.2d 195, 200 (1988)). It is equally the case that while the "status as a corporate officer does not automatically subject a defendant to personal jurisdiction in any forum where the company is subject to jurisdiction . . . a defendant's status as an employee or corporate officer "does not somehow insulate them from jurisdiction." *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 99 (Bankr. S.D.N.Y. 2010) (quoting *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804, 813).

As an alternative argument, the Trustee contends that the Amended Complaint makes a *prima facie* showing that the Court can exercise specific personal jurisdiction over Beith on the basis of actions taken by CIL in the United States at Beith's direction and/or through his agents. Trustee's Opp'n at 84. In support of this agency argument, the Trustee relies on *Nelson A. Taylor Co., Inc. v. Tech. Dynamics Grp. Inc.*, No. 95-CV-0431, 1997 WL 176325, at *5 (N.D.N.Y. Apr. 7, 1997) ("*Nelson Taylor*"). In that case, the plaintiffs, all New York residents, sued Technology Dynamics Group, Inc. ("**TDG**"), a Delaware corporation and TDG's directors, David Wensley and George Grauer, for damages occasioned by their alleged breach of a loan agreement (the "**Agreement**") and securities fraud. Wensley and Grauer were California residents who collectively held 61.5% of TDG's stock. Among other things, the defendants moved to dismiss the complaint for lack of personal jurisdiction. In denying TDG's motion, the district court found that the complaint alleged sufficient contacts between TDG and New York

since it asserted that TDG's president, Gerald Bench, negotiated the terms of the Agreement in New York. *Id.* The district court also denied Wensley and Grauer's motion. There was no dispute that Wensley and Grauer had not been in New York in connection with the negotiation of the Agreement. They contended that Bench did not act at their direction and that, as such, his contact with New York could not subject them to jurisdiction in New York. *Id*. at *4. The district court disagreed and found that the directors were subject to jurisdiction in New York for purposes of New York's long arm statute, N.Y. Civ. Prac. L. & R. § 302(a)(1),[23] because they benefitted from and consented to Bench's activities in New York. *Id*. at *5. In doing so, the district court relied on *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988). There, the New York Court of Appeals held that an out-of-state corporate officer who has not personally transacted business in New York, can still be subject to personal jurisdiction under § 302(a)(1) of New York's long-arm statute, if it can be shown that the corporation transacted business in New York as the officer's agent. *Id*. at 467.[24] The *Kreutter* court explained that even though the plaintiff had no direct dealings with the out-of-state officer, and dealt only with the corporation in New York:

---

[23]   Section 302(a)(1) states:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person *or through an agent*:
> 1.        transacts any business within the state or contracts anywhere to supply goods or services in the state[.]

N.Y. Civ. Prac. L & R. § 302(a)(1). (McKinney 2017) (emphasis added).

[24]   In *Kreutter*, the court held that an individual defendant (Downman, a corporate officer of McFadden Oil Corporation, a Texas corporation) and a corporate defendant (Harmony Drilling Co., a Texas corporation) transacted business in New York within the meaning of § 302(a)(1), through an agent, McFadden Company, a Texas corporation that was licensed to do business in New York and had its principal place of business in New York. 71 N.Y.2d at 464. The court held that personal jurisdiction could be exercised over Downman and Harmony even though the plaintiff did not deal directly with McFadden Oil, Harmony or Downman. The court also found that the plaintiff dealt with McFadden Company in New York, as the agent of the Texas defendants so that its actions were attributable to them and supported the assertion of jurisdiction over them.

> [a] [p]laintiff need not establish a formal agency relationship between defendants
> and [the corporation].... He need only convince the court that [the corporation]
> engaged in purposeful activities in this State in relation to [plaintiff's] transaction
> for the benefit of and with the knowledge and consent of the [ ] defendants and that
> they exercised some control over [the corporation] in the matter.

*Id*. Applying that standard, the *Nelson Taylor* court found that the complaint alleged sufficient

facts to defeat the directors' motion to dismiss based on the following:

- Wensley and Grauer owned 61.5% of the outstanding shares of TDG.

- At all relevant times, Wensley and Grauer had "absolute and total control" of TDG.

- The plaintiffs had "daily conversations" with Grauer regarding the exact terms and provisions of the Agreement.

- Wensley and Grauer controlled the day-to-day activities of TDG and "every detail" of TDG's relationship with the plaintiffs.

- Although both Wensley and Grauer claimed to have been ignorant of Bench's activities in New York, the plaintiff's had alleged facts showing that based upon their level of control over TDG and their control of the negotiations, Wensley and Grauer "well may have consented to Bench's activities for the benefit of [TDG] and [TDG's] controlling shareholders."

*Id*.

The Trustee contends that "Beith's conduct easily meets [the *Nelson Taylor*] standard."

Trustee's Opp'n at 83. He asserts that that CIL's fate was determined by parties acting in the

United States, and those parties were directed in material part by Beith. To that end, the Trustee

asserts that:

- As one of two directors of CIL, Beith dominated the affairs of CIL, and he exploited that control to benefit himself and Apollo. Am. Compl. ¶¶ 11, 24, 50-56.

- From the outset of the CEVA "restructuring," Beith assembled a team of conflicted United States actors to further the objectives of the CEVA Equity Transfer. *Id.* ¶ 49.

37

- Beith retained and controlled Apollo's regular outside counsel, Mintz Levin in the United States, to play an instrumental role in transferring CEVA's equity from CIL to CEVA Holdings. *Id.* ¶¶ 50-51, 56-57.

- Beith utilized Mintz Levin to arrange and supervise vacuous negotiations between CIL and CEVA's legal representatives and a secretive board meeting to enable CIL's interest in CEVA to be wiped out. *Id.* ¶ 56.

- Beith manipulated and changed the E&Y report while it was being prepared by E&Y's New York valuation team. *Id.* ¶¶ 64, 76, 78.

- In the Chapter 7 Case, CIL, while it was still under the control of Beith, attempted to misuse the E&Y Report to create a misleading impression in this Court that Beith and Turner relied on the E&Y Report to justify the CEVA Equity Transfer. *Id.* ¶¶ 65, 121-22.

*See* Trustee's Opp'n at 83-84.[25]  The Trustee misplaces his reliance on *Nelson Taylor*.  First, Beith is not a controlling shareholder of CIL and CIL is not a closely held corporation.  *Cf. Karabu Corp. v. Gitner,* 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y. 1998) (Sotomayor, J.) (noting that "[c]ases finding the benefit prong of *Kreutter* to be satisfied typically have involved claims against the controlling shareholders of closely held corporations . . . ").  Next, in *Nelson Taylor,* the "agent" was the corporate president and the directors controlled the day-to-day activities of TDG and "every detail" of TDG's relationship with the plaintiffs.  Here, in contrast, the alleged "agents" are not CIL's employees or officers.  Instead, the Amended Complaint makes clear that the purported "agents" were the professionals retained as outside service providers by CIL and

---

[25]    The Trustee also asserts that "Beith was also, throughout, not just a director of CIL but a director of (and investor in) Apollo, which the [Amended] Complaint alleges to have committed numerous acts in the U.S." Trustee's Opp'n at 84. To the extent the Trustee is asserting that Beith is subject to jurisdiction in the U.S. based upon Apollo's actions in the United States, the argument fails because Apollo was Beith's employer, not Beith's agent, *see* Am. Compl. ¶ 24 ("Upon information and belief, at all times relevant to this Complaint: Beith was employed by Apollo Global or an affiliate thereof . . ."), and the Amended Complaint fails to allege that Beith exercised any control over Apollo.  *See, e.g., Nelson Taylor,* 1997 WL 176325, at *5 ("[A] plaintiff need not establish a formal agency relationship …. [Plaintiff] need only convince the court that . . . [the defendants] exercised some control over [the company] in the matter" and finding that Wensley and Grauer had "absolute and total control" of TDG, and had controlled the negotiations with the plaintiff).

for CIL—namely, Paul Ricotta at Mintz Levin and the valuation team of E&Y.  *See, e.g.*, Am.

Compl. ¶ 51 (referring to CIL's counsel at Mintz Levin); ¶ 57 ("Ricotta also proposed that

CEVA should file a chapter 7 case (a U.S. proceeding) for the obligor of the CIL Cash as a

means of frustrating the ability of CIL – his firm's client – to recover the CIL Cash."); ¶ 62 ("In

early January 2013, Beith spoke to representatives of E&Y about providing an opinion

concerning restructuring options for CIL and the value of CEVA's shares.").  Neither Mintz

Levin nor E&Y were retained by Beith as his personal advisors, and Beith is not alleged to have

control over the day to day activities of these third-party professionals.  Even where courts have

found personal jurisdiction "predicated upon activities performed in New York for a *foreign*

*corporation*," by an agent or professional, the standard requires that "[t]he agent must be

primarily employed by the defendant and not engaged in similar services for other clients."

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (citing *Miller v. Surf Props,*

*Inc.*, 4 N.Y.2d 475, 481 (1958)) (emphasis added).  *Cf. Rates Tech. Inc. v. Cequel Commc'ns,*

*LLC*, 15 F. Supp. 3d 409, 416 (S.D.N.Y. 2014) (noting that "[t]he bar for a plaintiff to establish

agency in the jurisdictional context is set high," and declining to find agency relationship for

purposes of personal jurisdiction where plaintiff did not allege that third-party networks in New

York were operated "solely at the behest of [the defendant] and not for other clients lacking

network infrastructure in the area.").  Here too, the Trustee has not alleged, and cannot possibly

allege, that Mintz Levin was providing legal services solely to Beith, or that E&Y did not

provide similar valuation services for other clients, to render them binding agents of Beith in the

jurisdictional context.  In short, Mintz Levin and E&Y are not Beith's agents and personal

jurisdiction over Beith cannot be based upon actions taken by Mintz Levin and E&Y in the

forum.  *See Nursan Metalurji Endustrisi A.S. v. M/V TORM GERTRUD*, No. 07 CV  7687, 2009

WL 536059, at *2 (S.D.N.Y. Feb. 27, 2009) ("The attorneys and the investor relations firm allegedly retained by Defendant Torm are considered independent contracts for jurisdictional purposes. Their activities may not be deemed, under agency law, to be attributable to Defendant Torm."); *see also Indem. Ins. Co. of North Am. V. K-Line Am., Inc.*, No. 06 Civ. 0615, 2007 WL 1732435, at * 4 (S.D.N.Y. June 14, 2007) (concluding that defendant's outside sales representatives and pro-staff are not defendant's employees or agents).

In any event, even beyond Beith's lack of "minimum contacts" with New York, it is plainly "unreasonable" to exercise personal jurisdiction over him.  As noted above, the due process analysis consists of two parts: a minimum contacts test, and a reasonableness analysis. The latter calls for "an equitable balancing test" of the following factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering social substantive policies. *Tymoshenko v. Firtash*, No. 11 Civ. 2794, 2013 WL 1234943, at *5 (S.D.N.Y. March 27, 2013) (internal quotation marks and citations omitted).  "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction." *Id.  See also Porina v. Marward Shipping Co.*, No. 05 CIV. 5621, 2006 U.S. Dist. LEXIS 60535, at *17 (S.D.N.Y. Aug. 24, 2006) ("[I]f a defendant's contacts with the United States are weak, the plaintiff has to make a stronger showing of reasonableness in order to show that jurisdiction over the defendant is proper.").

The Trustee argues that it is reasonable to impose personal jurisdiction over Beith because: (1) Beith has New York counsel to represent him in CIL's bankruptcy and this Adversary Proceeding; (2) Beith has appeared in CIL's Chapter 7 Case and this Adversary Proceeding for such purposes that suit him; (3) Beith committed the acts in question while employed by one U.S.-based enterprise (Apollo) and a director of another (CIL); (4) there is no financial hardship because Beith's defense costs are funded by liability insurance and/or Apollo, and he appears to be a wealthy individual in his own right; (5) there are frequent direct flights between New York and London (and New York is far easier to travel to than the Cayman Island); (6) Beith periodically spends time in the United States because his current employer— SilverLake—lists Beith's location as New York; and (7) regardless of how the Court decides the motions to dismiss, this Adversary Proceeding will survive and proceed against Turner, who has not moved to dismiss all of the claims against him, such that Beith still would be required to give evidence in this case.  *See* Trustee's Opp'n at 85-86.

The Trustee's arguments are unconvincing.  The Trustee is incorrect about Beith's location of employment.  Beith works in SilverLake's London office, not in New York. Likewise, Beith's prior employment with Apollo was out of Apollo's London office, and nothing in the record suggests that Beith frequently travels to New York.[26]  There is also nothing in the record supporting the Trustee's speculation that Beith is a "wealthy individual" and whose costs of litigation is being borne by Apollo or insurance.  In any event, Beith's financial well-being is of no moment to the reasonableness of forcing him to defend the litigation here.  That Beith has New York counsel and/or has appeared in this forum in the past does not negate the burden and

---

[26]    It is not clear what relevance there is to the fact the Beith "committed the acts in question while employed by one U.S.-based enterprise (Apollo) and a director of another (CIL)."  As noted above, Beith worked at Apollo's London location, and CIL is a Cayman Islands company.  Neither of those positions supports the argument that it would be reasonable for Beith to be sued in New York for actions taken primarily outside of the United States.

hardship imposed on him in being sued here.  The frequency of flights between New York and

London is also irrelevant.  Finally, the Trustee has not articulated what interest a Court sitting in

New York has, and what substantive social policies would be advanced by U.S. courts, in

adjudicating a litigation between a foreign plaintiff and mostly foreign defendants over a

transaction that took place almost entirely outside of the United States.  While there is

undoubtedly an interest in the plaintiff obtaining convenient and effective relief, the dismissal of

Beith based on lack of personal jurisdiction does not mean that the Trustee would not be able to

continue this Adversary Proceeding and ultimately obtain effective relief.  *See, e.g.*, *Eternal Asia

Supply Chain Mgmt. (USA) Corp. v. Chen*, No. 12 CIV. 6390, 2013 WL 1775440, at *10

(S.D.N.Y. Apr. 25, 2013) (finding that application of reasonableness factors did not favor

plaintiff where it would be a weighty burden for the defendant to defend suit in New York,

which has no interest in determining a dispute centered around California, and plaintiff's

interests are insufficient to tip the scales).  Based on the foregoing, it would be unreasonable for

this Court to exercise *in personam* jurisdiction over Beith, particularly in light of the lack of

minimum contacts Beith has with New York as discussed above.  *See Sherwin-Williams Co. v.

Avisep, S.A. de C.V.*, No. 14-CV-6227, 2016 U.S. Dist. LEXIS 10270, at *21 (S.D.N.Y. Jan. 28,

2016) (stating that "[w]here, however, the contacts that permit the imposition of jurisdiction

under a minimum contacts analysis are weak, the importance of the reasonableness factors—

each of which counsels against the exercise of jurisdiction here—are enhanced" and declining to

exercise jurisdiction as unreasonable, even where minimum contacts had been established (citing

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2002)).

In sum, the Trustee has not made a *prima facie* showing that the Court can assert personal

jurisdiction over Beith.  However, after the motions were submitted to and argued before the

Court, the parties conducted further discovery. That additional discovery may provide details

and information on matters relevant to this Court's exercise of jurisdiction over Beith. As such,

the Amended Complaint is dismissed against Beith, without prejudice. The Trustee is granted

leave to replead additional facts as to Beith's contacts with the United States as the basis for

establishing that this Court can exercise jurisdiction over Beith, within 45 days of the entry of

this Memorandum Decision.

## CEVA Finance

CEVA Finance seeks to dismiss Counts 13-19 against it based on a lack of personal

jurisdiction. The Trustee contends that the Court has personal jurisdiction over CEVA Finance

because (i) CEVA Finance "maintains bank accounts and conducts business in the United

States," and (ii) CEVA Group Global Treasure Department (which is the entity that oversees

CEVA Finance's pooling agreements) and CEVA Finance's in-house counsel are tied to

Houston, Texas. *See* Trustee's Opp'n at 92.

Before addressing those assertions, the Court considers the Trustee's additional

contention that the Court "does not even need" personal jurisdiction over CEVA Finance,

because the Trustee's claims to the CIL Cash are *in rem* claims. *Id.* That argument lacks merit

because even assuming, *arguendo*, that this Court can exercise *in rem* jurisdiction over the CIL

Cash, CEVA Finance will not be subject to the jurisdiction of this Court unless its contacts with

the United States satisfy the *International Shoe* minimum contacts test. *See Viacom Int'l, Inc. v.

Melvin Simon Productions, Inc.*, 774 F. Supp. 858, 862 (S.D.N.Y. Oct. 1991) ("[U]nder *Shaffer

v. Heitner*, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977), all assertions of state court

jurisdiction -- *in personam, in rem* and *quasi in rem* -- must be evaluated by the minimum

contacts standard of *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct.

154 (1945) and its progeny."); *see also CME Media Enters. B.V. v. Zelezny*, No. 01-CIV-1733, 2001 WL 1035138, at * 3 (S.D.N.Y. Sept. 10, 2001) ("[J]urisdiction based on property is usually subject to the same minimum contacts test that is applied to *in personam* cases as set forth in *International Shoe* [].") (internal citation omitted).[27]

Thus, the Court must determine whether the Trustee has alleged in the Amended Complaint that CEVA Finance has sufficient "minimum contacts" with the United States for purposes of exercising personal jurisdiction over it. CEVA Finance functions as the in-house bank and clearing house for CEVA Group. *See* Pijl Decl. ¶ 6. It is incorporated in the Netherlands and maintains its principal place of business there. *Id.* ¶ 4. It has no employees. *Id.* ¶ 5. Its two statutory directors are citizens of the Netherlands and they conduct CEVA Group's business from the Netherlands. *Id.* No document may legally bind CEVA Finance unless it is executed by one or both statutory directors. *Id.* On occasion, the directors must obtain approval of CEVA Group's Financial Officer, who is also located in the Netherlands. *Id.* However, the Trustee is correct that CEVA Finance has business contacts in the U.S. In its capacity as the CEVA Group's in-house bank and clearing house, CEVA Finance manages four cash pooling agreements. One is with Citibank in New York, where it maintains a bank account. *Id.* ¶ 7. Moreover, since July 2014, employees of the CEVA Group Global Treasury Department (who are not CEVA Finance employees) have been located in Houston, Texas. *Id.* ¶ 11. They perform an international function that relates to multiple CEVA Group subsidiaries, including

---

[27]    The case relied upon by the Trustee in support of his argument—*McLean Industries*—is inapposite and actually included an extensive analysis by the bankruptcy court on the issue of whether *in personam* jurisdiction could be exercised over the defendant on an action for injunctive relief and civil contempt where there was *in rem* jurisdiction over property of the debtor's estate. *See U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*, 68 B.R. 690, 691 (Bankr. S.D.N.Y. 1986) ("[T]he principal issue to be resolved by this Court is whether GAC Marine is subject to in personam jurisdiction before this Court."). Nowhere in *McLean Industries* does the court indicate that personal jurisdiction over a defendant party is not necessary where an *in rem* claim has been asserted as to property of the estate.

oversight of CEVA Group's cash pooling arrangements.  *Id.*  Finally, since 2013, CEVA Finance

has occasionally obtained legal advice from a CEVA Group in-house counsel located in the

United States.

For a corporation, the "paradigm" bases for the assertion of general jurisdiction are the

corporation's place of incorporation and principal place of business.  *See Sonera Holding, B.V. v.*

*Cukurova Holdings A.S.*, 750 F.3d 221, 225 (2d Cir. 2014).  No such jurisdiction exists here,

since, as set forth above, CEVA Finance's place of incorporation and principal place of business

is the Netherlands.  CEVA Finance's contracts with Citibank in New York and CEVA Group's

in house counsel and representatives of its Global Treasury Department in the U.S. do not alter

that analysis because they are not so "continuous and systematic" as to "render it essentially at

home in the [United States]."  *Daimler AG v. Bauman*, 134 S. Ct. 746, 760-61 (2014).  Nor do

they support a finding of specific personal jurisdiction because those contacts are not related, in

any way, to the matters at issue in the Amended Complaint.  *See, e.g.*, *Hosking v. TPG Capital*

*Mgmt., L.P. (In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R. 488, 511 (Bankr. S.D.N.Y.

2015) (concluding that the alleged contacts between certain foreign defendants were not

sufficiently related to the plaintiffs' claims such that specific personal jurisdiction exists and

dismissing those non-U.S. defendants).

The allegations in the Amended Complaint are not enough to establish that this Court can

exercise personal jurisdiction over CEVA Finance.  However, as with the jurisdictional analysis

for Beith, the Trustee has taken additional discovery since the submission and arguments for the

motions to dismiss that may provide further details concerning the basis for this Court's exercise

of personal jurisdiction over CEVA Finance.  Therefore, all counts against CEVA Finance are

dismissed for lack of personal jurisdiction, but without prejudice to the Trustee to replead within

45 days following the entry of this Memorandum Decision to address these jurisdictional deficiencies.

Having addressed the Rule 12(b)(2) motions, the Court now turns its attention to the Rule 12(b)(6) motions.

## Motion to Dismiss Counts 1, 2 and 3

In Counts 1 and 2 of the Amended Complaint, the Trustee seeks to avoid the CEVA Equity Transfer as actually and constructively fraudulent under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, respectively, and, to the extent necessary, preserve and recover the New CEVA Shares pursuant to section 550 and 551 of the Bankruptcy Code. *See* Am. Compl. ¶¶ 132-139 (Count 1); ¶¶ 140-148 (Count 2). To the extent relief under section 548 is not available to the Trustee, in Count 3, by application of sections 544(b), 550 and 551, the Trustee seeks to avoid the CEVA Equity Transfer under the U.K. Insolvency Act of 1986, the Cayman Islands Companies Law, and/or New York State Debtor and Creditors Law and, to the extent necessary, preserve and recover the New CEVA Shares. *Id.* ¶¶ 149-162.[28] The CEVA Defendants contend that those Counts must be dismissed, with prejudice, because the transfer at issue is foreign and sections 544, 548 and 550 of the Bankruptcy Code cannot be applied extraterritorially. They also contend that, in any event, international comity mandates that this Court apply Cayman Islands law in resolving those claims. In that regard, the CEVA Defendants contend that, in contrast to U.S. law, Cayman law does not allow for the avoidance of constructive fraudulent transfers. Accordingly, the CEVA Defendants assert that the Court should dismiss Counts 1, 2 and 3, with prejudice, and if anything, allow the Trustee to assert an intentional fraudulent

---

[28]   Specifically, the Trustee alleges that the CEVA Equity Transfer can be avoided under sections 238 and 423 of the U.K. Insolvency Act of 1986, sections 146 and 147 of the Cayman Islands Companies Law, and sections 273, 274, 275 and 276 of the New York Debtor & Creditor Law. *See* Am. Compl. ¶ 160.

transfer claim under Cayman law in this proceeding, divorced from any aspect of the Bankruptcy

Code. The Trustee opposes the motion and contends that he has adequately pled claims for both

actual and constructive fraudulent transfer under section 548 and 544(b) of the Bankruptcy Code,

as well as any other applicable law. Trustee's Opp'n at 42. Moreover, he denies that either the

"presumption against extraterritoriality" or principles of international comity preclude

application of section 548 herein. *Id.* Further, he maintains that even if the Court finds that

section 548 is not available to him, the Amended Complaint adequately pleads avoidance claims

under both United Kingdom ("U.K.") and Cayman law, although he contends that the Court

should apply U.K. law. *Id.* He asserts that, in any event, the fraudulent transfer claims survive

the CEVA Defendants' motion to dismiss, and there is no basis for the Court to abstain from

resolving them on the grounds of comity. The Court considers those arguments below.

### Presumption Against Extraterritoriality

"It is a longstanding principle of American law 'that legislation of Congress, unless a

contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (quoting *Foley

Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). *Accord, RJR Nabisco, Inc. v. European Cmty,*

136 S. Ct. 2090, 2100 (2016) ("***Nabisco***"); *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247

(2010) ("***Morrison***"). This principle is expressed in a "canon of statutory construction known as

the presumption against extraterritoriality: Absent clearly expressed congressional intent to the

contrary, federal laws will be construed to have only domestic application." *Nabisco,* 136 S. Ct.

at 2100 (citation omitted).

In assessing whether sections 544, 548, and 550 of the Bankruptcy Code apply

extraterritorially, the Court must conduct a two-part inquiry, as articulated in *Morrison*. First,

the Court must determine "whether the presumption against extraterritoriality has been rebutted –
*i.e.*, whether the statute gives a clear, affirmative indication that it applies extraterritorially."
*Nabisco,* 136 S. Ct. at 2101.  *See also Societe General plc v. Maxwell Commc'n Corp. (In re
Maxwell Commc'n Corp. plc),* 186 B.R. 807, 816 (S.D.N.Y. 1995) ("**Maxwell I**"), *aff'd on other
grounds*, 93 F.3d 1036 (2d Cir. 1996) ("**Maxwell II**") (noting that "if the presumption [against
extraterritoriality] is implicated, an inquiry into Congressional intent must be undertaken to
determine if Congress intended to extend the coverage of the relevant statute to such
extraterritorial conduct.").  "'[U]nless there is the affirmative intention of Congress clearly
expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned
with domestic condition.'"  *Morrison,* 561 U.S. at 255 (quoting *Aramco*, 499 U.S. at 248, 111 S.
Ct. at 1227).  Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it
has none."  *Id.*  If it is determined that the statute applies extraterritorially, the inquiry ends.  *See
Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 605 (Bankr.
S.D.N.Y. 2017); *Nabisco*, 136 S. Ct. at 2101.

However, "[i]f the statute is not extraterritorial, then at the second step [the Court must]
determine whether the case involves a domestic application of the statute[.]"  *Nabisco,* 136 S. Ct.
at 2101.  *See also Maxwell I,* 186 B.R. at 816 ("after identifying the conduct proscribed or
regulated by the particular legislation in question, a court must consider if that conduct occurred
outside of the borders of the U.S.") (citation omitted).  To do so, the Court must look to the
"focus" of the statute.  *Nabisco,* 136 S. Ct. at 2101.  That is, it must determine whether the
transactions at issue are "the objects of the statute's solicitude" or are among the "transactions
that the statutes seek to 'regulate.'"  *Morrison*, 561 U.S. at 266 (citations omitted).  "If the
conduct relevant to the statute's focus occurred in the United States, then the case involves a

48

permissible domestic application even if other conduct occurred abroad[.]" *Nabisco*, 136 S. Ct.

at 2101.  That is because the presumption against extraterritoriality "has no bearing when the

conduct which Congress seeks to regulate occurs largely in the United States – that is when the

regulated conduct is domestic rather than exterritorial." *French v. Liebmann (In re French)*, 440

F.3d 145, 149 (4th Cir. 2006), *cert. denied*, 549 U.S. 815 (2006).   (internal citations and

quotations omitted).  However, if the statute is not extraterritorial, and "the conduct [relevant to

the statute's focus] occurred in a foreign country, then the case involves an impermissible

extraterritorial application regardless of any other conduct that occurred in U.S. territory."

*Nabisco*, 136 S. Ct. at 2101.

### Whether The Avoidance Statues Apply Extraterritorially

The Court will first consider whether the Bankruptcy Code's avoidance and recovery

provisions apply extraterritorially.  *Cf. id.* ("Because a finding of extraterritoriality at step one

will obviate step two's 'focus' inquiry, it will usually be preferable to proceed in [that] sequence

. . . we do not mean to prelude courts form staring at step two in appropriate cases.")  The

presumption against extraterritorial application "represents a canon of construction, or a

presumption about a statute's meaning, rather than a limit upon Congress's power to legislate."

*Morrison*, 561 U.S. at 255 (citing *Blackmer v. United States*, 284 U.S. 421, 437, 52 S. Ct. 252,

76 L. Ed. 375 (1932)).   "While the presumption can be overcome only by a clear indication of

extraterritorial effect, an express statement of extraterritoriality is not essential." *Nabisco,* 136 S.

Ct. at 2102.  However, "[i]f the legislative purpose is not 'unmistakably clear,' any ambiguity in

the statute must be resolved in favor of refusing to apply the law to events occurring outside U.S.

territory." *Maxwell I,* 186 B.R. 807, 818 (S.D.N.Y. 1995) (quoting *Labor Union of Pico Korea*

*v. Pico Prods.*, 968 F.2d 191, 195 (2d Cir. 1992)).  Nothing in the language of sections 544, 548

and 550 of the Bankruptcy Code suggests that Congress intended those provision to apply to foreign transfers. *Cf. Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch. Inc.)*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006) ("Nothing in the text of [11 U.S.C.] § 548 indicates congressional intent to apply it extraterritorially."); *Maxwell I,* 186 B.R. at 819 ("[N]othing in the language or legislative history of [11 U.S.C.] § 547 expresses Congress' intent to apply the statute to foreign transfers."); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 228 (S.D.N.Y. 2014) ("Nothing in [11 U.S.C. § 550(a)] suggests that Congress intended for this section to apply to foreign transfers . . .") (hereinafter "***Madoff/CACEIS***"). Thus, the Court must examine the "context, including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that [those] section[s] apply extraterritorially." *Id.* (internal citation omitted). *See also Morrison*, 561 U.S. at 265 (noting that, in evaluating whether a statute applies abroad, "context can be consulted as well as [the language of the statute].").

Although section 548 speaks of avoiding transfers of "an interest of the debtor in property," 11 U.S.C. § 548(a), and section 550(a) authorizes the debtor to recover the "property" or "value of the property" to the extent transfers are avoided under section 548, the Bankruptcy Code does not define the term "property."   The Trustee contends that in assessing the breadth of the coverage of those provisions, the Court should look to the meaning of "property of the estate" as set forth in section 541 of the Bankruptcy Code.   He argues, in substance, that because the term "property of the estate" encompasses "property wherever located," as of the commencement of the case (11 U.S.C. § 541(a)(1)), including "[a]ny interest in property that the trustee recovers" under section 550 of the Bankruptcy Code (*see id.* § 541(a)(3)), it follows that the avoidance provisions of the Bankruptcy Code allow the Trustee to avoid and recover

property that, absent unlawful transfer, would rightfully constitute estate property, including such property that is located overseas. *See* Trustee's Opp'n at 47. That is essentially what Judge Lifland found in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ("***Madoff/BLI***"), and for that reason, the Trustee contends that this Court should be guided by that decision and find that section 548 applies extraterritorially.

In that case, the Bureau of Labor Insurance ("**BLI**"), a Taiwanese entity, invested in Fairfield Sentry Ltd. ("**Fairfield Sentry**"), a large feeder fund organized in the British Virgin Islands that invested substantially all of its assets in the SIPA debtor, Bernard L. Madoff Investment Securities LLC ("**BLMIS**"). That was the vehicle through which Bernard Madoff operated his Ponzi scheme. *Id*. at 509. In response to its customer BLI's redemption request, Fairfield Sentry withdrew funds from BLMIS that originated from a BLMIS bank account in New York, and, at BLI's direction, wired those funds to a BLI bank account in New York. Thereafter, BLI caused the redemption payment to be sent to BLI's bank account in London. *Id.* Following his appointment, the BLMIS trustee resolved the estate's claims against Fairfield Sentry under the avoidance and recovery provisions of the Bankruptcy Code. Thereafter, the trustee sued BLI under section 550 of the Bankruptcy Code, to recover the redeemed funds, as a subsequent transferee of those funds, on the grounds that the initial transfers from BLMIS to Fairfield Sentry were "avoidable" under section 548. *Id.* at 520. BLI moved to dismiss the trustee's complaint, arguing, among other things, that the presumption against extraterritoriality precluded the application of section 550 of the Bankruptcy Code. *Id.* at 506, 520. In accordance with *Morrison*, the court first considered the "focus" of the Bankruptcy Code's avoidance and recovery provisions and found that "the focus of the avoidance and recovery sections is on the

initial transfers that deplete the bankruptcy estate and not on the recipient of the transfers or

subsequent transfers." *Id*. at 524. From that, it found that the application of section 550 was

domestic because the depletion of the BLMIS estate occurred in New York and the fact that BLI

received BLMIS's fraudulently transferred property in a foreign country did not make the

trustee's application of this section extraterritorial. *Id*. at 524-25. The court then considered

whether Congress intended for section 550 to have extraterritorial application. It found that

"Congress demonstrated its clear intent for the extraterritorial application of section 550 through

interweaving terminology and cross-references to relevant Code provisions." *Id.* at 527. In

summary, the court reasoned that:

> (i) "property of the estate," under Section 541, includes all property worldwide; (ii)
> the avoidance provisions of Sections 544(b), 547, and 548 . . . incorporate the
> language of Section 541—"an interest of debtor in property"—to delineate the
> extent to which transfers can be avoided, i.e., that which would have been property
> of the estate but for the improper transfer can be avoided; and (iii) Section 550
> explicitly authorizes the recovery of all transfers that have been avoided, which
> necessarily includes overseas property.

*Id.* at 527. In reaching that conclusion, among other things, the court noted that Congress's use

of the terminology "interest of the debtor in property" in the avoidance provisions and section

541(a) "is not coincidental." *Id.* Relying on *Beiger v. I.R.S.*, 496 U.S. 53 (1990), the court found

that "property subject to avoidance is defined by 'property of the estate' in section 541," and that

the term "property of the debtor," as used in the avoidance provisions, "is best understood as that

property that would have been part of the estate had it not been transferred before the

commencement of the bankruptcy proceedings." *Id.* (quoting *Begier v. Internal Revenue Serv.*,

496 U.S. 53, 58 (1990)). Noting that the court in *In re French* concluded that the avoidance

provisions' reference to section 541 also incorporates that section to permit the avoidance of

overseas transfers, the court found that "Congress explicitly incorporated the language of Section

541 to allow a trustee to maximize recoveries for the bankruptcy estate by permitting the

avoidance of any transfer that would have been property of the estate, which necessarily includes

assets fraudulently transferred outside the United States." *Id.* at 528 (*citing French*, 440 F.3d at

152).[29]  From that, the court concluded that because section 550 "allows a trustee to recover any

transfer to the extent it has been avoided[,]" and "the use of the term 'transfer' specifically refers

to all transfers 'avoided under the [avoidance provisions of the Bankruptcy Code],' by

incorporating the avoidance provisions by reference . . . Congress expressed intent for the

application of Section 550 to fraudulently transferred assets outside the United States and the

presumption against extraterritoriality does not apply." *Id.*

The CEVA Defendants contend that *Madoff/BLI* does not withstand scrutiny because the

phrase "interest of the debtor in property" under section 541(a) is different from the language in

sections 544 and 548 and provides a temporal limitation that excludes property transferred by a

---

[29]    French involved the application of section 548 of the Bankruptcy Code to a transfer of a house located in the
Bahamas.  There, the debtor, a U.S. resident, gifted the house to her two children, both U.S. residents.  Shortly after
the children recorded the transfer, an involuntary chapter 7 petition was filed against the debtor by her creditors.
443 F.3d at 148.  After an order for relief was entered against the debtor, the chapter 7 trustee commenced an
adversary proceeding against the children to avoid the transfer of the house as a constructively fraudulent transfer
under § 548(a)(1)(B).  *Id.*  The children conceded that the trustee had established a *prima facie* case to avoid the
transfer, but they moved to dismiss arguing that the U.S. avoidance laws should not apply to the Bahamian transfer.
*Id.* at 149.   The bankruptcy court denied the motion and the district court affirmed.  On appeal, the Fourth Circuit
did not resolve whether the transfer was extraterritorial.  Rather, it ruled that by incorporating the term "property of
the estate" into the definition of in § 548 of the Bankruptcy Code, "Congress made manifest its intent that § 548
apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that
property is located." *Id.* at 152.  The Fourth Circuit reasoned that:

Section 541 defines "property of the estate" as, *inter alia,* all "interests of the debtor in property." 11
U.S.C. §541(a)(1).  In turn, § 548 allows the avoidance of certain transfers of such "interest[s] of the
debtor in property."  11 U.S.C. § 548 (a)(1).  By incorporating the language of § 541 to define what
property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any
transfer of property that *would have been* "property of the estate" prior to the transfer in question—as
defined by § 541 -- even if that property is not "property of the estate" *now.*  *Cf. Begier v. Internal
Revenue Serv.,* 496 U.S. 53, 58, 59 n.3, (1990) (reaching a similar conclusion about another avoidance
provision, § 547 of the Bankruptcy Code); *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell),* 102
F.3d 1411, 1416 (5th Cir. 1997) ("These § 541 'property of the estate' definitions have been directly
linked with the term 'interest of the debtor in property' under § 547(b).").

*Id.* at 152.

debtor in possession pre-petition. *See* CEVA Reply at 6. Specifically, they contend that

although property of the estate includes "interests of the debtor in property as of the

commencement of the case," a debtor does not have an interest in property transferred pre-

petition that is the subject of an avoidance action until the transfer is avoided and the property is

recovered. *Id.* (citing 11 U.S.C. §§ 541(a)(1), (3)). They argue that the property at issue here

does not qualify as "property of the estate" under section 541 because it was not an interest of

CIL at the time of the bankruptcy filing, and it has not yet been recovered. *Id.* As support for

that argument, they rely on *Madoff/CACEIS*, 513 B.R. 222 (S.D.N.Y. 2014). That case involved

the BLMIS trustee's efforts to recover, as alleged fraudulent transfers, redemption payments

made abroad to foreign feeder funds, which thereafter transferred those payments to certain

foreign individuals and entities. The trustee sued to recover those payments from the feeder

funds, as the initial transferees of the alleged fraudulent transfer, and from the foreign persons

and entities, as alleged immediate and mediate transferees of the payments. *Id.* at 225. A

number of the alleged subsequent transferees, including CACEIS Bank and CACEIS Bank

Luxembourg, moved to dismiss the trustee's complaints in their respective adversary

proceedings arguing that section 550(a)(2) of the Bankruptcy Code did not apply

extraterritorially and therefore could not reach subsequent transfers made abroad by one foreign

entity to another. *Id.* at 226. The District Court granted those defendants' motion to withdraw

the reference so that it could consider that issue. *Id.* [30] In applying the *Morrison* methodology,

the court first considered the "regulatory focus" of the Bankruptcy Code's avoidance and

recovery provisions, to determine whether the trustee was seeking to apply section 550

---

[30] The motions to dismiss before the District Court were briefed before Judge Lifland issued the *Madoff/BLI* opinion, and the *Madoff/CACEIS* decision did not mention that opinion.

extraterritorially.  The court found that "[o]n a straightforward reading of section 550(a), this

recovery statute focuses on 'the property transferred' and the fact of its transfer, not the

debtor[,]" and that section 548 "focuses on the nature of the transaction in which property is

transferred, not merely the debtor itself."  *Id* at 227.  Accordingly, the court concluded that

"[u]nder *Morrison*, the transaction being regulated by section 550(a)(2) is the transfer of property

to a subsequent transferee, not the relationship of that property to a perhaps-distant debtor."  *Id.*

The court found that in considering both the location of the subsequent transfers and the

component events of those transfers, the BLMIS trustee was seeking to apply section 550(a)(2)

extraterritorially, because the foreign initial transferees were transferring assets abroad to their

foreign customers.  *Id.* at 228.  Next the court considered whether Congress intended for section

550(a) to apply to foreign transfers and concluded that it did not, noting that "[n]othing in [the

language of section 550(a)(2)] suggests that Congress intended for this section to apply to

foreign transfers . . ."  *Id.* at 228.  In seeking to rebut the presumption against extraterritoriality,

the trustee argued that because section 541(a) of the Bankruptcy Code, which defines "property

of the estate," is incorporated into the avoidance and recovery provisions of the Bankruptcy

Code to define the transfers that may be avoided, and because section 541(a) defines "property of

the estate" to include certain specified property "wherever located and by whomever held," it

follows that the avoidance provisions equally apply to estate property "wherever located and by

whomever held" and thus have extraterritorial application.  *Id.* at 228-29.  The court rejected that

argument.  Adopting the holding and logic of *Fed. Deposit Ins. Corp. v. Hirsch* (*In re Colonial

Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992), the court ruled that

> whether 'property of the estate' includes property 'wherever located' is irrelevant
> to the instant inquiry: fraudulently transferred property becomes property of the
> estate only after it has been recovered by the Trustee, so section 541 cannot supply

any extraterritorial authority that the avoidance and recovery provisions lack on
their own.

*Id.* at 229.  In doing so, the court noted that in *Maxwell I*, the District Court rejected a similar

argument with regard to the extraterritorial application of the avoidance provisions under section

547.  *Id.* at 230.  The *Maxwell I* court likewise relied on *Colonial Realty*, and found that

"[b]ecause preferential transfers do not become property of the estate until recovered, § 541 does

not indicate that Congress intended § 547 to govern extraterritorial transfers."  *Maxwell I*, 186

B.R. at 820.[31]  Thus, the court in *Madoff/CACEIS* found that the trustee could not use section

550(a)(2) to reach "purely foreign subsequent transfers," because the "presumption against

extraterritorial application of federal statutes ha[d] not been rebutted."  513 B.R. at 231.

The Trustee contends that the CEVA Defendants' reliance upon *Madoff/CACEIS* is

misplaced for several reasons.  First, he says that the case is inapplicable on its facts because

there the trustee sought to recover a subsequent transfer received abroad by a foreign transferee

from a foreign transferor under section 550(a)(2), while here, the Trustee seeks to avoid an initial

transfer of property of CIL, a U.S. debtor, to CEVA Holdings, an initial transferee.  *See* Trustee's

Opp'n at 50.  He also contends that *Madoff/CACEIS* is inapplicable because that case is limited

to the recovery of transfers under section 550, not the avoidance of the transfer.  *Id.*  The Court

finds no merit to those contentions.  The District Court's analysis of the extraterritorial reach of §

550(a)(2) did not turn on the fact that the transferee was a subsequent, and not initial, transferee,

or that the trustee only sought to recover avoided transfers.  Rather, it turned on the court's

interpretation of the application of § 541(a) to the avoidance provisions, in light of Second

---

[31]    In affirming *Maxwell I*, the Second Circuit did not address the issue of the extraterritorial application of the
avoidance provisions.  It limited its analysis to the application of the doctrine of comity.  *See Maxwell II*, 93 F.3d at
1055 ("We decline to decide whether, setting aside considerations of comity, the 'presumption against
extraterritoriality' would compel a conclusion that the Bankruptcy Code does not reach the prepetition transfers at
issue.").

Circuit authority. *See Madoff/CACEIS*, 513 B.R. at 228 (noting that "section 541's definition of

'property of the estate' may be relevant to interpreting 'property of the debtor' does not

necessarily imply that transferred property is to be treated as 'property of the estate under section

541 prior to recovery by the Trustee."). That rationale applies equally to sections 548 and

550(a)(1). The Trustee further asserts that while the *Colonial Realty* court stated that transferred

property, while in the transferee's hands, is not technically property of the estate, applying that to

contradict the trustee's avoidance power is circular. *See* Trustee's Opp'n at 49. As support, the

Trustee argues that because *Begier* stands for the proposition that the purpose of the avoidance

provisions is to recover property that would have would have belonged to the estate absent the

transfer, it follows that the avoidance statutes are designed to look at property of the estate

aspirationally. *Id.* The Court disagrees. The law in this circuit is clear—property that is the

subject of an avoidance action is not considered property of the estate until it is recovered. As

the *Colonial Realty* court explained:

> In accordance with 11 U.S.C. § 541(a)(1) (1988), the property of a bankruptcy
> estate includes (with exceptions not presently pertinent) "all legal or equitable
> interests of the debtor in property as of the commencement of the case;" and
> pursuant to 11 U.S.C. § 541(a)(3) (1988), the property of a bankruptcy estate also
> includes "[a]ny interest in property that the trustee recovers" under specified
> Bankruptcy Code provisions, including 11 U.S.C. § 550 (1988).... "If property that
> has been fraudulently transferred is included in the § 541(a)(1) definition of
> property of the estate, then § 541(a)(3) is rendered meaningless with respect to
> property recovered pursuant to fraudulent transfer actions." Further, "the inclusion
> of property recovered by the trustee pursuant to his avoidance powers in a separate
> definitional subparagraph clearly reflects the congressional intent that such
> property is not to be considered property of the estate until it is recovered."

*In re Colonial Realty Co.*, 980 F.2d at 131 (citation omitted) (quoting *In re Saunders*, 101 B.R.

303, 305 (Bankr. N.D. Fla. 1989)). Further, the Trustee may be overstating the significance of

*Begier*. There, a chapter 7 debtor sought to avoid and recover a transfer made by a debtor within

ninety days of the petition date in satisfaction of a debt owing for trust fund taxes pursuant to

sections 547 and 550 of the Bankruptcy Code.  The issue before the Supreme Court was whether

at the time of the transfer, the transferred funds were property of the estate as set forth in § 541

of the Bankruptcy Code.  496 U.S. at 59.  In considering that matter, the Supreme Court noted

that while "[t]he reach of § 547(b)'s avoidance power . . . is limited to transfers of 'property of

the debtor[,]' the Bankruptcy Code does not define that term.  Noting that "the purpose of the

avoidance provision is to preserve the property within the bankruptcy estate[,]" the Supreme

Court found that the term "property of the debtor" as used in section 547(b) "is best understood

as the property that would have been part of the estate had it not been transferred before the

commencement of the bankruptcy proceedings."  *Id.*  For "guidance," the Supreme Court turned

to section 541, "which delineates the scope of 'property of the estate' and serves as the

postpetition analog to § 547(b)'s 'property of the debtor.'"  *Id.*  The Supreme Court determined

that the trustee could not avoid the transfers because "the debtor does not own an equitable

interest in property he holds in trust for another, that interest is not 'property of the estate.'  Nor

is such an equitable interest 'property of the debtor' for purposes of § 547(b)."  *Id.* at 59.  Thus,

*Begier* did not address issues relating to the extraterritorial application of the avoidance

provisions.  *See In re Ampal-Am Israel Corp.*, 562 B.R. at 608 ("*Begier* did not deal with the

issue of extraterritoriality.").  Its focus was on the extent of the debtor's interest in the money

transferred prepetition.  *Id.* (stating "[t]he issue before the Supreme Court [in *Begier*] was

whether the transferred property was property of the debtor within the meaning of Bankruptcy

Code § 541 at the time of the transfer.")

The Trustee raises two additional points.  First, he contends that application of

*Madoff/CACEIS* to the facts here "would be poor public policy" and "[p]rohibiting the Trustee

from recovering the CEVA Equity Transfer would "create an easy way to for the debtors to

defraud their creditors," because "[a] foreign entity could transfer its assets to another foreign

entity and then file a U.S. Bankruptcy case." Trustee's Opp'n at 50. However, as the

*Madoff/CACEIS* court noted in response to a similar argument, "the desire to avoid such

loopholes in the law 'must be balanced against the presumption against extraterritoriality, which

serves to protect against unintended clashes between our laws and those of other nations which

could result in international discord.'" 513 B.R. at 231 (*quoting In re Euro Exch. Inc.,* 347 B.R.

708, 718 (Bankr. C.D. Cal. 2006)). *See also Morrison*, 561 U.S. at 270 (in rejecting a policy-

based argument on why U.S. securities laws should apply to certain transactions occurring

abroad, the Supreme Court observed that "[i]t is our function to give the statue the effect its

language suggests, however modest that may be, not to extend it to admirable purposes it might

be used to achieve.").

Finally, the Trustee contends that, in any event, this Court is not bound by either the logic

of, or conclusions reached in, *Madoff/CACEIS*. *See* Trustee's Opp'n at 51. The Court agrees

with that proposition. *See In re Jamesway Corp.*, 235 B.R. 329, 336 n.1 (Bankr. S.D.N.Y. 1999)

("[W]here the bankruptcy court sits in a multi-judge district, it is not bound by principles of *stare

decisis* by the decision of a district judge in that district. Indeed, bankruptcy courts in this

district have reached different conclusions with regard to the application of that decision. In

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127 (Bankr. S.D.N.Y. 2016), a

liquidating trustee sought to avoid and recover pre-petition shareholder distributions as

fraudulent transfers under sections 548 and 550 of the Bankruptcy Code. After finding that the

transfers were extraterritorial, Judge Gerber, held that section 548 applied extraterritorially. *Id.*

at 153-55. In so ruling, the court relied on, among other things, *In re French,* 440 F.3d 145. The

court found that when read in conjunction with section 548, section 541(a)(3) demonstrates that Congress intended to apply section 548 extraterritorially.  In part, the court reasoned:

> Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 becomes property of the estate. Section 550 authorizes a trustee to recover transferred property to the extent that the transfer is avoided under either section 544 or section 548. It would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States. It is necessary to rule as the *French* court did in order to protect the *in rem* jurisdiction of the bankruptcy courts over assets that Congress has declared become property of the estate when recovered under section 541(a)(3).

543 B.R. at 154-55.  In reaching that conclusion, the court recognized that in *Colonial Realty*, the Second Circuit concluded that "fraudulently conveyed property does not become property of the estate until it is recovered."  *Id.* at 153 (footnote omitted).  However, the court viewed that as "just a matter of timing[,]" and reasoned that it was "not at all the same thing as finding a lack of Congressional intent to allow property to be recovered on an extraterritorial basis."  *Id.*  The court noted that to the extent his decision was inconsistent with *Madoff/CACEIS* and *Maxwell I,* he "respectfully disagree[d]" with those decisions.  *Id.* at 153 n.111.

In contrast, in *In re Ampal-Am. Israel Corp.*, 562 B.R. 601 (Bankr. S.D.N.Y. 2017), Judge Bernstein found those decisions to be persuasive in rejecting a claim that section 547 of the Bankruptcy Code applied extraterritorially.  There, a chapter 7 trustee sued to avoid and recover a single prepetition transfer made by the debtor in Israel to an Israeli law firm, as a preference pursuant to sections 547 and 550 of the Bankruptcy Code.  The court dismissed the trustee's claim because it found that "Congress did not intend the avoidance provisions of the Bankruptcy Code to apply extraterritorially, and the transfer at issue occurred in Israel."  *Id.* at

603.   In considering whether section 547 applied extraterritorially, the court conducted an in

depth analysis of the holdings in *Maxwell I, French, Begier, Madoff/BLI, Madoff/CACEIS and*

*Lyondell* (from which this Court has benefitted) and, relying on *Maxwell I* and *Madoff/CACEIS*,

found that section 547 did not.  *Id.* at 612.  Like those courts, Judge Bernstein focused, in part,

on the plain language of the relevant provisions of the Bankruptcy Code and the corresponding

jurisdictional sections.  Accordingly, to that end, he noted that by its terms, section 541(a)(1)

applies only to property of the estate or property of the debtor at the time the case is commenced,

and that property that is the subject of an avoidance action does not fall within either category,

because it does not become estate property until after it is recovered.  *Id.* ("Property transferred

to a third party prior to bankruptcy in payment of an antecedent debt is neither property of the

estate nor property of the debtor at the time the bankruptcy case is commenced, the only two

categories of property mentioned in Bankruptcy Code § 541".).  *See also Maxwell I,* 186 B.R. at

820 ("Because preferential transfers do not become property of the estate until recovered, § 541

does not indicate that congress intended § 547 to govern extraterritorial transfers." (citing

*Colonial Realty* 980 F.2d at 131)); *Madoff/CACEIS*, 513 B.R. at 229 ("whether 'property of the

estate' includes property 'wherever located' is irrelevant to the instant inquiry: fraudulently

transferred property becomes property of the estate only after it has been recovered by the

Trustee. So section 541 cannot supply any extraterritorial authority that the avoidance and

recovery provisions lack on their own.").   In a similar vein, the court noted the significance of

language missing from section 547.  The court found that because sections 541(a)(1) and 28

U.S.C. § 1334(e)(1) expressly encompass property "wherever located,"[32] and section 547 does

---

[32]   Section 541(a)(1) of the Bankruptcy Code states that "property of the estate" includes all "legal or equitable
interests of the in property as of the commencement of the case . . . wherever located."  11 U.S.C. § 541(a)(1).
Section 1334(e)(1) provides that the district court shall have exclusive jurisdiction "of all of all the property,

not, "'the presumption against extraterritoriality operates to limit [section 547] to its terms." *Id.* (quoting *Morrison*, 561 U.S. at 265). *See also Madoff/CACEIS*, 513 B.R. at 230 (quoting *Morrison* and noting that "the fact that section 541, by virtue of its 'wherever located' language, applies extraterritorially may cut against the Trustee's argument [that section 550(a)(2) applies extraterritorially.]"). Finally, focusing on a different issue, the court found that the M*adoff/BLI* and *French* courts misplaced their reliance on *Begie*r in finding that the "property of the debtor," as used in the avoidance provisions, encompasses property that would have been estate property had it not been transferred prepetition. As the court noted (and as discussed above), the focus in *Begier* was on whether transferred property was property of the debtor within the scope of section 541(a)(1), not whether section 547 applied extraterritorially. Accordingly, the court found that "[t]he Supreme Court read section 541(a) as a limitation on the trustee's avoiding powers, not as an expansion of those powers." *Id.*

Congress has not expressed an affirmative intent for sections 548 and 550 to be applied extraterritorially, and nothing in the text of those sections indicates such an intent. Like the courts in *Madoff/CACEIS* and *Ampal,* this Court finds that Congress's failure to do so, particularly in light of the fact that sections 541(a)(1) and 1334(e) expressly apply extraterritorially, operates to limit sections 548 and 550 to their terms. Moreover, the Court agrees with *Maxwell I*, and *Madoff/CACEIS* that in assessing the scope of the Bankruptcy Code's avoidance provision section 541(a)(1) is irrelevant because property that is the subject of an action does not become estate property until it is recovered. *See Maxwell I,* 186 B.R. at 820; *Madoff/CACEIS*, 513 B.R. at 229. *See also In re Midland Euro Exch. Inc.*, 347 B.R. at 718

---

wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334e)(1).

(holding that "allegedly fraudulent transfers do not become property of the estate until they are

avoided."); *Ampal*,, 562 B.R. at 612 ("Property transferred to a third party prior to bankruptcy in

payment of an antecedent debt is neither property of the estate nor property of the debtor *at the

time the bankruptcy case is commenced*, the only two categories of property mentioned in

Bankruptcy Code.").  To be sure, as the *Lyondell* court noted, application of section 541(a)(3)

might be viewed as to give rise to a "timing" problem.  543 B.R. at 154 (observing that "it is

hard to believe that Congress intended for the Code to apply extraterritorially with respect to

property of the estate, but not to apply extraterritorially with respect to what would have been

property of the estate but for a fraudulent transfer.").  However, as the *Maxwell I* court noted, "'

[w]hen it desires to do so, Congress knows how to place the highs seas within the jurisdictional

reach of a statute.'"  186 B.R. at 820 (*quoting Argentine Republic v. Amerada Hess Shipping

Corp.* 488 U.S. 428, 440, 109 S. Ct. 683, 691, 102 L.Ed.2d 808 (1989).  Congress has not

"clearly expressed" that sections 548 and 550 apply extraterritorially and the Court finds that

they do not.

### Whether This Litigation Involves Extraterritorial Application of the Avoidance Statutes

The Court will now consider whether the Trustee is seeking to apply the avoidance

provisions extraterritorially.  Because the Trustee is seeking to avoid the CEVA Equity Transfer

pursuant to sections 548(a)(1)(A) and (B) of the Bankruptcy Code, the Court "looks to the

regulatory focus of the Bankruptcy Code's avoidance and recovery provisions specifically."

*Madoff/CACEIS,* 513 B.R. at 227.  In an actual fraudulent transfer under § 548(a)(1)(A), the

"objects of the statute's solicitude" are transfers by a debtor seeking to "hinder, delay or defraud"

its creditors.  *See* 11 U.S.C. § 548(a)(1)(A).  For constructively fraudulent transfers under section

§ 548(a)(1)(B), the "transactions that the statute seeks to 'regulate,'" are transfers for "less than

reasonably equivalent value," by insolvent transferors, or transferors rendered insolvent by the transfer. *See* 11 U.S.C. §548(a)(1)(B). Section 550 complements those provisions by providing for the recovery of an avoided transfer from an initial or subsequent transferee. *See* 11 U.S.C. § 550(a). In that way, sections 548 and 550 "work in tandem to further the Code's policy of maximizing the value of the bankruptcy estate by permitting a trustee to avoid certain transfers that deplete the estate and recover the payments for the benefit of creditors." *Madoff/BLI*, 480 B.R. at 524; *see also In re French*, 440 F.3d at 154 (noting that avoidance provisions "protect creditors by preserving the bankruptcy estate against illegitimate depletions."). The focus of those avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate. *Madoff/BLI*, 480 B.R. at 524; *accord Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990) (stating that the purpose of "the [preference] avoidance provision is to preserve the property includable within the bankruptcy estate – the property available for distribution to creditors."); *In re French,* 440 F.3d at 154 ("[T]he Code's avoidance provisions protect creditors by preserving the bankruptcy estate against illegitimate depletions."); *but compare Madoff/CACEIS*, 513 B.R. at 227 ("[U]nder *Morrison*, the transaction being regulated by section 550(a)(2) is the transfer of property to a subsequent transferee, not the relationship of that property to a perhaps-distant debtor.").

At issue in the Amended Complaint is the authorization by CIL, a Cayman Islands company, of the issuance of stock in CEVA Group, an English and Wales company, to CEVA Holdings, a Marshall Islands company. *See* Am. Compl. ¶¶ 3, 9, 13, 27, 28, 133. The allegedly aggrieved Petitioning Creditors are Cayman Island entities, and the PIK Notes evidencing their claims were entered into by CIL and the London Branch of Credit Suisse, as Administrative Agent, with payments being tendered in London. *See* Declaration of Howard Schub [Case No.

13-11272, ECF No. 7,], Ex. E (Debt Instrument Agreement), at 1-3.  The purportedly fraudulent "transfer" that the Trustee seeks to recover is CEVA Group's issuance of additional shares to CEVA Holdings, which diluted CIL's ownership interest in CEVA Group by 99.99%.  *See* Am. Compl. ¶ 3 (defining "CEVA Equity Transfer" as the issuance of "a massive amount of new CEVA shares to . . . [CEVA Holdings] in exchange for nothing.").  Not only was the transfer one among foreign entities that allegedly harmed foreign creditors, it was accomplished outside of the United States by: (i) CIL, acting through its board at a series of meetings chaired in London, consenting to CEVA Group's recapitalization and restructuring; and (ii) CEVA Group issuing "New CEVA Shares" in accordance with U.K. law during a meeting of shareholders in London, attended by a representative of CIL who consented to the issuance.  *See* Chapman Decl., Ex. E (CIL RSA), §§ 2(c), 3(a), Ex. C (Form of CEVA Group Shareholder Resolutions), at 1-2.  Thus, the CEVA Defendants contend that the challenged conduct in this case is foreign, not domestic.

The Trustee disagrees.  He contends that in determining where the challenged conduct took place, the Court should consider all component events of the transfers, to ascertain whether the "center of gravity" of the transfer is the United States.  *See* Trustee's Opp'n at 44 (citing *Florsheim Grp., Inc. v. USAsia Int'l Corp. (In re Florsheim Grp., Inc.)*, 336 B.R. 126, 130 (Bankr. N.D. Ill 2005) ("In analyzing preferential transfers, courts have applied a 'center of gravity' test, under which they look at the facts of the case to determine whether they have a centers of gravity outside the United States.") (internal citation and quotations omitted)).  The Trustee contends that the "center of gravity" of the CEVA Equity Transfer is the United States, and, as such, the transfer is a domestic transaction to which U.S. avoidance laws apply, because the CEVA Defendants, the Directors, Apollo and their respective agents allegedly planned and hatched the scheme to divest CIL of the CEVA Equity in the United States.  *See* Trustee's Opp'n

at 43-44.[33]   However, the Trustee overstates the significance of those contracts with the United

States.   First, the Amended Complaint is clear that CIL's professionals, Appleby and E&Y were

located in the Cayman Islands and that Appleby "perform[ed] significant work."   *See* Am.

Compl. ¶ 51 ("Mintz Levin and Appleby began to perform significant work regarding the

---

[33]   In particular, he alleges in the Amended Complaint that:

> The CEVA Equity Transfer was performed for the benefit of Apollo (Am. Compl. ¶¶ 2-3, 8) and engineered and directed by Apollo in New York.  (*Id.* ¶¶ 3-4, 8, 10-11.)

> Apollo controlled the Debtor and each of the Defendants from the U.S.  (*Id.* ¶¶ 2-3, 8, 27-28.)

> The CEVA Equity Transfer was performed for Apollo's benefit.  (*Id.* ¶¶ 2-3, 8.)

> One of CIL's two directors who enabled the CEVA Equity Transfer, Turner, resided and worked in New York.  (*Id.* ¶¶ 11, 23.)

> CIL's other director, Beith, performed multiple acts to advance the scheme while physically present in New York headquarters, and directed numerous communications and instructions to agents and actors in New York that were critical to the CEVA Equity Transfer.  (*Id.* ¶¶ 25, 54; *see also* Beith Decl. ¶¶ 14-15.)

> The final form of the CEVA Equity Transfer was negotiated between lawyers at the U.S. firms of Mintz Levin and Akin Gump, including elements deliberately designed to hinder, delay and defraud CIL's creditors.  (*Id.*  ¶¶ 97-107.)

> The CIL RSA among CIL (executed by the Directors), Louis Cayman and CEVA, pursuant to which CIL agreed to the CEVA Equity Transfer, provides that it shall be governed by the internal laws of the State of New York.  (*Id.* ¶ 108.)

> The removal of CIL's officers that left Apollo's employees in sole control of CIL was determined by Apollo in New York and effectuated by Mintz Levin.  (*Id.* ¶¶ 54-55.)

> The E&Y Report and the MS Report were prepared in New York, and "restructuring" advice was provided by Houlihan Lokey from its New York City office.  (*Id.* ¶¶ 5, 8, 67-68, 76, 94, 121.)

> Mintz Levin, in New York and Massachusetts, actively worked to help conceal the Directors' fraudulent conduct, including by furnishing misleading representations to this Court in the Chapter 7 Case.  (*See, e.g., id.* ¶¶ 11, 51, 57, 79, 103-07.)

> The CEVA Enterprise has headquarters and vast operations in the United States.  (*Id.* ¶¶ 1, 8, 27.)

> None of the parties have employees or any substantial business operations in Cayman Islands.

potential CEVA transaction in January 2013."); *see also id.* ¶¶ 58-59 (describing work performed

by Appleby); ¶¶ 84-87 (same).  Moreover, "it is a rare case of prohibited extraterritorial

application [of a statute] that lacks all contact with the territory of the United States."  *Morrison*,

561 U.S. 247, 266 (2010).  Further, courts in this district have questioned whether the

"component parts test" remains relevant in light of the Supreme Court's rejection in *Morrison* of

the "conduct and effects" test,[34]  a similar test used by the Second Circuit in determining where

the conduct at issue occurred.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In

re Madoff)*, No. 08-01789, 2016 WL 6900689, at *21 (Bankr. S.D.N.Y. Nov. 22, 2016) (finding

irrelevant "'where the defendants engaged in business regarding the transaction' and 'where the

parties' relationship was centered when conducting the transaction underling the debt that

triggered the transfers'" and noting that the analysis was similar to the conducts and effects test

abrogated by the *Morrison* court).  *See also Official Comm. Of Unsecured Creditors of Arcapita

Bank B.S.C.(c) v. Tadhamon Capital B.S.C. (In re Arcapita Bank B.S.C.(c))*, No. 12-11076, 2017

WL 4620967, at *11 (Bankr. S.D.N.Y. Oct. 13, 2017) (questioning the continued applicability of

the component parts analysis test advocated by *Maxwell I,* because it "was decided before

*Morrison*, which changed the legal landscape on this issue.").  Instead, under *Morrison*, the focus

of the inquiry is on where the challenged conduct (here the issuance of the New CEVA Shares)

occurred.  That is plainly outside the United States.

Finally, and in any event, application of the "center of gravity" test, given the allegations

in the Amended Complaint, does not support the Trustee's assertion that the issuance of the New

CEVA Shares was a domestic transaction.  Under that test, courts "look at the facts of a case to

---

[34]    The "effects" test asked "whether the wrongful conduct had a substantial effect in the United States or upon
United States citizens."  *Morrison*, 561 U.S. at 257.  The "conducts" test asked "whether the wrongful conduct
occurred in the United States."  *Id.* at 257, 130 S. Ct. 289 (quotations omitted).

determine whether they have a center of gravity outside the United States." *In re Florsheim Grp., Inc.*, 336 B.R. 126, 131 (N.D. Ill. 2005). In doing so, "the court considers the location of the assets as well as the component events of those transactions." *Maxwell I,* 186 B.R. at 817. *See also Florsheim Grp., Inc.*, 336 B.R. at 131 (noting the "courts generally consider all component events of a financial transaction, rather than one dispositive factor, to determine where it took place."). Here, as set forth above, the issuance of the New CEVA Stock took place outside of the United States. To be sure, the Trustee has alleged that the avoidance claims and CEVA Equity Transfer have some connection to the United States. However, the inquiry is whether these connections alleged are significant enough to render the CEVA Equity Transfer a domestic transaction. *See, e.g.*, *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 543 B.R. 127, 150-51 (Bankr. S.D.N.Y. 2016) ("[E]ven where the claims touch and concern the territory of the United States they must do so with sufficient force to displace the presumption against extraterritorial application." (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013))). They are not.

It is undisputed that CIL retained professionals outside the United States. However, even assuming that the CEVA Equity Transfer was negotiated and documented at least in part by Turner and Beith and CIL's professionals in the United States, it is not enough to make the CEVA Equity Transfer a domestic transaction. *See, e.g.*, *Maxwell I*, 186 B.R. at 817 (sale of assets that funded transfers, and even initiation of transfers in the United States, are "more appropriately characterized as a 'preparatory step'" to the extraterritorial transfers); *Morrison*, 561 U.S. at 271–72 (rejecting the notion that section 10(b) claim at issue was domestic even as a significant portion of fraudulent conduct occurred in the United States); *Madoff*/*CACEIS*, 513 B.R. at 228 (chain of transfers originating in New York from a New York-based debtor

insufficient to conclude that transfers occurred domestically); *In re Lyondell Chem. Co.*, 543

B.R. at 149 (rejecting the trustee's arguments that "at least some of the decisions to make the

December Distributions were made in the United States[,]" and that "the December Distribution

was initiated by and occurred at the direction of Blavatnik" rendered the distribution at issue

domestic); *see also Official Comm. of Unsecured Creditors v. Transpac. Corp. (In re*

*Commodore Int'l Ltd.)*, 242 B.R. 243, 260 (Bankr. S.D.N.Y. 1999), *aff'd*, 2000 U.S. Dist. LEXIS

9790 (S.D.N.Y. July 14, 2000) (transfer approved by board of directors and documented by

professionals in United States insufficient to outweigh Bahamian interests in transactions). [35]

 The CEVA Equity Transfer is the transfer that the Trustee seeks to avoid and recover

under sections 548 and 550 of the Bankruptcy Code.  It was not a domestic transfer and, as such,

it cannot be avoided under those provisions.

### Application of Sections 544 and 551

 As noted previously, in Count 3, the Trustee seeks to avoid the CEVA Equity Transfer

pursuant to U.K., Cayman and/or New York state law by application of sections 544(b) and 550

of the Bankruptcy Code.  Am. Compl. ¶¶ 160-161.  In relevant part, section 544(b) states:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any
> obligation incurred by the debtor that is voidable under applicable law by a
> creditor holding an unsecured claim that is allowable under section 502 of this
> title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).   Having determined that the presumption against extraterritoriality bars

the extraterritorial application of section 548 of the Bankruptcy Code, and that the CEVA Equity

Transfer is a foreign transfer, the Court must consider whether that ruling should extend to

section 544(b).  The Trustee contends that it would be "senseless" for the court to do so, because

---

[35] To the extent that the Trustee is arguing that the CIL RSA's choice of New York law renders the CEVA Equity
Transfer domestic, the fraudulent transfer claims are not contract claims but tort claims that are not governed by the
CIL RSA.

by its terms, that section incorporates whatever law may be "applicable." The Trustee maintains

that because section 544(b) is unambiguous, it "must be construed according to the meaning of

its words." Trustee's Opp'n at 53 (quoting *Hayden v. Pataki*, 449 F.3d 305, 314-15 (2d Cir.

2006)). From that, he asserts that as used in the statute, the term "applicable law" should be read

to include foreign law. Thus, he maintains that by application of section 544(b), he can seek to

avoid the CEVA Equity Transfer under foreign law, including U.K. law. *Id.* at 54. He argues

that he is entitled to do so, because he is not attempting "an 'extraterritorial' exportation of U.S.

law[,]" but rather, through section 544(b), he is seeking to bring foreign law into a U.S.

bankruptcy proceeding. *Id.* However, the Trustee is still attempting to apply U.S. avoidance

laws to a foreign transaction. As the Court has already found, incorporation of the "interest of

the debtor in property" language does not manifest a clear intention by Congress that such

provision has extraterritorial application. Furthermore, "broad, boilerplate language such as the

term ["applicable law"] is insufficient to overcome the presumption against extraterritoriality."

*Maxwell I*, 186 B.R. at 819 (finding "nothing in the language or legislative history of § 547

expresses Congress' intent to apply the statue to foreign transactions."). The Court is not

persuaded that the inclusion of the phrase "voidable under applicable law" gives section 544(b)

*de facto* extraterritorial application. The Court finds that it does not. As the Court has

previously determined, the CEVA Equity Transfer was not a domestic transfer. As such, it

cannot be avoided under section 544(b) of the Bankruptcy Code.

In relevant part, section 551 of the Bankruptcy Code states that "[a]ny transfer avoided

under [sections 544 and 548] . . . is preserved for the benefit of the estate but only with respect to

property of the estate." 11 U.S.C. § 551. As such, it does not provide for an independent cause

of action. Rather, it creates a statutory effect to a transfer that has been avoided under, for

instance, sections 544 or 548. That effect is automatic, and springs into existence upon a
successful avoidance under other sections of the Code, such as sections 544 or 548. *See, e.g.*, 5
A. Resnick & H. Sommer, COLLIER ON BANKRUPTCY ¶ 551.01 (16th ed. 2015). Based upon the
foregoing, it has no application to this case.

### **International Comity**

The CEVA Defendants also contend that application of the avoidance and recovery
provisions of the Bankruptcy Code is precluded by principles of international comity. *See*
CEVA MTD at 27-29. "[I]nternational comity is a separate notion from the 'presumption
against extraterritoriality,' which requires a clear expression from Congress for a statute to reach
non-domestic conduct." *Maxwell II,* 93 F.3d 1036, 1047 (2d Cir. 1996) (citation omitted).
Rather, it "is the recognition which one nation allows within its territory to the legislative,
executive, or judicial acts of another nation, having due regard both to international duty and
convenience, and to the rights of its own citizens, or of other persons who are under the
protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). The doctrine "is concerned
with maintaining amicable working relationships between nations, a 'shorthand for good
neighbourliness, common courtesy and mutual respect between those who labour in the
adjoining judicial vineyards." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.,*
412 F.3d 418, 423 (2d Cir. 2005) (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984]
E.C.C. 36, 41 (Eng. C.A.)). The doctrine is applied not as "an imperative obligation of courts
but rather [a]s a discretionary rule of practice, convenience, and expediency." *Royal & Sun
Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,* 466 F.3d 88, 92 (2d Cir. 2006) (internal
quotation marks and citation omitted).

As a general matter, the doctrine of comity embraces two concepts: "comity of the courts" and "comity of nations."  *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting).  By application of the former, also known as "adjudicative" or "abstention" comity, "judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere[.]"  *Id.  See also Maxwell II,* 93 F.3d at 1047 (noting that the "so-called comity among courts," "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state[.]"); *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d at 424 (noting that comity among courts "involves not a choice of law but rather the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction.") (citation omitted).

In contrast, "comity of nations," or "prescriptive comity," is "the respect sovereign nations afford each other by limiting the reach of their laws.  That comity is exercised by legislatures when they enact laws, and courts assume it has been exercised when they come to interpreting the scope of laws their legislatures have enacted.  It is a traditional component of choice-of-law theory."  *Hartford Fire Ins. Co.* 509 U.S. at 817 (Scalia, J., dissenting).  *See also Maxwell II*, 93 F.3d at 1047 (prescriptive comity "is a canon of construction [that] might shorten the reach of the statute."); *Mujica v. Airscan Inc.,* 771 F.3d 580, 598 (9th Cir. 2014) ("[L]egislative or 'prescriptive comity' . . . guides domestic courts as they decide the extraterritorial reach of federal statutes.").

The CEVA Defendants assert that in filing this action, "[t]he Trustee is attempting to bypass the legitimate interests of having Cayman law govern this dispute to gain advantage of the more generous avoidance provisions of the U.S. Bankruptcy Code."  CEVA MTD at 31.

They contend that because CIL, a Cayman Islands domiciled company, is already a debtor in a home based parallel insolvency proceeding, the Cayman Islands has a greater interest in adjudicating the avoidance claims than the United States.  They also assert that because there is an actual conflict between U.S. and Cayman fraudulent transfer law, this Court should dismiss the Trustee's avoidance claims so they can be heard by a Cayman court, or at the very least evaluate these claims strictly under the laws of the Cayman Islands.  CEVA MTD at 28-29.  The Trustee disputes those contentions and contends that this Court is the only suitable forum for bringing the fraudulent transfer claims.  *See* Trustee's Opp'n at 58.  He also contends that if U.S. law does not apply to the adjudication of the avoidance claims, the Court should apply U.K. law, not the law of the Cayman Islands, and that there is no conflict between U.K. and U.S. fraudulent transfer law.  *See id.* at 51-52.

The pendency of parallel insolvency proceedings is a factor relevant to application of the "comity of courts" doctrine.  *See, e.g.*, *Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006).  However, "the mere existence of an adequate parallel action, by itself, does not justify the dismissal of a case on grounds of international comity abstention."  *Id.* "Abstention comity, or 'comity among courts,' is concerned with which court should decide the parties' rights, and relatedly, whether a U.S. court should enforce a foreign bankruptcy court's order relating to the debtor's assets or the adjudication of a creditor's claim."  *SMP Ltd. v. SunEdison, Inc. (In re SunEdison)*, No. 16-10992, 2017 WL 4570702, at *8 (Bankr. S.D.N.Y. Oct. 13, 2017).  Under this doctrine, courts in the United States will refrain from "adjudicat[ing] creditor claims that are the subject of a foreign bankruptcy proceedings" and, in doing so, defer to those proceedings, "so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States."  *JP Morgan Chase Bank v. Altos*

*Hornos de Mexico, S.A. de C.V.*, 412 F.3d at 424 (citing *Cunard S.S. Co. Ltd. v. Salen Reefer Servs, AB*, 773 F.2d 452, 457-59 (2d Cir. 1985)).  In that way, "[a]bstention comity aims to prevent an 'end-run' around the foreign bankruptcy proceeding[.]"  *In re SunEdison,* 2017 WL 4570702, at *8.

The Trustee argues that the International Protocol "conclusively resolves" the question of comity, and that the pendency of the Cayman Islands Proceeding is not a bar to the prosecution of Counts 1, 2 and 3 of the Amended Complaint in this Court.  The purpose of that agreement is to "promote the orderly administration of the estate of the [Debtor] and avoid duplication of work and expense or conflict" by "setting forth the allocation of various duties and responsibilities to be undertaken by the JOLs and the Trustee."  International Protocol § 2.  The Trustee maintains that, to that end, this Court is the proper forum in which the avoidance claims should be adjudicated because under the protocol, the Cayman Court and Joint Liquidators "have each renounced interest in having the fraudulent conveyance claims heard in the Cayman Court."  Trustee's Opp'n at 57 (citations omitted).   As support, he cites to the following provisions of the protocol:

> If, upon consultation, the JOLs and the Trustee jointly conclude that the liquidation of any assets owned by the Company should be effected by the Trustee, the JOLs and the Trustee will agree in writing the asset(s) to be liquidated by the Trustee. Similarly, if the JOLs and the Trustee jointly conclude that the liquidation of any assets owned by the Company should be effected by the JOLs, the JOLs and the Trustee will agree in writing the asset(s) to be liquidated by the Trustee. (International Protocol at ¶ 5.1.)

> The approval of this Protocol by the Cayman Court shall constitute the Cayman Court's authorisation, without further order, for the JOLs to permit the Trustee to effect the liquidation of such asset(s).  (*Id.* at ¶ 5.3)

> The JOLs and Trustee have identified various potential claims and causes of action which may be pursued for the benefit of the Company. Following further investigation of those claims, the JOLs and the Trustee will jointly consider whether

each claim is most closely connected with the US or with another territory.  (*Id*. at
¶ 7.1.)

Where the JOLs and Trustee agree that such claims are most closely connected with
the US, or that it is in the best interests of the Company that claims be pursued in
the US, the Trustee is authorized to pursue such claims in accordance with section
5 herein. The approval of this Protocol by the Cayman Court shall (i) constitute
authorization for the JOLs to leave the task of prosecuting any claims and/or causes
of action to the Trustee; and (ii) constitute sanction of those claims by the Cayman
Court, to the extent necessary.  (*Id*. at ¶ 7.2)

To be sure, as set forth above, the protocol provides a process pursuant to which the Joint

Liquidators and Trustee can, among themselves, and without further order of either court, select

the forum in which to prosecute estate claims.  Moreover, the Joint Liquidators have determined,

among other things, that the Trustee's pursuit of the Amended Complaint in the United States

"appears to be in the best interests of the Debtor's creditors[,]" and that it was "appropriate for

the Original Complaint to be issued in the U.S., and it was in the best interests of the Debtor and

its estate to file and prosecute the Original Complaint in the Bankruptcy Court."  *See* First

Declaration of Matthew Wright [ECF No. 42], at ¶ 10. They have also advised that they "have no

intention of prosecuting such claims before the Cayman Court[,]" because "it would probably be

a breach of the terms of the International Protocol[,]" and, in any event, "the required sanction of

the Cayman Court to commence separate proceedings would be difficult to obtain."  *Id*.   In this

light, the Trustee contends that in invoking the doctrine of comity among the courts as grounds

for dismissing Counts 1, 2 and 3, in favor of pursuing those claims in the Cayman Court, the

CEVA Defendants "have it backwards" because they are "attempting to impose their wishes on

foreign liquidators who do not wish to bring the claims [in the Cayman Court], and a foreign

court that has long since issued an order deferring in favor of the U.S. Court."  Trustee's Opp'n

at 58.  As such, they say that the CEVA Defendants "are attempting to *disrupt* an established

environment of cooperation and harmonization between the two jurisdictions." *Id.* (emphasis

original).  However, the Trustee overstates both the import of the International Protocol and the

significance of the Joint Liquidators' consent to the Trustee's pursuit of the Amended Complaint

in this Court.   The protocol does not specify the court in which particular claims will be resolved

or the law that will govern resolution of the claims, and neither court has deferred to the other on

any matter, let alone those relating to the resolution of claims held by the estate against third

parties.  Moreover, the Joint Liquidators' conclusion that the United States is the appropriate

forum in which to pursue the claims set forth in the Amended Complaint is plainly not binding

on the CEVA Defendants or this Court.  However, there is no question that under Cayman law,

the Trustee has standing to pursue this litigation. *Cf. Official Comm. of Unsecured Creditors v.*

*Transpacific Corp., Ltd. (In re Commodore Int'l Ltd.)*, 242 B.R. 243, 248-50 (Bankr. S.D.N.Y.

1999) (dismissing creditors' committee's complaint seeking to avoid transfers under U.S.

avoidance laws where dual insolvency proceedings were pending in the United States. and The

Bahamas, in part on the grounds that committee lacked standing because Bahamian court had

ruled that Bahamian liquidators lacked authority under Bahamian law to consent to the

committee's prosecution of the action).  Moreover, the Trustee asserts that this Court is the only

suitable forum in which to bring the fraudulent transfer claims because it is unlikely that the Joint

Liquidators could get leave from the Cayman Court to bring suit in the Cayman Islands.  To that

end, they note that under Cayman law, unless the Defendants are served with process in the

Cayman Islands or submit to the jurisdiction of that court, the Joint Liquidators could not sue the

Defendants unless they apply for, and receive, permission from the Cayman Court to serve the

Defendants outside of the Cayman Islands. *See* First Declaration of J. Ross McDonough [ECF

No. 41], ¶¶ 12.  The Trustee contends that it is unlikely that the Cayman Court would grant such

relief because it is doubtful that under Cayman Islands law, the Cayman Court has the power to authorize the Joint Liquidators to do so, and it is unlikely that the court would grant such permission, even if it had the power to do so.  *Id.* ¶¶ 17-21, 24.  Moreover, he contends that in any event, as a condition to granting such relief, the Cayman Court would have to find that Cayman Islands is the "*forum conveniens*" or most appropriate forum in which to conduct that litigation.  The Trustee maintains that it is unlikely that the Cayman Court would do so, especially because the CEVA Defendants have not moved to dismiss all of the Counts of the Amended Complaint and, as such, there would be duplicative or parallel proceedings in the Cayman Islands and the United States.  *Id.* ¶¶ 25-26, 29.  The Court finds that those practical concerns, coupled with the Court's desire to foster the goal of cooperation among this Court and the Cayman Court, as generally contemplated by the International Protocol, particularly in light of both courts' willingness to permit the Joint Liquidators and the Trustee to select the forum in which to bring avoidance actions, provide sufficient grounds to allow the adjudication of the avoidance claims to proceed in this Court.

However, it does not follow that U.S. law will govern the resolution of those claims.  In determining which law to be applied, the rule is that this Court "[must] apply the law of the jurisdiction having the greatest interest in the litigation.  *Koreag, Controle et Revision, S.A. v. Refco F/X Assocs. (In re Koreag, Controle et Revision, S.A.),* 961 F.2d 341, 350 (2d Cir.), *cert, denied,* 506 U.S. 865 (1992).   To make that determination, the Court will engage in a choice-of-law analysis guided by the factors set out in the *Restatement (Third) of Foreign Relations* § 403.  *See, e.g., Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 818-19 (1993) ("In sum, the practice of using international law to limit the extraterritorial reach of statutes is firmly established in our jurisprudence. In proceeding to apply that practice to the present cases, I shall

rely on the Restatement (Third) [of Foreign Relations §403] for the relevant principles of

international law.") (Scalia, J. dissenting); *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 139

(2d Cir. 2014) ("We have previously suggested that when a court order will infringe on

sovereign interests of a foreign state, district courts may appropriately conduct an analysis using

the framework provided by § 403 of the Restatement (Third) of Foreign Relations Law, entitled

'Limitations on Jurisdiction to Prescribe.'").  These factors "correspond to familiar choice-of-law

principles."  *Maxwell II,* 93 F.3d at 1048 (noting that "[t]he analysis must consider the

international system as a whole in addition to the interests of the individual states, because the

effective functioning of that system is to the advantage of all the affected jurisdictions.").   Thus,

in undertaking that analysis, the Court must determine whether application of U.S. law would be

"reasonable" in light of the competing interests of the United States and any foreign state.  *See*

*id.* at 1047; *Madoff/CACEIS,* 531 B.R at 231 ("Courts conducting a comity analysis must engage

in a choice-of-law analysis to determine whether application of U.S. law would be reasonable

under the circumstances.").  *See also Restatement (Third) of Foreign Relations* (1986) § 403(1)

("a state may not exercise jurisdiction to prescribe law with respect to a person or activity having

connections with another state when the exercise of such discretion is unreasonable.").  Whether

the application of U.S. law would be reasonable turns on an evaluation of all relevant factors

including "the link between the regulating state and the relevant activity, the connection between

the state and the person responsible for the activity (or protected by the regulation), the nature of

the regulated activity and its importance to the regulating state, the effect of the regulation on

justified expectations, the significance of the regulation to the international system, the extent of

other states' interests, and the likelihood of conflict of other states' regulations."  *Maxwell II*, 93

F.3d at 1048 (citing the Restatement (Third) of Foreign Relations Law of the U.S. § 403(2)).

The Trustee contends that this Court's connection to and interest in the litigation far outweighs that of the Cayman Court.  In particular, he notes that the Amended Complaint alleges that the CEVA Equity Transfer was orchestrated in the United States while, in contrast, CIL's only material connection to the Cayman Islands is that it is registered there.  *See* Trustee's Opp'n at 61-62.  Moreover, he contends that if U.S. law is not applicable, the Court should apply the U.K. law.  *Id.* at 60.  He says this is so, because (a) CEVA Group is a U.K. entity (Am. Compl. ¶ 27); (b) CEVA Group is the asset of CIL that was misappropriated when it issued the New CEVA Shares to CEVA Holdings, which, itself is a non-Cayman entity (*id.* ¶¶ 3, 28); (c) virtually none of the conduct alleged in the Amended Complaint occurred in the Cayman Islands, and that which did was directed by parties outside of Cayman; (d) CIL did not conduct business in the Cayman Islands; (e) CIL was operated by non-Cayman directors; and (f) the only business person who can be found outside the United States is Beith, a citizen and alleged resident of the U.K.

The Court finds that the Cayman Islands has a greater interest in the adjudication of the avoidance claims than the United States or the U.K.  First, there are plenary insolvency proceedings pending on behalf of CIL in the Cayman Islands.  The Trustee purports to challenge the legitimacy of those proceedings and alleges that the Defendants put CIL into the Cayman Liquidation Proceedings in bad faith and for the sole purpose of delaying and hindering CIL's creditors.  *See* Am. Compl. ¶ 117.  For purposes of the comity analysis, the Court attaches no weight to that assertion.  The Cayman Court, not this Court, is the appropriate forum for challenging the *bona fides* of those insolvency proceedings.  Other factors weigh heavily in support of the application of Cayman law, including: (i) CIL is a Cayman Islands entity; (ii) since its incorporation CIL's registered offices have always been located in George Town, Grand

Cayman, Cayman Islands; (iii) CIL is the entity that made the CEVA Equity Transfer; (iv) to the

extent CIL was injured, it suffered that injury in the Cayman Islands; (v) the Cayman Islands has

a strong interest in in evaluating allegedly fraudulent transfers  that involve Cayman debtors, and

applying its avoidance provisions to conduct originating in the Cayman Islands and involving

mostly Cayman parties, and nothing in the International Protocol detracts from that; and (vi)

Cayman-domiciled companies transact business and guide their conduct based on local legal

norms, not foreign norms, and such expectations should be respected.   Moreover, the Court

finds it significant that the PIK Noteholders who commenced this chapter 7 case, and who

comprise the majority of CIL's creditors, are Cayman entities.  None of those factors are relevant

in the analysis of U.K. and U.S. interests in the litigation.  That CEVA Group is a U.K. entity

and that the Defendants and/or their agents took actions in the U.K. in furtherance of the CEVA

Equity Transfer and CEVA Restructuring is not without significance, but it does not vest the

U.K. with a greater interest in this litigation than the Cayman Islands.  The same holds true for

the United States.  Although the Defendants and their agents took actions in the United States in

furtherance of the CEVA Restructuring, the Court has already determined that they were

tangential to the CEVA Equity Transfer at the heart of this litigation.  Those are the principal

contacts with the United States.  They are not enough to vest the United States with a greater

interest in the litigation than the Cayman Islands.  Having determined that the law of the Cayman

Islands is applicable herein, the Court will consider whether there is a true conflict between U.S

and Cayman avoidance law.  *See Maxwell II*, 93 F.3d at 1049 ("International comity comes into

play only if there is a true conflict between American law and the law of the foreign

jurisdiction.").

The CEVA Defendants have demonstrated that such a conflict exists.  Under Cayman law, the avoidance and recovery of fraudulent transfers, like those asserted in Counts 1 and 2 of the Amended Complaint, are governed by sections 146 and 147 of the Cayman Islands Companies Law (as revised) (the "**Companies Law**").  While section 548 of the Bankruptcy Code recognizes both "constructive" and "actual" (or intentional) fraudulent conveyance actions, the relevant provisions of the Companies Law are "narrower" because under Cayman Law, "[a]n 'intention to defraud' and/or 'fraudulent purpose' is a necessary ingredient" of a "liquidation claw back claim." *See* Declaration of Michael John Makridakis [ECF No. 34] at ¶ 36.  In other words, "[a]ctual dishonesty is required" such that "if a liquidator or creditor (as applicable), sought to bring a fraudulent disposition or fraudulent trading claim in the Courts of the Cayman Islands on the basis of 'constructive' rather than actual, intentional or purposive fraud, the claim would  . . . be bound to fail."  *Id.*  It is settled that "a conflict between two avoidance rules exists if it is impossible to distribute the debtor's assets in a manner consistent with both rules." *Maxwell II*, 93 F.3d at 1050.  Here, as in *Maxwell II*, "the 'intent' requirement in the [Cayman Islands] law would dictate a different distributional outcome than would United States law. Consequently, it is not possible to comply with the rules of both forums and the threshold requirement of a true conflict exists for purposes of comity analysis."  93 F.3d at 1050. Accordingly, Cayman law will be applied in resolving the avoidance claims.

In sum, the Court finds that the claims asserted under sections 544, 548 and 550 of the Bankruptcy Code should be dismissed because the CEVA Equity Transfer that the Trustee seek to avoid was a foreign transfer and sections 544, 548 and 550 do not apply extraterritorially, and because by application of the principles of international comity, the laws of the Cayman Islands are applicable to the resolution of the avoidance claims.  Accordingly, Counts 1, 2 and 3 are

dismissed, with prejudice, except that the Trustee will be permitted to assert an intentional

fraudulent transfer claim herein under Cayman law, divorced of any aspect of the Bankruptcy

Code.

**Motion to Dismiss Counts 1-3, 5, 6 & 10-12**

The premise underlying the Trustee's complaint is that Apollo was not satisfied merely

controlling CEVA Group through its ownership of CIL's stock, because it wanted to do so

without the burden of CIL's PIK Note indebtedness.  As such, the Trustee maintains that because

"[t]he Debtor and its [€103] million of creditors stood between Apollo and the lucrative CEVA

Enterprise," the Defendants—at Apollo's direction—"devised [the CEVA Restructuring] to cut

the Debtor and its creditors out of the capital structure."  *See* Trustee's Opp'n at 13.  It is

undisputed that the PIK Notes are unsecured obligations of CIL that were not guaranteed by

CEVA Group or any of its consolidated subsidiaries.  Because CIL was a pure "holdco," the PIK

Notes were structurally subordinated to the claims of CEVA Group's creditors.  *See, e.g.*, *NA*

*Gen. P'ship & Subsidiaries v. Comm'r*, 103 T.C.M. (CCH) 1916, 2012 WL 2344719, at *9 (U.S.

Tax Ct. June 19, 2012) ("With holding companies, any debt issued is necessarily subordinated to

the creditors of its operating company.").  It is also uncontested that if CEVA Group was

insolvent in April 2013, it follows that CIL's equity interest in CEVA Group had no value at that

time, and that the Trustee cannot state a claim for relief in any of the Counts in the Amended

Complaint which are based on the notion that the CEVA Equity Transfer deprived CIL of value

that it otherwise possessed.  Those are Counts 1, 2, 3 (relating to the fraudulent conveyance of

the CEVA Group's equity), 5 (avoidance of the post-petition transfer of CEVA Group's equity),

6 (turnover of CEVA Group's equity), 10 (conversion of CEVA Group's equity), 11 (unjust

enrichment by the CEVA Group equity/shares), and 12 (conspiracy under Cayman law/aiding and abetting fraud under New York law).

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).[36]  In accordance with the Supreme Court's decision *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Court will apply a "plausibility standard" in assessing whether the Amended Complaint satisfies Rule 8.  Two "working principles" guide the Court's application of that standard.  *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  First, although "a court must accept as true all of the allegations contained in a complaint," that mandate "is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The CEVA Defendants contend that each of the Counts at issue must be dismissed for failing to state a claim for relief, because the facts and allegations before the Court demonstrate that (i) there plainly is an inference that CEVA Group was insolvent in April 2013 based upon, among other things, the "market behavior" of CEVA Group's stakeholders; and (ii) the Amended Complaint does not contain allegations plausibly establishing that CEVA Group was solvent. *See* CEVA MTD at 32.  The Trustee disputes those assertions.

---

[36]   That rule is made applicable herein by Fed. R. Bankr. P. 7008.

As a preliminary matter, the Trustee contends that the value of CEVA Group and the solvency of CIL are factual matters that likely may not be decided any time prior to trial, but in any event, cannot be decided on a motion to dismiss.  *See* Trustee's Opp'n at 68.  The CEVA Defendants do not dispute that point.  *See* CEVA MTD at 32 ("To be clear, in no way are the CEVA Defendants asking the Court to make a finding at this stage that CEVA Group was in fact insolvent or lacked adequate capital as of April 2013.").  It is well settled that "[i]nsolvency is a question of fact," s*ee Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996) (citations omitted), and that "factual issues cannot be determined on [a] motion to dismiss."  *Tronox Inc. v. Andarko Petroleum Corp.* (*In re Tronox Inc.),* 429 B.R. 73, 97 (Bankr. S.D.N.Y. 2010) (finding that determination of whether a debtor received reasonably equivalent or fair value in exchange for its assets is a question of fact that could not be resolved on a motion to dismiss).  Thus, in resolving this aspect of the CEVA Defendants' motion to dismiss, the Court will not determine whether CIL's equity interest in CEVA Group had value in April 2013.  Rather, the Court will consider only whether the Trustee has alleged facts from which the Court can reasonably infer that it is plausible that CIL was solvent at that time.  *See generally Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, 571 B.R. 241, 262 (Bankr. E.D. Ky. 2017) ("To plead the constructively fraudulent transfer claims sufficiently, Trustee must allege facts to plausibly establish that a Debtor was insolvent when it made the Total Transfers, or became insolvent as a result of such a transfer."); *cf. Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*, No. 13-12783, 2015 WL 5146161, at *8 (Bankr. D. Del. Aug. 31, 2015) (noting that while reasonably equivalent value in context of constructive fraudulent transfer claims is a fact-intensive determination, the court may plausibly infer lack of reasonably

equivalent value based on the trustee's allegation that debtor had transferred an approximately

$200 million asset to defendant in return for little or no compensation).

The CEVA Defendants argue that in assessing the adequacy of the Trustee's pleadings,

the Court must view the CEVA Equity Transfer as the first step in a single, fully-integrated,

multi-step transaction.  They say that in that light, the strong inference is that CIL's equity

interest in CEVA Group had no value because: (i) Apollo would not impair its own interests by

reducing its pre-restructuring near-100% equity interest in CEVA Group to a 21% interest post-

restructuring if there was any value to the CIL equity; and (ii) "sophisticated independent market

players"—namely, CapRe and Franklin—would not have converted their debt to equity if CEVA

Group was solvent.  *See* CEVA MTD at 35-40.  Thus, they contend that such a restructuring "is

totally at odds with the notion that CEVA . . . was solvent, adequately capitalized, and able to

repay all of its creditors, much less the Trustee's allegation that CEVA Group was solvent by

hundreds of millions of dollars."  *Id.* at 32.

The Trustee disputes those contentions and argues that the Amended Complaint alleges,

"with an exceptional level of detail," that (i) CIL owned CEVA Group, (ii) the Defendants

caused CIL to be divested of its ownership interest in CEVA Group, and (iii) that CIL received

nothing whatsoever in exchange for the transfer.  *See* Trustee's Opp'n at 67.  He contends that

the CEVA Defendants challenge only whether CEVA's equity had value and that the Amended

Complaint pleads that it does.  *Id.*  Further, he argues that in requesting the Court to find the

allegations of solvency "implausible," the CEVA Defendants are "asking the Court to draw the

far-fetched inference that CEVA [Group] had no value to CIL from the fact that Apollo reduced

its equity interest in the CEVA Enterprise more than a month after the challenged CEVA Equity

Transfers in exchange for other value (reduced enterprise debt)."  *Id.* at 67-68; *see also id.* at 75

("the CEVA Defendants' plausibility argument is grounded upon overly-simplistic inferences that do not render implausible the Trustee's detailed, document-based allegations of CEVA equity value and damage to CIL."). The Trustee contends that any discussion about what Apollo elected to do with CEVA Holdings' equity after the CEVA Equity Transfer is irrelevant because the Amended Complaint alleges with specificity that the Defendants looted CEVA Group's equity from CIL via the CEVA Equity Transfer and CIL received nothing in return. *Id.* at 71. He maintains that the CEVA Debt Transaction, in which Apollo's equity interest in CEVA Holdings was diluted in exchange for other consideration (reduction in debt) was a separate non-integrated transaction and that the CEVA Equity Transfer was not contingent upon the occurrence of the CEVA Debt Transaction. *Id.* He also contends that even if that transaction was an integrated transaction, CIL still received nothing in return for the CEVA Equity Transfer; and, in any event, once the New CEVA Shares were transferred to CEVA Holdings, Apollo was free to do whatever it wanted to do with CEVA Holdings. *See* Trustee's Opp'n at 71–73.

The Court finds *CarCo I*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010), instructive in assessing whether the CEVA Restructuring should be viewed as being comprised of five independent transactions or as one integrated, multi-step transaction. Briefly, as previously discussed,[37] in that case, the trustee under the CarCo Trust contended that prior to CarCo's bankruptcy, Daimler stripped valuable assets out of CarCo for little or no consideration before selling a controlling interest in a newly created entity, Holding, to Cerberus for $7.2 billion. The sale to Cerberus was pursuant to a so-called "Contribution Agreement" and was preceded by a restructuring of the Chrysler Companies that was effectuated pursuant to a 48 Step-Plan. *Id.* at 180-82. The CarCo Trust contended that certain segments of the Step-Plan resulted in transfers that enriched Daimler

---

[37] *See* Appendix III at n.3.

at the expense of CarCo's creditors who could not reach those assets.  In support of its assertion

that the transfers to Daimler under the Step-Plan were voidable fraudulent conveyances, the

CarCo Trust focused on discrete steps in that plan, and contended that Daimler failed to provide

consideration for assets it received under the Step Plan.  *Id.*  In support of its motion to dismiss

the CarCo Trust's complaint, Daimler argued, among other things, that the trust erred in focusing

on isolated parts of the Step-Plan because that plan and the Contribution Agreement comprised a

single integrated plan, and that when viewed in that light, it was clear that Daimler provided

valuable consideration in return for the assets it received under the plan.  *Id.*  In resolving that

dispute, the court looked to the terms of the "deal documents," i.e., the Contribution and Step-

Plan, and read those documents to constitute a single, integrated restructuring plan.  *See id.* at

185 ("In the instant matter, the deal documents themselves make clear that the transaction is

integrated, and that Daimler intended to sell its interest in the Chrysler Companies once those

companies were restructured.").  When viewed in that light, the *CarCo I* court found that

Daimler had provided valuable consideration for the assets it received under the Step-Plan.  *Id.* at

187.  Here, the CIL RSA, the Term Sheet annexed to the CIL RSA, and related documents of

record prove the CEVA Restructuring was a single, integrated five-part transaction, as

follows:

    1.    Recapitalization (the new share issuance by CEVA, substantially diluting CIL's ownership of CEVA Group);[38]

    2.    CEVA exchange offer (the exchange of new equity interests in CEVA Holdings with creditors holding more than €1.2 billion of CEVA Group's Second Lien Debt and Unsecured Debt);[39]

---

[38]    The recapitalization involved two steps: (i) the sub-division, re-classification, and consolidation of CIL's shares; and (ii) the issuance of new shares by CEVA Group to CEVA Holdings. CIL facilitated the execution of both steps by agreeing to vote in favor of various CEVA shareholder resolutions.  CIL RSA §§ 2(c), 3(a).

[39]    Three parties—certain Apollo Funds, CapRe and Franklin—collectively owned more than 69.5% of the Second Lien Debt and 83.5% of the Senior Unsecured Debt of CEVA Group.  CIL RSA Restructuring Term Sheet at 1.  The

3.      CIL exchange offer (consideration offered to the CIL PIK Noteholders);[40]

4.      Rights offering (€200 million of new money raised to provide CEVA Group with adequate capital to operate its business of which the Apollo Funds agreed to contribute €65 million);[41] and

5.      Franklin financing commitment (providing further reduced interest expense and new money).[42]

Those documents show that each of the five steps was dependent upon the occurrence and satisfaction of the others.  In that light, it is not true that CIL received nothing in exchange for the CEVA Equity Transfer.  The CIL RSA provides that CIL's consent to the recapitalization was fully contingent on the PIK Noteholders being given "the opportunity . . . to receive a distribution of certain equity interests in [CEVA] Holdings" and "participat[e] in [the] rights offering."  CIL RSA at 1.[43]  Further, Apollo did not obtain its 21% interest in recapitalized CEVA based upon its pre-restructuring equity interest in CEVA Group.  The documents make clear that Apollo obtained that interest in consideration of the cancellation of its $295 million unsecured debt and its infusion of new money (€65 million) into CEVA Group.  *See* CIL RSA,

---

Apollo Funds held $295 million in CEVA Group Second Lien and Senior Unsecured Debt, which constituted 19% of the total CEVA Group debt exchanged pursuant to the CEVA exchange offer.

[40]    The offered value was based on the proportional value of the CIL Cash.  CIL RSA, Ex. B (Consideration to PIK Noteholders under the CIL exchange offer).

[41]    All CEVA Group and CIL creditors participating in the Exchange Offers had the opportunity to purchase up to a total of €200 million of A-1 convertible preferred shares of CEVA Holdings.  *See* CIL RSA, Ex. A (Restructuring Term Sheet), at 7, 11.  Certain Apollo Funds and CapRe agreed to "backstop" the rights offering by agreeing to fund the rights offering in the event that participants in the CEVA Group and CIL exchange offers did not subscribe for the full €200 million rights offering; CapRe agreed to fund up to €75 million and the Apollo Funds agreed to fund up to €65 million.  *See id.* at 12-13.

[42]    Franklin did not agree to participate in the rights offering.  Instead, it agreed to lend €65 million in cash and exchange its Senior Secured Debt holdings for New First Lien Cash Pay Notes.  *See id.* at 15.

[43]    Both shareholder resolutions executed in connection with the recapitalization contain similar language.  *See* CIL Shareholder Resolution (Chapman Decl., Ex. R); CEVA Group Shareholder Resolution (Chapman Decl., Ex. S).

Ex. A-1.  Moreover, Apollo was not free to do what it wanted with CEVA Holdings after the

CEVA Equity Transfer.  The CIL RSA is clear: "if the CEVA Exchange is not consummated,"

CEVA Group must "seek to commence the CEVA Chapter 11 case and seek confirmation of the

CEVA Chapter 11 Plan."  CIL RSA at § 4(c).

In support of the Amended Complaint, the Trustee alleges that "the value of CEVA

[Group] substantially exceeded its debts, and CIL's shares of CEVA [Group] had substantial

value."  Am. Compl. ¶ 1.  In assessing whether the Trustee has met his burden of alleging facts

from which this Court can "reasonably infer" CIL's solvency as of April 2013, the Court will

consider "the full factual picture presented by the [Amended] [C]omplaint, the particular cause

of action and its elements, and the existence of alternative explanations so obvious that they

render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419,

430 (2d Cir. 2011) (citations omitted).  As the CEVA Defendants note, here, too, *CarCo I* is

instructive.  Part of the relief that the CarCo Trust sought in its complaint was to avoid the

transfers to Daimler as intentional fraudulent transfers under state and federal law.  435 B.R. at

175.  In opposing Daimler's motion to dismiss that count of the complaint, the CarCo Trust

argued that CarCo's purported insolvency at the time of the transfers was a "surrounding

circumstance" that demonstrated that Daimler acted with fraudulent intent.  *Id.* at 193 (noting

further that "it is not actual insolvency that is at issue but whether the fact of insolvency, if

established, should weigh against Daimler to evidence intent.").  The court found that because

the CarCo Trust was "seeking to utilize CarCo's putative insolvency as an accumulative factor

from which to infer intentional fraud . . . the market participants' perception of CarCo's solvency

[was] relevant."  *Id.*  In that regard, the court noted that:

> The sale of the Chrysler Companies was open and highly publicized, with financial
> information concerning the valuation of the Chrysler Companies readily available

to the investors and lenders. Therefore, the contemporaneous actions of the independent market participants serve as a benchmark of what is plausible concerning the perception of CarCo's insolvency.

*Id.* After taking judicial notice of the actions of "market participants" at the time of the

transaction, the court found that "[t]he involvement of sophisticated and independent market

participants shows the implausibility of intentional fraud." *Id.* In particular, in reaching that

conclusion, the court focused on the willingness of Cerberus and other third parties to invest in,

or provide financing in connection with, the transaction, as follows:

> FinCo financed both the dealers and consumers of the cars manufactured by CarCo. Therefore, FinCo's value depended upon CarCo's performance. It is implausible to suggest that an investor, such as Cerberus, would invest $7 billion to acquire a controlling position in a finance company whose value depended upon the performance of a company that was poised to fail. Nor is it plausible that several sophisticated banking establishments would agree to make $10 billion in credit available to fund the transaction. Further, one of CarCo's creditors, the United Automobile Workers union, agreed to accept warrants in the company for an obligation owed to it, an action that is not consistent with an impression that the company was being set up to fail.

*Id.* The bankruptcy court dismissed the intentional fraud claim, with prejudice. *Id.* at 194.[44]

Here, the actions of the "independent investors"—CapRe and Franklin—arguably were not those

---

[44]    In doing so, the bankruptcy court granted leave to the CarCo Trust to replead other claims, including those seeking to avoid the transfers to Daimler as constructively fraudulent transfers. After the CarCo Trust filed the Second Amended Complaint, Daimler again moved to dismiss. In granting dismissal of the constructive fraudulent conveyance counts re-pled in the Second Amended Complaint, the court noted:

> The Trust's allegations concerning the gap in the consideration given and received by CarCo in the overall transaction are not plausible. Moreover, the allegations ignore the contemporaneous market information concerning the involvement of other sophisticated parties in the transactions. Indeed, the allegations are implausible in the context of the involvement of Cerberus, who paid billions of dollars in the transaction, the United Automobile Workers union, which accepted warrants in the restructured enterprise, the PBGC, which negotiated settlements with CarCo, and the banks, which made available billions of dollars to CarCo. The Trust's allegations would require an inference that all of these parties were led astray. It is implausible that these sophisticated parties, who had access to the same financial information as Daimler, would invest and rely on the wherewithal of CarCo if it had been stripped of its assets and were unable to sustain its operations.

*CarCo II*, 454 B.R. 38, 59-60 (Bankr. S.D.N.Y. 2011), *aff'd In re Old CarCo LLC*, 11 Civ. 5039 (DLC), 2011 U.S. Dist. LEXIS 134539 (S.D.N.Y. Nov. 22, 2011*); aff'd In re Old CarCo LLC*, 509 F. App'x 77 (2d Cir. 2013).

of investors who believed that there was value in CEVA Group. Nor was Apollo's exchange of it $295 million in debt and cash payment of €65 million in consideration for 21% of recapitalized CEVA Group. However, that CapRe and Franklin agreed to swap their claims against CEVA Group for equity in CEVA Holdings under the RSA, does not render CIL's solvency completely "implausible" because, as the Trustee correctly notes, "it is commonplace for parties to exchange their debt for equity, and there are many valid reasons for doing so." Trustee's Opp'n at 74 (citations omitted). Moreover, *CarCo* is distinguishable from this case. As noted, in finding that the actions of Cerberus and others could serve as a benchmark in assessing whether the Chrysler Companies were "plausibly" insolvent at the time of the restructuring, the court took solace in the fact that the underlying sale was "open and highly publicized" and that financial information about the Chrysler entities was "readily available to lenders and investors." Here, the Trustee complains that the opposite is true. He asserts that the Defendants actively concealed the restructuring transaction from the PIK Noteholders. Specifically, he asserts that "the Defendants had determined to proceed with the CEVA Equity Transfer in the most secretive manner possible in order to prevent CIL's creditors from asserting their rights until after the Defendants had already deprived CIL of its interest in CEVA [Group]." Am. Compl. ¶ 97. To that end, the Trustee alleges, among other things, that the Defendants (i) were advised by counsel not to be "too forthcoming" with its goals, strategy and alternatives in documents describing CEVA Restructuring (*id.* ¶ 106); (ii) effectuated the CEVA Restructuring by shareholder resolution action so as to avoid providing notice in advance of the exchange offer to non-insiders, including CIL's other shareholders (*id.* ¶ 107); and (iii) changed the Debtor's name from "CEVA Investments Limited" to "CIL Limited" because "Apollo did not want the word 'CEVA' to

appear on shareholder notices or documents filed in the course of the Cayman Proceeding in

hopes of prolonging the secrecy of the transfer." *Id.* ¶ 116.

The CEVA Defendants assert that those contentions fail to raise any inference of

plausibility concerning CEVA Group's solvency because (i) the allegations focus on CIL and the

Directors and do not implicate the CEVA Defendants (aside from the allegations of secrecy); and

(ii) the allegations that the restructuring was done in secret and was orchestrated to avoid

advance notice to the PIK Noteholders of CIL's agreement to the CIL RSA are explainable

without resort to the inferences that the Trustee asks this Court to draw.  *See* CEVA Reply at 25.

However, at this stage of the litigation, the alleged lack of transparency undermines the

significance that the Court will attach to the actions of the stakeholders, especially when coupled

with the following allegations in the Amended Complaint in support of the Trustee's assertion

that CIL was solvent in April 2013:

- The Amended Complaint identifies U.S. SEC Filings that were signed by the Directors and filed on May 4, 2012 and August 29, 2012 (the latter just a few months before the Defendants began working on the CEVA Equity Transfer) that valued CIL at approximately $1.2 billion.  (*See* Novick Decl., Exs. H, I.)  These filings were not withdrawn until April 2, 2013.  Am. Compl. ¶¶ 6, 41-44.

- The Amended Complaint alleges that, by formal resolution passed at a board meeting, the Directors valued CIL's equity (*i.e.*, the value of the CEVA equity plus the CIL Cash, less the PIK Note liabilities) on September 20, 2012 as €1.1 billion.  This was less than three months before the Defendants began working on the CEVA Equity Transfer.  *Id.* ¶¶ 6, 45-48.

- The Amended Complaint alleges that the MS Report, despite manipulation by the Defendants, showed that CEVA Group possibly had equity value in 2013.  *Id.* ¶¶ 6, 68-72.

- The Complaint alleges that the E&Y Report would have shown that CEVA had material positive equity value but for the Directors' interference with E&Y's work by requiring it to use a below-median market multiple (among other interferences).  *Id.* ¶¶ 6, 62-96.

The CEVA Defendants counter that none of those valuations "are remotely sufficient to raise a plausible inference that CIL's equity in CEVA Group had value as of the date of the restructuring." CEVA Reply at 24. First, they contend that those are not "the allegations of solvency one would expect to see in a case like this". *Id.* To that end, they note that the Amended Complaint does not allege (i) that CEVA Group could have been sold for an amount sufficient to return value to CIL or that either the CEVA Group debt or the PIK Notes traded at prices consistent with CEVA Group's solvency; or (ii) that CEVA Group could have drawn down on any existing financing source or otherwise obtained financing to support its operations. *See id* at 24. Further, they complain that the materials that the Trustee relies on do not raise a "plausible inference" of solvency. *Id.* at 26. Briefly, they contend that the SEC filings were outdated, and that the Trustee cannot rely on the MS Report and the E&Y Report because in the Amended Complaint, the Trustee assails the reliability of those reports. *See, e.g.*, Am. Compl. ¶ 69 ("The short period of time that Morgan Stanley spent preparing the MS Report indicates that Morgan Stanley performed little or no diligence in preparation of the MS Report."); ¶ 71 ("the MS Report was not suitable for CIL or CIL's professionals to rely upon in evaluating or agreeing to any restructuring or recapitalization proposals for CEVA"); ¶ 77 ("The E[&]Y Report also contained multiple errors that resulted in lower values for CEVA."); ¶ 87 ("the report was misleading in that E[&]Y stated its conclusion was for 'any available scenario' notwithstanding that E[&]Y had not analyzed whether CEVA could be sold as a going concern business and whether there would be any value for shareholders in such a sale process, or whether CEVA could raise significant funds through an IPO."). In effect, the CEVA Defendants are asking the Court to put the Trustee to his proof of solvency in response to their motion to dismiss. However, "[t]he task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the

legal feasibility of the complaint, not to assay the weight of the evidence which might be offered

in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Ryder Energy*

*Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 780 (2d Cir. 1984)). "The

determination is not whether a claimant will ultimately prevail, but whether the claimant should

be allowed to offer evidence to support the claim." *CarCo II*, 454 B.R. 38, 47 (Bankr. S.D.N.Y.

2011) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S. Ct. 992, 997 (2002)).  The

Court finds that the Trustee has met that burden.  It is settled that "plausibility" is a standard

lower than "probability" and, as such, "a given set of actions may well be subject to diverging

interpretations, each of which is plausible." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d

162, 184 (2d Cir. 2012) (citation omitted).  Moreover, because "[f]act-specific question[s] cannot

be resolved on the pleadings[,]" *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001), "[t]he

choice between two plausible inferences that may be drawn from factual allegations is not a

choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C.*, 680 F.3d at

185.  Rather, at this stage of the litigation, "the question . . . is not whether there is a plausible

alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations

to make the complaint's claim plausible." *Id.* at 189.  The Court finds that the Trustee has met

that burden.  The CEVA Defendants' motion to dismiss Counts 1, 2, 3, 5, 6, 10, 11, and 12 on

the grounds that the Trustee has failed to allege that CIL was plausibly solvent in April 2013, is

denied.

## Motions to Dismiss Counts 4, 10, 12, 13, 14 & 15

### Count 4 –Violation of Automatic Stay

Upon the filing of a petition for bankruptcy, including an involuntary petition under

section 303 of the Bankruptcy Code, section 362 of the Bankruptcy Code bars "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay took effect upon the filing of

the April 22, 2013 involuntary chapter 7 petition against CIL, and the CEVA Debt Transaction

closed more than a week later, on May 2, 2013. *See* Am. Compl. ¶¶ 120, 125. The Trustee

contends that the "Defendants performed the CEVA Debt Transaction after the Petition Date and

with actual knowledge that the Involuntary Petition had been filed." *Id.* ¶ 165. From that, he

asserts that "[i]n the event it should be adjudged that the CEVA Equity Transfer and the CEVA

Debt Transaction are parts of a single integrated transaction, the CEVA Equity Transfer is part of

a transfer and transaction that was performed in part after the Petition Date." *Id.* ¶ 166. Thus,

the Trustee seeks an order (a) declaring that the Defendants violated the automatic stay; (b)

declaring that any action taken by the Defendants in violation of the automatic stay provisions of

section 362 of the Bankruptcy Code are null and void *ab initio*, including the conveyance of

CEVA Group to CEVA Holdings; and (c) directing the Defendants immediately to take all

actions necessary to restore the parties to their relative positions as they would have existed had

no violation of the automatic stay occurred. *Id.* ¶ 167.

Turner and Beith seek to dismiss Count 4 because the Amended Complaint does not

allege that they took any action after the Petition Date in furtherance of the CEVA Restructuring.

Directors' MTD at 29-30. They are correct. In substance, the Amended Complaint alleges that

CIL's component in the restructuring transaction was fully completed by April 1, 2013, when it

executed the CIL RSA and, in doing so, "allow[ed] CEVA Holdings . . . to obtain virtually all of

the equity of CEVA [Group] without providing any value or compensation to CIL." Am. Compl.

¶ 108. The Trustee has not alleged that the Directors took any affirmative action (on behalf of

CIL or otherwise) post-petition.[45]  Instead, the Trustee contends that if it is determined that the

CEVA Equity Transfer and CEVA Debt Transaction are parts of one unified transaction that did

not close until after the Petition Date, the Directors' prepetition actions "will have facilitated and

caused a post-petition transfer in violation of the automatic stay."  Trustee's Opp'n at 100.  The

Trustee cites no support for that proposition.  The Court rejects it, as it flies in the face of the

plain language of section 362(a) that clearly provides that the automatic stay does not arise until

the filing of a voluntary or involuntary bankruptcy petition.  *See* 11 U.S.C. § 362(a).  *Cf. In re

Moss*, 270 B.R. 333, 343-44 (Bankr. W.D.N.Y. 2001) (holding that although government's

exclusion and debarrment were administrative proceedings designed to collect and recover from

the debtor, such actions were fully completed pre-petition and thus do not give rise to a violation

of the debtor's automatic stay where the government took no post-petition actions in connection

with the debtor's exclusion and debarrment).

　　　The Amended Complaint fails to state a claim for relief under section 362 of the

Bankruptcy Code against Turner or Beith, and the Trustee is not able to do so.  Accordingly, the

Court dismisses Count 4 against Turner and Beith, without leave to replead.

### Count 10 – Conversion of CEVA Equity

　　　In Count 10 of the Amended Complaint, the Trustee seeks to recover damages from

CEVA Holdings occasioned by its alleged conversion of the "value of CIL's interest in CEVA

[Group]" through the allegedly "improper CEVA Equity Transfer."  Am. Compl. ¶ 199.  The

Trustee asserts that the "CEVA Equity Transfer intentionally and improperly interfered with

CIL's ownership and/or denied CIL's rights to 99% ownership of the equity of CEVA [Group]

---

[45]　Indeed, the Directors would not have been able to taken any actions on behalf of CIL in connection with the CEVA Restructuring after April 2, 2013, when CIL commenced liquidation proceedings in the Cayman Court and joint provisional liquidators were appointed for CIL.

and wrongfully converted those rights to CEVA Holdings" (*id*. ¶ 200), and that he is "entitled to judgement against CEVA Holdings in an amount to be proved at trial." *Id.* ¶ 201.  CEVA Holdings contends that this Count must be dismissed.

As a preliminary matter, the Trustee does not allege what law he is relying on in support of Count 10.  The CEVA Defendants note that CIL is a Cayman-domiciled entity, and that the issuance of shares that the Trustee alleges operated to convert CIL's property was made by CEVA Group, an English entity, in England, in accordance with English law, to CEVA Holdings, a Marshall Islands entity. *See* CIL RSA §§ 2(c), 3(a) (Chapman Decl., Ex. E); Form of CEVA Group Shareholder Resolutions at 1-2 (Chapman Decl., Ex. C); CEVA MTD at 52 n.128. Thus, they contend that U.K. law may be applicable to the conversion claim alleged in Count 10. However, as the CEVA Defendants correctly note, a choice of law determination is only necessary where there is an actual conflict between the laws of the potential jurisdictions involved.  *See* CEVA MTD at 52 (citing *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006)).  They contend, the Trustee does not dispute, and the Court finds that like New York (as discussed below), the U.K. does not generally recognize a cause of action for conversion of intangible property, except in the limited case of misappropriation of a document that evidences a debt.  *See OGB Ltd. v. Allan*, [2008] 1 A.C. 1, 100 (H.L.) (re-affirming fundamental principle that "'[t]he subject matter of conversion or trover must be specific personal property, whether goods or chattels.'").  Accordingly, the Court will apply New York law in resolving this aspect of the CEVA Defendants' motion to dismiss.

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  *Vigilant Ins. Co. v. Housing Auth. of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995) (internal quotation marks omitted) (quoting

*Emp'rs Fire Ins. Co. v. Cotton*, 245 N.Y. 102, 105, 156 N.E. 629, 630 (1927)).  Under New York

law, "[a] conversion takes place when someone, intentionally and without authority, assumes or

exercises control over personal property belonging to someone else, interfering with that

person's right of possession."  *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50

(2006).  "To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: '(1) the

property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership,

possession or control over the property before its conversion; and (3) defendant exercised an

unauthorized dominion over the thing in question, to the alteration of its condition or to the

exclusion of the plaintiff's rights.'"  *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y.

2009) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).

        The general rule in New York is that "'an action for conversion will not normally lie'

when it involves intangible property because there is no physical item that can be

misappropriated."  *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 289 (2007) (quoting

*Sporn v. MCA Records*, 58 N.Y.2d 482, 489, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983));

*accord Matzan v. Eastman Kodak Co.*, 521 N.Y.S.2d 917, 918 (App. Div. 4th Dep't 1987) ("A

claim for conversion does not lie for the withholding of indefinite, intangible, and incorporeal

species of property.").

        That rule has a well-settled, but limited, exception.  The so-called "merger doctrine"

recognizes that "an intangible property right can be united with a tangible object for conversion

purposes," such as a stock certificate for the ownership of a share of stock.  *Thyroff*, 8 N.Y.3d at

289 (citing *Agar v. Orda*, 264 N.Y. 248, 251, 190 N.E. 479 (1934); *Iglesias v. United States*, 848

F.2d 362, 364 (2d Cir. 1988))).[46]  *See also Nelly de Vuyst, USA, Inc. v. Europe Cosmetiques,*

_____

[46]    In *Thyroff*, the Second Circuit certified to the New York Court of Appeals the question whether the common
law tort of conversion applied to electronic computer records and data.  8 N.Y.3d at 284.  The personal property at

*Inc*., No. 11 CV 1491, 2012 WL 246673, at *8 (S.D.N.Y. January 6, 2010) ("*Thyroff* stands for

the proposition that intangible property interests may be subject to conversion when they are

represented by something that is subject to conversion—e.g., physical or electronic documents.")

(citation omitted); *Jin Yung Chung v. Sano*, 10 CV 2301, 2011 WL 1298891, at *9 (E.D.N.Y.

March 31, 2011) (noting that for purposes of stating a claim for conversion under New York law,

"physical representation[] of intangible property can be considered tangible property for

purposes of conversion.  Thus in awarding damages pursuant to a finding of conversion of stock

certificates, the court could award the value of the shares of stock, which are represented by

physical stock certificates that were converted.") (citation omitted).  CEVA Holdings contends

that Count 10 must be dismissed because in seeking damages occasioned by the diminution in

the value of CIL's interest in CEVA Group resulting from the issuance of New CEVA Shares to

CEVA Holdings, the Trustee has not alleged that any "physical or virtual representations of

CIL's ownership interests in CEVA Group were converted by CEVA Holdings."  CEVA MTD

at 53.

The Trustee disputes that position.  He asserts that "'there has been a growing trend [in

New York] towards recognizing certain types of intangible property as proper subjects of

conversion claims.'"  Trustee's Opp'n at 98 (quoting *Harris v. Coleman*, 863 F. Supp. 2d 336,

342 (S.D.N.Y. 2012)).  Moreover, the Trustee cites a number of cases in which New York courts

have allowed conversion claims to proceed where the alleged conversion is of tangible property

or intangible rights which have been merged into documents.  *See Harris v. Coleman*, 863 F.

Supp. 2d at 345 (physical conversion of patents and trademarks was allegedly effectuated by the

---

issue was customer information and personal information about plaintiff stored on defendant's computers.  *Id*. at
285.  The Court found no reason "in law or logic" why the electronic files should be treated any differently than "a
paper document kept in a file cabinet[,]" and held that the plaintiff could maintain a cause of action for conversion
of his intangible property.  *Id.* at 292.

transfer of a "record of patent ownership"); *Schron v. Grunstein*, 975 N.Y.S.2d 369 (N.Y. Sup.

Ct. 2013) (finding transfer of equity interests in entities that owned real property, rather than

transfer of real property itself, could state a claim for conversion; "stock certificates are

considered personal property"); *Siegel v. Siegel*, 949 N.Y.S.2d 662, 663 (App. Div. 1st Dep't

2012) (allegation that defendant had "interfered with [a] possessory interest in . . . stock"

sufficient to state a claim for conversion; defendant "wrongfully refused to surrender stock" in

which the plaintiff had an interest); *LaRosa v. Arbusman*, 903 N.Y.S. 2d 371, 373 (App. Div. 1st

Dep't 2010) (finding that defendant's wrongful "remov[al] [of] funds from the corporation"

constituted conversion.").  However, those cases are inapposite since each involves a wrongful

transfer or interference with the possessory interest of specific identifiable property.[47]  Here, the

Trustee has not—and cannot—allege that the CEVA Holdings deprived the Debtor of its shares

in CEVA Group.  The newly issued shares did not belong to CIL, and it is undisputed that the

Debtor still owns all the CEVA Group share it owned just prior to the CEVA Equity Transfer.

CEVA Holdings' alleged "conversion" is that by receiving the newly issued shares of CEVA

Group stock, it wrongfully diluted the value of the Debtor's shares in CEVA Group, not that

CEVA Holdings wrongfully exercised dominion over the Debtor's shares.  "It is clear that

intangible property subject to conversion law in New York is limited to items that bear a

substantial similarity to tangible property, like electronically stored data . . . "  *Yankowitz Law

Firm v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 649 (Bankr. E.D.N.Y. 2013).  The "value" of

the Debtor's CEVA Group shares bears no resemblance to tangible property.  Instead, it is an

---

[47]    For example, in *LaRosa v. Arbusman*, the allegation was not that the defendant had wrongfully appropriated
equity interests in a corporation.  Rather, that case involved a purported shareholder – who did not actually own any
shares – converting funds that had been invested in the corporation.  *See LaRosa*, 903 N.Y.S.2d at 602.
Accordingly, *LaRosa* does not support the Trustee's position in this case.

"indefinite, intangible, and incorporeal species of property," that cannot be the subject of a

conversion action.  *See, e.g.*, *Jin Yung Chung,* 2011 WL 1298891, at *9 (noting that "stock

interests" cannot be converted); *In re Tashlitsky*, 492 B.R. at 649 ("business opportunities cannot

be converted"); *Nelly de Vuyst, USA, Inc.,* 2012 WL 246673 at *8 (finding that allegations that

defendant deprived plaintiff of marketing rights under an agreement cannot be the subject of a

conversion claim because "a right to the benefits under a contract is not the type of intangible

property interest which *Thyroff* contemplated."); *Rushing v. Nexpress Solutions, Inc*., 05 Civ.

6243, 2009 WL 104199, at *6 (W.D.N.Y. Jan. 14, 2009) (concluding that plaintiff failed to state

a claim for conversion where the claim was that the "Defendants converted [the plaintiff's]

patentable idea, not a tangible expression of that idea[.]").

CEVA Holdings also asserts that Count 10 should be dismissed because the Trustee

admits that the Debtor consented to and authorized the issuance of the new shares to CEVA

Holdings (*see* Am. Compl. ¶ 108), and in New York, "actual consent or acquiescence" is a

complete defense to a claim of conversion.  *See Knight v. Del. & Hudson Co.*, 165 N.Y.S. 583,

584 (App. Div. 1st Dep't 1917); *accord B&C Realty, Co. v. 159 Emmut Props. LLC*, 966

N.Y.S.2d 402, 405-06 (App. Div. 1st Dep't 2013) (dismissing conversion claim where complaint

"tacitly concedes that possession [of the allegedly converted property] was authorized").

Although the Trustee admits in the Amended Complaint that the Debtor consented to the

issuance of the new shares to CEVA Holdings, he argues that such consent was "meaningless"

because it was granted by the Apollo-employed directors in breach of their duties to CIL for the

benefit of CEVA Holdings and Apollo.  *See* Trustee's Opp'n at 99.  However, as the court in

*B&C Realty* recognized, the fact that consent may have been obtained by fraud or other improper

means does not transform an authorized transfer into an actionable conversion.  *See B&C Realty*,

966 N.Y.S.2d at 405-06 (in dismissing claim that defendant converted $2 million paid by

plaintiff to the defendant in connection with a real estate transaction, the court noted that "the

complaint alleges that defendants took the $2 million under false pretenses, knowing all the

while that the building did not conform to the proper zoning standards and thus might not receive

a final C of O. If anything, plaintiff's allegations either duplicate the dismissed fraud claim, or

they amount to a claim that defendants intentionally deprived it of the benefit of its bargain.").

Thus, the Trustee's claim against CEVA Holdings for conversion of CEVA Group's shares fails

as a matter of law.[48]   For the foregoing reasons, the Court finds that Count 10 fails to state a

claim upon which relief can be granted and must be dismissed, without leave to replead.

### Count 12 – Conspiracy Cayman Islands

The Directors argue that Count 12 should be dismissed if the Court finds that the

Amended Complaint fails to allege facts that give rise to a plausible inference that CIL's equity

in CEVA Group had value.  The Court has not done so and has denied the CEVA Defendants'

motion to dismiss several Counts on that basis.  As such, the Directors' motion to dismiss Count

12 is denied.

### Count 13 – Turnover of CIL Cash

In Count 13 of the Amended Complaint, the Trustee seeks an order pursuant to section

542 of the Bankruptcy Code directing the CEVA Defendants to turnover the CIL Cash.  The

Trustee alleges that the CIL Cash represents proceeds from its sale of "minority interests in [the

Debtor's] equity from 2006 onwards" that the Debtor gave to CEVA Group to hold because the

---

[48]   The case cited by the Trustee, *Plaza Hotel*, does not compel a different result.  In that case, the court held that
the owners of a corporation could not effectively consent to the dual representation by the same attorney of both the
debtor corporation and the guarantor owners (of the debtor).  *See In re Plaza Hotel Corp.*, 111 B.R. 882, 891 (Bankr.
E.D. Cal. 1990).  The issue before the court in *Plaza Hotel* was the disqualification of the attorney and disgorgement
of fees for, among other things, lack of disclosure of the attorney's conflict.  *Plaza Hotel* did not involve a claim for
conversion under New York law.  *Id.*

Debtor did not generally maintain bank accounts.  Am. Compl. ¶ 128.  He says that, in turn,

"CEVA and its subsidiaries and affiliates administered cash through CEVA Finance[,]" which

was "in effect, the inter-company bank for the multi-billion dollar CEVA enterprise." *Id.*  Thus,

he contends that "CEVA Finance or its agent is in possession, custody or control of the CIL

Cash[,]" (*id.* at ¶ 218), and that "[b]y reason of their direct and indirect control of CEVA Finance

and the entire CEVA Enterprise, CEVA[Group] and CEVA Holdings possess and control the

CIL Cash." *Id.* ¶ 219.  The Trustee maintains that for a number of years prior to the CEVA

Equity Transfer, CEVA Group and its affiliates recognized the CIL Cash as an asset on their

books and records.  *Id.* ¶ 213.  Moreover, he contends that (i) in its 2012 Annual Report, CEVA

Group acknowledged an intercompany payable in favor of CIL as of December 31, 2012 (i.e.,

the CIL Cash) and did not indicate that the amount was subject to dispute (*id.* ¶ 225); and (ii) in a

March 23, 2013 email, a representative of E&Y, referring to the CIL Cash, advised Beith and

various attorneys at Mintz Levin and Appleby that he had "'never seen any evidence to suggest

whey the intercompany amount is not a good claim.'" *Id.* ¶ 214.  The Trustee alleges that the

CIL Cash "is of substantial value and benefit to CIL's estate that may be used, sold or leased by

the Trustee." *Id.* ¶ 220.  Accordingly, he contends that "pursuant to section 542 of the

Bankruptcy Code, the Court should enter an order directing the [CEVA Defendants] immediately

to pay and turnover to the Trustee the CIL Cash, and all proceeds, products and profits thereof,

with interest." *Id.* ¶ 221.

A turnover action under section 542 of the Bankruptcy Code applies only to property that

belongs to the estate.  *See, e.g.*, *U. S. v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991), *cert.*

*denied*, 502 U.S. 1048, 112 S. Ct. 913, 116 L.Ed.2d 813 (1992).  "Congress envisioned the

turnover provision of § 542 of the Code . . . to apply to tangible property and money due to the

debtor without dispute which are fully matured and payable on demand." *Charter Crude Oil Co.*

*v. Exxon Co., U.S.A. In re Charter Co.)*, 913 F.2d 1575, 1579 (11th Cir. 1990) (citing *United*

*States v. Whiting Pools, Inc.*, 462 U.S. 198, 202-03 (1983)).  Thus, "[i]t is settled law that the

debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand

assets whose title is in dispute." *U. S. v. Inslaw, Inc.,* 932 F.2d at 1472.  *See also Geron v.*

*Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013) ("When the

turnover power [under §542] is properly invoked, it is simply an effort to recover property – or

on property – that is *already* property of the estate.  That, in turn, invokes the court's *in rem*

jurisdiction over the bankruptcy *res.*"); *Penthouse Media Grp. v. Guccione (In re Gen. Media,*

*Inc.),* 335 B.R. 66, 76 (Bankr. S.D.N.Y. 2005) ("Section 542(a) does not apply if title [to the

property that is the subject of the turnover request] is disputed."); *Hassett v. BancOhio Nat'l*

*Bank (In re CIS Corp.),* 172 B.R. 748, 760 (Bankr. S.D.N.Y. 1994) (stating that an action should

be regarded a turnover proceeding under § 542(b) "only when there is no legitimate dispute over

what is owed to the debtors.").

The Trustee contends that the CIL Cash is plainly within the scope of the Trustee's

powers to marshal existing assets of the estate for the benefit of estate creditors.  *See* Trustee's

Opp'n at 89-90.  As support he relies on *In re Pali Holdings, Inc*., 488 B.R. 841.  There, the

chapter 7 trustee brought an action to compel turnover of the proceeds of a promissory note

executed by a former employee of the debtor. Among other things, the court found that the

promissory note was estate property subject to turnover, and that where "there are no serious

defenses to the estate's section 542 turnover rights, a bankruptcy judge can exercise the

bankruptcy court's *in rem* jurisdiction to issue a final judgment for the turnover of the estate's

property, or to monetize it." *Id.* at 853.  For the Trustee, the CIL Cash and promissory note in

*Pali* are indistinguishable, because "the CIL Cash is property rightfully belonging to the CIL estate which the trustee can recover and monetize for the benefit of CIL's creditors." Trustee's Opp'n at 90.

The CEVA Defendants do not contest the central premise of the Trustee's allegation, i.e., that the CIL Cash consists of the "proceeds from the CIL equity issuances," and they do not dispute that they are holding the CIL Cash. They contend that the Court should dismiss Count 13 because contrary to the allegations in ¶¶ 129 and 215 of the Amended Complaint, the ownership of the CIL Cash is "hotly disputed." CEVA MTD at 60. To that end, the CEVA Defendants assert that (i) each of its 2012, 2013 and 2014 annual reports includes an explicit statement that the claim to the CIL Cash is disputed; (ii) the Offering Memorandum issued in connection with the restructuring states that they "vigorously dispute" that CIL is owed the CIL Cash; and (iii) the Report to Bondholders includes a provision explaining why they have "vigorously disputed" that the CIL Cash is owed to CIL. CEVA Reply at 38.[49] Moreover, they say that the Trustee's reliance on the email sent by the E&Y representative should be accorded little weight. *Id.* at 39.

It is well settled, that "[a]llegations in a complaint that are 'contradicted by more specific allegations or documentary evidence' are not entitled to a presumption of truthfulness." *Zaretsky v. Gemological Inst. of Am., Inc.*, No. 14-CV-1113, 2014 WL 1678990 (S.D.N.Y. Apr. 28, 2014) (quoting *Kirkendall v. Halliburton, Inc.,* 707 F.3d 173, 175 n.1 (2d Cir. 2013), *cert. denied*, 134

---

[49]   The CEVA Defendants also say that the Petitioning Creditors who moved for the appointment of the Trustee at the outset of this case stipulated that CIL's right to the CIL Cash was disputed by the CEVA Group. *See* CEVA MTD at 60. However, that is not completely accurate. To be sure, that stipulation states, in part, that "CIL's assets include . . . certain intercompany claims against CEVA in the new amount of €12.6 million (which CEVA has disputed) . . . ." *See* Supplemental Declaration of David Friedman [ECF No. 28] Ex. A at ¶ 6. However, the stipulation goes on to provide that "[t]he Petitioning Creditors have not had the opportunity to verify the facts set forth in paragraph[] [6] of this Stipulation, and reserve the right to challenge such facts should they deem it necessary." *Id.* at ¶ 15. Moreover, the stipulation is not binding on the Trustee, and he plainly denies that the CIL Cash is the subject of a *bona fide* dispute.

S. Ct. 241 (2013)).  In considering the documents cited by the CEVA Defendants to rebut the

presumption of truthfulness attached to the allegations in the Amended Complaint, the Court

notes, as a preliminary matter, that in contrast to the Annual Reports cited by the CEVA

Defendants, the Court has determined that the Offering Memorandum and Report to

Bondholders are outside of the scope of the record of this motion.  *See* Appendix III.  As such,

the Court will not consider them in resolving the motion.  That said, each of the 2012, 2013 and

2014 Annual Reports includes an explicit statement to the effect that CEVA Group disputes

CIL's claim to the CIL Cash.

However, the CEVA Defendants' mere denial of CIL's entitlement to the CIL Cash

without explanation or support by any documentary evidence is insufficient grounds to find that,

for purposes of the Rule 12(b)(6), CIL's right to the CIL Cash is the subject of a bona fide

dispute.  *See, e.g.*, *In re Legal Xtranet*, 2011 WL 3236053, *1 n.1 (Bankr. W.D. Tex. July 26,

2011) (refusing to dismiss plaintiff's turnover claim and noting in *dicta*, "simply resisting

recovery is not enough to create a legitimate dispute").  Instead, courts have found the existence

of a "bona-fide" or "substantial" dispute to defeat a claim for turnover where defendants have

provided specific bases in defense of turnover.  *See, e.g.*, *In re W. Integrated Networks, LLC*, 329

B.R. 334, 342 (Bankr. D. Colo. 2005) (citing to defendant's defense that ownership of funds

were disputed because they were subject to recoupment or the right to receive them had been

sold to a third party); *cf. In re Zaretsky v. Gemological Inst. of Am., Inc.*, 2014 WL 1678990, at

*4-5 (plaintiff's release letter contradicted plaintiff's allegation of defendant's entitlement to

diamond, defeating plaintiff's conversion claim).  Here, the CEVA Defendants have done

nothing more than assert that they dispute CIL's right to the CIL Cash. That does not provide
grounds for dismissing Count 13. Accordingly, the motion to dismiss Count 13 is denied.

### Counts 14 & 15 – Recovery of CIL Cash

In Counts 14 through 17 of the Amended Complaint, the Trustee focuses on the recovery
of the CIL Cash. In Count 14, he asserts that the CEVA Defendants have "intentionally and
improperly interfered with CIL's ownership of and/or denied CIL's rights to, the CIL Cash[,]"
and, as such, "they have wrongfully converted those rights to [themselves]." Am. Compl. ¶ 223.
Thus, they seek a judgment against the CEVA Defendants "in the amount of the CIL Cash, plus
all proceeds therefrom and interest thereon." Id. ¶ 224. In support of Count 15, the Trustee
alleges that the CEVA Defendants have been "unjustly enriched" because they have "wrongfully
and unconscionably benefitted from the retention of the CIL Cash." Id. ¶ 226. He asserts that
"by their retention of the CIL Cash[,]" the CEVA Defendants "have been enriched at the expense
of CIL and CIL's creditors[.]" Id. ¶ 227. Thus, he maintains that "[e]quity and good conscience
require full restitution by [the CEVA Defendants] of the direct and indirect value of the CIL
Cash together with any and all proceeds and profits of the New CEVA Shares. Id. ¶ 228. In the
alternative, in Count 16, the Trustee seeks damages equal to the amount of the CIL Cash
predicated on the CEVA Defendants breach of their obligation to pay the CIL Cash to the Debtor
(id. ¶¶ 229-231), and in Count 17, the Trustee seeks an order directing CEVA Group and CEVA
Holdings to cause the turnover and payment of the CIL Cash to CIL. Id. ¶¶ 232-237. The
CEVA Defendants have moved to dismiss all of those Counts. As noted, the Trustee has
withdrawn Counts 16 and 17. As such, the motion with respect to those Counts is denied as
moot, and the Court will focus on Counts 14 and 15.

As a preliminary matter, the CEVA Defendants contend that in resolving their motion to dismiss Counts 14 and 15, to the extent there is a conflict with New York law, Dutch law should govern the resolution of those claims. They say this is so because it is undisputed that the CIL Cash is being held by CEVA Finance, a Dutch entity, in a bank account in the Netherlands, and that the account is subject to one of two cash pooling agreements (the "Cash Pooling Agreements"), both of which are (i) governed by Dutch law and (ii) contain exclusive jurisdiction clauses requiring all disputes relating to them to be brought in the Netherlands. They also assert that, in any event, by application of the "center of gravity" or "interest analysis" tests applied by New York courts in resolving "choice of law" disputes, Dutch law applies to the resolution of the motion. *See* CEVA MTD at 61-63. The Trustee disputes those assertions. He argues that the Court cannot consider the Cash Pooling Agreements because they are outside the scope of the record of the motion, and, in any event, are irrelevant because he is seeking to recover an estate asset, the CIL Cash, not asserting a claim for an intercompany receivable governed by a contract or forum selection clause. *See* Trustee's Opp'n at 93-94. He also contends that New York law applies because "New York has an 'interest' in not allowing its citizens to park other people's money in a (possibly) offshore subsidiary and refuse to return it[,]" and because this Court "certainly has a strong interest in marshalling the assets of a debtor with a case before it, so the assets may be distributed to creditors." *Id.* at 95. The Court agrees that the Cash Pooling Agreements are outside the scope of the record of this motion and, otherwise are not relevant to the analysis of the conversion and unjust enrichment claims in Counts 14 and 15, respectively.[50] Moreover, it agrees that it has a strong interest in marshalling

---

[50]    The CEVA Defendants contend that Counts 14 through 17 should be dismissed as to CEVA Finance on the grounds of *forum non conveniens. See* CEVA MTD at 69-71. They base that argument on the forum selection clauses in the Cash Pooling Agreements. As those agreements are not part of the record of the CEVA Defendants' motion, at this time, the Court rejects *forum non conveniens* as a grounds for dismissing the Amended Complaint.

estate assets and seeing them distributed to creditors.    However, as explained below, the Court

disagrees that in this case, New York's choice of law rules dictate that New York law will apply

where it is in conflict with Dutch law.  In resolving the motion to dismiss Count 14, the Court

will apply the Dutch law of conversion, because it is in conflict with New York law.  In contrast,

the Court will apply New York's law of unjust enrichment in resolving the motion to dismiss

Count 15, because there is no conflict between New York and Dutch law.

In adjudicating state law claims, federal courts apply the choice-of-law rules of the state

in which it sits.  *See Gaetano Assocs. Ltd. v. Artee Collections, Inc*., 05 Civ. 3329, 2006 WL

330322, at *3 (S.D.N.Y. Feb. 14, 2006) ("A federal court applies the choice of law of the state in

which it resides to state law claims." (citing *Lazard Freres & Co. v. Protective Life Ins. Co*., 108

F.3d 1531, 1538-39 (2d Cir. 1997))); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425 (S.D.N.Y.

2006) ("A federal court adjudicating supplemental state law claims applies the choice-of-law

rules of the forum state.") (citations omitted).  Thus, the Court will "look[] to choice of law rules

of New York to resolve [the] conflict of laws questions."  *Enron Wind Energy Sys. LLC v.

Marathon Elec. Mfg. Corp. (In re Enron Corp. Inc.)*, 367 B.R. 384, 392 (Bankr. S.D.N.Y. 2007).

Under New York law, "the first question to resolve in determining whether to undertake a choice

of law analysis is whether there is an actual conflict of laws."  *Curley v. AMR Corp*., 153 F.3d 5,

12 (2d Cir. 1998) (citing *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

When there is no material difference between the applicable laws, the Court will apply New

York law, and need not decide the choice of law issue.  *See Fieger v. Pitney Bowes Credit Corp.*,

251 F.3d 386, 393 (2d Cir. 2001).  *See also McHale v. Boulder Capital LLC (In re 1031 Tax

Grp., LLC)*, 439 B.R. 47, 59 (Bankr. S.D.N.Y. 2010) (Under New York law, "[w]here there is no

material difference . . . between the possible applicable laws, courts may apply New York law to

the issues at bar.") (citation omitted).  An actual conflict exists when (i) the applicable law from

each jurisdiction provides different substantive rules; (ii) the differences are relevant to the issues

at hand; and (iii) the differences have a significant possible effect on the outcome of the

underlying matter.  *See Finance One Public. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414

F.3d 325, 331 (2d Cir. 2005) (internal quotations and omitted).  *See also Desarrolladora*

*Farallon S. de R.L. de C.V. v. Cargill Fin. Servs. Int'l, Inc.*, 666 Fed. Appx. 17, 21 (2d Cir. 2016)

("The question whether the laws of two jurisdictions are in actual conflict turns on whether there

is any substantive difference between the jurisdictions' law that is potentially relevant to the

disposition of the case before the court.").  The conflict need not be outcome determinative.

*Finance One Public. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d at 331-32 ("This does

not imply, however, that before embarking on a choice-of-law analysis a court must apply the

relevant substantive rules of each jurisdiction to the facts of the case and determine what the

various results would be and whether they would differ.").

     The CEVA Defendants do not contend that the elements of an action for unjust

enrichment are different under New York and Dutch law.  Accordingly, the Court will apply

New York law in resolving the CEVA Defendants' motion to dismiss Count 15.  *See, e.g., In re*

*1031 Tax Grp., LLC*, 439 B.R. at 59 (applying New York law to resolve whether the debtor was

holding funds in trust, where the court found the laws of states with a possible interest in the

resolution of the issue, were not materially different from that of New York).  However, as to

Count 14, in contrast to New York law, it is undisputed, and the Court finds, that "[t]he legal

concept of 'conversion' as such, as a legal basis for repayment of the allegedly converted

amount, does not exist in the Dutch Civil Code []."  *See* Declaration of Maurits L.S. Kalff In

Support of CEVA Defendants' Motion to Dismiss the Amended Complaint [ECF No. 37] ¶ 12

(the "**Kalff Declaration**").  As such, there is an actual conflict—i.e., a relevant difference that has a significant possible effect on the outcome of the trial—between Dutch law and New York law as it relates to the law of conversion, because application of Dutch law would have an immediate effect on this litigation as it would lead to the dismissal of Count 14.  Accordingly, the Court will apply New York's choice of law rules to determine whether to apply New York or Dutch law in resolving the motion to dismiss Count 14.

In New York, "the relevant analytical approach to choice of law in tort actions" is the "interest analysis." *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 197 (1985).  That is, "the law of the jurisdiction having the greatest interest in the litigation will be applied[.]"  *Id.  See also Travelers Indem. Co. v. Levy,* 1606 N.Y.S.2d 167, 170 (App. Div. 1st Dep't 1993) (for choice of law matters relating to tort claims, New York focuses on which jurisdiction has the greater interest in a dispute).  In *GlobalNet Fiancial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 385 (2d Cir. 2006), a case involving choice of law issues under New York relating to contract and tort (alleged professional negligence) claims, the Second Circuit put a finer point on the "interest analysis" test relating to tort claims, as follows:

> Under the interest-analysis test, torts are divided into two types, those involving "'the appropriate standards of conduct, rules of the road, for example'" and those that relate to "'allocating losses that result from admittedly tortious conduct ... such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.'" *Mascarella v. Brown,* 813 F. Supp. 1015, 1019 (S.D.N.Y. 1993) (quoting *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993); *see Northwestern Mut. Life Ins. Co. v. Wender,* 940 F. Supp. 62, 66 (S.D.N.Y. 1996). If the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important. *Cooney,* 81 N.Y.2d at 72, 595 N.Y.S.2d 919, 612 N.E.2d 277.

*Id.* at 384-85.  "Conduct-regulating" rules plainly are at issue here, because the Trustee is alleging that the CEVA Defendants converted the CIL Cash.  *See* Am. Compl. ¶ 223.  Thus, the Court will apply the law of the jurisdiction where the tort occurred.  *See, e.g.*, *Kwiecinsk v. John K. Renke II, Law Office,* No. 11-cv-2246, 2012 WL 4344589, at *5 (E.D.N.Y. July 30, 2012) (where defendant allegedly converted funds from the plaintiff, court found that differences between the law of conversion in New York and Florida gave rise to "conflicting conduct-regulating laws" and applied Florida law because  "'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.'" (quoting *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993))); *Hacochen v. Bolliger Ltd.*, 489 N.Y.S.2d 75, 78 (App. Div. 1st Dep't 1985) (in analyzing choice of law governing conversion claim, stating that "[w]here, as here, it is the defendant's standard of conduct that is to be judged, 'it is appropriate to look to the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders….'" (quoting *Bing v. Halstead*, 495 F. Supp. 517, 520 (S.D.N.Y. 1980))).

As alleged in the Amended Complaint, the CIL Cash represents approximately €14 million raised from CIL's sale of minority interests in its equity beginning in 2006.  *See* Am. Compl. ¶ 128.  CIL gave the CIL Cash to CEVA Group to hold, because CIL did not maintain its own bank accounts.  In turn, CEVA Group and its subsidiaries and affiliates administered cash through CEVA Finance.  *See id.*  The CIL Cash is located in the Netherlands.  *See, e.g.*, CEVA MTD at 63 ("the disputed cash [] is held in bank accounts in the Netherlands.").  The Trustee maintains that by CEVA Finance's failure to return the CIL Cash to CIL, despite demand, CEVA Finance "intentionally and improperly interfered with CIL's ownership of and/or denied CIL's

rights to, the CIL Cash, and wrongfully converted those rights to CEVA, CEVA Holdings, and

CEVA Finance." Am. Compl. ¶ 223. Thus, the alleged act of conversion—i.e., withholding the

CIL Cash (denominated in Euros) in the Netherlands bank accounts—as well as the resulting

injury—i.e., being deprived of the CIL Cash—took place in the Netherlands. *See, e.g.*, *Gerloff v.

Hostetter Schneider Realty*, No. 12 Civ. 9404, 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20,

2014) (finding that, "despite Plaintiff's contentions, the actions that give rise to any equitable

claim [of unjust enrichment] occurred in Germany – where Escada is located and likely

committed any wrongful acts.").

### *Count 14*

Based on the foregoing, in applying New York's choice of law rules, the Court will apply

Dutch law in resolving the motion to dismiss Count 14. The tort of conversion is not recognized

under Dutch law. *See* Kalff Decl. ¶ 12. Accordingly, for that reason and because Dutch law

applies to this aspect of the motion, the Court grants the CEVA Defendants' motion to dismiss

Count 14 of the Amended Complaint.

However, even assuming, *arguendo*, that New York law is applicable to the resolution of

the motion to dismiss Count 14, the Court finds that the claim should be dismissed. It is well

settled that the liability of a parent company for alleged torts of a wholly owned subsidiary "can

never be predicated solely upon the fact of a parent corporation's ownership of a controlling

interest in the shares of its subsidiary." *Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163

(1980). Rather, "[a]t the very least," a plaintiff seeking to hold a parent company so accountable,

must demonstrate "direct intervention by the parent in the management of the subsidiary to such

an extent that 'the subsidiary's paraphernalia of incorporation, directors and officers' are

completely ignored." *Id.* (quoting *Lowendahl v. Baltimore & Ohio R. R. Co.*, 247 App. Div.,

144, 155 (App. Div. 1st Dep't 1936)). *See also Musman v. Modern Deb, Inc.*, 377 N.Y.S.2d 17,

20 (1975) ("It is well settled that there must be complete domination and control of a subsidiary

before the parent's corporate veil can be pierced. . . . The control must actually be used to commit

a wrong against the plaintiff and must be the proximate cause of the plaintiff's loss."). *See, e.g.*,

*Baratta v. Kozlowski*, 464 N.Y.S. 2d 803, 805 (App. Div. 2d Dep't 1983) (complaint seeking to

hold parent liable for the torts of its subsidiary dismissed "because complaint fails to allege that

it exercised complete domination and control over the subsidiary.") (citations omitted).

     Here, the Trustee's contention that CEVA Group and CEVA Holding should be held

accountable for CEVA Finance's alleged acts is based on his assertion that CEVA Group and

CEVA Holdings "generally have the ability to cause CEVA Finance . . . to release the CIL Cash

to the Trustee." Am. Compl. ¶ 130. That falls far short of the pleading necessary to provide

grounds to pierce CEVA Group's and CEVA Holdings' corporate veil. That is especially so

given the fact that the Trustee seeks to hold CEVA Group's and CEVA Holdings' responsible

for CEVA Finance's alleged conversion of the CIL Cash, but has made no allegations that either

of them so dominated and controlled CEVA Finance's operations that corporate formalities

should be disregarded. To the contrary, the Trustee acknowledges that CEVA Group and CEVA

Holdings are holding companies (which are not alleged to have any operational responsibilities)

(Am. Compl. ¶¶ 1, 27, 28, 37, 130), while CEVA Finance functioned as the day-to-day "inter-

company bank" for the entire CEVA Enterprise without any alleged interference. In this light,

even if New York conversion law applies, Count 14 of the Amended Complaint should be

dismissed.[51] Accordingly, Count 14 is dismissed, without leave to replead.

---

[51] In his Opposition, the Trustee seems to tie his conversion claim against CEVA Group and CEVA Holdings to his assertion that "CEVA [Group] and CEVA Holdings, who control CEVA Finance, are directing their wholly-owned subsidiary to withhold money that belongs to the CIL estate." Trustee's Opp'n at 95. The Court finds no merit to that contention because even assuming that those entities gave that direction, which the Trustee has not

114

*Count 15*

In Count 15, the Trustee asserts that the CEVA Defendants have been unjustly enriched because one or more of them received and are holding the CIL Cash, alleged by the Trustee to be property of CIL's estate, and are thereby benefitting from it having not returned it to the Trustee despite due demand.  *See* Am. Compl. ¶¶ 128-130, 226-228.  Under New York law, "[t]he essence of unjust enrichment is that one party has received money or a benefit at the expense of another."  *Levin v. Kitsis*, 920 N.Y.S.2d 131, 134 (2011) (internal quotation marks omitted) (quoting *Goldman v. Simon Prop. Group, Inc.*, 869 N.Y.S.2d 125).  To establish a claim for unjust enrichment, a plaintiff must show "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (internal quotation marks omitted) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481 (App. Div. 2d Dep't 2004).

The Trustee has failed to state a claim of unjust enrichment against CEVA Group and CEVA Holdings because the Amended Complaint does not plead facts which, if true, establish that CEVA Group and CEVA Holdings have been enriched, unjustly or otherwise, by virtue of CEVA Finance's retention of the CIL Cash.  What's more, as with a claim for conversion (discussed above), a parent corporation cannot be held liable to a plaintiff under a theory of unjust enrichment for its subsidiary's possession of disputed property, unless the plaintiff can

---

alleged (*cf.* Am. Compl. ¶ 130), that would not rise to the level of conversion.  Under New York law, "[t]he rule is clear that to establish a cause of action in conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Indep. Discount Corp. v. Bressner*, 365 N.Y.S. 2d 44, 46 (App. Div. 2d Dep't 1975) (citation omitted).  The Trustee does not contend that CEVA Group and CEVA Holdings are in possession of the CIL Cash.  The Court finds no support for the notion that a parent company's failure to direct its subsidiary to return property allegedly converted by the subsidiary, gives rise to a claim that the parent has converted the property.

establish grounds for piercing the corporate veil. *See Bigio v. Coca-Cola*, 675 F.3d 163, 176-77

(2d Cir. 2012) (in rejecting unjust enrichment claim against parent, Court held that "[a]ny

recovery under an unjust enrichment theory, as with any recovery on a . . .  conversion theory,

would [] require us to pierce the veil separating" the parent company form the subsidiary holding

the disputed property.). *See also Levin v. Kitsis*, 920 N.Y.S.2d at 134 (dismissing claim for

unjust enrichment against 100% shareholder because complaint "[did] not allege any basis for

piercing the corporate veil").  The Trustee has failed to allege such a claim.  Accordingly, Count

15 is dismissed, without leave to replead.

### Conclusion

Based upon the foregoing the Court finds and determines, as follows:

### Rule 12(b)(2) Relief

The Court lacks personal jurisdiction over Beith and, as such, all Counts alleged against
Beith in the Amended Complaint (Counts 4, 7, 12 & 19) are dismissed, with leave to
replead within 45 days of this Memorandum Decision.

The Court lacks personal jurisdiction over CEVA Finance and, as such, all claims
asserted against CEVA Finance in the Amended Complaint are dismissed, with leave to
replead within 45 days of the Memorandum Decision.

### Rule 12(b)(6) Relief

The CEVA Equity Transfer that the Trustee seeks to avoid pursuant to sections 544, 548
and 550 of the Bankruptcy Code in Counts 1, 2 and 3 was a foreign transfer and those
sections of the Bankruptcy Code do not apply extraterritorially.  Moreover, by application
of the principles of international comity, Cayman law is applicable to the resolution of
the avoidance claims.  Accordingly, Counts 1, 2 and 3 are dismissed, without leave to
replead, except that the Trustee will be permitted to assert an intentional fraudulent
transfer claim herein, under Cayman law, divorced of any aspect of the Bankruptcy Code.

The Trustee has alleged plausibly that CEVA Group was solvent at the time of the CEVA
Restructuring, thus the CEVA Defendants' motion to dismiss Counts 1, 2, 3, 5, 6, 10, 11,
and 12 on that basis is denied.

The Directors' motion to dismiss Count 4 (Violation of Automatic Stay) is granted,
without leave to replead.

The Directors' motion to dismiss Count 12 (Conspiracy Cayman Islands law) is denied.

The CEVA Defendants' motion to dismiss Count 10 (Conversion of CEVA equity) is granted as against CEVA Holdings, without leave to replead.

The CEVA Defendants' motion to dismiss Count 13 (Turnover -- CIL Cash) as against all CEVA Defendants is denied.

The CEVA Defendants' motion to dismiss Count 14 (Conversion -- CIL Cash) is granted as against all CEVA Defendants, without leave to replead.

The CEVA Defendants' motion to dismiss Count 15 (Unjust Enrichment -- CIL Cash) is granted as against CEVA Group and CEVA Holdings, without leave to replead.

The CEVA Defendants' motion to dismiss Count 6 (Turnover of CEVA Equity), Count 12 (Aiding/Abetting under New York law), Count 16 (Breach of Contract – CIL Cash), and Count 17 (Injunction) are denied as moot.

The CEVA Defendants' motion to dismiss Counts 14-17 against CEVA Finance based on *forum non conveniens* is denied.


SETTLE ORDER.


Dated: New York, New York

      January 5, 2018

/s/ *James L. Garrity, Jr.*

United States Bankruptcy Judge