NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
:
In re:                                              :          Chapter 7
:
CIL Limited,                                         :          Case No. 13-11272-JLG
:
                Debtor.          :
:
-------------------------------------------------------x
:
Salvatore LaMonica, as Chapter 7 Trustee            :
  For CIL Limited,                                  :
:          Adv. Proc. No. 14-02442-JLG
              Plaintiff,       :
:
v.                                                  :
:
CEVA Group PLC, CEVA Holdings LLC,                   :
CEVA Logistics Finance B.V.,                         :
Gareth Turner, and Mark Beith,                       :
:
              Defendants.      :
:
-------------------------------------------------------x

**MEMORANDUM DECISION GRANTING CHAPTER 7 TRUSTEE'S MOTION FOR**
**LIMITED RECONSIDERATION AND AMENDMENT OF THE COURT'S JANUARY**
**23, 2018 ORDER AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

**APPEARANCES:**

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
By:    Robert M. Novick, Esq.
        David S. Rosner, Esq.
        Howard W. Schub, Esq.

*Special Counsel for Salvatore LaMonica,*
*Chapter 7 Trustee for the Debtor*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:      David M. Zensky, Esq.
         Dean L. Chapman Jr., Esq.
         Jennifer L. Woodson, Esq.

*Counsel for Defendants CEVA Group Plc, CEVA Holdings LLC*


FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York 10036
By:      Scott M. Berman, Esq.
         Jeffrey C. Fourmaux, Esq.
         Alexander D. Levi, Esq.
         Eric Seiler, Esq.

*Attorneys for Defendant Gareth Turner*

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:


Until the spring of 2013, CIL Limited, the debtor herein ("**CIL** or the "**Debtor**"), owned

100% of the stock of CEVA Group Plc ("**CEVA Group**").  In April 2013, CEVA Group, with

CIL's authorization, issued shares of its stock (the "**New CEVA Shares**") to CEVA Holdings,

LLC ("**CEVA Holdings**").  The issuance of those shares (the "**CEVA Equity Transfer**") left

CIL and CEVA Holdings with 00.01% and 99.99% of the equity interests in CEVA Group,

respectively.  Salvatore LaMonica, the plaintiff herein, is the Chapter 7 trustee (the "**Trustee**")

of CIL's bankruptcy estate.  In Counts 1, 2 and 3 of his Amended Complaint,[1] the Trustee seeks

to avoid the CEVA Equity Transfer as a fraudulent transfer pursuant to sections 544, 548, and

550 of the Bankruptcy Code and, to the extent necessary, preserve and recover the New CEVA

Shares pursuant to sections 550 and 551 of the Bankruptcy Code (collectively, the "**Bankruptcy**

**Code Avoidance Claims**").  The CEVA Defendants[2] moved to dismiss those Counts (and

others) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3]  By order dated

January 23, 2018 (the "**Rule 12 Order**"),[4] the Court dismissed the Bankruptcy Code Avoidance

Claims, with prejudice, except that the Court permitted the Trustee to assert an avoidance claim

---

[1]    *See* Chapter 7 Trustee's Amended Complaint for Fraudulent Transfer of the Debtor's Interests in CEVA Group PLC Related Tortious Acts, and Turnover of Property of the Estate, filed March 31, 2015 [ECF No. 21].

[2]    The "CEVA Defendants" are CEVA Group, CEVA Holdings and CEVA Logistics Finance, B.V. ("**CEVA Finance**").

[3]    Rule 12(b)(6) of the Federal Rules of Civil Procedure is made applicable to this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.

[4]    *See* Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Amended Complaint, dated January 23, 2018 [ECF No. 104]; s*ee also* Memorandum Decision Granting in Part and Denying in Part Defendants' Motions to Dismiss Amended Complaint [ECF No. 100] (the "**Memorandum Decision**").

under Cayman law, divorced of any aspect of the Bankruptcy Code. *See* Rule 12 Order ¶ 4; *see also* Memo. Dec. at 82.

The matter before the Court is the Trustee's motion (the "**Motion**") for an order (i) pursuant to Federal Rule of Civil Procedure 54(b), reconsidering and amending the Rule 12 Order to the extent it dismissed the Bankruptcy Code Avoidance Claims with prejudice, and (ii) pursuant to Federal Rule of Civil Procedure 15(a), granting him leave to file a second amended complaint (the "**Proposed Second Amended Complaint**").[5] The CEVA Defendants oppose the Motion.[6] For the reasons discussed below, the Motion is GRANTED.

### Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2102 (Preska, C.J.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

---

[5]    *See* Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint, dated February 6, 2018 [ECF No. 107]. Rules 15 and 54 of the Federal Rules of Civil Procedure are made applicable to this adversary proceeding by Rules 7015 and 7054, respectively, of the Federal Rules of Bankruptcy Procedure.

[6]    *See* CEVA Defendants' Memorandum of Law in Opposition to Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint [ECF No. 110] (the "**Opposition**"). The CEVA Defendants also filed the Declaration of Jennifer L. Woodson in Support of the CEVA Defendants' Opposition to the Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint [ECF No. 111] (the "**Woodson Declaration**").

Gareth Turner and Mark Beith, CIL's former directors (collectively, the "**Directors**"), are defendants in the Amended Complaint. Turner has joined the CEVA Defendants' opposition to the Motion. *See* Defendant Gareth Turner's Joinder in the CEVA Defendants' Memorandum of Law in Opposition to Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint [ECF No. 112].

The Court dismissed CEVA Finance and Mark Beith from this adversary proceeding for lack of personal jurisdiction. *See* Rule 12 Order at ¶¶ 2-3. Both are named defendants in the Proposed Second Amended Complaint, but only *pro forma*, for the purpose of preserving the trustee's rights to appeal from the Memorandum Decision and Rule 12 Order. Neither has appeared in connection with the Motion.

## Facts[7]

CIL is a holding company.  In the spring of 2013, its sole asset consisted of its direct and indirect ownership of 100% of the shares of CEVA Group – itself a holding company that controlled a number of operating entities comprising the so-called "CEVA Enterprise."  CIL was owned by funds (the "**Apollo Funds**") under the control of Apollo Global Management, LLC (collectively with its subsidiaries, affiliates and managed entities, "**Apollo**"), and CIL's debt consisted principally of unsecured payment-in-kind notes (the "**PIK Notes**") totaling at least €103 million.  At that time, CEVA Group's secured and unsecured debt totaled approximately €2.1 billion and €575 million, respectively.  The holders of that debt included the Apollo Funds, Capital Research Management L.P. ("**CapRe**") and Franklin Advisers, Inc. and affiliated funds ("**Franklin**").  In April 2013, CIL entered into a restructuring support agreement (the "**CIL RSA**") with, among others, CEVA Group and CEVA Holdings, a newly formed affiliate of Apollo.  Pursuant to that agreement, CIL authorized CEVA Group to issue the New CEVA Shares to CEVA Holdings.  CEVA Group did so, and, as a consequence, CIL's interest in CEVA Group was reduced to 00.01%, while CEVA Holdings gained a 99.99% ownership interest in CEVA Group.  Shortly after CEVA Holdings received the New CEVA Shares, the Apollo Funds, CapRe, Franklin, CEVA Group and CEVA Holdings entered into a debt restructuring support agreement in which they agreed to support an exchange of €1.2 billion of CEVA Group debt for equity in CEVA Holdings (the "**CEVA Debt Transfer**").  That transfer did not close until after the commencement of CIL's bankruptcy case.

---

[7]    The facts recited herein are intended to reflect allegations contained in the Amended Complaint.  The Court is not making any findings as to the truth of any of the allegations discussed herein.

_The Initial Complaint_

On December 8, 2014, the Trustee commenced this action by filing a complaint (the

"**Initial Complaint**")[8] against the CEVA Defendants and Directors.  In Counts 1 and 2 of the

complaint, the Trustee sought to avoid the CEVA Equity Transfer as a fraudulent transfer under

sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code, respectively, and if necessary,

preserve and recover the New CEVA Shares pursuant to sections 550 and 551 of the Bankruptcy

Code.  _See_ Initial Compl. ¶¶ 105 – 112 (Count 1); ¶¶ 113 – 121 (Count 2).  In doing so, the

Trustee challenged the CEVA Equity Transfer on a stand-alone basis.  In part, he asserted that he

was entitled to that relief because CEVA Holdings provided no consideration to CIL or to CEVA

Group in return for the New CEVA Shares, and because CIL did not benefit from the CIL RSA,

or the issuance of New CEVA Shares.  _See, e.g._, Initial Compl. ¶ 89.[9]  As an alternative to those

Counts, in Count 3 the Trustee challenged the issuance of the New CEVA Shares as an

integrated part of the larger restructuring transaction that included the CEVA Debt Transfer.  He

contended that because the CEVA Debt Transfer closed after the petition date, and the CEVA

Defendants failed to get stay relief, the CEVA Equity Transfer was null and void _ab initio_, as

having closed in violation of the automatic stay.  _See_ Initial Compl. ¶¶ 122-126.

---

[8]    _See_ Chapter 7 Trustee's Complaint For Fraudulent Transfer Of The Debtor's Interests In CEVA Group PLC
Related Tortious Acts And For Payment Of Intercompany Claims [ECF No. 1].

[9]    The Trustee contended that:

> CEVA Holdings gave no consideration whatsoever to CEVA or to CIL in return for the New CEVA
> Shares it received. CIL did not benefit from the CIL RSA or the issuance of the New CEVA Shares
> in any way. The issuance of the New CEVA Shares effectuated a transfer of CIL's primary asset,
> CEVA, to CEVA Holdings in exchange for nothing. Although the Defendants' purported objective
> was to use the New CEVA Shares in connection with a debt-for-equity exchange with some of
> CEVA's creditors, the New CEVA Shares were transferred to CEVA Holdings in exchange for
> nothing in order to transfer CIL's interest in CEVA away from CIL before the PIK Holders learned
> of the Transaction and had an opportunity to seek judicial intervention.

Initial Compl. ¶ 89.

*Motion to Dismiss Initial Complaint*

The CEVA Defendants filed a motion to dismiss the Initial Complaint. *See* ECF Nos. 12-17. In that motion, among other things, they contended that the restructuring transaction must be viewed as a multi-step, integrated transaction. *See* Memorandum of Law in Support of Motion to Dismiss [ECF No. 13] at 11 ("All of these steps were interdependent, and the execution and performance of each was a condition to completing the fully-integrated out-of-court restructuring."). They also argued that because the allegedly fraudulent transfer (i.e., the CEVA Equity Transfer) occurred outside the United States, Counts 1 and 2 should be dismissed based on the presumption against extraterritorial application of the Bankruptcy Code's avoidance provisions, and under principles of international comity, as the Cayman Islands has the strongest connection to the fraudulent transfer. *See id.* at 21-29.

*The Amended Complaint*

In response to that motion, and with the consent of the defendants, the Trustee filed the Amended Complaint. In Counts 1 and 2 of that complaint, he seeks to avoid the issuance of the New CEVA Shares as a fraudulent transfer under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, respectively, and, to the extent necessary, preserve and recover the New CEVA Shares pursuant to sections 550 and 551 of the Bankruptcy Code. *See* Am. Compl. ¶¶ 132-139 (Count 1); ¶¶ 140-148 (Count 2). In Count 3, he seeks to avoid and recover the CEVA Equity Transfer as a constructive and/or intentional fraudulent transfer under sections 544(b) and 551 of the Bankruptcy Code, and "applicable laws." Am. Compl. ¶¶ 149-162. In support of those claims for relief, the Trustee asserts that the CEVA Equity Transfer should be viewed in isolation, apart from the broader recapitalization transaction.[10] In Count 4 – which he pleads in

---

[10]    For example, in the Amended Complaint, the Trustee alleges the following:

the alternative – the Trustee seeks a determination that the issuance of the New CEVA Shares is

null and void, as having been effectuated in violation of the automatic stay under section 362 of

the Bankruptcy Code. *See* Am. Compl. ¶¶ 163-167. In doing so, he accounts for the possibility

that the CEVA Equity Transfer and CEVA Debt Transfer could be determined to be parts of a

single, integrated transaction. *See* Am. Compl. ¶ 166 ("In the event that it should be adjudged

that the CEVA Equity Transfer and the CEVA Debt Transaction are part of a single integrated

transaction, the CEVA Equity Transfer is part of a transfer and transaction that was performed in

part after the Petition Date [and in violation of section 362 of the Bankruptcy Code.]").

<u>Motion to Dismiss Amended Complaint</u>

The CEVA Defendants moved to dismiss the Amended Complaint.[11] As relevant herein,

they sought to dismiss Counts 1, 2 and 3, with prejudice. In granting that relief, the Court made

two rulings that are central to this Motion. First, the Court found that sections 544(b), 548(a) and

550 of the Bankruptcy Code (the "**Bankruptcy Avoidance Provisions**") do not apply to

extraterritorial transactions (*see* Memo. Decision at 24, 63, 116), and that the Trustee's

---

CEVA Holdings gave no consideration whatsoever to CIL in return for the CEVA Equity Transfer. CIL did not benefit in any way from the CEVA Equity Transfer. Although the Defendants' purported objective was eventually to use the New CEVA Shares as currency for a debt-for-equity exchange with some of CEVA's creditors, no debt-for-equity exchange occurred prior to the Petition Date and, in any event, an exchange of CEVA's debt for New CEVA Shares provides no value whatsoever to CIL – although it did provide value to Beith and Turner because they were personally invested in an Apollo fund that participated in the exchange. To whom Apollo subsequently transfers interests in CEVA Holdings, and what CEVA Holdings or Apollo may have received in exchange for such a transfer, does not alter the facts that (i) CEVA was transferred from CIL to CEVA Holdings in exchange for nothing, and (ii) Apollo's postpetition subsequent transfers also provided no value to CIL.

Am. Compl. ¶ 111; *see also id*. ¶ 112 ("Not only was the subsequent debt-for-equity exchange by CEVA [Group] of no relevance to the avoidability of the CEVA Equity Transfer, if offers the Defendants no excuse or quarter from liability.").

[11]  *See* CEVA Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint [ECF No. 35]. The Trustee opposed that motion. *See* Trustee's Memorandum in Opposition to Defendants' Motions to Dismiss the Complaint [ECF No. 39].

allegations in the Amended Complaint failed to allege that the CEVA Equity Transfer was a domestic transaction to which the Bankruptcy Avoidance Provisions apply. *Id.* at 24, 69, 116. Second, the Court found, in addressing the CEVA Defendants' argument that CEVA Group was solvent, that the CEVA Equity Transfer should be viewed as one step in an integrated, five-step out of court restructuring transaction. *See id.* at 87.[12]

*The Trustee's Motion For Leave to Amend the Amended Complaint*

The Trustee contends that the Court's determination that the CEVA Equity Transfer is part of an integrated restructuring transaction (defined by the trustee as the "**CEVA Transaction**") alters the "domesticity" analysis of the transaction. He says that if the Court grants him leave to amend, he can revive the Bankruptcy Code Avoidance Claims because he is now able to allege numerous additional facts which he says demonstrate that "on the whole," the CEVA Transaction is a domestic transaction subject to the reach of the Bankruptcy Avoidance Provisions. Motion ¶ 2.[13] The Trustee explains that he did not allege any of those facts in

---

[12]    The Court found the following integral steps:

> a. The sub-division, reclassification, and consolidation of CIL's shares, and the CEVA Equity Transfer (the issuance of new shares by CEVA Group to CEVA Holdings);
>
> b. The exchange of new equity interests in CEVA Holdings with creditors holding more than €1.2 billion of CEVA Group's Second Lien Notes and Unsecured Debt;
>
> c. A CIL exchange offer that offered consideration to the holders of CIL's PIK Notes;
>
> d. A rights offering to raise €200 million of new money for CEVA Group, of which CapRe agreed to fund up to €75 million or $96.1 million, and the Apollo Funds agreed to fund up to €65 million or $86.3 million pursuant to a backstop agreement; and
>
> e. A financing commitment from Franklin to provide CEVA Group with reduced interest expense and new money.

*See* Memo. Dec. at 87-88.

[13]    The Trustee asserts that those facts include that the CEVA Transaction involved U.S. creditors, credit facilities with U.S. agents, overwhelmingly (if not exclusively as to the later steps) negotiations in the U.S., professionals that negotiated and documented the CEVA Transaction in the U.S., transactional documents with U.S. choice of law and forum selection provisions, approval by CEVA Group and CEVA Holdings at a board meeting in New York, an

support of the Amended Complaint because they cut against what had been his theory of the case – i.e., that the Court should consider the CEVA Equity Transfer in isolation from the other steps of the CEVA Transaction. *Id.* ¶ 3. He is seeking leave to file the Proposed Second Amended Complaint to allege certain "jurisdictional facts" (and incorporate by reference the transaction documents of the CEVA Transaction). He says those facts will support his contention that the CEVA Transaction is a domestic transaction that was fraudulent as to CIL and enable him to avoid that transaction or recover damages for the benefit of CIL's estate under sections 544, and 548 through 551 of the Bankruptcy Code and/or analogous applicable local or foreign fraudulent transfer laws. The Trustee also proposes to amend his complaint "to conform it to evidence developed during discovery, to delete claims the Trustee voluntarily agreed to dismiss, and to clarify and amplify certain existing allegations." Motion ¶ 4, n.5. Further, although the Trustee did not say as much in the Motion, he is seeking leave to assert additional allegations in the Proposed Second Amended Complaint in support of his damage claims. To that end, and without limitation, the Trustee asserts that even if CEVA Group's debts exceeded its enterprise value, CEVA Group's equity "had substantial value to CIL" by reason of its sale, option, and control value. *See* Proposed Second Am. Compl. ¶¶ 7(k), 65, 110-12.[14]

---

agreement to support and accept a proposed fully-negotiated Delaware prepackaged bankruptcy plan for CEVA Group and 69 of its affiliates (including approximately 20 U.S. entities), a backstopped DIP facility for the Delaware bankruptcy case, and, in particular, a new rights offering and a new note financing that closed in New York. *See* Motion ¶ 3.

[14]    Those allegations are:

> 7.k. Regardless of whether CEVA Group's debts exceeded its enterprise value (they did not) CEVA Group's equity had substantial value to CIL. CIL's shares of CEVA could have been monetized by CIL, and the proceeds used to pay CIL's creditors, if CIL had been operated by an independent board (or even an independent committee of the board) that was not beholden to Apollo.

> 65. The value of owning equity-level control of a business with over $8 billion of revenues is considerable, even if that business is alleged to have excess leverage and financial challenges to overcome. In CEVA Group's case, for example, a mere 1% increase in EBITDA as a percentage of revenue would be approximately $85 million. At a conservative 11x multiple, that amounts to an

The Trustee also asserts that the Court should reconsider the Rule 12 Order solely to the extent that the Court dismissed the Bankruptcy Code Avoidance Claims "with prejudice." He contends that he requires that relief so that he will be able to replead Counts 1, 2 and 3 in the Proposed Second Amended Complaint. Motion ¶ 5. In part, he maintains that dismissal with prejudice is appropriate only where it would be futile to do so, but that "the Court did not have a sufficient record before it to conclude 'futility' because the Trustee had alleged a different theory

---

additional $935 million of enterprise value. A 3% increase in EBITDA margins and a more optimistic, but still reasonable, 14x multiple yields $3.570 billion of increased enterprise value. The upside potential of CIL's shares of CEVA Group was enormous. Even in January 2013, Apollo positively valued its equity interests in CIL (i.e., net of PIK Debt) for its option value. It is entirely implausible that CIL's 100% equity control of CEVA Group had no value, and that an independent board would simply give it away largely to and at the direction of its controlling shareholder, stranding over €100 million with no source of repayment.

110. Upon information and belief, the Directors never obtained an independent analysis by a qualified professional as to whether CIL's shares of CEVA Group could be sold and what value might have been realized from selling them or even their option or control value. Upon information and belief, the Directors never authorized, and CIL never conducted, any marketing or other process to determine whether CIL's shares of CEVA Group could be sold and to learn how the market valued CIL's shares of CEVA Group. EY did not even purport to analyze the value for which CIL could have sold some or all of its shares of CEVA to a third party. CEVA was an international company with revenues in the $7 to $8 billion range. CIL could have sold its shares of CEVA to a party that wished to control CEVA and its restructuring for significant value, regardless of whether CEVA was alleged to be insolvent. Equity securities of companies that are insolvent regularly trade for significant value.

111. If the Directors were not conflicted, they would have sought, and likely consummated, a sale of CIL's shares of CEVA rather than accept and authorize the CEVA Transaction. A sale of CIL's shares of CEVA to a third party would have deprived Apollo of its control of CEVA, its control of any recapitalization affecting Apollo's CEVA debt that CEVA might perform under new ownership, and Apollo's ability to retain the unlimited upside profit potential of continuing its equity ownership. Therefore, as employees of Apollo, the Directors did not make any efforts to pursue such a transaction.

112. If the Directors were not conflicted, they would have demanded, and likely obtained, a considerable amount of money in exchange for authorizing the CEVA Transaction. The Directors knew that authorizing the CEVA Transaction allowed CEVA Group and its stakeholders to avoid large losses in value that they would have suffered if CEVA Group had to recapitalize without CIL's authorization and consent, such as through a bankruptcy proceeding.

than that which the Court found – i.e., that the CEVA Equity Transfer was separate from the

other steps of CEVA Group's debt restructuring." *Id.*

## Discussion

*Request for Reconsideration*

Federal Rule of Civil Procedure 54 governs judgments in federal litigation generally, and

Rule 54(b) focuses on judgments as to fewer than all the claims and parties.  As relevant, it

provides that a court's non-final order "may be revised at any time before the entry of a judgment

adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).[15]  A

party seeking relief under Rule 54(b) must do so "within the strictures of the law of the case

doctrine."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992);

*see also Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964) (stating "where litigants have

once battled for the court's decision, they should neither be required, nor without good reason

permitted, to battle for it again.").  That means to obtain such relief the party "must show an

intervening change in controlling law, the availability of previously unavailable evidence, or the

need to correct a clear error of law or prevent manifest injustice[.]"  *Id.* (internal quotation

omitted); *see also Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard

for granting [a Rule 54(b)] motion is strict, and reconsideration will generally be denied unless

the moving party can point to controlling decisions or data that the court overlooked—matters, in

---

[15]    Rule 54 is applicable to this adversary proceeding pursuant to Bankruptcy Rule 7054.  Rule 54(b) states:

**(b) Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

other words, that might reasonably be expected to alter the conclusion reached by the court.")

(citations omitted); *Vornado Realty Trust v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d

267, 275 (E.D.N.Y. 2013) (same); *Long v. U.S. Dep't of Justice*, 778 F. Supp. 2d 222, 228-29

(N.D.N.Y. 2011) (same).

The Trustee did not oppose the CEVA Defendants' request that Counts 1, 2 and 3 be

dismissed with prejudice.  Nor did it request leave to amend the complaint in the event the

motion to dismiss was granted in whole or in part.  Nonetheless, as Trustee correctly notes, as a

general rule "[t]he proper time for a plaintiff to move to amend the complaint is when the

plaintiff learns from the District Court in what respect the complaint is deficient."  *Cresci v.

Mohawk Valley Cmty. College*, 693 Fed. Appx. 21, 25 (2d Cir. 2017).  That is because "[b]efore

learning from the court what are its deficiencies, the plaintiff cannot know whether he is capable

of amending the complaint efficaciously."  *Id.*; *see also Loreley Financing (Jersey) No. 3 Ltd. v.

Wells Fargo Sec., LLC,* 797 F.3d 160, 190 (2d Cir. 2015) (noting that "[w]ithout the benefit of a

ruling, many a plaintiff will not see the necessity of amendment or be in a positon to weight the

practicality and possible means of curing specific deficiencies.").  The Court erred in

overlooking those factors in dismissing the Bankruptcy Code Avoidance Claims, with prejudice.

Accordingly, the Court grants the Trustee's request for reconsideration to enable him to seek

leave pursuant to Rule 15 to file the Proposed Second Amended Complaint.

<u>Request for Leave to Amend</u>

Rule 15(a) provides that other than for amendments as a matter of course, "a party may

amend its pleading only with the opposing party's written consent or the court's leave[,]," which

the court should "freely give [] when justice so requires."  Fed. R. Civ. P. 15(a).  Generally, "the

grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial

court." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1971) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) ("A decision to grant or deny a motion to amend is within the sound discretion of the trial court.").  Although liberally granted, leave to amend "may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The CEVA Defendants contend that the Court should deny the Trustee leave to amend his complaint because: (i) it is futile for the Trustee to do so, because the Trustee's proposed amendments to Counts 1, 2 and 3 do not cure the defects in those Counts; (ii) the Trustee has unduly delayed in seeking leave to replead Counts 1, 2 and 3; and (iii) the Trustee is acting in bad faith in seeking leave to assert a new theory of damages in the Proposed Second Amended Complaint.  The Court considers those matters below.

<u>Whether It Is Futile To Grant The Trustee Leave To Replead Counts 1, 2 and 3</u>

In dismissing the Bankruptcy Code Avoidance Claims, the Court found that sections 544, 548 and 550 do not apply extraterritorially.  *See* Memo. Dec. at 81-82.  The Court also found that the factual allegations in the Amended Complaint did not support the Trustee's assertion that the CEVA Equity Transfer was a domestic transaction under either the transactional test annunciated in *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247 (2010), or the pre-*Morrison* "center of gravity" or "component parts" test.  *See id.* at 48-69.  The Trustee argues that the Court should grant him leave to replead Counts 1, 2 and 3, because the additional facts that he has alleged in the Proposed Second Amended Complaint establish that under both standards, the CEVA

Transaction is a domestic transaction that can be avoided and recovered under sections 544, 548 and 550 of the Bankruptcy Code.

The *Morrison* test for determining whether a statute is being applied domestically or extraterritorially centers on the "objects of the statute's solicitude," and what the statute "seeks to regulate." 561 U.S. at 266-267. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). *Morrison* involved the interpretation of Rule 10(b) of the Securities Exchange Act of 1934. The Court held that it applies only to "transactions in securities listed on domestic exchanges and domestic transactions in other securities." *Id.* at 267. In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012), the Second Circuit found that for purposes of Rule 10(b), a "domestic transaction" is one in which "the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." In contrast to the transactional focus of the *Morrison* test, the "center of gravity" or "components parts" test focuses on "the facts of a case to determine whether they have a center of gravity outside the United States." *In re Florsheim Grp., Inc.*, 336 B.R. 126, 131 (N.D. Ill. 2005) (citations omitted). Courts applying that test "generally consider all component events of a financial transaction, rather than one dispositive factor, to determine where it took place." *Id.* The Trustee contends that the Proposed Second Amended Complaint satisfies the *Morrison* test because it contains allegations to the effect that, among other things, creditors that participated in the CEVA Transaction incurred irrevocable liability to exchange their debt in the United States,

and that title to securities bought, sold and exchanged in the CEVA Transaction was transferred

in the United States.  *See* Motion ¶ 22 (identifying the allegations in the Proposed Second

Amended Complaint that support the *Morrison* analysis).  He also says that the Proposed Second

Amended Complaint satisfies the "center of gravity/component parts" test because it includes

more than fifteen pages of new factual allegations detailing the steps that parties to the CEVA

Transaction took in the United States in furtherance of that transaction.  He contends that those

facts, coupled with the facts already alleged in the Amended Complaint, prove that the United

States is the "center of gravity" of the CEVA Transaction.  *See id.* ¶ 24 (identifying the

allegations in the Proposed Second Amended Complaint that support the "center of

gravity/component parts" test).

Courts deny requests for leave to amend as futile where "it appears that plaintiff cannot

address the deficiencies identified by the court and allege facts sufficient to support the claim."

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009) (citing

*Joblove v. Barr Labs., Inc.*, 466 F.3d 187, 220 (2d Cir. 2006)); *see also Nat'l Credit Union*

*Admin. Bd. v. HSBC Bank USA, N.A.*, 117 F. Supp. 3d 392, 398 (S.D.N.Y. 2015) ("Where a

plaintiff inadequately pleads a claim and cannot offer additional substantive information to cure

the deficient pleading, granting leave to replead is futile.") (citing *Cuoco v. Moritsugu*, 222 F.3d

99, 112 (2d Cir. 2000)).  The CEVA Defendants do not dispute that the facts alleged in the

Proposed Second Amended Complaint demonstrate that parties to the CEVA Transaction took a

number of steps in the United States in furtherance of that multi-step transaction.  Still, they

contend that Counts 1, 2 and 3 of the Proposed Second Amended Complaint present the same

deficiencies as those found in the Amended Complaint.  First, they contend that many of the

"new" allegations that the Trustee seeks leave to plead are merely variations on the same facts

that the Trustee already pled in the Amended Complaint and in his opposition to the CEVA

Defendants' motion to dismiss the Amended Complaint.  In addition, they argue that the

Trustee's "new" theory -- that the alleged fraudulent transfer is the entire integrated CEVA

Transaction, and not merely the CEVA Equity Transfer -- is inconsistent with the law of

extraterritoriality, which focuses on the situs of the conduct central to the statutory scheme

which, in this case, is the transfer of property from the debtor's estate.  *See In re Ampal-*

*American Israel Corp.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) ("[T]he focus of the

[Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the

property that would have become property of the estate.") (citations omitted); *accord Begier v.*

*Internal Revenue Serv.*, 496 U.S. 53, 58 (1990) ("[T]he purpose of the avoidance provision is to

preserve the property includable within the bankruptcy estate—the property available for

distribution to creditors[.]").  They contend that although the CEVA Transaction was a multi-

step process in which each step depended on the other, only the CEVA Equity Transfer involved

CIL and CIL's property, and that transfer occurred outside the United States.  Accordingly, they

maintain that it is "completely appropriate" to focus on that step of the CEVA Transaction in

determining whether United States law applies to the alleged fraudulent transfer.

It is well settled in this Circuit that "an allegedly fraudulent conveyance must be

evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as

a whole with all its composite implications."  *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir.

1993) (internal quotations and citations omitted); *see also HBE Leasing Corp. v. Frank*, 48 F.3d

623, 635 (2d Cir. 1995) (multilateral transactions may be collapsed and treated as phases of a

single transaction for analysis under the Uniform Fraudulent Conveyance Act.).  The Trustee

contends that one of the implications of collapsing the multi-step CEVA Transaction into a

single integrated transaction is that in assessing the situs of the alleged fraudulent transfer, the Court must focus on the transaction as a whole, and not on a particular step in the integrated transaction. In that light, he maintains that the facts alleged in support of the Proposed Second Amended Complaint establish that the CEVA Transaction is a domestic transaction. The CEVA Defendants dispute that contention. They assert that no court has applied the collapsing doctrine to determine the situs of an alleged fraudulent transfer, and that application of the doctrine in that fashion runs afoul of the *Morrison* "transactional" analysis. To be sure, to date, the collapsing doctrine has been employed almost exclusively in evaluating whether a transferee of an alleged fraudulent transfer provided "reasonably equivalent value" to the transferor in consideration for the transferred asset. *See, e.g.*, *In re Orr v. Kinderhill Corp.*, 991 F.2d at 36 ("The record is clear that Kinderhill's conveyance of the New York Property to KIC and Kinderhill's subsequent distribution of KIC shares were elements of a single restructuring plan.... So viewed, the restructuring was not supported by fair consideration...."); *In re O'Day Corp.*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991) (stating that "in analyzing the fair consideration requirement of the UFCA in the LBO context, courts not infrequently 'collapse' the discrete steps employed by the parties in structuring the transaction."); *see also Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., (In re Sunbeam Corp.),* 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("A loan may appear to provide fair consideration because the lender provided funds to an entity in exchange for a security interest. If, however, the proceeds of that loan are transferred to a third-party for less than fair consideration, the transactions may be collapsed and the initial lender's transfer deemed fraudulent if that initial transferor was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party."). The Court is not aware of any case in which a court has considered the

implications of collapsing a multi-step transaction on a determination of the situs of an alleged

fraudulent transfer.  However, it is clear that in directing courts analyzing fraudulent transfer

claims to consider the "composite implications" in collapsing a multi-step transfer, the Second

Circuit did not limit that review only to the implications for assessing reasonably equivalent

value.  *See generally, In re Sabine Oil and Gas Corp.,* 547 B.R. 503, 540 (Bankr. S.D.N.Y.

2016) (noting that in *Orr v. Kinderhill*, the Second Circuit "refer[red] to all composite

implications, not just implications for assessing reasonably equivalent value.").  Indeed, in

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.*), 503 B.R. 239, 269 (Bankr. S.D.N.Y.

2013), Judge Gropper applied the collapsing doctrine in evaluating whether the plaintiff's

fraudulent transfer claim was barred by the statute of limitations.  On the record of the Motion,

the Court cannot conclude that it would be futile to grant the Trustee leave to replead Counts 1, 2

and 3 as set forth in the Proposed Second Amended Complaint.  For that reason, the Court finds

no merit to this aspect of the CEVA Defendants' objection to the Motion.  In so ruling, however,

the Court is not adopting the Trustee's view that the CEVA Transaction is a domestic transaction

or that the collapsing doctrine is applicable in determining the situs of an alleged fraudulent

transfer.  To the extent that the CEVA Defendants have a good faith basis for doing so, they are

free to renew their motions to dismiss as to the newly pleaded Counts 1, 2 and 3.  *See, e.g.*, *In re*

*McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 218, 224

(D.D.C. 2017) (concluding that because court was unable to determine whether plaintiff's

amended alternative theory was plausible without the benefit of additional briefing, leave to

amend was allowed, but without prejudice to the defendants to renew their motions to dismiss to

address plaintiff's new theory); *Chubb INA Holdings Inc. v. Chang*, No. CV 16-2354-BRM-

DEA, 2016 WL 6841075, at *6 (D.N.J. Nov. 21, 2016) ("In the interests of judicial economy and

17

in the absence of undue prejudice, the Court may decline to engage in a detailed futility analysis where the Court finds that these arguments are better suited for consideration in the context of a motion to dismiss.").

<u>Whether The Trustee Has Unduly Delayed In Seeking Leave to Amend</u>

Generally, mere delay, "absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (quoting *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). *See also* 3 MOORE'S FEDERAL PRACTICE § 15.15[2] (3d ed. 2016) (stating "the passage of time alone is usually not enough to deny leave to amend in most cases, a court will deny leave to amend only if the non-moving party is in fact prejudiced by the delay" and citing, *inter alia*, *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234-45 (2d Cir. 1995); *United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1254-55 (2d Cir. 1989)). The Trustee says that he filed the Motion promptly after the entry of the Rule 12 Order and that he did not delay in seeking leave to amend the Amended Complaint. The CEVA Defendants counter that under the facts here, the date that the Trustee filed the Motion is not the relevant baseline from which to assess whether he timely filed the Motion. They say that the baseline should be set no later than the date of the Amended Complaint because at that time the Trustee was in possession of all the facts he is alleging in support of Counts 1, 2 and 3 of the Proposed Second Amended Complaint and had been since at least the date that he filed the Initial Complaint.[16] They also contend that the Trustee was well

---

[16]    There is no dispute that the Trustee filed the Initial Complaint approximately 16 months after the Court granted his motion to conduct discovery pursuant to Fed. R. Bankr. P. 2004 ("**Rule 2004**"). *See* Memo. Dec. at 19. During that period, the Trustee conducted substantial discovery of Apollo, CEVA Group, and Houlihan Lokey, CEVA Group's financial advisor. *Id.* In the aggregate, in response to the Trustee's Rule 2004 subpoenas, those parties produced 57,840 documents totaling 373,310 pages. *Id.* at 20. The Trustee also served document subpoenas on, and received production from, CIL's former directors and their legal advisors, as well as Morgan Stanley and Ernst &

aware of their contention that the CEVA Equity Transfer was part of an integrated, multi-step

transaction, and that the Trustee accounted for it in both the Initial and Amended Complaints by

asserting a claim for violation of the automatic stay under section 362 of the Bankruptcy Code as

an alternative to the Bankruptcy Code Avoidance Claims.  They say that in drafting the

Amended Complaint, the Trustee made a strategic decision not to plead that the CEVA Equity

Transfer was part of an integrated multi-step transaction in support of the avoidance claims.

They argue that it is too late for him to assert the alternative argument now.

　　　　However, *Loreley Financing No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir.

2015) completely undercuts that argument.  In that case, the plaintiff had an opportunity to

amend its complaint prior to the defendants' filing their Rule 12(b)(6) motion to dismiss the

complaint.  Although the plaintiff was aware of the defendants' arguments in support of the

motion, and of the alleged defects in its complaint, it declined to amend the complaint.  *See id.* at

169.  The district court dismissed the case, with prejudice, reasoning that the complaint failed to

state a claim for relief and that the plaintiff had failed to use the earlier opportunity to amend the

complaint.  *Id.*  In reversing the district court's order, the Second Circuit held that it is

"premature and inconsistent with the course of litigation prescribed by the Federal Rules" to

require a party to a Rule 12(b)(6) motion to dismiss, to amend its complaint in the "absence of a

definitive ruling."  *Id*. at 191.  The Court reasoned that without such a ruling, "many a plaintiff

will not see the necessity of amendment or be in a positon to weigh the practicality and possible

means of curing specific deficiencies [in their complaint]."  *Id.*  In *Loreley,* the Second Circuit

reaffirmed that the "liberal spirit" of the Federal Rule of Civil Procedure 15 embodies a "strong

---

Young.  *Id.*  It is undisputed that pursuant to his Rule 2004 discovery, the Trustee obtained all the CEVA Group
documents that he relies on in support of the Proposed Second Amended Complaint.

preference for resolving disputes on the merits." *See id.* at 190-91 (quoting *Williams v.*

*Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011)).  In this light, there is no merit to the CEVA

Defendants' assertion that by awaiting the resolution of the motion to dismiss the Amended

Complaint, the Trustee unduly delayed in seeking leave to file the Proposed Second Amended

Complaint.[17]

---

[17]  In opposing the Motion, the CEVA Defendants rely primarily on *Goldfish Shipping, S.A. v. HSH Nordbank AG*, 623 F. Supp. 2d 635 (E.D. Pa. 2009) ("**Goldfish Shipping**") and *State Trading Corp. of India Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409 (2d Cir. 1990) ("**State Trading**").  However, both cases are distinguishable.

In *State Trading,* the owner of cargo lost at sea ("**STC**") obtained a judgment equal to the value of the lost cargo against the owner of the vessel carrying the cargo ("**Euroam**").  921 F.2d at 411.  STC was unable to satisfy the judgment against Euroam and, thereafter, sued Euroam's insurer ("**Skuld**") pursuant to Connecticut's direct action statute.  *See id.*  Skuld moved for summary judgement dismissing the case on the grounds (among others) that under choice of law principles, the Connecticut direct action statute had no bearing on the litigation.  The district court granted the motion.  *See id.*  Promptly thereafter, STC moved for reconsideration and for leave to amend its complaint to add two additional causes of action based on Norwegian and Panamanian law.  The district court denied both motions.  As to the latter, the district court found that STC had unduly delayed in seeking leave to amend the complaint.  *See id.* at 412.  On appeal, the Second Circuit upheld both determinations.  In affirming the district court's denial of STC's request for leave to amend the complaint, the court found that STC had unduly delayed in seeking leave to amend, because it waited until judgment on the merits was entered dismissing its complaint.  *See id.* at 418.  The Trustee overstates the significance of this case because it predates *Loreley,* and here, unlike *State Trading*, the Court's dismissal of the Bankruptcy Code Avoidance Claims was based on the adequacy of the pleadings, not the merits of the Amended Complaint.

In *Goldfish Shipping*, Odin Denizcilik, A.S. ("**Odin**") was the owner of a vessel (the "**Ship**") that was subject to a first mortgage held by HSH Nordbank A.G. ("**Nordbank**").  623 F. Supp. 2d at 636-37.  Odin defaulted on the mortgage, Nordbank seized the Ship and a marshal sold it in a foreclosure sale to the plaintiff ("**Goldfish**").  Thereafter, Odin had the Ship seized twice, claiming that it still owned it.  *See id.*  Goldfish sued Nordbank seeking damages associated with Odin's two seizures of the ship.  Nordbank filed an answer to the complaint.  After the parties commenced discovery, the court granted Goldfish leave to amend the complaint.  *See id.* at 637.  In support of the first amended complaint, Goldfish asserted that Odin remained the registered owner of the Ship and, as such, Nordbank had failed to deliver the Ship to "free and clear" of Odin's claims to the Ship.  Goldfish contended that Nordbank was liable for the damages that Goldfish had suffered on account of the arrest of the Ship based upon, among other things, Nordbank's alleged breach of contract, warranty and good faith and fair dealing.  *See id.*  Nordbank moved to dismiss the first amended complaint, and the district court granted the motion.  In substance, the court, in part, found that all of Goldfish's claims failed because they rested on the faulty premise that the Ship had not been sold "free and clear" of all liens, claims and encumbrances.  The court explained that the Ship had been sold pursuant to the Ship Mortgage Act which, by its terms, mandates that the sale is "free of all . . . claims."  *See id.* (citing 46 U.S.C. § 31326(b)).  Thereafter, Goldfish sought leave to amend the amended complaint.  In the proposed second amended complaint, Goldfish sought to assert the same claims it had asserted in the first amended complaint, plus additional claims for breach of duty.  However, the proposed second amended complaint was premised on the ground that the ship had been sold free and clear of all claims.  In denying the motion for leave to amend, the district court found that there had been undue delay in that the plaintiff had a prior opportunity to amend, but failed to do so without any defensible explanation, which "place[d] an unwarranted burden on the court and undermine[d] the interest of judicial economy and finality."  *See id.* at 641 (internal quotation marks and citations omitted).  The *Goldfish Shipping* court seemed particularly perturbed by what it viewed as plaintiff's deliberate withholding of its alternative theory of recovery "while [the court] invested considerable time and judicial resources evaluating" the

<u>Whether The Trustee Has Acted In Bad Faith In Seeking Leave To Amend</u>

One premise underlying the allegations in the Amended Complaint is that CEVA Group

was solvent at the time of the CEVA Equity Transfer.  *See, e.g*., Am. Compl. ¶ 6 ("At the time of

the CEVA Equity Transfer, CEVA's equity had substantial value (and continues to have

substantial value as of the date of this Complaint).").  The CEVA Defendants dispute that

assertion.  As noted previously, they sought to dismiss the Bankruptcy Code Avoidance Claims

on the grounds that the Trustee failed to plead factual allegations raising a plausible inference

that CIL was solvent at the time of the CEVA Equity Transfer.  In this Motion, the Trustee seeks

leave to include damage claims in the Proposed Second Amended Complaint that account for the

possibility that CEVA Group was insolvent at the time of the CEVA Transaction.  He seeks

leave to allege that even if CEVA Group were insolvent (i.e., even if CEVA Group's debts

exceeded its enterprise value), CIL nonetheless was damaged by the CEVA Transaction because

it was deprived of the sale, option and control value of CIL's interest in CEVA Group for no

consideration.  *See* Proposed Second Am. Compl. ¶¶ 7(k), 65, 110 – 112.[18]  The CEVA

Defendants oppose that request.  They contend that the Trustee acted in bad faith in filing this

Motion because he failed to disclose that the Proposed Second Amended Complaint included

new allegations in support of what they say is a new theory of damages.  Moreover, they say that

the Trustee's alleged bad faith aside, nothing prevented the Trustee from asserting those damage

---

first amended complaint.  *See id. Goldfish Shipping* was not decided by a court in the Second Circuit and, in any
event, predates *Loreley*.  Moreover, the case is distinguishable because (i) Goldfish sought to amend the complaint
to add new causes of action that were not in the first amended complaint, (ii) Goldfish sought to amend the
complaint after a final order was entered dismissing the action in its entirety, and (iii) the proposed amendments
were determined to be futile.

[18]   The Trustee has also included a new theory of how the CEVA Transaction could have occurred.  *See* Proposed
Second Am. Compl. ¶ 179 ("The CEVA Transaction could have been performed without the CEVA Equity Transfer
step by converting CEVA Group debt into equity of CIL instead of CEVA Holdings".).

claims at the outset of this adversary proceeding, or in the Amended Complaint. They claim that

they will be prejudiced if the Court permits the Trustee to allege those claims now because they

could have subjected those claims to motion practice, fact discovery and expert submission. The

Court will not separately address those objections because it finds that they are subsumed by the

CEVA Defendants' assertion that the Trustee is barred from asserting the "new" damage claims

because he violated Rule 26 of the Federal Rules of Civil Procedure and an order of this Court,

in failing to disclose them earlier in this action.

Rule 26(a) of the Federal Rule of Civil Procedure states, in part and with certain

irrelevant exceptions, that a party must, without awaiting a discovery request, provide to the

other parties:

> a computation of each category of damages claimed by the disclosing party--who
> must also make available for inspection and copying as under Rule 34 the
> documents or other evidentiary material, unless privileged or protected from
> disclosure, on which each computation is based, including materials bearing on the
> nature and extent of injuries suffered[.]

Fed. R. Civ. P. 26(a)(1)(A)(iii).[19]  On June 5, 2015, the Trustee served his initial disclosures on

the CEVA Defendants. *See* Trustee's Initial Disclosures (Ex. A to Woodson Decl.) [ECF No.

111-1].[20]  Those disclosures did not include a computation of the Trustee's money damages. The

parties disputed whether the Trustee was required to provide such a computation. In resolving

that dispute, the Court ordered the Trustee to supplement his initial disclosures to provide "a

---

[19]    Rule 26 is made applicable to this adversary proceeding by Rule 7026 of the Federal Rules of Bankruptcy
Procedure.

[20]    In that disclosure, the Trustee requested (i) that the Court declare that "the authorization and issuance of the
New CEVA Shares [] be null and void or, alternatively, avoid the transfer of CEVA Group to CEVA Holdings and
recover CEVA Group's equity interests for the benefit of CIL's bankruptcy estates"; (ii) "damages, plus interest,
costs and attorneys' fees based on, *inter alia*, the amount equal to the value of the CEVA equity"; and (iii) damages
"that may be in possession of, or liable for, the CIL Cash in an amount not less than €13,991,263.58, plus interest
and attorneys' fees." Trustee's Initial Disclosures at 24.

computation of each category of damages claimed by the Trustee." *See* Order dated Feb. 5, 2016

[ECF No. 67] (the "**February Discovery Order**").  Thereafter, the Trustee served the CEVA

Defendants with the Trustee's Second Supplemental Disclosures Pursuant to Fed. R. Civ. P.

26(a)(1).  *See* Trustee's Second Supplemental Disclosures (Ex. C to Woodson Decl.) [ECF No.

111-3].  In those disclosures, the Trustee calculated CIL's damages at €150 to €300 million,

which he said represented:

> [his] assessment of the value of the CEVA Group shares held by CIL … prior to
> the occurrence of the restructuring transaction …. The damage amount was
> calculated … by utilizing an expert to apply generally accepted valuation
> methodologies to … compute a total enterprise valuation range for CEVA [Group],
> and deducting appropriate debt and making other adjustments as determined by the
> Trustee's expert.

*Id.* at 4.

In June 2016, the parties completed discovery in this action.  During the course of that

discovery, the parties took twenty fact depositions, produced ten expert reports, and deposed five

expert witnesses.  The CEVA Defendants say that none of that discovery focused on the control,

option or sale value of CIL's equity in CEVA Group in the event CEVA Group itself was

insolvent, or based on the alleged ability to simply demand greater value in exchange for its

consent to CEVA Group's restructuring transaction.  They say that is so because the Trustee's

Rule 26(a) disclosure did not include a theory of damages predicated on any of those factors.

The CEVA Defendants have prepared for filing a motion for summary judgement dismissing the

remaining claims in the Amended Complaint that they say is tied directly to the Trustee's

previously disclosed damages theory – which assumes that the CEVA Group was solvent.  In

that summary judgment motion, the CEVA Defendants argue, in part, that the Trustee cannot

succeed on those claims unless he can show that the CEVA Group had positive equity value.

They maintain that based upon the discovery produced to date, it is clear that the Trustee will not

be able to do so.[21]  The CEVA Defendants contend that the Trustee is seeking leave to plead new damages theories—all of which assume that CEVA Group was insolvent and unable to pay its debts as they fell due—to construct an argument to oppose the CEVA Defendants' summary judgment motion.  They say that since the Trustee failed to disclose any of those theories in his Rule 26 disclosures, he is precluded from doing so now.

The Trustee denies that the Proposed Second Amended Complaint introduces a new theory of damages and that he has violated Rule 26 or the February Discovery Order.  He says that his "unwavering theory of damages" is that the estate is entitled to the value of the CEVA Group shares that were stripped away from CIL in the CEVA Equity Transfer and that his Rule 26 disclosures reflect as much.  *See* Trustee's Second Supplemental Disclosure at 3 ("The Trustee seeks an award of damages, plus interest, costs and attorneys' fees based on, *inter alia*, the amount equal to the value of the CEVA equity which the Defendants stripped from CIL via the CEVA Equity Transfer along with any consequential damages suffered as a result of the Defendants' actions.").  Moreover, the Trustee contends (but the CEVA Defendants deny) that matters relating to the sale, control and option values of CIL's CEVA Group shares have been the subject of discovery among the parties.

The Court finds that this aspect of the CEVA Defendants' objection to the Motion is more appropriately addressed in the context of an evidentiary motion, not as a response to the Trustee's request for leave to file the Proposed Second Amended Complaint.  *See, e.g.*, 7 MOORE'S FEDERAL PRACTICE § 37.60[2][a] (3d ed. 2013) (noting that violations of Rule 26

---

[21]    The CEVA Defendants advise that in their summary judgment motion they will argue, among other things, that in determining the solvency of CEVA Group, the Trustee's expert miscalculated the "equity hurdle" because he inappropriately subtracted €171 million from CEVA Group's debt based on cash in CEVA's bank account—i.e., its working capital, and thereby improperly deflated CEVA Group's liabilities to €2,722 million, and failed to account for a €100 million liquidity deficit that the expert conceded existed.  They contend that with those errors corrected, CEVA Group was insolvent even if the expert's claims as to enterprise value are assumed, *arguendo*, to be true.

disclosure issues "may be brought to the court's attention by means of a motion *in limine* to exclude the evidence or testimony, a motion to exclude the evidence or testimony made later in the proceedings, or a motion for exclusion in combination with a motion to compel.").

## **Conclusion**

For all of the foregoing reasons, the Motion is GRANTED.  The Trustee is directed to SETTLE an ORDER consistent with this Memorandum Decision.

Dated: June 15, 2018
   New York, New York

/s/ *James L. Garrity, Jr.*

Hon. James L. Garrity, Jr.
United States Bankruptcy Judge

25