Related Documents Redacted in accordance with Court's Order signed on 7/6/2018 Granting
Motion to File Under Seal [ECF No. 135]

AKIN GUMP STRAUSS HAUER & FELD LLP
David M. Zensky, Esq.
Dean L. Chapman, Jr., Esq.
Jennifer L. Woodson, Esq.
One Bryant Park
New York, New York  10036
Tel :  (212) 872-1000
Fax : (212) 872-1002

*Counsel for Defendants CEVA Group Plc and
CEVA Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CIL LIMITED,<br><br>     Debtor. | Chapter 7<br><br>Case No. 13-11272 (JLG) |
| SALVATORE LaMONICA, as Chapter 7<br>Trustee for CIL Limited,<br><br>     Plaintiff,<br><br>v.<br><br>CEVA GROUP PLC, CEVA HOLDINGS<br>LLC, CEVA LOGISTICS FINANCE B.V.,<br>GARETH TURNER, and MARK BEITH,<br><br>     Defendants. | Adv. Proc. No. 14-02442 (JLG)<br><br>ORAL ARGUMENT REQUESTED |

**NOTICE OF CEVA GROUP PLC AND CEVA HOLDINGS LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE, that upon the accompanying (i) *CEVA Defendants'*

*Memorandum of Law in Support of Their Motion for Summary Judgment*, (ii) *Statement of*

*Undisputed and Material Facts Pursuant to Local Rule 7056-1* and exhibits attached thereto, (iii)

*Declaration of Rubin McDougal* and exhibits attached thereto, and (iv) *Declaration of Marvin*

*Schlanger* and exhibits attached thereto, Defendants CEVA Group Plc and CEVA Holdings LLC

(collectively, the "CEVA Defendants"), by and through undersigned counsel, shall move for

summary judgment on Counts 1, 2, 3, 4, 5, 11, 12, and 13, any claim for damages under Counts

4, 7, 8, and 9, and the Trustee's request for avoidance of the Equity Transfer as a remedy all as

set forth in the *Amended Complaint for Fraudulent Transfer of the Debtor's Interests in CEVA*

*Group Plc, Related Tortious Acts, and Turnover of Property of the Estate* [A.P. ECF No. 21] (the

"Amended Complaint") brought by Salvatore LaMonica, as Chapter 7 Trustee for CIL Limited

(the "Trustee").  The CEVA Defendants move for summary judgment (i) on Counts 1, 2, 3, 5, 11,

and 12, and any claim for damages under Counts 4, 7, 8, and 9 on the grounds that the Trustee,

based on undisputed facts, cannot show that CIL's equity in CEVA Group had any value at the

time of the restructuring; (ii) on Counts 4 and 5 on the grounds that the interference with estate

property alleged by the Trustee undisputedly occurred prior to CIL's bankruptcy filing and on the

doctrine of laches; (iii) on the appropriate remedy available to the Trustee assuming, arguendo, a

triable issue is presented on any count on the grounds that it would be practically impossible and

inequitable to direct the reversal of all or even part of the restructuring at this stage; and (iv)

Count 13 (turnover of the so-called "CIL Cash") on the grounds that there is a genuine dispute as

to the ownership of the so-called "CIL Cash."

A date for the hearing to consider the relief requested in the motion shall be determined

with Chambers pending a decision on the CEVA Defendants' separate Motion to File under Seal.

Such hearing will be held at the United States Bankruptcy Court for the Southern District of New

York, Courtroom 601, One Bowling Green, New York, New York  10004.

**Hearing Date: To Be Determined**
**Opposition Date: April 19, 2018**

Dated: March 15, 2018
       New York, New York

                By:  /s/ David M. Zensky_____

                AKIN GUMP STRAUSS HAUER & FELD LLP
                David M. Zensky, Esq.
                Dean L. Chapman, Jr., Esq.
                Jenny L. Woodson, Esq.
                One Bryant Park
                New York, New York  10036
                Tel :  (212) 872-1000
                Fax : (212) 872-1002

                *Counsel for Defendants CEVA Group Plc and*
                *CEVA Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CIL LIMITED,<br><br>　　　　　　Debtor. | Chapter 7<br>Case No. 13-11272 (JLG) |
| SALVATORE LaMONICA, as Chapter 7<br>Trustee for CIL Limited,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CEVA GROUP PLC, CEVA HOLDINGS LLC,<br>CEVA LOGISTICS FINANCE B.V., GARETH<br>TURNER, and MARK BEITH,<br><br>　　　　　　Defendants. | Adv. No. 14-02442 (JLG)1 |

**CEVA DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT .......................................................................................................................3
    I.     Legal standard...........................................................................................3
    II.    The Trustee Cannot Prove CEVA Group's Equity Had Value at the Time of
        the 2013 Restructuring .....................................................................................4
        A.     There Is No Dispute that at the Time of the 2013 Restructuring
              CEVA Group Had a Liquidity Deficit...........................................8
        B.     Despite Acknowledging the Liquidity Deficit, Mr. Maxwell
              Reduces the Equity Hurdle by CEVA Group's Needed Working
              Capital in Contravention to Accepted Methodology, His Own
              Practice, Case Law and Common Sense.......................................9
              1.     Mr. Maxwell Reduces His Equity Hurdle by Cash
                      Constituting Working Capital Despite an Admitted
                      Liquidity Deficit................................................................9
              2.     Mr. Maxwell's Equity Hurdle Is Contrary to Accepted
                      Methodology ................................................................12
              3.     Mr. Maxwell's Equity Hurdle Is Contrary to His Own Prior
                      Testimony......................................................................13
               4.     Mr. Maxwell's Equity Hurdle Is Contrary to Case Law ...............15
        C.     Once Mr. Maxwell's Equity Hurdle Is Corrected, the Trustee
               Cannot Prove Equity Value..........................................................17
        D.     The Trustee's Claims Rise and Fall with Mr. Maxwell's Valuation ..........18
    III.   Counts 4 and 5 fail because there was no post-petition transfer and,
        regardless, the claims are barred by the doctrine of laches....................................23
        A.     There Was No Post-Petition Transfer or Interference with Estate
              Property in Violation of the Automatic Stay...............................24
              1.     The Transfer of CIL's Ownership Interest in CEVA Group
                      Took Place Prior to the Bankruptcy Filing ....................................24
               2.     None of the Events That Occurred After the Bankruptcy
                      Filing Involved or Impacted Estate Property in Any Way ..............25
               3.     Because No Estate Property Was Transferred or Interfered
                      with Following the Bankruptcy Filing, the CEVA
                      Defendants Are Entitled to Summary Judgment...........................26
        B.     The Trustee's Claims for Violation of the Automatic Stay and Post-
               Petition Transfer Are Barred by Laches......................................27
               1.     The Petitioning Creditors Made a Conscious Decision Not
                      to Try to Enjoin the 2013 Restructuring .......................................29
               2.     The CEVA Defendants Have Operated Their Global
                      Business in Reliance on the 2013 Restructuring for the Past
                      Five Years.......................................................................32

ii

IV.   The Trustee cannot seek the remedy of avoidance at this stage ............................34
      A.   The CEVA Defendants Are Entitled to Summary Judgment on the
           Appropriate Remedy ...................................................................................35
      B.   Avoidance of the Entire 2013 Restructuring Is Impossible ......................36
      C.   Avoidance of Only the CEVA Equity Transfer Would Also Be
           Inequitable..................................................................................................39
V.    The Trustee's claim for turnover (count 13) fails because the parties
      dispute that the funds are owed to CIL ..................................................................42
      A.   Relevant Factual Background .....................................................................43
           1.   The Cash at Issue Is Held in Cash Pooling Accounts Owned
                and Administered by CEVA Finance ..............................................43
           2.   In the Months Leading Up to the 2013 Restructuring,
                CEVA Group Personnel Discovered Accounting Errors in
                Connection with the Cash Pools .....................................................45
      B.   The CEVA Defendants Dispute that Some or All of the Funds Are
           Owed to CIL for Three Separate Reasons...................................................48
           1.   CEVA Group Employee Purchases of CIL Stock Should
                Have Been Accounted for as Equity, Not Debt...............................48
           2.   The Stock Option Recharge Expenses Credited to CIL
                Should Have Been Reduced When Options Failed to Vest ...........49
           3.   The Balance of the Claim Due to CIL Should Be Reduced
                by the Amounts CEVA Group Forwarded to CIL For
                Payment of Professional Fees ........................................................51
      C.   The CEVA Defendants Are Entitled to Summary Judgment on the
           Trustee's Claim for Turnover .....................................................................52

CONCLUSION..............................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramson v. Pataki*,
  278 F.3d 93 (2d Cir. 2002)..................................................................................4

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................4

*In re Best Prods. Co., Inc.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994)................................................................40

*In re Big Apple Volkswagen, LLC*,
  Case No. 11–11388 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17,
  2016) (Garrity, J.) ..............................................................................................4

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).......................................................................................3, 4

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
  10 F.3d 944 (2d Cir. 1993).............................................................36, 37, 38, 39

*Gaither v. Stop & Shop Supermarket Co. LLC*,
  84 F. Supp. 3d 113, 122, 122 ..........................................................................35

*Gottlieb v. Cty of Orange*,
  84 F.3d 511 (2d Cir. 1996)................................................................................4

*Hamblin v. British Airways PLC*,
  717 F. Supp. 2d 303 (E.D.N.Y. 2010) .............................................................35

*Matthews v. Rosene*,
  739 F.2d 249 (7th Cir. 1984) ...........................................................................34

*In re MES Int'l Inc.*,
  Case No. 09-14109 (Bankr. Del Apr. 23, 2010) ..............................................13

*In re Murphy*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005)..............................................................40

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. Withum Smith
  Brown, P.C.*,
  692 F. 3d 283 (3d Cir. 2012)......................................................................40, 42

*Parker v. Motor Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010) ................................................. 37

*Perez v. Danbury Hosp.*,
    347 F.3d 419 (2d Cir. 2003) ................................................. 28

*Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs.)*,
    343 B.R. 68 (S.D.N.Y. 2006) ................................................. 38

*Secs. Inv'r. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
    490 B.R. 59 (S.D.N.Y. 2013) ................................................. 28, 29

*Secs. Inv'r. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
    491 B.R. 27 (S.D.N.Y. 2013) ................................................. 29

*Senno v. Elmsford Union Free Sch. Dist.*,
    812 F. Supp. 2d 454 (S.D.N.Y. 2011) ................................................. 4

*In re Shea & Gould*,
    198 B.R. 861 (Bankr. S.D.N.Y. 1996) (Garrity, J.) ................................................. 53

*Slone v. Lassiter (In re Grove–Merritt)*,
    406 B.R. 778 (Bankr. S.D. Ohio 2009) ................................................. 40

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (Bankr. S.D.N.Y. 2016) ................................................. 53

*Stern v. Trs. of Columbia Univ.*,
    131 F.3d 305 (2d Cir. 2007) ................................................. 4

*In re Teligent, Inc.*,
    325 B.R. 134 (Bankr. S.D.N.Y. 2005) ................................................. 53

*In re Terrace Hous. Assocs., Ltd.*,
    577 B.R. 459 (Bankr. E.D. Pa. 2017) ................................................. 29

*U.S. S.E.C. v. Fisher*,
    No. 07 C 4483, 2012 WL 3757375 (N.D. Ill. Aug. 28, 2012) ................................................. 35

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ................................................. 13, 14

*Young v. United States*,
    535 U.S. 43 (2002) ................................................. 36, 40

## Statutes

11 U.S.C. § 362(a) ................................................. 27

11 U.S.C. § 542.................................................................................................3, 42, 52, 53

11 U.S.C. § 549.........................................................................................................26, 27

## Other Authorities

Fed. R. Civ. P. 26(a)(1)(A)(iii) .................................................................................19, 20

Fed. R. Civ. P. 56(a) ......................................................................................................4

Fed. R. of Bankr. P. 7056...............................................................................................3

Copeland, Tom, Koller, Tim, Murrin, Jack, VALUATION METHODOLOGIES 3RD
EDITION .....................................................................................................................12

Damodaran, Aswath, INVESTMENT VALUATION 3RD EDITION .......................................12

Defendants CEVA Group Plc ("CEVA Group") and CEVA Holdings LLC ("CEVA

Holdings," and together with CEVA Group, the "CEVA Defendants") respectfully submit this

memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

Five years ago, the CEVA Defendants implemented an out-of-court restructuring that

rescued their insolvent company from the precipice of financial ruin. The restructuring enabled

CEVA Group to shed more than €1 billion in debt, raise another €171 million in desperately-

needed cash, and continue to operate its global business without the necessity of a costly

bankruptcy filing. Ever since that time, a group of creditors of CIL Limited ("CIL"), CEVA

Group's former holding company, who were structurally subordinated to CEVA Group's

creditors and thus "wholly out of the money," have engaged in perpetual litigation with the

CEVA Defendants in an attempt to extract commercially unjustifiable value. After five years of

costly litigation that has demonstrated conclusively that none of the Trustee's claims have merit,

the CEVA Defendants now seek to bring this litigation to a close.

First and foremost, this Court should find, based on the undisputed facts, that the Trustee

cannot show that CEVA Group was solvent at the time of its restructuring and grant the CEVA

Defendants summary judgment on all claims that require a showing of solvency. While valuation

disputes are often factually complex arguments that cannot be resolved at the summary judgment

stage, the circumstances are different here because the entire issue can be resolved by correcting

for *one* simple error in the Trustee's valuation expert's report, ***even assuming the accuracy of***

***everything else***. Specifically, in determining the "equity hurdle" that must be overcome to show

equity value in the CEVA Group enterprise, the Trustee's expert improperly deducted from

CEVA Group's gross liabilities supposedly "excess cash" in the amount of €171 million and

failed to account for an ***admitted working capital deficit*** of at least €100 million. Treating cash

REDACTED

needed for ongoing operations as excess, and available for distribution, goes against accepted

valuation methodology, the expert's own practice and established case law. It also violates

common sense, and the CEVA Defendants submit that a reasonable trier of fact could not

possibly conclude that a company in CEVA Group's circumstances could use its last €171

million of liquidity to pay down debt or dividend cash out to its shareholders and yet somehow

continue operations. If this one error is corrected for, the Trustee's own expert's valuation shows

that CEVA Group was insolvent. Thus, the CEVA Defendants are entitled to summary judgment

on Counts 1–3, 5 and 11–12, and any claim for damages under Counts 4 and 7–9, all of which

require a showing that CEVA Group's equity had value at the time it was restructured.

Second, and independent of the fact that CEVA Group's equity had no value at the time

of the 2013 Restructuring, the CEVA Defendants are entitled to summary judgment on the

Trustee's claims for violation of the automatic stay (Count 4) and unauthorized post-petition

transfer (Count 5) on the grounds that the interference with estate property alleged by the

Trustee—the dilution of CIL's ownership interest in CEVA Group from 100% to 0.01%—

undisputedly occurred ***prior to*** CIL's bankruptcy filing. The CEVA Defendants are also entitled

to summary judgment on these claims under the doctrine of laches because the Petitioning

Creditors who filed the bankruptcy petition and now control the Trustee made a conscious

decision not to try to stop the restructuring from closing in 2013, and the CEVA Defendants have

relied on that restructuring to operate their global business for the last five years.

Third, even assuming, *arguendo*, a triable issue is presented as to whether CEVA Group's equity had any value at the time of the 2013 Restructuring, the CEVA Defendants are entitled to summary judgment on equitable grounds as to the avoidance remedy sought by the Trustee because avoiding the restructuring                    REDACTED

, a totally unnecessary result given that the Trustee could just as easily be satisfied by money damages in the event liability is established (which it will not be).

Finally, the CEVA Defendants are entitled to summary judgment on the Trustee's sole remaining claim related to the so-called "CIL Cash" for turnover under Section 542 of the Bankruptcy Code (Count 13) on the grounds that ownership of that cash is hotly disputed by the CEVA Defendants on three distinct, bona fide bases that have been the subject of substantial fact and expert discovery. This count cannot go forward in the presence of a dispute as to ownership or the amount of funds claimed by CIL.

Each of the arguments advanced by the CEVA Defendants in support of this summary judgment motion turns on undisputed facts and provides this Court with the long-awaited opportunity to bring this extortionary and wasteful proceeding to a close. The CEVA Defendants ask that the Court take that opportunity.

## ARGUMENT

### I.    LEGAL STANDARD

Under Federal Rules of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, summary judgment should be granted if "there is no genuine dispute as to

3

any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

Even though the Court must draw reasonable inferences from admissible evidence in favor of the nonmoving party, *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 2007), the opposing party cannot defeat summary judgment by "relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). And "mere denials or unsupported alternative explanations of its conduct" will not suffice. *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011). Rather, the non-moving party must still come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat a properly supported summary judgment motion. *In re Big Apple Volkswagen, LLC*, Case No. 11–11388 (JLG), 2016 WL 1069303, at *6 (Bankr. S.D.N.Y. Mar. 17, 2016) (Garrity, J.) (citing *Anderson*, 477 U.S. at 256). Thus, "[s]ummary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex*, 477 U.S. at 322).

Each strand of the CEVA Defendants' summary judgment motion satisfies the applicable standard, and should be granted.

## II.  THE TRUSTEE CANNOT PROVE CEVA GROUP'S EQUITY HAD VALUE AT THE TIME OF THE 2013 RESTRUCTURING

To prevail on Counts 1–3, 5 and 11–12 and any claim for damages under Counts 4 and 7–9 of the Amended Complaint, the Trustee must prove, among other things, that CEVA Group's

4

equity had value at the time CEVA Group was restructured in April 2013. If not, the debtor, CIL, was not deprived of anything of value because of the restructuring CEVA Group undertook in 2013 (the "2013 Restructuring"). While his Amended Complaint alleges that CEVA Group's equity had value of more than €1 billion at the time of the 2013 Restructuring, the Trustee's expert, Anders Maxwell, has submitted a report opining that as of March 31, 2013, CEVA Group's equity had value of €106 million, which, perhaps not coincidentally, is almost exactly the amount necessary to pay off the payment-in-kind notes at CIL (the "PIK Notes," the holders of which are, the "PIK Noteholders") as of March 31, 2013.[1] Specifically, Mr. Maxwell opined that CEVA Group had a total enterprise value of €2,828 million and total liabilities of €2,722 million, yielding an alleged equity value of €106 million.[2] This motion assumes Maxwell's *value* is correct, and is focused solely on his error, as a matter of law and undisputed fact, as to the total liabilities number (€2,722 million).

The CEVA Defendants are not asking the Court to determine on summary judgment which of two expert enterprise valuations is more accurate. In fact, as strong as it is, the CEVA Defendants are not relying on their expert's opinion at all in this motion. Rather, the CEVA Defendants submit that Mr. Maxwell's calculation of CEVA Group's debt (i.e., the equity hurdle) is contrary to case law, accepted methodology as set forth in the leading treatises, common sense and Mr. Maxwell's own practice in other cases. Correction of the equity hurdle, which Mr. Maxwell understates by at least €271 million (far in excess of his claimed equity value of €106 million), results in CEVA Group's equity having no value *even assuming Mr. Maxwell's*

---

[1] *See* Am. Compl. [ECF No. 21] ¶¶ 44–47; Rebuttal Report of Anders J. Maxwell, dated May 13, 2016 at 29, attached as Ex. B to the CEVA Defendants' Statement of Material Undisputed Facts (the "SMF"); SMF ¶ 107, Ex. KK (Noteholder Table) (showing total PIK debt at €105 million prior to the restructuring). CEVA Holdings holds approximately €31 million of PIK Notes as a result of certain PIK Noteholders tendering their Notes in the 2013 Restructuring. *See* SMF ¶ 110, Ex. II (Project Phelps Equity Allocation for Final Transaction).

[2] *See* SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 4; SMF, Ex. B (Rebuttal Report of Anders J. Maxwell dated May 14, 2016) at 18.

*enterprise valuation is correct*.[3] As such, Counts 1–3, 5 and 11–12 of the Amended Complaint, all of which depend on CIL's stock in CEVA Group having value (i.e., a finding of a solvent CEVA Group) and any claim for damages under Counts 4 and 7–9 must be dismissed.

The undisputed facts show that starting in mid-2012 CEVA Group endured a severe economic downturn.[4] By the time of the 2013 Restructuring, CEVA Group had a severe liquidity shortfall, was unable to make an interest payment of €62 million due April 1, 2013, and CEVA Group management projected, in its Project Phelps model, a liquidity deficit in excess of €100 million by September 2013.[5] Mr. Maxwell admits all of this, and indeed, adopts those very same Project Phelps projections to arrive at his enterprise valuation.[6]

Given this liquidity crisis and the fact that CEVA Group needed €100 million of new capital to simply survive, it is axiomatic that any cash on CEVA Group's balance sheet on March 31, 2013 (the date of Maxwell's valuation) was needed working capital for the company and unavailable for distribution to stakeholders or to pay down debt. Plain and simple, with an admitted looming liquidity deficit of €100 million, CEVA Group had no excess cash.[7] A reasonable trier of fact could not possibly conclude that a company that would cease operations without among other things, an infusion of at least €100 million of *additional* cash to keep the

---

[3] In fact, Mr. Maxwell has overstated CEVA Group's enterprise value by several hundred million euros. Nevertheless, for purposes of this summary judgment motion, the only thing at issue is Mr. Maxwell's calculation of CEVA Group's liabilities.

[4] *See* SMF ¶¶ 1–48; *see also* Declaration of Rubin McDougal dated Mar. 15, 2018 ("McDougal Decl.") ¶¶ 4, 14–31.

[5] *See* SMF ¶¶ 21–34, 48; McDougal Decl. ¶¶ 25, 31–32.

[6] *See* SMF ¶¶ 78–85, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 8 (REDACT "); *id.* at 15 ("[ REDACTED D

; *see also id.* at 12, 25, 27.

[7] *See* McDougal Decl. ¶ 32.

lights on could, at the same time, use its last €171 million to pay down debt and yet somehow continue operations.

Mr. Maxwell himself has testified in other proceedings that if cash is needed for a company's ongoing operations, it should not be treated as excess cash available to pay down debt.[8] And yet, Mr. Maxwell inexplicably treats the €171 million of cash on CEVA Group's balance sheet as "excess cash" and deducts it from CEVA Group's gross liabilities of €2,893 million to improperly reduce the equity hurdle to €2,722 million.[9] Not only should this €171 million of cash not be deducted from the equity hurdle, but the acknowledged €100 million of new capital needed at CEVA Group must be added to the equity hurdle, as whoever funded that new CEVA capital would necessarily be senior to CIL's equity in the capital structure. Correcting just these two errors in Mr. Maxwell's calculation of CEVA Group's debt results in an equity hurdle of €2,993 million and equity value of **negative €165 million** **_assuming everything else in Mr. Maxwell's report is correct, both as to CEVA Group's value and its debt_**.

Mr. Maxwell conceded that this conclusion logically follows:

> Q: Would you agree with me that if the Court were to determine that your claims amount understated the correct claims hurdle by 106 million euro or more, then even accepting everything else that you have said in your valuation report, that there would be no equity value as of March 31?
>
> A: If the Court elected to use the midpoint of the [enterprise value] range that I have, that seems like a reasonable conclusion.[10]

The CEVA Defendants respectfully request that the Court correct Mr. Maxwell's equity hurdle and conclude accordingly that no material dispute exists as to the fact that CEVA Group's

---

[8] *See infra* at 14.

[9] *See* SMF ¶¶ 81–84, Ex. B (Rebuttal Report of Anders J. Maxwell dated May 13, 2016) at 18.

[10] SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 211:10–19.

equity had no value using Mr. Maxwell's valuation. As such, there can be no fraudulent

conveyance and no damages associated with Counts 1–5, 7–9, or 11–12.

> **A.**     **There Is No Dispute that at the Time of the 2013 Restructuring CEVA Group Had a Liquidity Deficit**

The parties do not dispute that at the time of the 2013 Restructuring, CEVA Group had a

liquidity shortfall and needed €100 million of new capital to fill it. *See* SMF ¶¶ 79–80, Ex. I

(Maxwell Dep. Tr. dated May 26, 2016) at 60:17–18 ("I'm aware that the company needed to

raise 100 million euro"); *see also id.* at 59:5–10 ("Based on the cash flow forecast in the Phelps

Model *I agree that the company needed to raise 100 million euro* to address a cash shortfall that

was then projected at the end—sometime in the next two or three months.") (emphasis added).

This deficit was the result of declining performance in the latter half of 2012 and the first quarter

of 2013 coupled with high levels of indebtedness and associated interest payments.[11]

The Project Phelps model, completed by CEVA Group management in early February

2013, projected that CEVA Group was going to run out of cash by April 2013—with liquidity

dipping to negative €21 million in the middle of that month.[12] The model also showed a mid-

month liquidity deficit of more than €100 million by September 2013 absent a restructuring

transaction.[13] Houlihan Lokey, CEVA Group's financial advisor, in a presentation (the "Houlihan

Materials") to two of CEVA Group's largest holders of Second Lien and Senior Unsecured debt,

Capital Research Management L.P. ("CapRe") and Franklin Advisors Inc. and Franklin

Templeton Investment Corporation (together, "Franklin"), described the liquidity projections

from the Project Phelps model:

---

[11] *See* SMF ¶¶ 1–48; McDougal Decl. ¶¶ 14–31.
[12] *See* SMF ¶¶ 21–34; McDougal Decl. ¶ 25.
[13] *See* SMF ¶ 34; McDougal Decl. ¶ 25, Ex. 2 (Project Phelps Model).

- "With €238mm of PF Adjusted EBITDA, €80100mm of capex needs, and €266mm of cash interest expense, the Company [CEVA Group] is significantly cash flow negative and is likely to have liquidity issues in April."[14]; and

- "Absent a transaction, the Company is expected to be extremely liquidity strained by April 2013. By the Company's peak working capital month of September 2013, the liquidity shortfall may be greater than €100mm, assuming no additional changes in working capital, uncommitted lines, and letter of credit requirements."[15]

That CEVA Group would have liquidity issues by April 2013 was extremely worrisome because CEVA Group had a debt payment due of €62 million on its Second Lien and Senior Unsecured debt obligations on April 1, 2013, and its failure to make that payment within a 30-day grace period would trigger an event of default and potential acceleration of all of CEVA Group's debt obligations.[16]

On April 1, 2013, CEVA Group failed to make the €62 million cash interest payment due on its Second Lien and Senior Unsecured debt; this interest payment was ultimately waived as a result of the 2013 Restructuring.[17]

### B. Despite Acknowledging the Liquidity Deficit, Mr. Maxwell Reduces the Equity Hurdle by CEVA Group's Needed Working Capital in Contravention to Accepted Methodology, His Own Practice, Case Law and Common Sense

#### 1. *Mr. Maxwell Reduces His Equity Hurdle by Cash Constituting Working Capital Despite an Admitted Liquidity Deficit*

Mr. Maxwell does not dispute the reasonableness of the Project Phelps Model *or* the fact that CEVA Group had a liquidity shortfall at the time of the 2013 Restructuring *or* that the liquidity deficit was projected to exceed €100 million by September 2013 in the absence of a restructuring. Indeed, Mr. Maxwell *relies* on and adopts the Project Phelps model in arriving at

---

[14] McDougal Decl., Ex. 18 (Houlihan Materials) at 4.

[15] *Id.* at 14. Maxwell agreed that the Houlihan Materials' descriptions of CEVA Group's projected liquidity were consistent with the Project Phelps projections. SMF Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 67:3–9.

[16] *See* SMF ¶ 48; McDougal Decl. ¶ 31.

[17] *See* SMF ¶ 48; McDougal Decl. ¶ 31.

his enterprise valuation, and admits that a €100 million capital raise was needed for CEVA Group

to continue operations.[18]

In his opening report, Mr. Maxwell concedes that "                    REDACTED



"[19] Mr. Maxwell also expressed confidence in CEVA

Group's Project Phelps projections: "                    REDACTED

."[20] And in citing to the February 2013

Houlihan Materials, Mr. Maxwell acknowledges that CEVA Group "        REDACTED

."[21]

At his deposition, Mr. Maxwell reaffirmed his acceptance of the fact that the company

"needed to raise 100 million euro to address a cash shortfall that was then projected at the end—

sometime in the next two or three months."[22] And when asked whether the company could

continue business operations "absent a restructuring or an infusion of a substantial amount of

new capital," Mr. Maxwell conceded that he is "not questioning that the company needed to do

some kind of recapitalization or otherwise access the markets going forward."[23]

---

[18] *See* SMF ¶¶ 78–80, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 59:5–10.

[19] SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 15.

[20] SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 8; SMF Ex. I
(Maxwell Dep. Tr. dated May 26, 2016) at 88:15–20; *see also id.* at 61:12–13, 65:6.

[21] SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 15; *see also*
McDougal Decl., Ex. 18 (Houlihan Materials) at 24.

[22] SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 59:5–10; *see also id.* at 60:17–18 ("I'm aware that
the company needed to raise 100 million euro …").

[23] SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 53:25–54:10. It is not surprising that Mr. Maxwell
would concede that a restructuring was necessary given CEVA Group's poor earnings, tremendous leverage and
lack of liquidity at the time of the 2013 Restructuring and declining performance in the latter half of 2012 and the
first quarter of 2013. *See generally* SMF ¶¶ 1–48. CEVA Group's financial position was so precarious that CEVA
Group's auditor, PricewaterhouseCoopers declined to give CEVA Group a going concern opinion for its 2012
financials unless it could complete a substantial debt reduction and capital raise. *See* SMF ¶ 28. At the time of the
2013 Restructuring, CEVA Group's LTM adjusted EBITDA was a mere €207 million with a debt to EBITDA ratio

Yet, despite admitting that CEVA Group needed to raise an additional 100 million euro in addition to its existing cash to address a liquidity shortfall, Mr. Maxwell applied €171 million of cash on CEVA Group's balance sheet as of March 31, 2013, against CEVA Group's gross liabilities of €2,893 million to improperly reduce the equity hurdle to €2,722 million.[24] Mr. Maxwell also made no adjustments to his equity hurdle for the admitted €100 million of additional capital CEVA Group needed and that would necessarily be senior to CIL's equity.[25] In so doing, Mr. Maxwell treated the €171 million of cash on CEVA Group's balance sheet as *excess* cash, that could be treated as additional value to CEVA Group, i.e., cash that was in excess of needed working capital and therefore available for paying down CEVA Group's debt.[26] But it is self-evident that where a company needs an ***additional*** €100 million of capital, ***on top of whatever cash it had***, to address a liquidity shortfall, any cash then on the balance sheet is not "excess" but rather needed working capital to continue business operations.[27]

Deducting €171 million from CEVA Group's working capital, as Mr. Maxwell would have the Court sanction here, would only exacerbate CEVA Group's liquidity deficit and require

---

of more than 13.5x, and, absent a restructuring, CEVA Group had projected 2013 interest expense of €263 million, capital expenditures of €83 million and taxes of €42 million. *See* SMF ¶¶ 35, 42–45. The Project Phelps model projected a liquidity shortfall at CEVA Group as early as April 2013 absent a restructuring; indeed, on April 1, 2013, CEVA Group failed to make a €62 million cash interest payment due on its second lien and senior unsecured notes—debt that was ultimately eliminated in the 2013 Restructuring. *See* SMF ¶¶ 21–34, 48. Further, the Project Phelps' projected EBITDA forecasts relied upon by Mr. Maxwell in arriving at his enterprise valuation were contingent upon a successful out-of-court restructuring. *See* SMF ¶ 32.

[24] *See* SMF ¶¶ 73–85; *id.* Exs. I (Maxwell Dep. Tr. dated May 26, 2016) at 59:5–10, B (Rebuttal Report of Anders J. Maxwell dated May 13, 2016) at 18. Mr. Maxwell's equity hurdle and valuation of CIL's equity in CEVA Group is set forth in his Rebuttal Report dated May 13, 2016. In his opening report, Mr. Maxwell calculated the equity hurdle at €2,694 million; on rebuttal, Mr. Maxwell corrected this calculation to €2,722 million with an implied equity value of €106 million. Mr. Maxwell calculated €171 million of available cash by subtracting Project Phelps' February 2013 projections for Trapped Cash (€70 million), Local Cash (€28 million) and Cash in Transit (€15 million) from CEVA Group's Cash and Cash Equivalents (€284 million) as of March 31, 2013. *See* SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5 2016) at 23 n.(c).

[25] *See* SMF ¶¶ 73–85, Ex. B (Rebuttal Report of Anders J. Maxwell dated May 13, 2016) at 18.

[26] *See* SMF ¶¶ 73–85, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 224:5–10.

[27] *See* McDougal Decl. ¶ 32.

11

CEVA Group to borrow far in excess of the needed €100 million to meet its liquidity needs, and

that debt would, again, be part of the equity hurdle and ahead of CIL's equity.

### 2. Mr. Maxwell's Equity Hurdle Is Contrary to Accepted Methodology

Where cash is necessary for operations, indeed where there is an acknowledged working

capital deficit, such cash should not be deducted from the equity hurdle as the cash is not a

source of additional value. This common sense approach is supported by valuation literature. In a

treatise relied upon by Mr. Maxwell, Prof. Aswath Damodaran, perhaps the leading valuation

authority, has explained: "If a firm needs cash for its operations—an operating cash balance—

and this cash does not earn a fair market return *you should consider cash part of working

capital requirements rather than as a source of additional value*."[28] Here, the cash on CEVA

Group's balance sheet that Mr. Maxwell deducted from CEVA Group's debt was not invested,

and was not earning a market return on invested capital, but rather sitting in CEVA bank accounts

earning a nominal rate of return.[29]

Another well-known finance treatise makes clear that for cash to be considered "excess"

it must be cash held "*above [the company's] target cash balances to support operations*."[30]

Similarly, that treatise explains: "Specifically excluded [from working capital] are cash and

marketable securities *greater than the operational needs of the business.*" [31] Here, it is

undisputed the €171 million of cash on CEVA Group's balance sheet was not in excess of the

cash balances needed to support operations, but rather was working capital that was necessary

for operations; indeed, as of March 31, 2013, CEVA Group was €100 million *short* of its target

---

[28] SMF, Ex. V (Excerpt from Damodaran, Aswath, INVESTMENT VALUATION 3RD EDITION) at 423 (cited in SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 50).

[29] *See* SMF ¶ 47; McDougal Decl. ¶ 32.

[30] SMF, Ex. W (Excerpt from Copeland, Tom, Koller, Tim, Murrin, Jack, VALUATION METHODOLOGIES 3RD EDITION) at 161 ("Excess cash and marketable securities are the short-term cash and investments that the company holds above its target cash balances to support operations.").

[31] *Id.* at 160 (emphasis added).

cash balance, as demonstrated by the Project Phelps model.[32] Thus, the €171 million should have been treated as operating working capital and **not** subtracted from CEVA Group's debts in calculating the equity hurdle.

### 3. Mr. Maxwell's Equity Hurdle Is Contrary to His Own Prior Testimony

Mr. Maxwell is well aware that needed working capital should not be netted against a company's debt as he has twice testified to this fact under oath in other cases. In *In re MES International, Inc.*, Mr. Maxwell testified that a company's cash balances should not be included "as an additional asset or a value when coming up to a conclusion as to total enterprise value" where "the company's determination [is] that the balance of the cash was absolutely required in the operations."[33] He cited the same Damodaran treatise the CEVA Defendants quote above to support this conclusion, testifying that Prof. Damodaran instructs "that if a firm needs cash for its operations, an operating cash balance, and this cash does not earn a fair market return, you should consider such cash part of working capital requirements rather than as a source of additional value."[34]

More recently, in *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017), Mr. Maxwell issued expert valuation reports and testified at trial before judge Glenn that when calculating the equity hurdle, it is inappropriate to deduct cash the company believes is needed as working capital from the company's debt.[35] Mr. Maxwell testified that it is

---

[32] *See* SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 60:17–18 ("I'm aware that the company needed to raise 100 million euro"); *see also id.* at 59:5–10 ("Based on the cash flow forecast in the Phelps Model *I agree that the company needed to raise 100 million euro* to address a cash shortfall that was then projected at the end—sometime in the next two or three months.") (emphasis added); *see generally* SMF ¶¶ 21–34, 73–85.

[33] SMF, Ex. X (Hearing Transcript, *In re MES Int'l Inc.*, Case No. 09-14109 (Bankr. Del Apr. 23, 2010) [ECF No. 670]) at 214:5–10.

[34] *Id.* at 215:20–24.

[35] SMF, Ex. Y (Maxwell Expert Report dated Nov. 7, 2009) at 26, 53; SMF, Ex. Z (Maxwell Expert Report dated Feb. 28, 2011) at 24, 48; SMF, Ex. AA (Trial Transcript, *In re Lyondell Chem Co.*, Adv. Pro. No. 09-01375 (Bankr. S.D.N.Y Oct. 31, 2016)) at 1712:6–1713:7.

"well established" that cash that is needed for working capital is restricted cash that should not be netted against the company's debt.[36] Accordingly, in *Lyondell*, Mr. Maxwell **reduced** the cash on the balance sheet by the amount **management** determined was the minimum intraday cash requirement of $300 million before treating any cash as excess, and then netted just the remaining amount of cash ($144 million) against the company's debt in fixing the company's equity hurdle:[37]

## EXHIBIT P: RECONCILIATION OF AVAILABLE CASH

*(Amounts in Millions)*

| | |
|---|---:|
| Cash on balance sheet (a) | $623 |
| In-transit | (45) |
| Non-pooled: | |
|     Brazil, Bermuda, Asia, Argentina, Other (b) | (116) |
|     Accessible but not Daily Usable (b) | (18) |
| Minimum Intraday Cash Requirement (c) | (300) |
| Total Usable Cash | $144 |

(a) LyondellBasell Industries AF S.C.A Consolidated Financial Statement for September 30, 2008.
(b) LyondellBasell Liquidity Discussion dated April 11, 2008.
(c) LyondellBasell Bank Update Meeting dated December 29, 2008 states minimum intraday cash requirement of $300 million; further corroborated by LyondellBasell Liquidity Discussion dated April 11, 2008 which allocates $300 million of cash as unavailable due to "Uncertain Timing of Daily Collections / Daylight Overdraft."

The $300 million Mr. Maxwell deducted from cash on the balance sheet in *Lyondell* before finding there was excess cash to net against Lyondell's debt is the direct analogue to the €171 million that all parties agree here fell €100 million short of what CEVA Group needed as

---

[36] SMF, Ex. AA (Trial Transcript, *In re Lyondell Chem Co.*, Adv. Pro. No. 09-01375 (Bankr. S.D.N.Y Oct. 31, 2016)) at 1712:6–1713:7. Judge Glenn was highly critical of Mr. Maxwell in many respects, but not as it pertained to his calculation of the equity hurdle. *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),* 567 B.R. 55, 63–65 (Bankr. S.D.N.Y. 2017); *see also id.* at 105 ("Maxwell's testimony is seriously flawed.").

[37] *See* SMF, Ex. Z (Maxwell Expert Report dated Feb. 28, 2011) at 48 (highlighting added).

necessary working capital. Yet here Mr. Maxwell inexplicably treats the €171 million as excess cash.

Even at his deposition in this proceeding, Mr. Maxwell admitted that in doing an enterprise valuation, restricted cash should not be deducted from the company's debt; Mr. Maxwell further defined restricted cash as "cash that is not otherwise available to the company or [is] *directly required for the business*."[38] As described above, given that Mr. Maxwell admits that CEVA Group needed an infusion of €100 million of additional capital, over and above the €171 million of cash already on its balance sheet, that cash was obviously needed working capital for the business. Mr. Maxwell, however, improperly deducts the €171 million from his equity hurdle, flouting common sense, accepted methodology and his own prior valuation testimony.

Further, Mr. Maxwell was unable, when asked, to point to a single confirmed plan, court ruling or treatise to support netting that €171 million of needed cash against CEVA Group's debt.[39] Nor was he able to provide any explanation for how CEVA Group could have paid the €62 million interest payment due on its Second Lien and Senior Unsecured debt on April 1, 2013 (which creditors waived in the 2013 Restructuring) if all €171 million of cash was used to pay down principal on March 31, 2013 in order to purportedly preserve value for equity.[40]

### 4. Mr. Maxwell's Equity Hurdle Is Contrary to Case Law

Finally, where, as here, there is an admitted need for additional capital, rather than reduce the equity hurdle by the company's needed capital, the additional capital need must be accounted for either by *increasing* the equity hurdle by the amount of new capital needed or by decreasing

---

[38] SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 212:15–213:2 (emphasis added).

[39] *See id.* at 236:22–237:4.

[40] *See id.* at 221:10–222:5; *see generally* SMF ¶¶ 48, 73–85; McDougal Decl. ¶¶ 31–32.

the enterprise valuation by that amount. This is because any party contributing new capital to CEVA Group would necessarily expect to receive a debt or equity claim in CEVA Group, ahead of CEVA Group's existing equity holders.[41] Mr. Maxwell valued CEVA Group based on earnings that presupposed the 2013 Restructuring,[42] but in claiming value for CIL ignored the new capital CEVA Group needed to raise to generate those earnings.

At least one bankruptcy court has addressed the issue of whether new capital needed to sustain a company's business and achieve the earnings on which the valuation is based should *raise* the equity hurdle. At confirmation proceedings, in *In re Horsehead Holding Corp.*, the equity committee argued that there was distributable value to equity. Judge Sontchi of the United States Bankruptcy Court for the District of Delaware ruled that total claims equaled $650 million and the company's valuation was $653 million, and noted that it might therefore appear that equity was "in the money, although barely."[43] The Court then held, however, that the equity hurdle should be raised to at least $735 million because the company needed approximately $85 to $100 million of new capital, which the equity committee assumed in reaching its valuation, stating: "You simply cannot get to the equity committee's conclusion without that new money and it has to come from somewhere."[44]

Contrary to the approach in *Horsehead*, here, despite admitting that CEVA Group needed €100 million of new capital, Mr. Maxwell made no attempt to adjust his equity hurdle (or enterprise valuation) to account for this liquidity deficit.[45] Nor would Mr. Maxwell opine as to where an investor of €100 million in new capital would ultimately fall in CEVA Group's capital

---

[41] *See* SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 61:14–21; *id.* at 62:11–22.

[42] *See* SMF ¶¶ 32, 73–85.

[43] SMF, Ex. TT (Ruling on Confirmation Hearing, *In re Horsehead Holding Corp.*, Case No. 16-10287 (Bankr. Del. Sep. 2, 2016)) at 16:8–16.

[44] *Id.* at 16:8–16.

[45] SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016 ) and Ex. B (Rebuttal Report of Anders J. Maxwell dated May 13, 2016).

16

structure—evading the obvious conclusion that such investor would necessarily be senior to

CIL's equity in CEVA Group—but acknowledging that such investor would expect to receive a

debt or equity claim in CEVA Group.[46] Paradoxically, the only rationale Mr. Maxwell provides

for not adjusting his equity hurdle or enterprise valuation to account for the €100 million

liquidity shortfall is that "this liquidity shortfall was projected … to be mitigated by the pending

recapitalization."[47] That is, Mr. Maxwell determined that adjustment for the liquidity deficit was

unnecessary because the recapitalization *that the Trustee challenges and seeks to avoid in this

adversary proceeding* solved the problem. This is no answer.

### C.    Once Mr. Maxwell's Equity Hurdle Is Corrected, the Trustee Cannot Prove Equity Value

For the reasons set forth above, there can be no genuine dispute of material fact as to the

calculation of the equity hurdle. Accordingly, this Court can, and should, correct Mr. Maxwell's

equity hurdle by determining that (i) the €171 million of cash should not be deducted from the

equity hurdle, and (ii) the admitted €100 million of new capital needed at CEVA Group must be

added to the equity hurdle as that new capital would necessarily be senior to CIL's equity in

CEVA Group in the capital structure.[48]

These corrections to Mr. Maxwell's calculation of CEVA Group's debt would result in an

equity hurdle of €2,993 million as compared to Mr. Maxwell's enterprise valuation of €2,828

million.[49] Accordingly, once the Court makes this correction, the conclusion, as illustrated in the

---

[46] *See* SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 61:14–21; *id.* at 62:11–64:9; *id.* at 76:12–77:5.

[47] SMF, Ex. B (Rebuttal Report of Anders J. Maxwell dated May 13, 2016) at 19; *see also* SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 80:12–81:10.

[48] *See* SMF, Ex. TT (Ruling on Confirmation Hearing, *In re Horsehead Holding Corp.*, Case No. 16-10287 (Bankr. Del. Sep. 2, 2016)).

[49] After the CEVA Defendants raised their proposed summary judgment theory to the Court in a letter dated June 15, 2016 and after expert discovery concluded (including Mr. Maxwell's deposition), the Trustee on June 24, 2016, without obtaining leave of court, served a supplemental expert report increasing Mr. Maxwell's claimed equity value to €149 million. *See* SMF, Ex. C (Addendum to the Expert Valuation Report by Anders J. Maxwell) at

**REDACTED FILED UNDER SEAL**

chart below, is inescapable that CIL's equity in CEVA Group has no value, even if one accepted the balance of Mr. Maxwell's expert opinion, including even the high end of his enterprise valuation.[50]



### D.    The Trustee's Claims Rise and Fall with Mr. Maxwell's Valuation

Throughout the course of discovery, the Trustee's only theory of damages and only theory that anything of value was actually transferred has been based upon the claimed equity value of CIL's shares in an allegedly solvent CEVA Group. To make that showing at trial, the Trustee is relying exclusively on Mr. Maxwell's expert opinion. With Mr. Maxwell's equity hurdle corrected, resulting in a summary judgment determination that CEVA Group was insolvent on March 31, 2013 and its equity had no value, the Trustee is left with no other theory to prove

---

1. Regardless, even using Mr. Maxwell's revised, after-the-fact, even more inflated enterprise valuation, its mid-point of €2871 million is still more than €120 million shy of the corrected equity hurdle.

[50] *See* SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 211:10–19 (agreeing that if the Court were to determine that his equity hurdle were understated by €106 million, accepting everything else in his valuation report as correct, there would be no equity value as of March 31, 2013).

damages or that CIL transferred anything of value. During the discovery period, the Trustee did

not assert any theory or calculation of damages other than the alleged value of CIL's equity in a

**solvent** CEVA Group; thus, there is no alternative measure of damages and nothing for this Court

to try if Mr. Maxwell incorrectly calculated the equity hurdle at CEVA Group.[51] Thus, there is no

alternative measure of damages and nothing to try if Mr. Maxwell is wrong about the equity

hurdle.

    The Trustee may seek to argue that he does not seek to prove value solely through Mr.

Maxwell's expert testimony. This argument, which the Trustee conveniently asserted in letters

exchanged after the close of discovery and only when faced with the CEVA Defendants'

contemplated summary judgment motion,[52] is belied by the record: throughout the course of

discovery, the Trustee repeatedly asserted that CEVA Group's alleged value would exclusively be

proven by expert testimony.

    On June 5, 2015, the Trustee served his initial disclosures on the CEVA Defendants.[53]

The Trustee's damages disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), which rule

explicitly requires a party to disclose a computation of each category of damages claimed, stated

only that the Trustee sought, *inter alia*, "damages, plus interest, costs and attorneys' fees based

on, inter alia, the amount equal to the value of the CEVA equity."[54]

    On June 10, 2015, counsel to the CEVA Defendants sent a letter to counsel to the Trustee

requesting that the Trustee remedy deficiencies in his initial disclosures by providing a

---

[51] In the Trustee's recent Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and For Leave to File a Second Amended Complaint [ECF No. 107], the Trustee submitted to the Court a Proposed Second Amended Complaint, which for the first time since the commencement of this proceeding in 2014, asserted new theories of damages which assume that CEVA Group was **insolvent**. As argued in the CEVA Defendants' opposition to that motion, asserting such damages theories at this stage is improper, highly prejudicial and should not be allowed. *See* CEVA Defendants' Opp'n [ECF No. 110] at 24–32.

[52] *See* Ltr. From D. Friedman dated Jun. 30, 2016 [ECF No. 87] at 2.

[53] *See* SMF, Ex. BB (Trustee's Initial Disclosures).

[54] *Id.* at 24.

computation of his monetary damages.[55] Counsel to the Trustee responded that "the precise

calculation of CEVA's equity is not the product of a simple mathematical computation, but rather

***falls squarely within the purview of expert testimony***."[56] Over the course of more than six

months, the parties disputed whether the Trustee sufficiently met his obligations to provide a

computation of damages pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii). Counsel to the Trustee

repeatedly reaffirmed the Trustee's view that no computation was necessary given that the

Trustee intended to rely on expert testimony to prove CEVA Group's equity value and thus his

damages.

When the CEVA Defendants ultimately moved this Court to compel the Trustee to

produce such a computation of damages, the Trustee opposed the motion and argued to the Court

that:

> Essentially, the information that the CEVA Defendants claim has
> not been provided is our valuation of the equity of the CEVA
> enterprise that was fraudulently transferred from the Debtor by or
> to the CEVA Defendants. ***This is a complex expert analysis that is
> still in progress .… Valuing the equity of any large enterprise is a
> complex task requiring appropriate experts.***[57]

Likewise, at his deposition, the Trustee confirmed his reliance on expert testimony to prove

damages, repeatedly stating his intent to rely on his expert: "Whatever my valuation expert tells

me it is, it is .… That's what I'm going to rely on."[58] Thus, if Mr. Maxwell cannot establish a

triable issue that CEVA Group's equity had value as of March 31, 2013, the Trustee's claims set

---

[55] *See* SMF, Ex. CC (Ltr. From D. Zensky dated Jun. 10, 2015).

[56] SMF, Ex. DD (Ltr. From D. Friedman dated Jun. 19, 2015).

[57] Ltr. From D. Friedman dated Jan. 22, 2016 [ECF No. 64].

[58] SMF, Ex. J (LaMonica Dep. Tr. dated Jan. 14, 2016) at 105:3–9; *see also id.* at 21:19–24 ("Q: What do
you believe the size of the claims are here in this case? A: I have no idea .… We are waiting for our valuation
expert."); *id.* at 92:5–10 ("I have no thoughts as to what is the fair value. ***I'm going to rely on my expert to value
what it was***.") (emphasis added).

forth in Counts 1–3, 5 and 11–12, and any claims for damages under Counts 4 and 7–9, all fail as a matter of law.

Although the Trustee has always asserted his intent to prove value through expert testimony, the Amended Complaint references four sets of materials to purportedly support a finding of value ("Trustee's Collateral Value Materials"):

- CIL's SEC Form F-1s filed May 4, 2012 and August 29, 2012 respectively;

- September 12, 2012 Board Minutes in which the CIL Directors approved a fair market value of CIL's Class A shares of €50 per share;

- February 2013 Morgan Stanley Discussion Materials; and

- A report issued by Ernst & Young Limited to CIL's Directors.[59]

But the Trustee's counsel has admitted that these documents are merely "***preliminary indicia of the value***" and that "[c]alculating a value for CEVA [Group's] equity ***requires an expert to cull relevant data from those documents***, and other documents such as internal management reviews and projections that we have not yet obtained, perform diligence (e.g., review depositions of management) and perform complex calculations."[60]

Indeed, when the Court granted the CEVA Defendants' motion to compel and ordered the Trustee to supplement his initial disclosures to provide "a computation of each category of damages claimed by the Trustee,"[61] the Trustee's supplemental disclosures again stated that such damages would be proved by expert testimony: "The detailed calculation of the Trustee's damages and the application of the valuation methodologies ***will be set forth in the Trustee's***

---

[59] *See* Am. Compl. [ECF No. 21] ¶¶ 6, 41–48, 67–72; *see generally* Am. Compl. §§ C ("The Directors Manage and Control the EY Report") and D ("EY Prepares a Report that is Devoid of Independent Judgment and Heavily Adulterated by the Meddling of Apollo and its Agents.").

[60] SMF, Ex. EE (Ltr. From D. Friedman dated Jul. 22, 2015) (emphasis added).

[61] Order dated Feb. 5, 2016 [ECF No. 67].

*expert report*…."[62] As explained above, this motion conclusively shows that that report, which considered the Trustee's Collateral Value Materials,[63] cannot be used to show damages or that CIL transferred anything of value.

Notwithstanding the Trustee's admissions that value will not be proved through the Trustee's Collateral Value Materials but through expert testimony, these materials do not raise a triable issue of fact regarding value in any event. [64] Each of these materials was out of date as of March 31, 2013, was based on incomplete information, and/or actually supports the conclusion that CEVA Group was insolvent.[65] Indeed, counsel to the Trustee admitted as much in a letter to counsel to the CEVA Defendants:

> We recognize that the [Trustee's Collateral Value Materials] produced by the Defendants *require updating and adjustment to provide a value for CEVA's equity as of the time of the CEVA Equity Transfer.* Making those adjustments is a quintessential expert function, one that has not yet been performed, nor is required to have been performed at this point in the case.[66]

While Mr. Maxwell considered the Trustee's Collateral Value Materials in his reports, he did not use them to offer any alternative calculation of value. Thus, there can be no argument that the Trustee's Collateral Value Materials raise a genuine issue of material fact to defeat this summary judgment motion.

*** 

---

[62] SMF, Ex. FF (Second Supplemental Disclosures dated Feb. 23, 2016) at 4.

[63] *See* SMF, Ex. A (Expert Valuation Report of Anders J. Maxwell dated Apr. 5, 2016) at 8, 51.

[64] In his Proposed Second Amended Complaint [ECF No. 107-1], the Trustee seeks to amend his complaint to add a new value indicator, a purported January 31, 2013 valuation. The purported January 31, 2013 valuation fails to raise a triable issue of fact for all of the same reasons that the Trustee's Collateral Value Materials fail. In addition, the purported January 31, 2013 valuation is inadmissible as it cannot be authenticated. Counsel to the Trustee asked three witnesses at deposition regarding this purported valuation, and each witness testified that he had no recollection of seeing the document before and/or did not know who prepared the document. *See* SMF, Ex. N (Mehta Dep. Tr. dated Nov. 16, 2015) at 26:13–16, 27:5–6, 33:18–34:10, 43:17–21; SMF, Ex. H (McDougal Dep. Tr. dated Dec. 2, 2015) at 258:6–10, 261:21–262:2; SMF, Ex. O (Jupiter Dep. Tr. dated Jan. 12, 2016) at 224:9–13.

[65] *See* SMF ¶¶ 8–11; *id.*, Ex. L (Gupta Dep. Tr. dated Jan. 4, 2016) at 155:2–12; *id.*, Ex. K (Huh Dep. Tr. dated Jan. 21, 2016) at 199:16–23 and 274:5–15.

[66] SMF, Ex. EE (Ltr. From D. Friedman dated Jul. 22, 2015).

REDACTED FILED UNDER SEAL

Because Mr. Maxwell's equity hurdle must be at least €2,993 million, CEVA Group had no equity value at the time of the restructuring. The Trustee's claims set forth in Counts 1–3, 5 and 11–12 and any claims for damages under Counts 4 and 7–9 of the Amended Complaint fail as a result.

## III.    COUNTS 4 AND 5 FAIL BECAUSE THERE WAS NO POST-PETITION TRANSFER AND, REGARDLESS, THE CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES

CEVA Group's 2013 Restructuring did not close until May 2, 2013, nearly two weeks after CIL's Petitioning Creditors first filed an involuntary bankruptcy petition against CIL. The Trustee alleges that, by closing the final steps of the transaction after the filing (e.g., exchanging the shares of CEVA Holdings for CEVA Group's debt securities), the CEVA Defendants violated the automatic stay (Count Four) and conducted an unauthorized post-petition transfer (Count Five).

The CEVA Defendants are entitled to summary judgment on Counts Four and Five for at least two reasons. First, there was no post-petition transfer or interference with estate property. The act giving rise to these claims is CIL's consenting to and CEVA Group's issuance of new shares, thereby diluting CIL's ownership interest in CEVA Group from 100% to .01% (the so-called "CEVA Equity Transfer"). But these actions undisputedly took place and were final ***prior to*** the bankruptcy filing. After the bankruptcy filing, CEVA Group proceeded with the remaining steps of the larger 2013 Restructuring, but those actions could not and did not cause any further effect to CIL or its property.

Second, even if the completion of the restructuring transaction could be found to have violated the automatic stay or constitute an unauthorized post-petition transfer (which it did not), the Trustee's claims are nevertheless barred by the doctrine of laches. The Petitioning Creditors were well aware when they filed the petition in April 2013 that CEVA Group intended to close

the 2013 Restructuring in early May but did nothing to try to stop it. Instead, CIL's creditors

preferred to let the 2013 Restructuring close, knowing that it would likely ensure CEVA Group's

survival and financial ability to settle this case or satisfy any judgment the Trustee might succeed

in obtaining.[67] Further, since that time, CEVA Group's capital structure has been predicated on

the 2013 Restructuring transaction: it equitized nearly €1.1 billion in debt (more than €600

million of which would have matured by now), exchanged and restructured €238 million of other

debt, and raised approximately €171 million in desperately needed cash to fund its operations. REDACT

### A. There Was No Post-Petition Transfer or Interference with Estate Property in Violation of the Automatic Stay

#### 1. *The Transfer of CIL's Ownership Interest in CEVA Group Took Place Prior to the Bankruptcy Filing*

CEVA Group's 2013 Restructuring affected property of CIL in one respect and one

respect only: at the outset of the transaction, CEVA Group (with CIL's consent) issued a large

number of new shares, thereby diluting CIL's ownership interest from 100% to 0.01%.

Specifically, on April 1, 2013, during a meeting of CEVA Group's shareholders, CIL gave its

consent to CEVA Group issuing 3,499,650,000 new shares (the "New Shares").[68] That same day,

during a meeting of the CEVA Group Board of Directors, CEVA Group approved the issuance of

the New Shares and resolved to allot them to AP VI CEVA Holdings, L.P.[69] On April 16, 2013,

AP VI CEVA Holdings, L.P. formally applied for the shares, and that same day, CEVA Group

allotted the shares to AP VI CEVA Holdings, L.P., rendering it the 99.99% owner of CEVA

---

[67] In contrast, the Trustee (now being funded by the Petitioning Creditors) had no hesitation in moving to enforce the automatic stay against the Florida class action.

Group.[70] Thus, as of April 16, 2013 at the latest, the CEVA Equity Transfer had occurred in full, and the dilution of CIL's shareholding interest in CEVA Group down to 0.01% was complete.[71]

### 2. None of the Events That Occurred After the Bankruptcy Filing Involved or Impacted Estate Property in Any Way

Six days after the completion of the CEVA Equity Transfer, on April 22, 2013, the Petitioning Creditors filed an involuntary bankruptcy petition against CIL.[72] Thereafter, on April 29, 2013, CEVA Group's Board of Directors approved the resale of the New Shares from AP VI CEVA Holdings, L.P. to defendant CEVA Holdings, a new holding company, which would then issue its own shares in exchange for, inter alia, CEVA Group's unsecured bonds and second lien bonds in the approximate amount of €1.1 billion (the "Exchange Offer") and new money investment (the "Rights Offering").[73] AP VI CEVA Holdings, L.P. formally sold the New Shares to CEVA Holdings in a Share Purchase Agreement dated May 2, 2013.[74] In this way, CEVA Holdings became (and today remains) the 99.99% owner of CEVA Group, and CEVA Group's creditors became the owners of CEVA Holdings. At all times on and after April 22, 2013, CIL continued to hold the same 0.01% interest it held prior to the bankruptcy filing.

Further, to the extent that the Exchange Offer and Rights Offering were contingent (i.e., not yet completed) as of April 1, 2013, it had no impact on the finality of the CEVA Equity Transfer. As the Court has already observed, if for any reason CEVA Group was unable to complete the restructuring out of court, CIL had consented, and CEVA Group was obligated, to

---

[68] *See* Declaration of Marvin Schlanger dated March 15, 2018 ("Schlanger Decl.") ¶ 7, Ex. 1 (April 1, 2013 Meeting Minutes and Resolutions); SMF ¶¶ 54–60.

[69] *See* Schlanger Decl. ¶ 8; SMF ¶¶ 54–60.

[70] *See* Schlanger Decl. ¶ 9, Ex. 2 (April 16, 2013 Application for Shares) and Ex. 3 (April 16, 2013 Register of Members); SMF ¶¶ 54–60.

[71] *See* Schlanger Decl. ¶ 9; SMF ¶¶ 54–60.

[72] *See* Schlanger Decl. ¶ 10; SMF ¶ 61; Involuntary Petition [ECF No. 1].

[73] *See* Schlanger Decl. ¶ 14, Ex. 5 (Offering Memorandum) at 157–191, and Ex. 6 (Report to Bondholders) 20–28; SMF ¶¶ 63–64.

[74] *See* Schlanger Decl. ¶ 12, Ex. 4 (Share Purchase Agreement); SMF ¶ 63.

file a pre-packaged bankruptcy to accomplish the same restructuring.[75] In other words, under no circumstances was the CEVA Equity Transfer subject to reversal once CIL consented on April 1, 2013.

**3.**     *Because No Estate Property Was Transferred or Interfered with Following the Bankruptcy Filing, the CEVA Defendants Are Entitled to Summary Judgment*

Based on these events, the Trustee asserts claims against the CEVA Defendants for violation of the automatic stay under Section 362 of the Bankruptcy Code and unauthorized post-petition transfer under Section 549 of the Bankruptcy Code. Under Section 362(a), the filing of a bankruptcy petition operates as stay of, in relevant part, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Under Section 549, the Trustee may "avoid a transfer of property of the estate … that occurs after the commencement of the case." Both statutes are exclusively concerned with interference with estate property occurring *after commencement of the case*. But as described above, there has been no such interference in this case, because the CEVA Equity Transfer—the only portion of the 2013 Restructuring that involved CIL's property in any way—was complete prior to the bankruptcy filing.

In fact, the Court has essentially already determined that the CEVA Equity Transfer was complete prior to the bankruptcy filing. In support of Counts Four and Five, the Trustee alleges that "in the event it should be adjudged that the CEVA Equity Transfer and the CEVA Debt Transaction are parts of a single integrated transaction, the CEVA Equity Transfer is part of a transfer and transaction that was performed in part after the Petition Date."[76] But the Court

---

[75] *See* Schlanger Decl. ¶ 20; SMF ¶ 72; Memo. Decision [ECF No. 100] at 89.
[76] *See* Am. Compl. [ECF No. 21] ¶¶ 166, 170.

specifically rejected this line of argument in granting the CIL Directors' motion to dismiss the

automatic stay claim with prejudice:

> [T]he Trustee contends that if it is determined that the CEVA
> Equity Transfer and CEVA Debt Transaction are parts of one
> unified transaction that did not close until after the Petition Date,
> the Directors' prepetition actions "will have facilitated and caused
> a post-petition transfer in violation of the automatic stay." Trustee's
> Opp'n at 100. The Trustee cites no support for that proposition.
> The Court rejects it, as it flies in the face of the plain language of
> section 362(a) that clearly provides that the automatic stay does not
> arise until the filing of a voluntary or involuntary bankruptcy
> petition. *See* 11 U.S.C. § 362(a).

Memo. Decision [ECF No. 100] at 98.

The Court's decision is the law of the case and should be extended to the Trustee's claims

against the CEVA Defendants arising under Sections 362 and 549 based on the undisputed facts.

In closing the last steps of the restructuring after the involuntary petition had been filed, the

CEVA Defendants did not interfere with estate property in any fashion. Although the CIL Equity

Transfer was conditioned on CEVA Group's contractual undertaking to launch and effectuate the

Exchange Offer and Rights Offering (either out of court or through a bankruptcy filing), the

CEVA Equity Transfer was nevertheless a distinct, initial step in the restructuring—and the only

step allegedly involving CIL or its property. Because the CEVA Equity Transfer was entirely

complete before the bankruptcy filing and no interference with CIL property occurred after the

bankruptcy filing, the CEVA Defendants are entitled to summary judgment on the Trustee's

Counts Four and Five for violation of the automatic stay and for an unauthorized post-petition

transfer, respectively.

**B.      The Trustee's Claims for Violation of the Automatic Stay and Post-Petition
          Transfer Are Barred by Laches**

Alternatively, if a triable issue existed concerning Counts Four and/or Five, the Trustee's

claims are nevertheless barred by the doctrine of laches. Upon bringing the involuntary petition

to commence this bankruptcy, the Petitioning Creditors deliberately decided <u>not</u> to file a motion

to enforce the stay or otherwise prevent CEVA Group from completing the 2013 Restructuring;

instead, the Petitioning Creditors let the €1.1 billion transaction close and then waited more than

a year and a half to bring their claim to avoid the 2013 Restructuring. In the meantime, CEVA

Group has operated its business in reliance on the 2013 Restructuring          REDACTED


The Petitioning Creditors had a very deliberate motivation for letting the restructuring

close; indeed, it favored their interests because a CEVA Group bankruptcy—which would have

immediately followed any order blocking the out-of-court restructuring—would have threatened

CEVA Group's survival and at a minimum resulted in a material reduction in CEVA Group's

future earnings and thus its value. The idea that CIL could recover value on account of its equity

in an actual CEVA Group bankruptcy was not fathomable, and the Trustee has never alleged

otherwise. A bankrupt CEVA Group would have made it impossible for the CIL creditors to

recover anything.

In light of the conscious and unreasonable delay by CIL's creditors and the Trustee in

trying to stop the 2013 Restructuring and the substantial prejudice CEVA Group would suffer if

the restructuring were avoided today, the CEVA Defendants are entitled to summary judgment on

Counts Four and Five on the grounds of laches. *See Perez v. Danbury Hosp.*, 347 F.3d 419, 426

(2d Cir. 2003) (laches defense under federal law is established by showing (i) unreasonable delay

by the claimant in bringing suit and (ii) prejudice resulting from that delay); *Secs. Inv'r.*

*Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 490 B.R. 59, 74 (S.D.N.Y. 2013) (denying

Trustee's claim for stay violation on laches grounds where Trustee, despite having "full

knowledge" of the details of the action it believed violated the automatic stay, "waited on the

sidelines for nearly four years prior to seeking to declare the [action] void *ab initio*"); *Secs. Inv'r.*

*Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 491 B.R. 27, 33–35 (S.D.N.Y. 2013)

(internal citations omitted) (denying Trustee's claim for stay violation on laches grounds where

Trustee had waited three years before trying to stay pending lawsuit, and third parties had acted

in reliance upon the existence of the pending lawsuit in deciding not to bring their own); *In re*

*Terrace Hous. Assocs., Ltd.*, 577 B.R. 459, 462–63 (Bankr. E.D. Pa. 2017) (concluding that the

debtor was precluded from prosecuting a motion to enforce the stay under the doctrine of laches

because, among other things, the sale transaction the debtor sought to stay had already been

completed and the creditor had "relied on the Debtor's silence and apparent acquiescence with

the sale" in completing the sale).

### 1. The Petitioning Creditors Made a Conscious Decision Not to Try to Enjoin the 2013 Restructuring

At the very outset of this case, the Petitioning Creditors were aware that the CEVA Equity

Transfer had already been completed, and made a conscious decision ***not*** to try to stop the

remaining steps of the 2013 Restructuring.[77] By way of background, the Petitioning Creditors are

three investment funds affiliated with Cyrus Capital Partners ("Cyrus").[78] Collectively, Cyrus

held approximately €68 million of the €105 million of PIK Notes issued by CIL and outstanding

as of the 2013 Restructuring.[79] It is Cyrus, acting through counsel at the Kasowitz law firm,

which initiated the bankruptcy filing and moved for the appointment of the Trustee.[80] Upon his

appointment, the Trustee retained Kasowitz as his counsel, and Cyrus has continued to instruct

---

[77] *See generally* SMF ¶¶ 106–125.

[78] *See* Involuntary Petition [ECF No. 1]; SMF ¶ 106.

[79] *See* SMF ¶ 107, Ex. KK (CIL PIK Noteholder Table).

[80] *See* Involuntary Petition [ECF No. 1]; Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee [ECF No. 6]; SMF ¶ 108.

the Trustee over the course of this litigation.[81] Because PIK Noteholders holding approximately €1 million of PIK Notes tendered their PIK debt in connection with the 2013 Restructuring, Cyrus is the only major PIK Noteholder outstanding and thus the primary beneficiary of the claims.[82] Indeed, Cyrus has funded the litigation from the outset.[83]

Cyrus is a highly sophisticated distressed debt investor which, according to public reports, has approximately $6.2 billion of assets under management.[84] Unsurprisingly, Cyrus was entirely aware of the 2013 Restructuring—including the Exchange Offer and the Rights Offering—from the moment it was announced and followed it very closely.[85] Within eight days of the announcement, Cyrus had retained counsel in the Cayman Islands which had begun to engage with the CIL liquidators.[86] By April 22, 2013, Cyrus's attorneys at Kasowitz had prepared and filed an involuntary bankruptcy filing and lengthy motion papers seeking the expedited appointment of a Trustee.[87] Those papers, which totaled more than 600 pages and evidenced an advanced understanding of the 2013 Restructuring, contained an entire section titled "The

---

[81] *See* Application to Employ Kasowitz, Benson, Torres & Friedman LLP as Special Counsel for the Trustee [ECF No. 35]; SMF ¶ 109.

[82] *See* SMF ¶ 110, Ex. LL (Documentation Evidencing Exchange of PIK Debt by Funds Affiliated with Caspian Capital LP).

[83] *See, e.g.,* Motion to Approve (i) Postpetition Financing, Superpriority Claims, and Granting of Liens; and (ii) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for the Chapter 7 Trustee and Retained Professionals [Case No. 13-11272 ECF No, 63]; Motion to Authorize Payment to the Joint Official Liquidators, their Counsel and Counsel to the Liquidation Committee from Certain Loan Proceeds [ECF No. 109]; Second Motion to Authorize Payment To The Joint Official Liquidators, Their Counsel And Counsel To The Liquidation Committee From Certain Increased Loan Proceeds [ECF No. 128]; Motion to Authorize Payment to Peter J. Solomon Company, L.P. from Certain Loan Proceeds [ECF No. 133]; SMF ¶ 111.

[84] *See* SMF ¶¶ 112–113.

[85] *See* SMF ¶ 114, Ex. MM (April 4, 2013 Emails Among Cyrus Personnel).

[86] *See* SMF ¶ 115, Ex. NN (April 11, 2013 Letter from Cyrus Cayman Counsel). Six days later, Cyrus's Cayman counsel sent another letter in which they indicated their "          **REDACTED**

                    *See* SMF, Ex. OO (April 17, 2013 Letter from Cyrus Cayman Counsel ).

[87] *See* Involuntary Petition [ECF No.1]; Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee [ECF No. 6] and Declaration in Support Thereof [ECF No. 7]; SMF ¶ 117.

Automatic Stay Applies But It May Not Suffice," establishing that Cyrus and its counsel had

considered the exact status of the 2013 Restructuring as of the filing date, and whether the

automatic stay would have any application to the remaining steps.[88]

Ultimately, neither Cyrus nor the Trustee ever made any attempt to stop CEVA Group

from completing the remaining steps of the restructuring after the bankruptcy filing. During his

deposition, Cyrus's Founder and Chief Investment Officer Stephen Freidheim admitted that

REDACTED

[89] Mr. Freidheim testified that Cyrus "           REDACTED

.[90] Moreover,

during an April 30, 2013 hearing before the Court just days after the petition was filed and before

the remaining steps of the transaction were completed, Judge Peck specifically asked counsel for

the Petitioning Creditors (now counsel to the Trustee) what kind of action, if any, the Petitioning

Creditors intended to take in respect of the Exchange Offer, and counsel responded that they

would not try to stop it.[91]

It is clear that Cyrus and the Trustee's counsel made a strategic decision ***not*** to seek to

enjoin the transaction because they knew that obtaining an injunction would result in an

immediate bankruptcy filing by CEVA Group. Forcing CEVA Group to commence a bankruptcy

case to consummate the 2013 Restructuring would have been value destructive, and would have

resulted in no possibility of recovery by CIL; Cyrus instead wanted CEVA Group to restructure

out of court so that it would have a solvent entity against which to litigate their claims. Indeed,

---

[88] *See* Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee [ECF No. 6] at 15; SMF ¶ 118.

[89] *See* SMF ¶ 120, Ex. D (Freidheim Tr.) at 121:24–123:4.

[90] *See id.* at 122:9–22; *see also* SMF ¶ 113.

[91] *See* SMF ¶ 122, Ex. E (April 30, 2013 Hearing Tr.) at 7:14–9:2; 15:3–8.

when asked during his deposition, "                    REDACTED

                    Mr. Freidheim answered, "        REDACTED        ."[92] And

the Petitioning Creditors' counsel admitted during the April 30, 2013 hearing that while Cyrus

"think[s] that [CEVA] is solvent today, [] they're restructuring it in a way where it's going to

become even more solvent. So that's certainly an avenue of recovery."[93]

        Ultimately, rather than trying to stop the restructuring transaction, the Trustee spent more

than a year and a half conducting extensive Rule 2004 discovery and made no effort to stop or

undo the 2013 Restructuring. When he finally filed his original complaint in this adversary

proceeding in December 2014 he claimed that the CEVA Equity Transfer—completed before the

filing—was a fraudulent transfer and stay violation and had caused CIL damages. While the

CEVA Defendants expected the Trustee might bring a lawsuit seeking damages related to the

restructuring given his extensive discovery efforts, they were shocked to see the Trustee asserting

claims seeking to undo the restructuring itself.[94]

        **2.      The CEVA Defendants Have Operated Their Global Business in
                Reliance on the 2013 Restructuring for the Past Five Years**

        The CEVA Defendants have operated their global business in reliance on the 2013

Restructuring for the past five years.[95] The restructuring was absolutely vital to CEVA Group's

ability to continue to function as a going concern.[96] As a result of the restructuring, CEVA Group

was able to shed more than €1 billion in secured and unsecured debt, raise €171 million in

desperately needed cash, and slash its ongoing cash interest obligations.[97] Additionally, one of

---

[92] *See* SMF ¶ 121, Ex. D (Freidheim Tr.) at 122:23–123:4.

[93] *See* SMF ¶ 123, Ex. E (April 30, 2013 Hearing Tr.) at 15:8–11.

[94] *See* Schlanger Decl. ¶ 30; SMF ¶ 124.

[95] *See* Schlanger Decl. ¶ 21; SMF ¶¶ 92–105.

[96] *See* Schlanger Decl. ¶ 21; SMF ¶¶ 65, 92.

[97] *See* Schlanger Decl. ¶ 15; SMF ¶¶ 93–94.

CEVA Group's largest creditors, Franklin, exchanged €72 million in first lien debt with EURIBOR/US LIBOR +5% interest due August 2016 and €166 million in first lien debt with 8.375% interest due December 2017 for $238 million in new first lien debt with 4% interest due May 2018 (which was subsequently exchanged, as described below) (the "Franklin Financing Commitment"); this saved CEVA Group €7.26 million annually in cash interest.[98]

It is impossible to conceive how the 2013 Restructuring could now be declared "void" and CEVA Group returned to its former capital structure,                REDACTED

103

---

[98] *See* Schlanger Decl. ¶ 19.

[99] *See id.* ¶ 22; *see generally* SMF ¶¶ 92–105. Alternatively, as discussed *infra* at 41, it would be highly inequitable to allow the Trustee to re-acquire 100% of the shares of a now de-levered and adequately capitalized CEVA Group without also reversing the other steps of the 2013 Restructuring.

[100] *See* Schlanger Decl. ¶ 22; SMF ¶ 97.

[101] *See* Schlanger Decl. ¶ 23; SMF ¶95.

[102] *See* Schlanger Decl. ¶ 24.

[103] *See id.* ¶ 25.

REDACTED                                                . For

example, in reliance on this massive de-leveraging and cash raise, CEVA Group has entered into

many material debt transactions that have permanently and significantly altered its capital

structure.[104]                              REDACTED


.[105] A chart demonstrating how CEVA

Group's capital structure differs from the time of the 2013 Restructuring is attached to the SMF

as Exhibit RR.

If the Petitioning Creditors were serious about blocking the 2013 Restructuring from

being completed, they should have moved to enjoin the transaction at the outset of the case, or at

the very least, shortly thereafter. Their delay is inexcusable, and the remedy sought, inequitable.

*See Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984) (finding automatic stay was barred by

laches and noting that "[s]uspension of Section 362 automatic stay provisions may be consonant

with the purposes of the Bankruptcy Act when equitable considerations weigh heavily in favor of

the creditor and the debtor bears some responsibility for creating the problems."). The CEVA

Defendants are therefore entitled to summary judgment on the Trustee's claims for violation of

the automatic stay and unauthorized post-petition transfers on the ground of laches.

## IV.   THE TRUSTEE CANNOT SEEK THE REMEDY OF AVOIDANCE AT THIS STAGE

Assuming *arguendo* that triable issues exist for one or more of the remaining claims, the

CEVA Defendants respectfully submit that they are nevertheless entitled to summary judgment

limiting the ***remedy*** to which the Trustee could ultimately be entitled to money damages. In his

---

[104] *See id.* ¶ 27; SMF ¶ 99.
[105] *See* Schlanger Decl. ¶ 28; SMF ¶ 100.

Amended Complaint, the Trustee seeks, *inter alia*, an order "avoiding the transfer of CEVA to CEVA Holdings, and preserving and recovering CEVA Group's equity interests for the benefit of CIL and its bankruptcy estate," and for damages.[106] Given the length of time that has elapsed as well as the substantial reliance that has been placed upon the 2013 Restructuring, it would be practically impossible and also inequitable to direct the reversal of all or even part of the 2013 Restructuring. Rather, even assuming, *arguendo*, the Trustee could prevail on one or more of the remaining claims, the Trustee should be limited to an award of damages.

### A.     The CEVA Defendants Are Entitled to Summary Judgment on the Appropriate Remedy

This Court is fully empowered to grant summary judgment as to a requested remedy. *See, e.g.*, *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307–08 (E.D.N.Y. 2010) ("claim" for purposes of Fed. R. Civ. P. 56 included both the theory of liability and the remedy that theory supports); *Gaither v. Stop & Shop Supermarket Co. LLC*, 84 F. Supp. 3d 113, 122, 122 n.8 (D. Conn. 2015) (considering on summary judgment whether defendant's invitation to plaintiff to reapply for her position and her failure to do so precluded plaintiff from an award of damages for back or front pay); *U.S. S.E.C. v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *9, *14-15 (N.D. Ill. Aug. 28, 2012) (finding that "a particular remedy is part of a claim on which summary judgment may be granted" and granting summary judgment as it related to the equitable remedies of injunction and director/officer bar where there was "no evidence to support" awarding those remedies). Here, summary judgment is appropriate because there is no dispute that one of the Trustee's requested remedies—avoidance of CEVA Group's 2013 Restructuring— would be highly inequitable and likely impossible. Thus, for the reasons described below, the Court should hold that, even if the Trustee ultimately establishes liability on any of the Trustee's

---

[106] *See* Am. Compl. [ECF No. 21] at 66.

counts seeking avoidance, the Trustee would be entitled only to damages and not avoidance as a matter of law.

### B.    Avoidance of the Entire 2013 Restructuring Is Impossible

As the Court has already determined, the 2013 Restructuring was an integrated, multi-step transaction.[107] Practically speaking, avoiding the restructuring would require the reversal of all of the steps undertaken at the time, and any related transactions taken since. For example, as explained above in connection with Counts Four and Five,            REDACTED



.[108]                    REDACTED                    .[109]

Bankruptcy courts are "courts of equity and appl[y] the principles and rules of equity jurisprudence." *Young v. United States*, 535 U.S. 43, 50 (2002). Under these circumstances equitable considerations preclude the actual reversal of the 2013 Restructuring as a remedy here. In the bankruptcy context, courts routinely decline to intervene even when they could do so pursuant to the doctrine of equitable mootness. Under Second Circuit precedent, claims for relief that require modification of a substantially consummated plan are presumed equitably moot unless all five of the following factors (the "*Chateaugay* Factors") are shown:

(a) The court can still order some effective relief;

(b) Such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

(c) Such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction

---

[107] *See* Memo. Decision [ECF No. 100] at 87.

[108] *See* Schlanger Decl. ¶¶ 22–27; SMF ¶¶ 92–105.

[109] *See* Schlanger Decl. ¶¶ 27–29; SMF ¶¶ 92–105.

> that has taken place and create an unmanageable,
> uncontrollable situation for the Bankruptcy Court;
>
> (d) The parties who would be adversely affected by the
> modification have notice of the appeal and an opportunity to
> participate in the proceedings; and
>
> (e) The [movant] pursue[d] with diligence all available remedies to
> obtain a stay of execution of the objectionable order … if the
> failure to do so creates a situation rendering it inequitable to
> reverse the orders appealed from.

*Parker v. Motor Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 80 (S.D.N.Y. 2010) (citing *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.*), 10 F.3d 944, 952–53 (2d Cir. 1993) ("*Chateaugay II*").

Although the CEVA Defendants acknowledge that equitable mootness usually applies in the appeal context where a reorganization has been approved by the Bankruptcy Court and has been substantially consummated, the equitable mootness case law is still instructive. Here, CEVA Group engaged in a consensual, out-of-court restructuring that saved the company, and all of its stakeholders stand by that restructuring except for a lone, structurally subordinated, and litigious out-of-the-money creditor.[110] Moreover, the restructuring that the Trustee seeks to undo was completed nearly five years ago and there has been substantial reliance on it as a result.[111] Therefore, the very same equitable considerations should apply, and four of the five *Chateaugay* factors are not satisfied here.

The first *Chateaugay* Factor requires that plaintiffs show that effective relief can be fashioned to address their claims. *See Chateaugay II*, 10 F.3d at 952–53. As discussed throughout this brief, the 2013 Restructuring cannot be unwound. Too many events have taken place in reliance on the restructuring.[112] Moreover, even if relief could be fashioned, doing so would be

---

[110] *See supra* p. 30; *see also* SMF ¶¶ 49–72, 106–125.

[111] *See supra* p. 33; Schlanger Decl. ¶ 21; SMF ¶¶ 92–105.

[112] *See supra* p. 33; Schlanger Decl. ¶¶ 22–27; SMF ¶¶ 92–105.

tremendously unfair to all of CEVA Group's stakeholders who have participated in various

aspects of the restructuring and various transactions since then and whom the Trustee has neither

sued nor accused of wrongdoing. In contrast, even if the Court found that CEVA Group's equity

had some sliver of value as of April 1, 2013 and found for the Trustee on any of his claims, that

can be remedied by a damages award.

The second *Chateaugay* Factor requires that the relief not affect the re-emergence of the

debtor as a revitalized corporate entity. *See Chateaugay II*, 10 F.3d at 952–53. REDACTED

.[113]

Under the third *Chateaugay* Factor, allowing the Trustee to avoid the 2013 Restructuring

would "unravel intricate transactions so as to 'knock the props out from" every subsequent

transaction that was predicated upon the 2013 Restructuring. *Chateaugay II*, 10 F.3d at 953

(quoting *Trone v. Robert Farms, Inc. (In re Roberts Farm, Inc.)*, 652 F.2d 793, 797 (9th Cir.

1981). In the nearly five years since the 2013 Restructuring was completed, CEVA Group has

operated its global business in reliance of its improved credit profile.[114]   REDACTED

. As the

court in *In re Trico Marine Services, Inc.* observed, "[i]f stock is issued under a plan to creditors

in satisfaction of their debts, restoration of the status quo requires the reinstatement of the debts

and the cancellation of the stock." *Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine

Servs.)*, 343 B.R. 68, 71 (S.D.N.Y. 2006). Here, new equity in the form of shares in CEVA

Holdings has been issued and traded in the secondary market in reliance of the restructuring.[115]

---

[113] *See supra* p. 33; Schlanger Decl. ¶¶ 20, 22, 28; SMF ¶ 93.
[114] *See supra* p. 33; Schlanger Decl. ¶ 29; SMF ¶¶ 92–105.
[115] *See* SMF ¶ 105.

These shares would theoretically lose all value if the restructuring was undone as the Trustee proposes.

Lastly, the fifth *Chateaugay* Factor requires that the Trustee "pursue[] with diligence all available remedies to obtain a stay of execution of the objectionable order … if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." *In re Motors Liquidation Co.*, 430 B.R. at 80 (quoting *Chateaugay II*, 10 F.3d at 952–53). Here, the Petitioning Creditors opted not to invoke the alleged impact of the automatic stay in 2013 and allowed CEVA Group to pursue its restructuring and emerge in a better financial posture.[116] This was by design, so the Trustee could litigate against a solvent CEVA Group.[117] But in waiting until CEVA Group de-levered itself by nearly €1.1 billion and raised €171 million in new equity capital before seeking an avoidance remedy, the Trustee effectively acquiesced to the 2013 Restructuring. It would be inequitable for the Court to now grant an avoidance remedy given the Trustee's delay.

These equitable considerations entitle the CEVA Defendants to summary judgment on the avoidance remedy sought by the Trustee.

## C.    Avoidance of Only the CEVA Equity Transfer Would Also Be Inequitable

The Trustee may argue that rather than avoid the entire transaction, the Court may simply avoid the CEVA Equity Transfer itself, i.e., the first step in the multi-step, fully-integrated transaction. This would again render CIL the 100% owner of CEVA Group, except that its ownership of CEVA Group would be drastically different than it was back at the time of the 2013 Restructuring which took nearly €1.1 billion of debt off CEVA Group's books and raised €171

---

[116] *See supra* p. 30; Schlanger Decl. ¶ 31; SMF ¶¶ 106–125.
[117] *See supra* p. 30; SMF ¶ 121.

million in cash.[118] This would constitute a gross windfall for CIL and be just as inequitable as avoiding the entire 2013 Restructuring, if not more so.

As noted above, regardless of what substantive law governs Counts 1–3 bankruptcy, courts are "courts of equity and appl[y] the principles and rules of equity jurisprudence." *Young*, 535 U.S. at 50. The Bankruptcy Code is thus intended to restore creditors to their positions and not to deliver a windfall. *See, e.g.*, *In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) (stating fraudulent transfer laws are remedial rather than punitive). For example, Section 550 provides for partial avoidance because creditors are entitled to recover only what is necessary to satisfy their claim. *See Slone v. Lassiter (In re Grove–Merritt)*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("A fraudulent transfer should be avoided only to the extent creditors were harmed."); *see also In re Murphy*, 331 B.R. 107, 114 (Bankr. S.D.N.Y. 2005):

> The bankruptcy objective of the avoidance powers in Sections 544 and 548 is to protect creditors generally from prejudice resulting from transfers of the debtor's property for less than fair consideration, resulting in diminution of the debtor's estate available to pay creditors. That objective can and must be reconciled with state law and public interest by limiting the measure of avoidance damages under Sections 548 and 550 to the amount necessary to make creditors of the debtor's estate whole.

Creditors are therefore entitled to collect only what is owed and no more. *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. Withum Smith Brown, P.C.*, 692 F. 3d 283, 295–96 (3d Cir. 2012).

Undoing just the CEVA Equity Transfer while leaving the remaining steps in place would result in an unacceptable windfall to CIL, its creditors, and its shareholders, at the expense of innocent non-parties that no one alleges are at fault. The "ownership of CEVA Group" that would be returned to CIL is totally different—and much more valuable—than what CIL allegedly

---

[118] *See* Schlanger Decl. ¶¶ 22–27; SMF ¶ 65.

"transferred" away in the 2013 Restructuring. Among other things, the restructuring took more

than €1 billion in debt off CEVA Group's balance sheet and raised €171 million in cash.

Ironically, if the CEVA Equity Transfer were avoided while leaving the rest of the restructuring

in place, then Apollo, whom the Trustee falsely alleges orchestrated the entire 2013

Restructuring, would also benefit as the majority shareholder of CIL, entitled to all value above

the CIL PIK debt. That result further highlights the fundamental cognitive dissonance of the

Trustee's case.

It would also unfairly penalize those who exchanged their debt in CEVA Group for equity

in CEVA Holdings as well as those who acquired CEVA Holdings equity in the Rights Offering

or later on, and essentially confiscate their beneficial ownership of CEVA Group, obtained for

value in the form of new money and relinquishing nearly €1.1 billion in debt. For example, as

part of the rights offering, CapRe (a party that has not been accused of any wrongdoing) (i)

equitized €285 million in second lien and senior unsecured CEVA Group debt[119] and (ii)

contributed €75 million in new money for shares in CEVA Holdings.[120] Ordering the reversal of

just the CEVA Equity Transfer but not the remaining steps in the 2013 Restructuring would

completely wipe out CapRe's investment and create a windfall for CIL, whose interest in CEVA

Group was junior to CapRe's!

Ultimately, an order confiscating CEVA Group's stock in 2018 and simply giving it to

CIL without undoing the entirety of the 2013 Restructuring would be functionally equivalent to

Apollo, CapRe, Franklin, and other participants in the 2013 Restructuring relinquishing their

secured and unsecured debt in the company and voluntarily contributing new capital, all for the

benefit of CIL and without receiving any consideration in return. A billion-euro transaction that

---

[119] *See* Schlanger Decl. ¶ 16, Ex. 7 (2013 Annual Report) at 59; SMF ¶ 66, Ex. II (Project Phelps Equity Allocation for Final Transaction)

[120] *See id.*

was consented to by virtually all of the stakeholders would be undone at the behest of an out-of-the-money creditor holding only €68 million in structurally inferior debt. Such a result is absurd, and thus, to the extent that the Court determines that the Trustee is entitled to a recovery, any remedy should be limited to money damages.[121] *See Nuveen Mun. Tr.*, 692 F. 3d at 295–96.

## V.    THE TRUSTEE'S CLAIM FOR TURNOVER (COUNT 13) FAILS BECAUSE THE PARTIES DISPUTE THAT THE FUNDS ARE OWED TO CIL

When the Trustee filed his Amended Complaint, he alleged five separate causes of action with respect to what he termed the "CIL Cash": turnover, conspiracy, unjust enrichment, breach of contract, and injunction.[122] Following this Court's decision on the CEVA Defendants' Motion to Dismiss, only one of those claims remains: turnover under Section 542 of the Bankruptcy Code.

The CEVA Defendants also had moved to dismiss the turnover claim, arguing that the ownership of the so-called "CIL Cash" was hotly disputed.[123] While the Court agreed that the existence of a bona fide dispute is sufficient to defeat a claim for turnover, its analysis of whether a dispute in fact exists was necessarily limited to the allegations contained in the Trustee's Amended Complaint and the few documents incorporated therein.[124] As a result, the Court denied the motion to dismiss on the ground that "the CEVA Defendants' mere denial of CIL's entitlement to the CIL cash *without explanation or support by any documentary evidence* is

---

[121] In fact, during his deposition, the Trustee repeatedly stated that he was primarily seeking money damages as opposed to avoiding the transaction. *See* SMF, Ex. J (LaMonica Dep. Tr. date Jan. 14, 2016) at 92:12–94:14 (Q. … What relief are you seeking? A. A money judgment. … Q. So you said earlier that you are seeking a money judgment. The first clause of that line reads that you're seeking to avoid the debtor's interest – A. Then it says or the value thereof. Q. Yes, or the value thereof. It is two separate relief. You're willing to accept either, right? You're willing to accept either a money judgment? A. I want the value. Q. Or the value. You said you want the value, I understand that. This line says that you want the value or you want the shares. Does it not? A. I guess you could interpret it that way, yes. Q. How else could you interpret it? A. It says I want the value.).

[122] *See* Am. Compl. [ECF No. 21] Counts 13–17.

[123] *See* Memorandum of Law Granting in Part and Denying in Part, Defendants' Motions to Dismiss Amended Complaint [ECF No. 100] at 105.

[124] *See id.* at 103–106.

42

insufficient grounds to find that, for purposes of Rule 12(b)(6), CIL's right to the CIL Cash is the subject of a bona fide dispute."[125]

The time to provide this "explanation [and] support by documentary evidence" has now arrived. As described herein, the CEVA Defendants dispute the Trustee's claim on a variety of different bases, all of which are supported by substantial fact and expert witness testimony, and numerous supporting documents. And while the CEVA Defendants are fully confident that they would prevail on the disputes on the merits, for purposes of the turnover claim, they need only establish that a bona fide dispute exists, thereby negating the "turnover" remedy. This is a low bar that the CEVA Defendants clear by a substantial margin.

## A.    Relevant Factual Background

To understand the CEVA Defendants' defenses entitling them to summary judgment on the turnover claim, it is important to understand the relevant background relating to what was previously known as the "Intercompany Claim" and what today the Trustee has dubbed the "CIL Cash." Reading the Trustee's Amended Complaint, one might come to the false belief that there is simply a bank account sitting in the Netherlands holding €14 million in cash that CIL gave to CEVA Group to hold and that CEVA Group agrees belongs to CIL. Such a belief, however, would be mistaken for the reasons described herein.

### 1.    The Cash at Issue Is Held in Cash Pooling Accounts Owned and Administered by CEVA Finance

Up until 2009, CIL had its own bank account.[126] That account, held at a financial institution called Coutts, was established to hold proceeds of CIL stock purchased by CEVA Group employees under CIL's 2006 long term incentive plan (the "LTIP").[127] In 2009, however,

---

[125] *See id.* at 106 (emphasis added).

[126] *See* McDougal Decl. ¶ 35; SMF, Ex. P (McDougal 30(b)(b) Tr.) at 16:10–13.

[127] *See* McDougal Decl. ¶ 35; SMF, Ex. P (McDougal 30(b)(b) Tr.) at 16:10–13.

in order to simplify CEVA Group's internal banking structure, CIL's account was closed and the cash was moved to one of CEVA Group's cash pooling arrangements managed by CEVA Logistics Finance B.V. ("CEVA Finance").[128]

CEVA Finance functions as the in-house bank and clearinghouse for the larger CEVA enterprise.[129] More than one hundred entities within the CEVA enterprise participate in one of the four cash pools administered by CEVA Finance, resulting in thousands of monthly accounting entries, cash deposits, and transfers.[130]

CIL was a "participant" in two of these cash pooling arrangements, one with Bank Mendes Gans ("BMG") and the other with the Royal Bank of Scotland ("RBS").[131] CIL's participation in the BMG cash pool was governed by a Logistics Cash Management Agreement ("LCMA") pursuant to which CIL consented to CEVA Finance opening a sub-account in its name.[132] The LCMA indicated that a positive balance "constitutes a payable from" CEVA Finance to CIL, while a negative balance "constitutes a payable to CEVA Finance."[133] CIL itself had no relationship with BMG and no ability to withdraw funds from the account.[134] At the time of the 2013 Restructuring, the balance in CIL's BMG sub-account was negative, indicating a payable owed by CIL to CEVA Finance.[135]

No documentation evidencing CIL's participation in the RBS cash pool exists.[136] This was not an oversight.[137] The RBS cash pool is a "notional" cash pool, meaning actual sub-

---

[128] *See* McDougal Decl. ¶ 36; SMF, Ex. P (McDougal 30(b)(b) Tr.) at 19:7–20:10.

[129] *See* McDougal Decl. ¶ 37; SMF ¶ 130.

[130] *See* McDougal Decl. ¶ 37; SMF ¶ 131.

[131] *See* McDougal Decl. ¶ 38; SMF ¶¶ 134, 139.

[132] *See* McDougal Decl. ¶ 38, Ex. 21 (LCMA) § 2.1; SMF ¶ 135.

[133] *See* McDougal Decl. ¶ 38, Ex. 21 (LCMA) §§ 2.2, 3.2; SMF ¶ 136.

[134] *See* McDougal Decl. ¶ 38; SMF ¶ 137.

[135] *See* McDougal Decl. ¶ 38; SMF ¶ 138, Ex. GG (Beith Spreadsheet).

[136] *See* McDougal Decl. ¶ 39; SMF ¶ 140.

accounts do not exist.[138] Instead, CEVA Finance created two "reference" accounts in CIL's name, one in euros and the other in U.S. dollars.[139] As with the BMG cash pool, only CEVA Finance held legal title to the accounts, and CIL had no ability to withdraw funds from the accounts.[140] At year-end 2012, the balance in CIL's reference accounts was positive on CEVA's books, but as discussed below and as CEVA Group discovered in early 2013, CEVA's books were incorrect.[141]

Over the course of CIL's participation in the cash pools, hundreds of payables to and receivables from CIL were recorded.[142] These payables and receivables related to, among other things, (i) CEVA Group employee purchases of CIL stock, (ii) CEVA Group employee redemptions of CIL stock, (iii) stock option "recharge expenses," (iv) certain fees and expenses, (v) legal settlements, and (vi) accrued interest.[143] The net sum of all the amounts listed as payables *to* CIL and all the amounts listed as payables *from* CIL was approximately €14 million in CIL's favor as of year-end 2012.[144] As described below, however, this amount was grossly overstated and should be disregarded or reduced.

**2.    *In the Months Leading Up to the 2013 Restructuring, CEVA Group Personnel Discovered Accounting Errors in Connection with the Cash Pools***

Until the end of 2012, CEVA Group and CIL had never been in a meaningful adversarial position.[145] As CEVA Group's parent holding company, CIL's interests were naturally aligned

---

[137] *See* McDougal Decl. ¶ 39.

[138] *See* McDougal Decl. ¶ 39, Ex. 22 (RBS Cash Pool Agreement) at 3 (referring to the "Notional Pooling Arrangement"); SMF ¶ 140.

[139] *See* McDougal Decl. ¶ 39, Ex. 23–24 (Documents evidencing reference accounts); SMF ¶ 141.

[140] *See* McDougal Decl. ¶ 39, Ex. 22 (RBS Cash Pool Agreement); SMF ¶ 142.

[141] *See* McDougal Decl. ¶ 39; SMF ¶¶ 143, 147–186, Ex. GG (Beith Spreadsheet).

[142] *See* McDougal Decl. ¶ 40, Exs. 25–27 (CIL BMG sub-account data), (CIL USD RBS reference account data), (CIL EUR RBS reference account data); SMF ¶ 144.

[143] *See* McDougal Decl. ¶ 40; SMF ¶ 145, Ex. GG (Beith Spreadsheet).

[144] *See* McDougal Decl. ¶ 40; SMF ¶ 146, Ex. GG (Beith Spreadsheet).

[145] *See* McDougal Decl. ¶ 41; SMF ¶ 147.

with CEVA Group's.[146] The two entities shared common management and pursued the same

ends.[147] This changed, at least in part, in the months leading up to the 2013 Restructuring once it

was determined that CIL's equity in CEVA Group was worthless and CIL would be asked to

relinquish that equity in order to facilitate a de-levering transaction that would rescue CEVA

Group from insolvency.[148]

At that time, CEVA Group began to scrutinize the intercompany payables and receivables

with CIL more closely and discovered certain errors related to the way in which the accounting

entries had been made. As discussed below, two errors were identified at that time. The first error

related to the cash paid over by CEVA Group employees for CIL stock. These funds were

mistakenly accounted for as debt, not equity. The decision to account for the CEVA Group

employee purchases of CIL stock as equity was actually made in 2009 when CIL joined the

CEVA Finance cash pooling arrangements.[149] When Rubin McDougal, CEVA Group's CFO at

the time of the restructuring, first joined the company in June of 2009, that decision had not yet

been implemented.[150] Upon joining, Mr. McDougal asked CEVA Group's treasurer to work with

his team and the legal department to implement the change.[151] It was only during the work

around the 2013 Restructuring that Mr. McDougal realized for the first time that his directive had

never been implemented.[152] This was not altogether surprising given that the dollar amounts

---

[146] *See* McDougal Decl. ¶ 41; SMF ¶ 148.

[147] *See* McDougal Decl. ¶ 41; SMF ¶ 148.

[148] *See* McDougal Decl. ¶ 41; SMF ¶ 150.

[149] *See* McDougal Decl. ¶ 45; SMF ¶¶ 155–156, Ex. P (McDougal 30(b)(6) Tr.) at 93:21–94:4, 99:19, 100:12–14.

[150] *See* McDougal Decl. ¶ 46; SMF ¶¶ 156–157, Ex. H (McDougal Tr.) at 266:10 –268:9; Ex. P (McDougal 30(b)(6) Tr.) at 32:6–35:5.

[151] *See* McDougal Decl. ¶ 46; SMF ¶ 157, Ex. P (McDougal 30(b)(6) Tr.) at 32:6–35:5.

[152] *See* McDougal Decl. ¶ 46; SMF ¶ 158, Ex. P (McDougal 30(b)(6) Tr.) at 28:3–13, 29:20–35:5, 59:23–61:6.

were comparatively small relative to CEVA Group's nearly €3 billion in debt owed to outside

creditors and were intercompany (as opposed to third-party) transactions.[153]

The second error related to the stock option "recharge expenses," specifically, CEVA

Group's failure to properly account for stock option awards that failed to vest. Like the failure to

account for the funds paid by CEVA Group employees for CIL stock as equity contributions, this

accounting error was not discovered until just prior to the restructuring and was not altogether

surprising given that the dollar amounts were comparatively small relative to CEVA Group's

nearly €3 billion in debt owed to outside creditors.[154] CIL was aware that CEVA Group was

concerned about this issue in March 2013.[155] And CIL Director Beith testified during his

deposition that, at the time of the 2013 Restructuring, CEVA Group had objected to both the total

amount of the so-called CIL Cash, as well as specific components thereof, including how those

components had built up over time and whether they were appropriate.[156]

The recharge expense issue is highly technical in nature. Indeed, in litigating the issue in

this proceeding, *both sides* retained experts on IFRS accounting, and each expert submitted

lengthy expert reports—a combined 157 pages—and sat for full-day depositions.[157] At the time

the issue was first discovered, the Company was in the midst of the 2013 Restructuring which

consumed nearly all its financial personnel resources, and thus CEVA Group could not devote the

necessary resources to resolve this complex issue to determine the exact amount and magnitude

of the errors relating to the stock option recharge expenses.[158] Thus, CEVA Group simply

indicated that the claim amount was "disputed" and chose to perform the particular calculations

---

[153] *See* McDougal Decl. ¶ 46; SMF ¶ 159.

[154] *See* McDougal Decl. ¶ 54; SMF ¶ 183, Ex. P (McDougal 30(b)(6) Tr.) at 28:3–13, 29:20–32:5.

[155] *See* SMF ¶ 184, Ex. HH (March 25, 2013 Beith email).

[156] *See* SMF, Ex. M (Beith Tr.) at 167:1–170:16.

[157] *See* SMF ¶ 166, Exs. T (Taub Report) and U (Brice Report).

[158] *See* McDougal Decl. ¶ 54; SMF ¶ 185, Ex. P (McDougal 30(b)(6) Tr.) at 51:23–24:24.

at a later time.[159] There is no question that CEVA Group immediately and consistently has

disputed this claim since prior to the 2013 Restructuring and throughout this lawsuit.[160]

### B.   The CEVA Defendants Dispute that Some or All of the Funds Are Owed to CIL for Three Separate Reasons

With this context, the CEVA Defendants can now further explain the disputes concerning

the CIL Cash. Again, all the CEVA Defendants must do is simply establish that there is a dispute,

not ask the Court to resolve it. The fact of the dispute is a sufficient basis to grant summary

judgment on the turnover claim in the CEVA Defendants' favor.

### 1.   *CEVA Group Employee Purchases of CIL Stock Should Have Been Accounted for as Equity, Not Debt*

The first basis for CEVA Group's dispute is that the cash paid by CEVA Group employees

for CIL stock deposited in the cash pools was improperly accounted for as debt rather than

equity. Beginning in 2006, CEVA Group management employees participating in the LTIP

purchased shares of CIL at an agreed-to price, both at the time the grants were awarded and upon

the vesting of stock options.[161] That cash ultimately was deposited into one of the operable cash

pools and recorded as a payable to CIL.[162] This was an error in contravention of instructions that

had been provided by CEVA Group management as far back as 2009.[163] As CEVA Group's then-

CFO testified both times he was deposed, CEVA Group management had determined in 2009 to

---

[159] *See* McDougal Decl. ¶ 54; SMF ¶ 186.

[160] *See* SMF, Exs. M (Beith Tr.) at 167:1–170:16 (CEVA Group disputed the entire amount and also objected to specific items within that total amount); O (Jupiter Tr.) at 274:21–25 (   REDACTED   ); Q (Parker Tr.) at 111:25–112:9 (   REDACTED   ); R (Ricotta Tr.) at 67:20–68:2 (   REDACTED   ), 69:5–20 (   REDACTED   ); G (Schlanger Tr.) at 308:8–18 (   REDACTED   ); and S (Turner Tr.) at 173:22–174:14 (   REDACTED   ).

[161] *See* McDougal Decl. ¶ 44, Ex. 28 (LTIP) at Article V; SMF ¶ 153.

[162] *See* McDougal Decl. ¶ 45; SMF ¶ 154, Ex. P (McDougal 30(b)(6) Tr.) at 15:23–18:19.

[163] *See* McDougal Decl. ¶ 45; SMF ¶ 155.

make these funds freely available for use by CEVA Group by accounting for them as an equity

investment, rather than debt.[164] This decision made business sense. CEVA Group management

purchased equity in order to invest in the growth of the enterprise, and it would have been

illogical to just leave the funds at CIL—a holding company with no need for cash.[165] Moreover,

as CEVA Group's 100% shareholder, CIL was the ultimate beneficiary of the enhanced equity

value of CEVA Group, and the cash was of real use to CEVA Group which could use it to fund its

operations or simply to hold in connection with complying with the relevant covenants under its

debt agreements.[166]

> ### 2.    *The Stock Option Recharge Expenses Credited to CIL Should Have Been Reduced When Options Failed to Vest*

The second basis for CEVA Group's dispute relates to the expensing of the CIL stock

options awarded to CEVA Group employees—and, in particular, CEVA Group's prior errors in

failing to comply with IFRS accounting standards and its own internal accounting policy relating

to the forfeiture of options that failed to vest.[167]

Under CIL's LTIP, CEVA Group employees received stock options to purchase CIL

shares at future points in time.[168] There were three tranches of stock options: A, B, and C.[169]

Tranche A options vested 20% per year over five years; Tranches B and C vested six months

---

[164] *See* McDougal Decl. ¶ 46; SMF ¶ 156–158, Ex. H (McDougal Tr.) at 266:10–268:9; P (McDougal 30(b)(6) Tr.) at 28:14–19. Mr. McDougal's testimony was corroborated by that of Michael Jupiter, a CEVA Group director, as well. *See* SMF, Ex. O (Jupiter Tr.) at 275:23 – 276:6 (funds                    REDACTED
).

[165] *See* McDougal Decl. ¶ 47; SMF ¶ 161, Ex. P (McDougal 30(b)(6) Tr.) at 32:6–35:5.

[166] *See* McDougal Decl. ¶ 48; SMF ¶ 162, Ex. P (McDougal 30(b)(6) Tr.) at 32:6–35:5.

[167] CEVA Group and CIL both prepared financial statements under IFRS. *See* McDougal Decl. ¶ 49, Ex. 1 (CEVA 2012 Annual Report); Ex. 30 (CIL 2006 Financial Statement).

[168] *See* McDougal Decl. ¶ 50, Ex. 28 (LTIP) at Article V; Ex. 30 (CIL 2006 Financial Statement); SMF ¶ 168.

[169] *See* McDougal Decl. ¶ 50, Ex. 30 (CIL 2006 Financial Statement); SMF ¶ 169.

after certain performance conditions were met.[170] All tranches required that the employee

remains employed at CEVA Group in order to vest.[171]

As explained at greater length in the expert report of Scott Taub, the CEVA Defendants'

IFRS accounting expert,[172] IFRS accounting rules require that a company issuing stock options

to employees in exchange for service record a corresponding expense.[173] To do this, CEVA

Group retained a company called "Global Shares" which calculated the fair market value of the

stock option awards in accordance with the Black-Scholes Merton model and prepared detailed

annual expense spreadsheets reflecting the calculation.[174] CEVA Group then booked this expense

and credited a "recharge payment" to CIL, in accordance with its own internal policy.[175] Over the

course of the existence of the LTIP (i.e., from November 2006 through April 2013),

approximately €15.8 million of these stock option recharge expenses accrued in favor of CIL.[176]

Because of employee attrition and CEVA Group's poor financial performance, many of

these stock options never vested—and that is the basis of CEVA Group's second dispute

regarding the so-called CIL Cash. ***IFRS standards require that, if an award's vesting conditions

are not met, the award is forfeited and the associated expense booked by the employer be***

---

[170] *See* McDougal Decl. ¶ 50, Ex. 30 (CIL 2006 Financial Statement); SMF ¶ 170.

[171] *See* McDougal Decl. ¶ 50; SMF ¶ 171.

[172] This description of the dispute over stock option accounting is highly summarized, and the CEVA Defendants refer the Court to Mr. Taub's expert report for further analysis. *See* SMF, Ex. T. For fairness, the CEVA Defendants also refer the Court to the rebuttal report of the Trustee's IFRS accounting expert, Stephen Brice. *See* SMF, Ex. U.

[173] *See* McDougal Decl. ¶ 51; SMF ¶ 172, Ex. T (Taub Report) ¶ 23.

[174] *See* McDougal Decl. ¶ 51, Ex. 38 (CEVA Internal Accounting Policy) and Exs. 31–37 (Expense Spreadsheets for 2006–07, 2008, 2009, 2010, 2011, 2012, and 2013); SMF ¶ 173, Ex. P (McDougal 30(b)(6)) Tr. at 36:11–37:22.

[175] *See* McDougal Decl. ¶ 51, Ex. 38 (CEVA Internal Accounting Policy) and Exs. 39 –45 (Expense Receipts and/or Bank Statements evidencing payment of recharge expenses for 2006 and 2007, 2008, 2009, 2010, 2011, and 2012); SMF ¶ 174.

[176] *See* McDougal Decl. ¶ 51; SMF ¶ 175, Ex. P (McDougal 30(b)(6) Tr.) at 15:23–18:19; SMF, Ex. GG (Beith Spreadsheet).

*reversed*.[177] This reversal never happened, even though it should have.[178] For example, with respect to Tranche A options, the expense associated with any unvested options should immediately have been reversed once an employee left the company prior to vesting.[179] No such reversals were ever made, even though many employees left the company prior to vesting.[180] The same is true with respect to Tranche B and C options, with the added requirement that the expense associated with these unvested options should also have been reversed when it became clear that the options would not vest due to the underlying performance conditions failing to occur.[181] No such reversals were ever made, even though it was clear no later than the time of the restructuring, and likely much earlier, that these performance conditions would never be met.[182] Correcting for these straightforward IFRS accounting errors (and a few other smaller errors identified by Mr. Taub that actually work in CIL's favor), the balance of the intercompany claims owed to CIL must be reduced by €10,147,528, exclusive of interest.[183]

### 3. The Balance of the Claim Due to CIL Should Be Reduced by the Amounts CEVA Group Forwarded to CIL For Payment of Professional Fees

The final basis on which the CEVA Defendants dispute that €14 million is owed to CIL relates to amounts payable by CIL to CEVA Group under three separate Reimbursement Agreements entered into between CEVA Group and CIL by which CEVA Group agreed to cover certain professional fees and expenses incurred by CIL in connection with the 2013

---

[177] *See* McDougal Decl. ¶ 52; SMF ¶ 176, Ex T (Taub Report) ¶¶ 29–42. The Trustee's expert Steven Brice agrees with this conclusion. *See* SMF, Ex SS (Brice Dep. Tr.) at 63:9–64:21.

[178] *See* McDougal Decl. ¶52; SMF ¶ 177, Ex P (McDougal 30(b)(6) Tr.) at 28:20–29:4, 43:3–16, 47:19–49:12.

[179] *See* McDougal Decl. ¶ 52; SMF ¶ 178, Ex. T (Taub Report) ¶¶ 56–62.

[180] *See* McDougal Decl. ¶ 52; SMF ¶ 179, Ex. P (McDougal 30(b)(6) Tr.) at 43:3–16, 45:6–24, 47:19–49:12.

[181] *See* McDougal Decl. ¶ 52; SMF ¶ 180, Ex. T (Taub Report) ¶¶ 63–69.

[182] *See* McDougal Decl. ¶ 52; SMF ¶ 181, Exs. P (McDougal 30(b)(6) Tr.) at 43:3–16, 45:6–24, 47:19–49:12; Ex. T (Taub Report) ¶ 28, n. 36 (                    REDACTED                    ).

[183] *See* McDougal Decl. ¶ 53; SMF ¶ 182, Ex. T (Taub Report) ¶¶ 78–79.

Restructuring. The three Reimbursement Agreements were in the amounts of $425,000,

$950,382, and $319,463, respectively, and each contained the following language:

> To the extent, if any, that amounts are presently due from any
> CEVA Entity to CIL on account of any debt or obligation of any
> nature, the delivery of Funds hereunder shall constitute (i) an
> irrevocable payment to CIL, in the amount of the Funds, on
> account of such obligations, which shall be applied by CIL in its
> discretion, and (ii) a corresponding reduction of such obligations
> owing from any CEVA Entity to CIL.[184]

These Reimbursement Agreements are fully enforceable contracts, and have not been challenged

by the Trustee. Further, there is no dispute that CEVA Group transferred such funds to CIL.[185]

Thus there should be a credit of at least $1,694,845 (the total amount forwarded by CEVA Group

to CIL) to whatever amount CIL alleges is due from CEVA Group.

### C.    The CEVA Defendants Are Entitled to Summary Judgment on the Trustee's Claim for Turnover

In light of the unmistakable bona fide disputes outlined above, CEVA Group is entitled to

summary judgment on the Trustee's claim for "turnover" related to the so-called CIL Cash. As

this Court held in deciding the CEVA Defendants' motion to dismiss:

> A turnover action under section 542 of the Bankruptcy Code
> applies only to property that belongs to the estate. *See, e.g.*, *U. S. v.
> Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991), *cert. denied*,
> 502 U.S. 1048, 112 S. Ct. 913, 116 L.Ed.2d 813 (1992). "Congress
> envisioned the turnover provision of § 542 of the Code … to apply
> to tangible property and money due to the debtor **without dispute**
> which are fully matured and payable on demand." *Charter Crude
> Oil Co. v. Exxon Co., U.S.A. In re Charter Co.*), 913 F.2d 1575,
> 1579 (11th Cir. 1990) (citing *United States v. Whiting Pools, Inc.*,
> 462 U.S. 198, 202-03 (1983)). Thus, "[i]t is settled law that the
> debtor cannot use the turnover provisions to liquidate contract
> disputes or otherwise demand assets **whose title is in dispute**." *U.
> S. v. Inslaw, Inc.*, 932 F.2d at 1472. *See also Geron v. Peebler (In re
> Pali Holdings, Inc.)*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013)
> ("When the turnover power [under §542] is properly invoked, it is

---

[184] *See* McDougal Decl. ¶ 56 , Exs. 46–48 (Reimbursement Agreements) ¶ 2; SMF ¶ 189.

[185] *See* McDougal Decl. ¶ 56; SMF ¶ 189.

simply an effort to recover property – or on property – that is *already* property of the estate. That, in turn, invokes the court's in rem jurisdiction over the bankruptcy *res*."); *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 76 (Bankr. S.D.N.Y. 2005) ("Section 542(a) does not apply if title [to the property that is the subject of the turnover request] is **disputed**."); *Hassett v. BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748, 760 (Bankr. S.D.N.Y. 1994) (stating that an action should be regarded a turnover proceeding under § 542(b) "**only when there is no legitimate dispute** over what is owed to the debtors.").[186]

Here, as outlined above, the CEVA Defendants dispute that some or all of the CIL Cash is owed to CIL for three distinct, bona fide reasons, each supported by substantial fact and expert witness testimony and extensive documentation. While the CEVA Defendants believe they would ultimately succeed on each of these disputes at trial, for the purposes of conclusively defeating the turnover claim all the CEVA Defendants must do is establish a dispute. There is no question they have done so and are entitled to summary judgment. *See In re Soundview Elite Ltd.*, 543 B.R. 78, 96-98 (Bankr. S.D.N.Y. 2016) (deciding on summary judgment motion that turnover claim was inappropriate where defendant disputed underlying debt and amount to be turned over, even though Court found the defenses "largely frivolous"); *In re Teligent, Inc.*, 325 B.R. 134, 137-38 (Bankr. S.D.N.Y. 2005) (affirming, on reconsideration, summary judgment on turnover claim where underlying debt was disputed); *In re Shea & Gould*, 198 B.R. 861, 867-68 (Bankr. S.D.N.Y. 1996) (Garrity, J.) (determining on summary judgment that the debtor's turnover claim was inappropriate because defendant disputed the underlying debt).

---

[186] Memorandum Decision Granting in Part and Denying in Part, Defendants' Motions to Dismiss Amended Complaint [ECF No. 100] at 103–04 (emphasis added).

**CONCLUSION**

For the foregoing reasons, the CEVA Defendants respectfully request the Court grant the

CEVA Defendants' Motion for Summary Judgment.


Dated: March 15, 2018
       New York, New York


                              By:    */s/ David M. Zensky*

                              AKIN GUMP STRAUSS HAUER & FELD LLP
                              David M. Zensky, Esq.
                              Dean L. Chapman Jr., Esq.
                              Jennifer L. Woodson, Esq.
                              One Bryant Park
                              New York, New York 10036
                              T: (212) 872-1000
                              F: (212) 872-1002
                              dzensky@akingump.com

                              *Counsel for Defendants CEVA Group Plc and CEVA Holdings
                              LLC*