**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                            :
In re:                                      :          Chapter 7
                                            :
CIL Limited,                                :          Case No. 13-11272-JLG
                                            :
                         Debtor.            :
                                            :
------------------------------------------------------x
                                            :
Salvatore LaMonica, as Chapter 7 Trustee    :
   For CIL Limited,                         :
                                            :          Adv. Proc. No. 14-02442-JLG
                         Plaintiff,         :
                                            :
v.                                          :
                                            :
CEVA Group PLC, CEVA Holdings LLC,          :
CEVA Logistics Finance B.V.,                :
Gareth Turner, and Mark Beith,              :
                                            :
                         Defendants.        :
                                            :
------------------------------------------------------x


**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN
PART, CEVA DEFENDANTS' MOTION FOR RULE 37 PRECLUSION SANCTIONS**


<u>APPEARANCES</u>:

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:     David M. Zensky, Esq.
        Dean L. Chapman Jr., Esq.
        Jennifer L. Woodson, Esq.

*Counsel for Defendants CEVA Group Plc and CEVA
Holdings LLC*

QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Richard I. Werder, Jr., Esq.
       Corey Worcester, Esq.
       Ben I. Finestone, Esq.
       Julia M. Beskin, Esq.

*Special Litigation Counsel for Salvatore LaMonica,*
*as Chapter 7 Trustee for CIL Limited*

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTYCY JUDGE:


INTRODUCTION[1]


In this adversary proceeding, Salvatore LaMonica (the "Trustee"), the chapter 7 trustee of

CIL, Ltd. ("CIL" or the "Debtor"), a debtor herein, is suing the CEVA Defendants to redress the

injuries that CIL allegedly suffered at their hands by reason of the CEVA Restructuring

transaction.  Before that transaction was consummated, CIL directly and indirectly owned 100%

of the issued shares of CEVA Group stock.  In that transaction, CEVA Group issued new shares

of its stock – none of which went to CIL.  As a consequence, CIL's percentage ownership

interest in CEVA Group was reduced to 00.01%.  The Trustee says that CIL was damaged by the

transaction and, among other things, seeks to avoid the issuance of the New CEVA Shares and to

recover damages from the CEVA Defendants.  The matter before the Court is the CEVA

Defendants' Motion for Rule 37 Preclusion Sanctions (the "Motion").[2]  In it they seek to

preclude the Trustee from relying at summary judgment and if necessary, at trial, on any and all

purported damages theories and/or calculations that are not part of the Trustee's Federal Rule 26

disclosures and the opening and rebuttal expert reports submitted by the Trustee's valuation

expert, Anders J. Maxwell, of Peter J. Solomon Company.  Specifically, they seek to bar the

---

[1]    Capitalized terms not identified in the Introduction are defined below. Unless otherwise indicated, citations to
"ECF No. ____" refer to entries on the electronic docket in this Adversary Proceeding, No. 14-02442.

[2]    *See* CEVA Defendant's Motion for Rule 37 Preclusion Sanctions [ECF No. 189].  In support of the Motion, the
CEVA Defendants filed the Declaration of Dean L. Chapman, Jr. in Support of the CEVA Defendants' Motion for
Rule 37 Preclusion Sanctions (the "Chapman Decl.") [ECF No. 190].  The CEVA Defendants also filed a reply to
the Trustee's opposition to the Motion.  *See* CEVA Defendants' Reply in Further Support of Their Motion for Rule
37 Preclusion Sanctions (the "Reply") [ECF No. 213].  In support thereof, the CEVA Defendants filed the
Supplemental Declaration of Dean L. Chapman in Further Support of the CEVA Defendants' Motion for Rule 7
Preclusion Sanctions (the "Chapman Supplemental Decl.") [ECF No. 214].  Rules 26 and 37 of the Federal Rules of
Civil Procedure (the "Federal Rules") are relevant to the Motion.  They are made applicable herein, respectively, by
Rules 7026 and 7037 of the Federal Rules of Bankruptcy Procedure.

Trustee from (i) using "Record Value Evidence"[3] to prove CEVA Group's equity value, separate

and apart from Mr. Maxwell's damages conclusions; and (ii) asserting damages based on what

they say is a new, previously undisclosed theory of damages predicated on the alleged control,

option or sale value of CIL's stock in CEVA Group, and using evidence in support thereof (the

"Control Value Evidence") to prove those damages.  They also seek to preclude the Trustee from

using a two-page "Addendum" to Mr. Maxwell's expert report.  The Trustee opposes the Motion

(the "Opposition").[4]  For the reasons set forth herein, the Court finds that the CEVA Defendants

have established grounds under Rule 37(c)(1) to preclude the Trustee from using the Record

Value Evidence and the Control Value Evidence Motion to establish or support purported

damages theories and/or calculations not contained in the Trustee's Rule 26 disclosures and in

Mr. Maxwell's opening and rebuttal reports at summary judgment and; if necessary, at trial.

However, the Court finds that the CEVA Defendants have not established cause to so limit the

Trustee's use of the Addendum.  Accordingly, the Motion is granted in part and denied in part.

<u>JURISDICTION</u>

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334(a) and 157(a),

and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States

---

[3]    The Record Value Evidence at issue consists of the following internal and public documents relating to the value of CEVA Group compiled during the period of February of 2012 through January of 2013:

(a)  SEC Filings in May and August 2012;
(b)  Apollo's April 4, 2012 valuation of CEVA Group;
(c)  The CEVA Group BOD resolution dated September 12, 2012, valuing CIL's Class A shares;
(d)  "Morgan Stanley Discussion Materials" from January 2013; and
(e)  An email attachment that the Trustee alleges values CIL's shares as of January 31, 2013.

*See* Motion at 4, n.5.

[4]    *See* Trustee's Response in Opposition to the CEVA Defendants' Motion for Rule 37 Preclusion Sanctions [ECF No. 200].

District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

BACKGROUND

The Trustee's Claims and Complaints

CIL is a Cayman Islands exempted company.  In the spring of 2013, it was a holding company controlled by several investment funds operated by Apollo Global Management LLC ("Apollo"). CIL's sole asset was its direct and indirect ownership of 100% of the equity of CEVA Group PLC ("CEVA Group" or the "Company"), a holding company, and its debt consisted of the unsecured claims of the holders (the "PIK Noteholders") of certain payment-in-kind notes, totaling at least €103 million.  In April of 2013, CIL acquiesced to and participated in an out-of-court restructuring and recapitalization of CEVA Group (the "CEVA Restructuring"). In connection with that transaction, CIL authorized CEVA Group to issue new shares of its stock (the "New CEVA Shares") to CEVA Holdings LLC ("CEVA Holdings"), an entity formed for purposes of the CEVA Restructuring.  Upon the issuance of the New CEVA Shares (the "CEVA Equity Transfer"), CIL's interest in CEVA Group was reduced to 00.01%.

In early April of 2013, shortly after the CEVA Equity Transfer, CIL filed a petition commencing liquidation proceedings in the Grand Court of the Cayman Islands.  Those proceedings are on-going.[5]  On April 22, 2013, three Cayman-based PIK Noteholders filed an involuntary petition under chapter 7 of the Bankruptcy Code against CIL in this Court.  On May 14, 2013, the Court entered an order for relief against CIL.[6]  Thereafter, Salvatore LaMonica was appointed Trustee of the CIL estate.

---

[5]    CIL was formerly known as "CEVA Investments Limited."  It changed its name to "CIL, Ltd." right before it commenced its Cayman Islands liquidation proceedings.

[6]    *See* Case No. 13-11272, ECF No. 30.

On December 8, 2014, the Trustee filed his initial complaint (the "Initial Complaint") in this adversary proceeding against, among others, CEVA Group, CEVA Holdings and CEVA Logistics Finance B.V. (collectively, the "CEVA Defendants").[7] The gravamen of the complaint is that CIL was damaged by the CEVA Restructuring because at the time of the restructuring, CEVA Group had substantial value, and CEVA Holdings gave no consideration to CEVA Group or CIL in return for the New CEVA Shares it received.[8] In that complaint, among other things, the Trustee sought to avoid the CEVA Equity Transfer as a fraudulent transfer under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, and if necessary, preserve and recover the New CEVA Shares from the CEVA Defendants pursuant to sections 550 and 551 of the Bankruptcy Code.[9] Without limitation, he also sought to recover economic damages that CIL allegedly suffered at the hands of some or all of those defendants predicated on CEVA Holdings' alleged unjust enrichment in retaining the New CEVA Shares, or its alleged conversion of CIL's right to the New CEVA Shares, and the CEVA Defendants' aiding and abetting alleged breaches of fiduciary duties by CIL's directors (the "Directors").[10] The CEVA Defendants moved to dismiss the complaint, and in response to that motion the Trustee filed the Amended Complaint.[11] In that complaint, the Trustee again asserted, in substance, that: (i) as of the CEVA Equity Transfer, the

---

[7]    *See* Chapter 7 Trustee's Complaint [ECF No. 1].

[8]    *See* Initial Complaint ¶ 1 ("Although CEVA [Group] faced financial challenges in early 2013, its value substantially exceeded its debts."); ¶ 3 ("The [CEVA Restructuring] left . . . CIL – which required that equity as the source by which to repay its creditors – as an insolvent debtor unceremoniously stripped of its assets.").

[9]    *See* Initial Complaint ¶¶ 105-112 (Count 1-Avoidance Under §548(a)(1)(A)); ¶¶ 113-121 (Count 2-Avoidance Under §548(a)(1)(B)).

[10]   *Id*. ¶¶ 150-152 (Count 7-Dishonestly Assisting or Procuring a Breach of Fiduciary Duties); ¶¶153-156 (Count 8-Conversion); ¶¶ 157-161 (Count 9-Unjust Enrichment).

[11]   *See* Chapter 7 Trustee's Amended Complaint [ECF No. 21].

value of CEVA Group exceeded its debts and CEVA Group's equity had significant value; (ii)

CIL was divested of its interests in CEVA Group for no consideration; and (iii) CIL was

rendered insolvent by the transaction.[12]  As in the Initial Complaint, the Trustee sought to avoid

the issuance of the New CEVA Shares as a fraudulent transfer under sections 548(a)(1)(A) and

(B) of the Bankruptcy Code, and, to the extent necessary, preserve and recover the New CEVA

Shares pursuant to sections 550 and 551 of the Bankruptcy Code.[13]  However, he added a claim

to avoid and recover the CEVA Equity Transfer as a constructive and/or intentional fraudulent

transfer under sections 544(b) and 551 of the Bankruptcy Code, and "applicable laws."[14]  As in

the Initial Complaint, the Trustee also sought damages from the CEVA Defendants based upon

their alleged aiding and abetting, or otherwise assisting in, the Directors' alleged breach of their

fiduciary duties, and from CEVA Holdings based upon its alleged conversion of the New CEVA

Shares, or its alleged unjust enrichment in retaining those shares.[15]  As support for his assertion

that CEVA Group's equity had substantial value as of the CEVA Restructuring, the Trustee cited

to "multiple sources," including miscellaneous documents, reports and analyses in the record,

that were compiled by the Debtor and/or professionals retained by the Debtor.[16]  Those

---

[12]  *See, e.g.*, *id.*  ¶ 1 (stating that as of the CEVA Restructuring, the "value of CEVA [Group] substantially exceeded its debts, and CIL's shares of CEVA [Group] had substantial value."); ¶ 3 ("Apollo engineered, directed and caused a secretive transaction that divested CIL of CEVA [Group], its primary asset, for no consideration, while leaving behind CIL's liabilities and rendering CIL insolvent."); ¶ 6("At the time of the CEVA Equity Transfer, CEVA [Group's] equity had substantial value.").

[13]  *See id.*  ¶¶ 132-139 (Count 1-Avoidance Under § 548(a)(1)(A)); ¶¶ 140–148 (Count 2-Avoidnace Under § 548(a)(1)(B)).

[14]  *Id.* ¶¶ 149-162 (Count 3-Avoidance of the CEVA Equity Under 11 U.S.C. §§ 544, 550, and applicable laws).

[15]  *Id.* ¶¶ 198-201 (Count 10-Conversion of CEVA Equity); ¶¶ 202-207 (Count 11-Unjust Enrichment (CEVA Equity)).

[16]  Paragraph 6 of the Amended Complaint states:

> At the time of the CEVA Equity Transfer, CEVA [Group's] equity had substantial value (and continues to have substantial value as of the dated of this [Amended] Complaint).  Evidence from multiple sources demonstrates this.

- In 2012, the Directors signed, and the Debtor filed with the U.S. Securities and Exchange Commission (the "SEC"), SEC Form F-1s that sought to sell up $400 million of additional CIL equity securities. The new equity (like all equity) was to be junior to CIL's debt obligations. The SEC filings thus indicated that the Directors believed in 2012 that CIL was solvent and CIL's shares of CEVA were extremely valuable. The Form F-1s were not withdrawn until April 2013.

- The Form F-1s presented balance sheets showing total assets in excess of $5 billion. The EY Report opined that there is value for CIL if the enterprise valuation of CEVA exceeds approximately €2.8 billion. That is more than $1.5 billion less than the amount of assets presented in the publicly filed balance sheets (varying slightly with currency exchange rates). The latter Form F-1/A was filed on August 29, 2012, less than two months before the Defendants and Apollo began plotting the CEVA Equity Transfer.

- Pursuant to a certain shareholders agreement, CIL's board was required at times "to determine the fair market value per share ("FMV") of Company shares in a manner it deems appropriate in good faith," among other requirements. At a September 12, 2012 meeting of the Debtor's Board of Directors, attended only by the two Directors, the Directors resolved that the fair market value of CIL's ordinary shares ("Class A Shares") was €50 per share. In and of itself this demonstrates that the Directors believed CIL was solvent. Companies without sufficient assets to pay their creditors cannot lawfully buy back their own shares.

- The implications of the €50 per Class A Share value determined by CIL and its Directors are staggering. There were approximately 4 million Class A Shares outstanding, the net value of which, therefore, was €200 million. However, there were also outstanding more than 4.4 million Class B ordinary shares ("Class B Shares"; together with the Class A Shares, the "Ordinary Shares"). The Class B Shares had a €200/share liquidation preference (€880 million in the aggregate), which was senior to the €200 million of Class A Shares. All together, this means that *the aggregate equity of CIL, as determined by the Directors, was approximately €1.1 billion just a few months before they and the other Defendants caused substantially all of CIL's assets to be transferred to an Apollo affiliate in exchange for nothing*. Notably, the Directors' valuation was performed for purposes of an actual transaction with a non-insider (the exercise by a former employee of a right to put CIL shares back to CIL).

- In line with the value implied by the €50 per Class A Share valuation, the Directors had represented on a separate occasion that the aggregate fair market value of CIL's Class B Shares was $949 million as of February 1, 2012. They made this representation in the Form F-1's filed with the SEC. Because the Class B Shares represented only approximately 80% of the equity of CIL, this representation is an additional demonstration that the Directors and CIL believed that CEVA enterprise was decidedly solvent with well over $1 billion of net equity in 2012 on a fair market value basis.

- In early 2013, at the initiation of Apollo, Morgan Stanley performed a valuation that concluded CEVA could be worth as much as $3.75 billion and its equity may have value. Several of the valuation methodologies employed by Morgan Stanley showed that CEVA's equity had a great deal of value.

Amended Complaint ¶ 6.

allegations were not in the Initial Complaint.  The CEVA Defendants moved to dismiss the

Amended Complaint.  While that motion was *sub judice*, the parties completed their Rule 26

disclosures and their document and deposition discovery.

Rule 26 Disclosures

On June 5, 2015, the Trustee served his Initial Disclosures on the CEVA Defendants.[17]

In furtherance of his obligations under Rule 26(a)(1)(A)(iii) to provide "a computation of each

category of damages" that he was claiming, the Trustee advised, in part, as follows:

> The Trustee requests that the Court declare the authorization and issuance
> of the New CEVA Shares to be null and void or, alternatively, avoid the transfer of
> CEVA to CEVA Holdings and recover CEVA's equity interests for the benefit of
> CIL's bankruptcy estate.
>
> The Trustee also seeks monetary damages arising from the allegations in
> the Amended Complaint, including, but not limited to, the CEVA Equity Transfer
> in an amount to be proven at trial. The Trustee seeks an award of damages, plus
> interest, costs and attorneys' fees based on, *inter alia*, the amount equal to the value
> of the CEVA equity which Defendants stripped from CIL via the CEVA Equity
> Transfer along with any consequential damages suffered as a result of the
> Defendants' actions.[18]

The Trustee did not provide a computation of the damages he sought or explain the

methodologies by which he intended to calculate CIL's alleged damages.  The CEVA

Defendants contended that those disclosures did not satisfy the requirements of Rule 26.  By

letter dated June 10, 2015, they requested the Trustee to remedy the alleged deficiencies in the

disclosure by providing a computation of his alleged money damages.[19]  The Trustee denied that

---

[17]   *See* Chapman Decl. Ex. A (Initial Disclosures Pursuant to FRCP 26(A)(1)).

[18]   *Id.* at 24.

[19]   *See* Chapman Decl. Ex. B (CEVA Defendants' letter, dated June 10, 2015).  In part, that letter states:

> Fed. R. Civ. P. 26(a)(l)(A)(iii) requires that all parties provide as part of their initial disclosures "a
> computation of each category of damages claimed." The Trustee's initial disclosures do not even
> attempt to include any such calculations, articulate a theory upon which such calculations will be
> made, or even provide the amount of damages sought for the alleged transfer of CEVA equity.

his Initial Disclosures were deficient.[20]  By letter dated January 20, 2016, the CEVA Defendants

moved to compel the Trustee to disclose a computation of CIL's alleged damages.  They

contended, among other things, that the Federal Rules mandate as much, and that the Trustee's

failure to provide such computation prejudiced them.[21]  The Trustee objected to the CEVA

Defendants' request for relief, arguing, among other things, that "[i]n a case of this complexity,

Rule 26(a) does not mandate the kind of precise and complete damages computation that the

---

Instead, the Trustee's initial disclosures merely state that the Trustee "seeks monetary damages ... in an amount to be proven at trial." The Trustee thus suggests that he has no obligation whatsoever under Fed. R. Civ. P. 26(a)(l)(A)(iii) because the amount of damages will be determined at a later date. This defeats the very purpose of Rule 26.

*Id.* at 1.

[20]   *See* Chapman Decl. Ex. C (Trustee's letter, dated June 19, 2015).  In part, the letter states:

[W]e do not agree that the Initial Disclosures are deficient. First, as the defendants correctly recognize, the precise calculation of CEVA [Group's] equity is not the product of a simple mathematical computation, but rather falls squarely within the purview of expert testimony. The defendants' assertion that the Trustee may not rely upon calculations by expert witnesses to supplement its Rule 26(a)(l) Initial Disclosures is, in our view, not correct. To the contrary, "[w]here, as here, the plaintiff's damages are not the product of a simple mathematical calculation and require expert testimony, the damages calculations need not be produced with the plaintiffs Rule 26(a)(l) disclosures and may be produced as part of the party's Rule 26(a)(2) [expert] disclosures." *Kingsway Fin. Servs. v. PriceWaterhouseCoopers LLP*, 2006 U.S. Dist. LEXIS 35615, *2 (S.D.N.Y. May 26, 2006)[.]

Second, our amended complaint (the "Amended Complaint"), incorporated by reference in the Initial Disclosures, provides a detailed and transparent account of our theories of damages relating to the misappropriation of CIL' s equity interest in CEVA [Group]. Indeed, in the motion to dismiss filed on behalf of the CEVA Defendants, *you acknowledge* that the Trustee's primary allegations are that "CIL's equity in CEVA Group had value at the time of the restructuring" and that "CEVA Group was solvent by hundreds of millions of dollars." *See* CEVA Defendants Memorandum of Law at 21, 32. Moreover, the Amended Complaint clearly provides that the principal measure of damages in this case . . . is the value of CIL's equity interest in CEVA at or about the time of the restructuring. That value will be realized either through a recovery in kind of the misappropriated stock or a recovery of its value.

*Id.* at 1.

[21]   *See* CEVA Defendants' letter, dated January 20, 2016 [ECF No. 61].  Specifically, counsel contended, among other things, that the Trustee's disclosures "provide no information that could give [the CEVA Defendants] any clear understanding as to what the [Trustee] is alleging in terms of the dollar amount" of the claimed damages.  He also asserted that the CEVA Defendants were "left to guess whether the [Trustee] seeks $5 million, $50 million, or $500 million in damages" from them.  *Id.* at 2.

CEVA Defendants suggest."[22]  To that end, the Trustee maintained that his claim for damages in

the action was based on a "complex expert analysis that is still in progress and is not due

[pursuant to Rule 26(a)(2) and the scheduling order in this case] until March 18, 2016."[23]

    Following a conference with the parties, the Court directed the Trustee to supplement his

initial disclosures by disclosing a computation of each category of damages claimed by the

Trustee.[24]  On February 8, 2016, the Trustee provided his First Supplemental Disclosures, in

which he "estimates that the damages arising from the CEVA Equity Transfer are approximately

€150,000,000 to €300,000,000, plus interest."[25]  The Trustee did not provide a specific

computation of the estimated damages, but stated that the estimate was based upon, among other

things, information, valuations and projections contained in various books and records prepared

by or on behalf of CIL and CEVA Group.[26]  (The Court will refer to that and other evidence of

---

[22]    *See* Trustee's letter, dated January 22, 2016, at 2 [ECF No. 64].

[23]    *Id.* at 1.

[24]    *See* Order signed on February 5, 2016 (the "Disclosure Order") [ECF No. 67].  In relevant part, that order states:

> The Trustee shall in accordance with Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure and applicable case law supplement his initial disclosures by disclosing a computation of each category of damages claimed by the Trustee and making available for inspection and copying as under Rule 34 the documents or other evidentiary material (or to the extent already produced in this litigation referring Defendants to such materials), unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]

> *Id*. at 2.

[25]    *See* Chapman Decl. Ex. E (Trustee's First Supplemental Disclosures Pursuant to FRCP 26(a)(1)) at 3.

[26]    Specifically, the Trustee stated:

> Computation of this figure [i.e., approximately €150,000,000 to €300,000,000, plus interest] is based upon, *inter alia*: (i) CEVA [Group's] books and records, including but not limited to CEVA [Group's] annual financial statements for fiscal years 2011, 2012 and 2013, CEVA [Group's] monthly operating reports and CFO Statements, and CEVA [Group's] financials projections for 2012 and 2013; (ii) valuations performed by CEVA [Group] concerning the fair market value of CIL's non-Class B shares; (iii) the CEVA [Group] Offering Memorandum, Consent Solicitation and Disclosure Statement Circular dated on or around April 2013; (iv) CEVA [Group's] Report to

that nature as the "Record Value Evidence," a subset of which contains the Record Value

Evidence that is the subject of this Motion.[27])  The CEVA Defendants contended that the

Trustee's First Supplemental Disclosures failed to satisfy the Trustee's disclosure obligations

under the Disclosure Order.[28]  On February 23, 2016, the Trustee served his Second

Supplemental Disclosures.[29]  In those disclosures he again expressed CIL's damages as a range

of €150 million to €300 million, but added that:

> The foregoing estimate of damages represents the Trustee's assessment of the value
> of the CEVA [Group] shares held by CIL immediately, or as of the closest
> practicable measurement date, prior to the occurrence of the restructuring
> transaction described in the Amended Complaint. The damage amount was
> calculated (and continues to be refined), generally, with reference to, among other
> things, the [Record Value Evidence], and by utilizing an expert to apply generally
> accepted valuation methodologies to the data contained in CEVA [Group's]
> financial statements and the financial projections developed by CEVA [Group]
> prior to the CEVA Equity Transfer (referred to as "Project Phelps" by CEVA
> [Group] and its advisors) to compute a total enterprise valuation range for
> CEVA[Group], and deducting appropriate debt and making other adjustments as
> determined by the Trustee's expert. The detailed calculation of the Trustee's
> damages and the application of the valuation methodologies will be set forth in the
> Trustee's expert report.[30]

---

Bondholders dated April 4, 2013; (v) filings with the Securities and Exchange Commission made
by or on behalf of CIL and/or CEVA [Group]  concerning an Initial Public Offering; (vi) notes and
minutes from meetings and conferences of the Board of Directors of CEVA [Group] and/or CIL, as
well as the notes and minutes from any meetings of any sub-committees of these boards; (vii) the
presentations and Discussion Materials prepared for CEVA [Group], CIL and/or their investors and
lenders by Houlihan Lokey, Morgan Stanley, Blackstone, and other investment banks and financial
advisory firms; (viii) valuation analysis concerning CEVA prepared by Ernst & Young; (ix)
valuations performed by Apollo concerning CEVA [Group]; and (x) the testimony concerning the
value of CEVA [Group's] equity adduced via depositions in this proceeding.

*Id.* at 3.

[27]  *See supra*, n.3.

[28]  *See* Chapman Decl. Ex. F (CEVA Defendants' letter, dated February 9, 2016); *see also* CEVA Defendants'
letter, dated February 10, 2016, at 2 [ECF No. 68].

[29]  *See* Chapman Decl. Ex. G (Trustee's Second Supplemental Disclosures Pursuant to FRCP 26(a)(1)).

[30]  Second Supplemental Disclosures at 4.

The CEVA Defendants did not challenge the adequacy of the Second Supplemental Disclosures.

<u>The CEVA Defendants Depose the Trustee</u>

On January 14, 2016, the CEVA Defendants took the Trustee's deposition. At that deposition, the Trustee testified without reservation that he was relying on his expert to establish the value of CEVA Group's equity, and thus, CIL's alleged damages in this litigation.[31]

<u>Expert Reports and Depositions</u>

Under the operative scheduling order, the parties exchanged opening and expert rebuttal reports on April 6, 2016 and May 11, 2016, respectively. In his report, Mr. Maxwell utilized the discounted cash flow ("DCF") and Comparable Companies methods to reach a composite valuation range for CEVA Group as of March 31, 2013. He concluded that as of that date, CEVA Group was solvent and had an equity value in excess of €100 million (i.e., CEVA Group's total enterprise value exceeded its liabilities – i.e., the "equity hurdle" – by more than €100 million). In Section VI of the report, Mr. Maxwell included a list of materials that he relied on in drafting his report. The list included Record Value Evidence. The report did not include a valuation calculation derived from the Record Value Evidence, or one based on the theory that CIL's ownership of CEVA Group stock could or should be valued on any basis other than CEVA Group's enterprise value, less its debt.

On May 26, 2016, the CEVA Defendants deposed Mr. Maxwell. Among other things, they questioned him about his reports and the materials on which he based the opinions in his reports.[32] The CEVA Defendants say and the Trustee does not dispute, that during his

---

[31]    When asked by CEVA Group's counsel about the amount of the damages sought, Mr. LaMonica stated that "[w]e are waiting on our valuation expert." *See* Chapman Decl. Ex. H (LaMonica Dep. Tr., dated Jan. 14, 2016, at 21:19-24). *See also id.* at 92:8-10 (when asked about his view of "fair value" of CEVA Group, Mr. LaMonica stated: "I'm going to rely on my expert to value what it was."); *id.* at 105:2-4 (when questioned for a third time about value, Mr. LaMonica stated: "Whatever my valuation expert tells me it is, it is.").

[32]    *See* Chapman Decl. Ex. I (Maxwell Dep. Tr., dated May 26, 2016), at 18:22-19:18.

deposition, Mr. Maxwell did not suggest that the Record Valuation Evidence informed his view in any way different from or in addition to his views as expressed in his experts reports, or disclose a theory of damages based on control, option, or sale value of CIL's equity in CEVA Group. On June 3, 2016, the last day for completing all expert discovery on valuation, the Trustee deposed Professor Anil Shivdasani, the CEVA Defendants' expert. All discovery was concluded on June 10, 2016.

<u>The CEVA Defendants Advise the Court That They Will Seek Summary Judgment</u>

On June 15, 2016, the CEVA Defendants sent the Court a pre-motion letter regarding, among other things, their proposed summary judgment motion (the "June 15 Letter").[33] In that letter, the CEVA Defendants argued that for the Trustee to prevail on the avoidance and damage claims in the Amended Complaint, he must prove that CEVA Group had value as of the CEVA Restructuring because, if it did not have value, CIL's stock in CEVA Group was worthless and, as such, CIL was not injured by the CEVA Equity Transfer because it was not deprived of anything of value.[34] They asserted that the Trustee was clear in his Rule 26 disclosures that he intends to prove matters relating to CEVA Group's valuation through his expert, Mr. Maxwell. They contended that in formulating his opinion on CEVA Group's value, Mr. Maxwell committed an error that, if corrected, would establish that CEVA Group was insolvent at the time of the CEVA Restructuring. They explained that Mr. Maxwell opined that as of March 31, 2013, CEVA Group had a total equity value of €2,828 million and liabilities of €2,722 million, yielding an alleged midpoint equity value of €106 million. In substance, they contended that in doing that

---

[33] *See* CEVA Defendant's letter, dated June 15, 2016 [ECF No. 86].

[34] *Id.* at 1.

DCF analysis, Mr. Maxwell understated CEVA Group's liabilities by, among other things, erroneously deducting purported "excess cash" in calculating the liabilities. They maintained that no expert would make such an adjustment[35] and argued that once the calculation of liabilities was corrected, they would establish that CEVA Group's equity had no value, even assuming *arguendo*, that everything else in Mr. Maxwell's report was correct.[36] In that case, CIL could not claim to have been damaged in any way by having agreed to the CEVA Restructuring and consequent dilution in its ownership of CEVA Group.

The Trustee Serves an "Addendum" to Maxwell's Reports

On June 24, 2016, the Trustee served an "Addendum" to Mr. Maxwell's report.[37] Mr. Maxwell says that throughout the projection period, in their respective DCF analyses, he and Professor Shivdasani utilized the same capital expenditure ("CapEx") figures – described by CEVA Group as gross capital expenditures – in calculating the CEVA Group's unlevered free cash flow. In the Addendum, Mr. Maxwell says that "prompted" by Professor Shivdasani's rebuttal and critique of his projections for CapEx as part of his DCF analysis, he conducted further review of the CEVA Group financial documents. He says that on the strength of that

---

[35]    *See id.* at 2. They said that is so because, among other things, (a) pre-restructuring CEVA Group had a working capital/liquidity deficit of at least €100 million and thus had no "excess" cash; (b) Mr. Maxwell used a stale forecast of restricted cash, rather than contemporaneous figures, causing a €50 million overstatement of cash (and thus an understatement of liabilities); and (c) Mr. Maxwell fails to account for €50 million of interest due to CEVA Group's creditors which CEVA Group was unable to pay  and was waived in the CEVA Restructuring, but which would have to be satisfied before an value could flow to CIL.

[36]    *See id.* They say that Mr. Maxwell agreed at his deposition that if he incorrectly deducted cash from CEVA Group's debt, the court could properly conclude that CEVA Group's equity had no value. *See* Chapman Decl. Ex. I (Maxwell Dep. Tr.), at 211:10–19 ("Q. Would you agree with me that if the court were to determine that your claims amount understated the correct claims hurdle by 106 million euro or more, then even accepting everything else that you have said in your valuation report, that there would be no equity value as of March 31? A. If the court elected to use the midpoint of the range that I have, that seems like a reasonable conclusion.").

[37]    *See* Addendum to Expert Valuation Report of Anders L. Maxwell, Managing Director Peter J. Solomon Company, dated June 24, 2016, attached as Exhibit C to the CEVA Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment (the "CEVA SMF") [ECF No. 138].

review, he concluded that it was appropriate to utilize net CapEx to calculate CEVA Group's

actual cash flow projections. The impact of the adjustment increased Mr. Maxwell's composite

valuation range of CEVA Group and increased its claimed midpoint equity value by 40% from

€106 million to €149 million.[38]

<u>The Trustee Denies That Summary Judgment on Valuation Matters Is Appropriate</u>

By letter dated June 30, 2016 (the "Trustee's June 30 Letter"), the Trustee responded to

the CEVA Defendants' June 15 Letter.[39]  In his response, among other things, the Trustee denied

that the issue of the CEVA Group's value was appropriate for summary judgment. As support,

he made two points. First, he asserted that summary judgment is not an appropriate means for

resolving a battle of experts because expert valuation is an inherently fact specific inquiry.[40]

Second, he contended that, in any event, the value of CEVA Group cannot be decided simply on

the basis of expert reports because the evidence of record, apart from those reports, proves that

CEVA Group had positive equity value.[41]

---

[38]    *Id.*

[39]    *See* Trustee letter, dated June 30, 2016, at 2-3 [ECF No. 87].

[40]    *See id.* at 2.  The Trustee asserted that:

> [E]xpert valuation is an inherently fact-specific inquiry that is not appropriate for summary
> judgment. . . . That is true here. The putative summary judgment issue identified in Defendants'
> letter is which of two competing experts' views is entitled to greater deference with respect to how
> to value the unrestricted cash of a company. The position of the Trustee's expert . . . Anders
> Maxwell . . . is that the methodology for a going concern valuation – which both competing experts
> conducted – requires that unrestricted cash on the balance sheet be deducted from liabilities (hence
> the common term, "net debt"). Defendants' expert is apparently of a different view. We do not
> believe a fact-finder can decide that issue without (i) hearing from the experts and subjecting them
> to cross-examination and (ii) evaluating that expert testimony within the context of the full trial
> record.

> *Id.* (citations omitted).

[41]    The Trustee stated that "CEVA [Group's] equity is not an issue that properly can be adjudicated exclusively on
the basis of post hoc expert testimony[,]" and that "Defendants' admissions that CEVA [Group] had positive equity
value are critical evidence which could support a judgment in favor of the Trustee even in the absence of expert
testimony."  *Id.* at 2.  As support for the latter, the Trustee observed that "the prepetititon documentary record

The Court Resolves Motion to Dismiss But Grants Leave To File Second Amended Complaint

The Court granted the defendants' motions to dismiss in part and denied it in part (the "Dismissal Decision").[42]  The Trustee moved this Court for limited reconsideration of the Dismissal Decision, and for leave to file a Second Amended Complaint.  The CEVA Defendants opposed the motion, arguing that the Trustee did not meet the standards required for reconsideration under Federal Rules 54(b) and 59(e), and in any event, that leave to amend should be denied.[43]  Among other things, they complained that the Trustee was acting in bad faith in bringing the motion, because the proposed amendments to the complaint pleaded a new theory of damages that accounted for the possibility that CEVA Group was insolvent at the time of the CEVA Restructuring.  They maintained that because the Trustee had not previously disclosed that theory in his Rule 26 disclosures and Mr. Maxwell's reports, the Court should bar him from relying on that theory and evidence in support thereof, in the Second Amended Complaint.  The Court granted the Motion for Reconsideration,[44] without prejudice to the defendants' right to challenge the introduction of the alleged new theory of damages and the

---

contains multiple instances of the Defendants and those acting in concert with them (*i.e.,* Apollo) valuing CEVA [Group's] net equity at amounts up to €1.2 billion at various dates close to the CEVA [Equity] [T]ransfer, and then attempting to cover that up."  *Id.*

[42]   *See* Memorandum Decision Granting In Part and Denying In Part, Defendants' Motions to Dismiss Amended Complaint [ECF No. 100].

[43]   *See* The CEVA Defendants' Memorandum of Law in Opposition to Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and For Leave to File a Second Amended Complaint [ECF No. 110].

[44]   *See* Memorandum Decision Granting Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and For Leave to File a Second Amended Complaint [ECF No. 128].

evidence in support thereof, in the context of an evidentiary motion.[45]  Thereafter, the Trustee

filed his Second Amended Complaint.[46]

The Second Amended Complaint

In his Second Amended Complaint, the Trustee seeks to avoid and recover the CEVA

Equity Transfer or recover damages for the benefit of the bankruptcy estate, claiming that the

CEVA Restructuring transaction was fraudulent as to CIL.  The Trustee seeks that relief under

sections 544 and 548 through 551 of the Bankruptcy Code and/or analogous applicable local or

foreign fraudulent transfer laws, including the law of the Cayman Islands.[47]  He also seeks to

recover economic damages that CIL allegedly suffered as a result of the CEVA Restructuring.[48]

As in the Amended Complaint, the Trustee asserts that the estate was damaged by the CEVA

Equity Transfer because CIL's stock in CEVA Group had value at the time of the transfer and

CIL received nothing in return for the issuance of the New CEVA Shares to CEVA Holdings.[49]

As support for those assertions, as in the Amended Complaint, the Trustee alleges that CIL's

shares in CEVA Group had substantial value at the time of the issuance of those shares, because

---

[45]    *Id.* at 24-25.

[46]    *See* Second Amended Complaint for Fraudulent Transfer of the Debtor's Interests in CEVA Group PLC,
Related Tortious Acts, and Turnover of Property of the Estate [ECF No. 141].

[47]    *See* Second Amended Complaint ¶¶ 175-184 (Count 1-Avoidance of CEVA Transaction Under 11 U.S.C. §
548(a)(1)(A)); 185-195 (Count 2 -Avoidance of CEVA Transaction Under 11 U.S.C. § 548(a)(1)(B)); ¶¶ 196-213
(Count 3- Avoidance of CEVA Transaction Under 11 U.S.C. §§ 544(b), 550, and applicable laws).

[48]    *See id.* ¶ 14 ("Third, the Trustee seeks to recover the economic damages that CIL has suffered as a result of the
Defendants' scheme to manipulate the recapitalization of CEVA Group, including through claims against CIL's
insiders for breach of fiduciary duties, and against those who aided and abetted them and conspired with them.").

[49]    *See id.* ¶ 123 ("Through the machinations of Mintz Levin, Parker, Apollo, Beith and Turner, that value was
taken from CIL and its creditors, and CIL and its creditors received nothing in exchange.."); ¶¶ 191, 207 ("CIL
received no value, or less than reasonably equivalent value, from CEVA Holdings and CEVA Group in the CEVA
Transaction."); 134 ("Needless to say, CIL should not have been "happy" to transfer all of its assets in exchange for
nothing and leave its creditors unpaid.").

the value of the CEVA Group assets substantially exceeded its debts.[50]  However, unlike the

Amended Complaint, as support for his damages claims, the Trustee also alleges that

"[r]egardless of whether CEVA Group's debts exceeded its enterprise value . . . CEVA Group's

equity had substantial value to CIL[,]" and that "CIL's shares of CEVA [Group] could have been

monetized by CIL, and the proceeds used to pay CIL's creditors[.]"[51]  As support for those

assertions, he contends that even if CEVA Group was insolvent at the time of the CEVA

Restructuring, CIL nonetheless was damaged by the CEVA Equity Transfer, because that

transaction deprived CIL of the sale, option and control value of CIL's interest in CEVA Group

for no consideration.[52]

The Summary Judgment Motions

The CEVA Defendants filed their motion for summary judgment on the claims in the

Second Amended Complaint (the "CEVA Summary Judgment Motion").[53]  Among other things,

they contend that they are entitled to summary judgment dismissing Counts 1-3, 5 and 11-12,

and any claim for damages under Counts 4 and 7-9 of the Second Amended Complaint because

all require a showing that CEVA Group's equity had value at the time of the CEVA

Restructuring, and the Trustee cannot make that showing.[54]  They say that is so because in doing

---

[50]   *See id*. ¶ 1 ("Although CEVA Group faced financial challenges in early 2013, those challenges were
surmountable without extraordinary measures.  The value of CEVA Group substantially exceeded its debts.  CIL's
shares of CEVA Group had substantial value."); ¶7 ("At the time of CEVA Transaction, CEVA Group's equity had
substantial value (and continues to have substantial value as of the date of this Complaint.").

[51]   *Id.* ¶ 7k.

[52]   *See id.* ¶¶ 7(k), 65, 110-112.  The Trustee also suggested a new theory of how the CEVA Restructuring
transaction could have occurred.  *See id*. ¶ 179 ("The CEVA Transaction could have been performed without the
CEVA Equity Transfer step by converting CEVA Group debt into equity of CIL instead of CEVA Holdings".).

[53]   *See* CEVA Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment [ECF No.
151].

[54]   *See* CEVA's Summary Judgment at 4-7.

his DCF analysis, Mr. Maxwell erred in calculating the "equity hurdle" because he improperly deducted from CEVA Group's gross liabilities purported "excess cash" in the amount of €171 million and failed to account for an admitted working capital adjustments of at least €100 million.  They say that treating cash needed for ongoing operations as excess and available for distribution, goes against common sense, as well as accepted valuation methodology, Mr. Maxwell's own practice and established case law.[55]  They maintain that a reasonable trier of fact could not possibly conclude that a company in CEVA Group's circumstances could use its last €171 million of liquidity to pay down debt or dividends to its shareholders and still continue to operate.  They say that if that error is corrected for, Mr. Maxwell's valuation shows that CEVA Group was insolvent at the time of the CEVA Restructuring and, thus, they are entitled to summary judgment dismissing Counts 1-3, 5 and 11-12, and any claim for damages under Counts 4 and 7-9 of the Second Amended Complaint.[56]  The Trustee opposes the motion and cross-moved for summary judgment dismissing certain of the CEVA Defendants' claims.[57]  As relevant, he maintains that summary judgment on Counts 1-3, 5 and 11-12 is not warranted.  He denies that he has ever conceded that he will prove damages only through his expert and says that he made that clear in the Trustee's June 30 Letter in which he advised the Court that "the value of CEVA [Group's] equity is not an issue that properly can be adjudicated exclusively on the basis of post hoc expert testimony," and identified additional evidence that he intended to rely on.[58]  He says that Record Value Evidence creates a genuine issue of material fact as to

---

[55]    *See id.*

[56]    *See id.*

[57]    *See* Chapter 7 Trustee's Cross–Motion for Summary Judgment and Opposition to CEVA Defendants' Motion for Summary Judgment (the "Cross Motion"), at 2 [ECF No. 159].

[58]    *See id.* at 2.

CEVA Group's value.[59]  Moreover, the Trustee says that even if he is precluded from relying on

the Record Value Evidence, the fact dispute between the parties' valuation experts cannot be

resolved on summary judgment.[60]

Rule 37 Motion

        In support of the Motion, the CEVA Defendants assert that the Court should hold the

Trustee to the four corners of his Rule 26 disclosures and Mr. Maxwell's opening and rebuttal

expert reports and, in doing so, bar the Trustee from seeking to prove the value of CEVA Group

other than as set forth in those reports.[61]  They say that the Court should preclude the Trustee

from seeking to prove the value of CIL's stock through an analysis of the Record Value

Evidence separate and apart from Mr. Maxwell's analysis in his opening and rebuttal reports, or

based upon the control, option and sale value of CIL's majority stake in CEVA Group as of the

CEVA Restructuring, as something distinct from CEVA Group's enterprise value, because the

Trustee did not previously introduce those theories and they have never been the subject of fact

or expert discovery.[62]  They also contend that pursuant to Rule 26(e), the Court should preclude

the Trustee from relying on the Addendum for any reason because the Addendum constitutes a

late filed expert report.

DISCUSSION

        Rule 26(a) lists the disclosures a party must make at the outset of a litigation.  As it

relates to this matter, the rule states that, with certain irrelevant exceptions, "a party must,

---

[59]   *See id.*

[60]   *See id.*

[61]   *See* Motion at 4.

[62]   *See id.* at 4-5.

without awaiting a discovery request, provide to the other parties . . . a computation of each

category of damages claimed by the disclosing party[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii).  Rule

26(e) complements that rule.  In part, it mandates that a party who has made a disclosure under

Rule 26(a) must timely "supplement or correct" that disclosure "if the party learns that in some

material respect the disclosure or response is incomplete or incorrect, and if the additional or

corrective information has not otherwise been made known to the other parties during the

discovery process or in writing[.]"  Fed. R. Civ. P. 26(e)(1)(A).

 In relevant part, Rule 37 states that "[i]f a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The rule "establishes the

mechanisms that make Rule 26 effective."  *Schiller v. City of N.Y.*, 2008 WL 4525341, at *3

(quotation marks and citation omitted).  The purpose of the rule is to "prevent the practice of

'sandbagging' an opposing party with new evidence."  *Ebewo v. Martinez*, 309 F. Supp. 2d 600,

607 (S.D.N.Y. 2004); *see also Am. Stock Exch. v. Mopex, Inc*., 215 F.R.D. 87, 93 (S.D.N.Y.

2002) ("The purpose of these rules is to avoid surprise or trial by ambush.") (internal quotation

marks omitted).  Accordingly, sanctions available under Rule 37 serve the following purposes:

> First, they ensure that a party will not benefit from its own failure to comply.
> Second, they are specific deterrents and seek to obtain compliance with the
> particular order issued. Third, they are intended to serve a general deterrent effect
> on the case at hand and on other litigation, provided that the party against whom
> they are imposed was in some sense at fault.

*S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010) (citations omitted);

*see also In re Schick*, No. 96 B 42902, 1997 WL 465217, at *9 (Bankr. S.D.N.Y. Aug. 12, 1997)

("Rule 37 sanctions serve several interrelated purposes. They prevent the offending party from

profiting from its own noncompliance, compensate the moving party and the court, deter future

violations by the offending party and other litigants and penalize the offending party, and

sometimes, the party's attorney.") (citations omitted).

By its terms, Rule 37(c) is triggered only where there has been a disclosure violation

under Rule 26(a) or 26(e).  *See* Fed. R. Civ. P. 37(c); *see also* 7 JAMES WM. MOORE ET AL.,

MOORE'S FEDERAL PRACTICE § 37.60[1] (3d ed. 2018) ("The preclusion sanction under Rule 37

may not come into play unless there has been a violation of a disclosure obligation imposed by

Rule 26(a) or 26(e)[.]"). "Bad faith" on the part of the alleged dilatory party is not an element of

a claim for relief under Rule 37(c)(1).  *See Design Strategy Inc. v. Davis*, 469 F.3d 284, 296 (2d

Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now

hold that such a requirement should not be read into the Rule.").  The burden is on the movant to

establish that the alleged dilatory party breached its disclosure obligations under Rule 26.  *See In

re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("The

moving party bears the burden of showing that its adversary failed timely to disclose information

required by Rule 26.").  However, even when the movant establishes that there is a violation of

Rule 26(a) or (e), a court may not impose sanctions under Rule 37(c)(1) on the dilatory party if

that party's failure to comply with Rule 26 was "substantially justified" or where its conduct was

"harmless."  *See* Fed. R. Civ. P. 37(c)(1); *see also U.S. Licensing Assocs., Inc. v. Rob Nelson

Co.*, No. 11 CV 4517, 2012 WL 1447165, at *5 (S.D.N.Y. Apr. 26, 2012) (noting that in

response to a Rule 37 motion, a party may "defend non-disclosure on the basis that it was

substantially justified or harmless.").  "The burden to prove substantial justification or

harmlessness rests with the dilatory party."  *Schiller v. City of N.Y.*, No. 04 Civ. 7922, 2008 WL

4525341, at *3 (S.D.N.Y. Oct. 9, 2008) (citing *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D.

at 93); *see also Markey v. Lapolla Indus., Inc.*, No. CV 12–4622,  2015 WL 5027522, at \*18

(E.D.N.Y. Aug. 25, 2015) ("The burden of proving either substantial justification or

harmlessness rests with the party which has failed to disclose information.") (citations omitted).

The term "substantial justification" means "justification to a degree that could satisfy a

reasonable person that parties could differ as to whether the party was required to comply with

the disclosure request." *Preuss v. Kolmar Laboratories, Inc.*, 970 F. Supp. 2d 171, 175

(S.D.N.Y. 2013) (citation and internal quotations omitted); *see also Henrietta D. v. Giuliani*, No.

95 CV 0641, 2001 WL 1602114, at \*5 (E.D.N.Y. Dec. 11, 2001) ("The test of substantial

justification is satisfied if "there exists a genuine dispute concerning compliance.") (citation

omitted).  A failure to provide the disclosure mandated by Rule 26 is harmless "when there is no

prejudice to the party entitled to the disclosure." *Lebada v. N.Y.C. Dep't of Educ.*, No. 14 Civ.

758, 2016 WL 626059, at \*5 (S.D.N.Y. Feb. 8, 2016) (internal quotation marks and citation

omitted); *see also Williams v. Boulevard Lines, Inc.*, No. 10 Civ. 2924, 2013 WL 5652589, at \*7

(S.D.N.Y. Sept. 30, 2013) (concluding that "[i]n the absence of prejudice. . . the[] discovery

violations were 'harmless' within the meaning of Rule 37(c)(1)").

        In the face of a disclosure violation, the imposition of sanctions under Federal Rule 37 is

not automatic.  The level of sanctions, if any, is left to the trial court's discretion.  *See Lorme v.

Delta Air Lines, Inc.*, 251 F. App'x 691, 692 (2d Cir. 2007) (noting that "[t]o the extent that the

Advisory Committee Note calls Rule 37(c)'s exclusion of evidence 'automatic,' ... that

characterization cannot be squared with the plain language of Rule 37(c)(1) itself, which

recognizes that the district court may impose other appropriate sanctions as an alternative to

preclusion.") (internal quotation marks and citation omitted); *Kunstler v. City of N.Y.*, 242 F.R.D.

261, 265 (S.D.N.Y. 2007) ("Despite the 'automatic' nature of Rule 37(c)(1), the imposition of

sanctions under the rule is a matter within the trial court's discretion.") (internal quotation marks and citation omitted).  In determining the appropriate sanction under Rule 37(c), courts consider: (1) the party's explanation for the failure to comply with the disclosure, (2) the importance of the evidence sought to be precluded, (3) the prejudice suffered by the opposing party as a result of having to address the new or undisclosed evidence, and (4) the possibility of a continuance.  *See Softel, Inc. v. Dragon Med. & Sci. Commc'ns*, 118 F.3d 955, 961 (2d Cir. 1997).  The sanction of preclusion is considered by courts to be a "harsh" remedy that should be used "only in rare situations."  *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988).  "'Before [granting] the extreme sanction of preclusion,' the Court 'should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses.'"  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012) (quoting *Outley v. N.Y.*, 837 F.2d 587, 591 (2d Cir. 1988)).  *See also Quiles v. City of N.Y.*, No. 11 Civ. 5613, 2014 WL 1918635, at *4 (S.D.N.Y. May 8, 2014) ("Preclusion, however, is a harsh remedy to be employed sparingly.") (citation omitted).  A court's exercise of its discretion will be upheld unless manifestly erroneous.  *Lorme v. Delta Air Lines, Inc.*, 251 F. App'x at 692.

Disclosure violations within the ambit of Rule 37 include the destruction of evidence, or spoliation, and untimely production of documents and information required to be produced.  *See In re September 11th Liab. Ins. Coverage Cases,* 243 F.R.D. at 125.  The CEVA Defendants say that the latter is at issue here.  They maintain that the Court should preclude the Trustee from using Record Value Evidence to prove CEVA Group's equity value, separate and apart from Mr. Maxwell's damages computation, and from asserting damages claims predicated on the alleged control, option or sale value of CIL's stock and using the Control Value Evidence to establish

those damages, because the Trustee has not previously disclosed those damages claims. They do not contend that the Trustee has acted in bad faith. Rather, they say that in precluding the Trustee from relying (at summary judgment, and if necessary, at trial) on those purported damages theories and/or calculations, the Court merely will hold the Trustee to the "four corners" of his Rule 26 disclosures and expert reports. They assert that the Court likewise should preclude the Trustee from using the Addendum to establish his damages claims, because it constitutes a new expert report from Mr. Maxwell that he submitted after the close of expert discovery. The Court considers those matters below.

<u>Record Value Evidence</u>

The Trustee contends that he disclosed his intent to rely upon the Record Value Evidence to prove CIL's damages in his First and Second Supplemental Disclosures. As such, he says that Rule 37(c) is not applicable because he complied with the mandates of Rule 26.[63] Moreover, he maintains that even if he failed to disclose information relating to the Record Value Evidence called for under Rule 26(a), the CEVA Defendants have not met the standards under Rule 37 for precluding him from relying on that evidence to prove CIL's damages in this litigation.[64]

Rule 26(a) requires a party to disclose "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection or copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which such computation is based[.]" *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). *See also Agence France Pressse v. Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013) ("Put simply, damages computations and the documents supporting those computations are two different things, and

---

[63]    *See* Opposition at 7.

[64]    *Id.*

Rule 26 obliges parties to disclose and update the former as well as the latter."); *Maharaj v. California Bank & Trust*, 288 F.R.D. 458, 463 (E.D. Cal. 2013) ("Rule 26 does not elaborate on the level of specificity required in the initial damages disclosure.  However, cases have held that the computation of damages required by Rule 26(a)(1)(C) contemplates some analysis; for instance, in a claim for lost wages, there should be some information relating to hours worked and pay rate.") (internal quotations and citations omitted); *Azure LLC v. Figueras Seating U.S.A., Inc.*, No. 12-23670-CV, 2014 WL 12512542, at *1 (S.D. Fla. Jan. 10, 2014) ("Plaintiff may not shift to Defendants the burden of attempting to determine the amount of Plaintiff's alleged damages. Rather, Plaintiff must compute in dollars how much it claims for each category of damages."); *see also* 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.22[4][c][i] (3d ed. 2018) (Noting that the case law is clear that "to fulfill the initial disclosure requirement, a party must provide a computation supported by documents.  Mere production of undifferentiated financial documents without explanation is not sufficient to fulfill the mandatory initial disclosure requirement.").

In the Amended Complaint, the Trustee put the CEVA Defendants on notice that he would rely on Record Value Evidence in proving CIL's damages in this case.[65]  Moreover, in disclosing CIL's estimated damages at €150 million to €300 million in the First and Second Supplemental Disclosures, the Trustee indicated that his estimate was, respectively, "based upon" and "with reference to," among other things, Record Value Evidence.[66]  However, neither

---

[65]   *See* Amended Complaint ¶6 (citing Record Value Evidence as support for the Trustee's assertion that CEVA Group's equity had substantial value as of the CEVA Restructuring.).

[66]   *See* First Supplemental Disclosures at 3 ("The Trustee presently estimates that the damages arising from the CEVA Equity Transfer are approximately €150,000,000 to €300,000,000, plus interest. Computation of this figure is based upon, *inter alia*: [the Record Value Evidence] . . . and . . . the testimony concerning the value of CEVA [Group]'s equity adduced via deposition in this proceeding."); Second Supplemental Disclosures at 4 ("The damage amount was calculated (and continues to be refined), generally, with reference to, among other things, the [Record Value Evidence] . . . by utilizing an expert to apply generally accepted valuation methodologies to the data

the Amended Complaint nor those disclosures included a computation of the estimated damages sought by the Trustee or a description of the valuation methodologies that the Trustee applied in reaching the estimate.  Instead, in the Second Supplemental Disclosure, the Trustee explained that "[t]he detailed calculation of the Trustee's damages and the application of the valuation methodologies will be set forth in the Trustee's expert report[.]"[67]  That was consistent with his earlier correspondence and his deposition testimony that he intended to rely on the damages calculation reached by his expert.[68]  In his opening and rebuttal expert reports, Mr. Maxwell used CEVA Group's "Project Phelps" financial data (i.e., CEVA Group's five-year forecast) in calculating CEVA Group's enterprise and equity value as of the CEVA Restructuring.  Neither the Trustee's disclosures nor Mr. Maxwell's reports provided alternative bases or computations with respect to the Trustee's damages, let alone one based upon the Record Value Evidence.[69]  The Trustee has never provided a damages calculation based on that evidence.

---

contained in CEVA's financial statements and the financial projections developed by CEVA prior to the CEVA Equity Transfer . . . to compute a total enterprise valuation range for CEVA, and deducting appropriate debt and making other adjustments as determined by the Trustee's expert.").

[67]    Second Supplemental Disclosure at 4.

[68]    *See, e.g.*, Chapman Decl. Ex. C (Trustee letter, dated June 19, 2015), at 1 (stating that the damages calculation would be "produced as part of the party's Rule 26(a)(2) [expert] disclosures") (citations omitted); Chapman Decl. Ex. D (Trustee letter, dated July 22, 2015) ("Calculating a value for CEVA's equity requires an expert to cull relevant data from [Rule 2004 discovery] documents . . . perform diligence . . . and perform complex calculation."); Trustee letter, dated Jan. 22, 2016 [ECF No. 64] ("Valuing the equity of any large enterprise is a complex task requiring appropriate experts.") at 2.  *See also* Chapman Decl. Ex. H (Trustee Depo. Tr. dated 1/14/16), at 21:19-24; 92:5-10 ("I have no thoughts as to what is a fair value.· I'm going to rely on my expert to value what it was.").

[69]    The Trustee notes that in his June 30 Letter, he advised the Court that, in his view, "the value of CEVA [Group]'s equity is not an issue that properly can be adjudicated exclusively on the basis of post hoc expert testimony."  June 30 Letter at 2.  To that end, he stated that:

> The prepetition documentary record contains multiple instances of the Defendants and those acting in concert with them (i.e., Apollo) valuing CEVA's net equity at amounts up to €1.2 billion at various dates close to the CEVA [Equity T]ransfer, and then attempting to cover that up. Defendants' admissions that CEVA [Group] had positive equity value which could support a judgment in favor of the Trustee even in the complete absence of expert testimony.

*See id.*  The Court attaches no weight to that letter.  The Trustee submitted it after he finalized the Rule 26 disclosures and after the close of discovery.  The letter does not contradict the Trustee's earlier disclosures that his

In merely identifying the Record Value Evidence as being relevant to his calculation of

CIL's damages in his First and Second Supplemental Disclosures, the Trustee failed to comply

with Rule 26(a)(1)(A)(iii), and was not "substantially justified" in believing otherwise.  The case

of *Design Strategy, Inc. v. Davis*, 469 F.3d 284, is instructive.  There, an employer ("Design")

sued its former employee ("Davis") to recover damages, including lost profits – caused by

Davis's alleged diversion of a corporate opportunity during the course of his employment with

Design.  *Id.* at 288.  After the close of discovery, Design disclosed two witnesses, one of whom it

disclosed as an expert witness, to testify regarding its "lost profits."  *Id.* at 293.  Davis objected

and moved to preclude Design from offering those witnesses or any other evidence of its lost

profits on the grounds that Design had not listed "lost profits" as a category of claimed damages

in its disclosures or at any point during discovery.  *Id.*  In granting the motion, the district court

found that while the complaint arguably put Davis on notice that Design might seek to recover

lost profits, Design had not provided any specific computation of the "lost profits" damages or

provided any evidence on the basis of which such a computation could be made.  *Id.*  The district

court rejected Design's argument that in turning over its financial records, it had, in fact, turned

over evidence from which a "lost profits" computation of damages could be made, since a

computation of damages based on those documents would be "simple arithmetic."  *Id.*  The

Second Circuit affirmed the district court.  Without limitation, in doing so, it found that Design

had run afoul of Rule 26 because: (i) it failed to list "lost profits" as even a category of damages

in its initial disclosures, and (ii) "by its very terms Rule 26(a) requires more than providing –

---

damages calculation would be derived from his expert's valuation, the details of which would be in his expert's
valuation report.  Moreover, it does not satisfy Rule 26(a) because it does not include a computation of CIL's
alleged damages based on the Record Value Evidence cited in the letter or otherwise.  That the CEVA Defendants
did not respond to the letter or otherwise challenge the Trustee's contentions regarding the calculation of CEVA
Group's value is of no moment.  The Court would not have expected them to do so.  The motion to dismiss the
Amended Complaint was *sub judice* and the Court's resolution of that motion could have rendered the issue moot.

without explanation – undifferentiated financial statements; it requires a 'computation' supported by documents." *Id*. at 295.

The Amended Complaint cited to Record Value Evidence as support for the Trustee's assertion that CEVA Group's equity had substantial value. However, it did not include a damages computation based upon that evidence. Neither did the First and Second Supplemental Disclosures. Mr. Maxwell's expert reports included a computation of damages, but not one based on that evidence. The Trustee failed to satisfy his disclosure obligations under Rule 26 as they relate to his damages claim predicated on the Record Value Evidence. It would be unreasonable for the Trustee to have expected that his mention of the Record Value Evidence in his disclosures satisfied the mandates of Rule 26. That is so even though that evidence consists of financial documents prepared by or for the benefit of certain of the CEVA Defendants. *See Murray v. Town of Stratford,* No. 3:11 CV 629, 2014 WL 3700982, at * 9-10 (D. Conn. July 25, 2014) (finding that plaintiff's reliance on publicly filed documents and documents produced by the defendant for her damages did not excuse her obligation under Rule 26 to provide defendant with a computation of her damages claim); *Agence France Presse v. Morel*, 293 F.R.D. at 684 (rejecting plaintiff's assertion that it was not required to amend and update damages disclosure to disclose new theory of damages because the information underlying the new theory came from materials produced by the defendants, and stating "even a party's own production of documents supporting its theory of damages cannot excuse that party from its separate obligation to disclose a damages calculation[.]") ( citations omitted); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (finding that defendants' production of seventeen statements consisting of 629 pages of documents which supposedly "document and detail" the defendants' basis for their counterclaim for damages did not satisfy their Rule 26 disclosure requirements

because neither the defendants nor their expert provided a computation of each category of damages claimed).

The CEVA Defendants have demonstrated that the Trustee failed to disclose a damages theory or computation based upon the Record Value Evidence and, as such, failed to comply with his disclosure obligations under Rule 26.  The Trustee has not shown that there is justification for his failure to satisfy the clear and unambiguous disclosure requirements under Rule 26 "to a degree that could satisfy a reasonable person that parties could differ as to whether . . . there exists a genuine dispute concerning compliance."  *AIG Glob. Asset Mgmt. Holdings v. Branch*, No. 04-Civ 8803, 2005 WL 425494, at *1 (S.D.N.Y. Feb. 16, 2005) (internal quotation marks and citation omitted).  As such, the Court finds that the Trustee's failure to comply with Rule 26(a) was not substantially justified.  The Court also finds that the Trustee has not demonstrated that his failure to comply with Rule 26 was harmless.  As is more fully discussed below, the CEVA Defendants have been prejudiced by the Trustee's breach because they have done extensive document and deposition discovery, retained experts and developed their defense to the complaint based on that disclosure.  In doing so, they did not, and could not have accounted for alleged damage claims predicated on the Record Value Evidence.

The Court now considers whether application of the *Softel* factors warrants precluding the Trustee from proving damages based upon the Record Value Evidence on a stand-alone basis. The first factor focuses on "the party's explanation for the failure to comply with the disclosure [requirement.]"  *See Softel, Inc. v. Dragon Med. and Sci. Commc'ns*, 118 F.3d 955, 961 (2d Cir. 1997).  The Trustee says that application of that factor weighs in his favor because he did not fail to comply the Rule 26 disclosure requirements, and, as such, need not provide an explanation for

his alleged failure to do so.[70]  He says that neither the Supplemental Disclosures nor the relevant

correspondence imply that the Trustee would rely solely on Mr. Maxwell to prove the value of

CEVA Group.[71]  He maintains that both disclosures made clear that the damages calculation is

based on Record Value Evidence.[72]  Moreover, he says that the CEVA Defendants were well

aware of the fact that he would seek to introduce Record Value Evidence at the summary

judgment stage since, in their summary judgment motion, the CEVA Defendants specifically

identified those documents as evidence the Trustee will use to support a finding of CEVA

Group's value.[73]  Specifically, the Trustee contends that in the Amended Complaint and his Rule

26 disclosures, he put the CEVA Defendants on notice that he would rely on the Record Value

Evidence to prove CIL's damages in this case.[74]  The Court finds no merit to those contentions.

The Rule 26 disclosures describe a damages theory predicated on the Record Value Evidence,

and did not contain a computation of damages based upon that evidence.  The disclosures made

it clear that the Trustee would be seeking damages consistent with the valuation set forth in Mr.

Maxwell's expert report.  That report does not contain a computation of damages based upon the

Record Value Evidence.  Based upon those disclosures and relevant correspondence, the CEVA

Defendants could not have known that the Trustee would seek to rely on the Record Value

---

[70]   *See* Opposition at 8.

[71]   *Id.* at 9.

[72]   *Id.*

[73]   *Id*. (citing CEVA Summary Judgment Motion at 21).

[74]   *Id.*

Evidence to prove his damages separate and apart from Mr. Maxwell's consideration of them in his report.[75]  Application of the first *Softel* factor favors the CEVA Defendants.

In applying the second *Softel* factor, courts consider "the importance of the [precluded] evidence." *Softel,* 118 F.3d at 961.  The CEVA Defendants do not dispute the Trustee's assertion that the central issue in this litigation is the value of CEVA Group as of the CEVA Restructuring.  Still, they contend that application of this factor supports their request to bar the Trustee from using the Record Value Evidence to establish damages on a stand-alone basis because he has already disclosed a damages computation in Mr. Maxwell's expert reports.[76] They contend that the Record Value Evidence will be given appropriate consideration by the trier of fact through its consideration of Mr. Maxwell's testimony – consistent with his reports – if and when it determines the appropriate level of damages.  Moreover, they say that the Record Value Evidence alone will not be useful to the trier of fact who lacks sophistication to fully understand the Record Value Evidence without the context an expert provides.[77]

The Trustee contends that application of the second *Softel* factor weighs in his favor because the Record Value Evidence is highly relevant to whether CEVA Group had value at the time of the CEVA Restructuring.[78]  He says that is so because that evidence plainly contradicts the CEVA Defendants' assertion that CEVA Group had no value as of the CEVA Equity

---

[75]    For example, the Second Supplemental Disclosure does not state that the Trustee's theory of damages is calculated based on the Record Value Evidence, only that it was in reference to, generally, certain categories of records, and to the expert valuation.  The Trustee then continues to say in the Second Supplemental Disclosure that the "detailed calculation of the Trustee's damages and the application of the valuation methodologies will be set forth in the Trustee's expert report."  Read together, it was entirely reasonable for the CEVA Defendants to conclude that the Trustee's damages calculation was based on the expert's valuation.

[76]    *See* Motion at 21–22.

[77]    *See id.*

[78]    *See* Opposition at 10.

Transfer, due to a projected €100 million liquidity need.[79]  He also says that the evidence

supports Mr. Maxwell's opinions and casts doubt on Professor Shivdasani's opinions, and

therefore will aid the trier of fact in assessing each experts' credibility.[80]  The Trustee contends

that standing alone, the Record Value Evidence will assist the trier of fact in determining the

value of CEVA Group as of the CEVA Equity Transfer because the fact finder can consider

evidence of CEVA Group's value in determining whether it is in fact plausible that over $1

billion of CEVA Group's value "evaporated" in only seven months.[81]  Thus, he says that the fact

that Mr. Maxwell has disclosed a damages calculation that is not predicated on the Record Value

Evidence should not preclude him from using the Record Value Evidence on a stand–alone basis.

Moreover, the Trustee maintains that he is entitled to rely on the Record Value Evidence in

proving value regardless of whether his expert relied upon it.  He says that to the extent that the

trier of fact credits that such evidence has already been considered by Mr. Maxwell, that is

merely a question of the weight of the evidence, not its admissibility.  In short, the Trustee

contends that the Record Value Evidence bears on the credibility determinations of the parties'

experts, and separately, casts doubt on the CEVA Defendants' theory the CEVA Group's value

declined dramatically immediately prior to the CEVA Equity Transfer.

    The Record Value Evidence is relevant to the matters at issue in the complaint.  Because

Mr. Maxwell considered it in formulating his opinion, it will be given consideration by the trier

of fact if it must determine the appropriate level of damages.  Likewise, it will be available to

assess the credibility of Professor Shivdasani, and may be probative on matters relating to the

---

[79]   *Id.*

[80]   *Id.*

[81]   *Id.* at 10-11.

CEVA Defendants' liability for the wrongs alleged in the complaint. However, the Trustee is

otherwise overstating the significance of that evidence. First, the Trustee's assertion that the

evidence is probative of the CEVA Group's value as of the CEVA Equity Transfer is undercut

by the fact that neither expert based his valuation on that evidence. Both Mr. Maxwell and

Professor Shivdasani relied on a discounted cash flow analysis premised upon the Project Phelps

projections and a comparative companies analysis premised upon an approximate April 1, 2013

valuation date. Neither expert provided a valuation based solely on the Record Value Evidence.

Moreover, the case law is clear that without more, as an evidentiary matter, proof of an entity's

solvency at one point in time is not necessarily indicative of its solvency at another point in time.

*See In re Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC),* 373 B.R. 283,

346 (Bankr. S.D.N.Y. 2007) (rejecting theory that without other supporting evidence, proof of an

entity's insolvency after the petition date is indicative of the entity's value prepetition). *See also*

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (determining that the value or

insolvency of a company at, or just after, the petition date is not indicative of the value of the

company at a transfer date significantly preceding the petition date); *Matson v. Strickland (In re*

*Strickland),* 230 B.R. 276, 283 (Bankr. E.D. Va. 1999) ("[t]he fact that the Debtor was insolvent

nine months after the alleged transfer is immaterial because evidence of insolvency on a date

significantly distant in time from the date of the alleged transfer, without more, is insufficient to

support finding of insolvency on the date of transfer . . .") (internal quotations and citations

omitted). That is because in assessing the probative value of that evidence, the fact finder must

consider factors such as the reliability or correctness of the initial valuation, whether the entity's

financial performance remained constant during the period between the two relevant dates, and

other matters that account for changed circumstances – both internal and external – that impact

the operation of the entity's business.  In that light, the fact that the Record Value Evidence may

demonstrate that CEVA Group was solvent at a point prior to the CEVA Equity Transfer does

not, in and of itself, establish that it was solvent as of the date of the transfer.  The case law that

the Trustee cites in support of his assertion that the Court should consider the Record Value

Evidence on a stand-alone basis is distinguishable, and not to the contrary.  *See Kerasotes v.*

*George G. Kerasotes Corp.*, No. 05-3215, 2006 WL 521746, at *3 (C.D. Ill. Mar. 2, 2006), *aff'd*

*sub nom. Klein v. George G. Kerasotes Corp.*, 500 F.3d 669 (7th Cir. 2007); *TNS Media*

*Research, LLC v. Tivo Research & Analytics, Inc.*, 629 Fed. App'x 916, 934 (Fed. Cir. 2015);

*Lippe v. Bairnco,* 288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).[82]

---

[82]    In *Kerasotes v. George G. Kerasotes Corp.*, the plaintiff sued the defendants for damages on the grounds that in
1995 he had been forced to sell his shares in a closely held corporation ("GKC") for an amount that was far less than
the market value of the shares.  2006 WL 521746, at *3.  The defendants moved for summary judgment on the
grounds that the action was time barred by the statute of limitations.  The district court granted the motion and
dismissed all claims against the individuals and the corporation on the grounds that all of the plaintiff's theories for
relief fell within the Illinois Securities Law (Act), and that the claims were barred by the running of the five-year
statue of repose under that law.  *Id.* at *2-4.  The undisputed facts showed that in 1995 the defendants represented to
the plaintiff that GKC was worth $7,850,000, but that in 1998, they valued GKC at $49,262,962 – more than six
times the value they attributed to the company in 1995.  *Id.* at *3.  The court found that the disparity in the
valuations created an issue of fact regarding whether the $7,850,000 valuation was false and, as such, whether the
representations made to the plaintiff regarding the value of the stock in 1995 was false.  *Id.*  The court also found
that if the defendants misrepresented the value of the stock to plaintiff in 1995, then the transaction would have
violated section 12 of the Act, leaving the plaintiff with a remedy of rescission under section 13 of the Act.  *Id.*  The
district court nonetheless granted summary judgment dismissing those claims, as time-barred by the running of the
statute of repose.  *Id.*  That case is distinguishable because there was no explanation given for the dramatic increase
in value to GKC in the three-year period, other than fraud as of the earlier point in time; no evidence was offered to
show a large increase in actual or expected earnings.  Here, in contrast, the Trustee cannot dispute that, as a general
matter, CEVA Group's financial outlook declined considerably from the time of the earlier alleged valuations (*see,
e.g.*, Trustee's Response to CEVA Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule
7056-1(c), ¶¶ 37, 38, 40 [ECF No. 154]), rendering the earlier alleged valuations meaningless as of the time of the
CEVA Restructuring.

    In *TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, the plaintiff ("Kantar") filed suit seeking a
declaratory judgment that it did not infringe a patent.  629 Fed. App'x at 934.  The defendant ("TRA")
counterclaimed, asserting infringement of certain patents, misappropriation of trade secrets, and breach of contract
and fiduciary duty claims against the plaintiff.  All the patents-in-suit related to systems and uses of consumer data
in advertising.  TRA had developed a product that utilized that data in a way that provided enhanced market
analysis.  In seeking to grow its company, TRA sought outside investment.  As of May 2010, when the third round
of investments closed, TRA was valued at roughly $54 million.  *Id.* at 920.  At that time, Kantar made substantial
investments in, and engaged in merger discussions with, TRA.  Those talks ended when Kantar acquired a
competitor of TRA and released its own analytics product that directly completed with TRA's product.  *Id.*
Thereafter, TRA unsuccessfully launched a fourth round of financing.  That lead to a substantial drop in value and in
July 2012, TRA was purchased for approximately $20 million.  *Id*. at 921.  Among other things, in support of its

claim for damages, TRA contended that Kantar's decisions to release a competing product and to file a declaratory judgment against TRA, "froze" the market for investing in TRA, because the commencement of the lawsuit spooked potential investors who were reluctant to fund a company embroiled in litigation. *Id.* at 924. TRA contended that Kantar's actions cost it $21-23 million. It calculated that figure by considering the value of TRA before Kantar's allegedly improper acts – $54 million – in May 2010 and after – $20 million – in July 2012 and reducing this figure by thirty percent because only seventy percent of this loss was attributable to Kantar. *Id.* As support for the "frozen market" theory of damages, TRA submitted the testimony of its CEO and a damages report submitted by its expert on damages (the "TRA Expert"). Among other things, the TRA Expert asserted that TRA's inability to acquire more financing in the fourth round of investments was caused in large part by Kantar's release of a competing product. *Id.* at 925. In granting Kantar summary judgment dismissing those damage claims, the district court held that the TRA Expert's opinion, based solely on a temporal relationship, was insufficient to satisfy Rule 702(c) of the Federal Rules of Evidence. For that reason, and others, the district court excluded the TRA Expert's report. *Id.* The district court found that the CEO's testimony was based solely on conjecture and, as such, could not alone justify the damages claim. *Id.* Accordingly, the court excluded the "frozen market" damages theory from the case. *Id.* On appeal, the Federal Circuit held that the district court did not abuse its discretion when it excluded the "frozen market" opinion in the TRA Expert's report. *Id.* at 934 However, it found that the court erred in prohibiting TRA from pursuing the "frozen market" damages claim against Kantar by reason of the fact that it excluded the expert's testimony. The Federal Court found that TRA's lay witness was competent to testify in support of the "frozen market" damage claim. *Id.* at 935. In doing so, it noted that "a party need not rely upon an expert to demonstrate it is entitled to damages[,]" and that "[w]hile it may be inappropriate to allow an expert to premise an opinion upon no more than a temporal relationship between TRA's dramatically divergent valuations, the jury is entitled to consider that fact, among others, when assessing TRA's request for compensatory damages." *Id.* (citations omitted). The case is distinguishable and does not support the Trustee's assertion that, standing alone, the Record Value Evidence is representative of CEVA Group's pre-equity transfer value and should be considered in determining the plausibility of CEVA Group's insolvency, because the fact at issue in *TNS* was whether Kantar's actions contributed to the valuation decrease, not whether the disparate valuations themselves were legitimate. The court did not question the plausibility of the decline in TRA's value and noted that many investors declined to invest because of "lack of strategic fit" and concerns about "management structure and sales cycle length." *Id.* at 934. Rather, the court rejected the defendant's expert who had merely assumed that the plaintiff's release of a competing product into the marketplace impacted defendant's market value without any explanation. *Id.* The cause of CEVA Group's decline in value is not at issue on this motion for summary judgment, only whether there was or was not equity value as of April 1, 2013, and no triable issue is raised merely by the existence of stale valuations, rendered when the company's actual and projected financial performance concededly was far greater.

In *Lippe v. Bairnco*, the court excluded expert testimony on *Daubert* grounds because the court was not persuaded that the testimony rested on a "reliable foundation." 288 B.R. at 689. There, the plaintiffs contended that in the 1980s the Keene Corporation ("Keene") engaged in a series of fraudulent transfers intended to place its assets beyond the reach of its creditors. *Id.* at 681. By 1993, Keene was the subject of more than 100,000 asbestos lawsuits and went into bankruptcy. The plaintiffs sued on behalf of the asbestos plaintiffs to challenge the transactions as fraudulent conveyances. *Id.* In support of those claims, the plaintiffs sought to rely on the expert testimony of a finance professor (the "Professor") on Keene's solvency at times relevant to the asset transfers. *Id.* at 694. Among other things, the Professor concluded that in May 1986, Keene had a value of $520.7 million, and that seven months later, the value dropped to $95.7 million. Although the court noted that "[i]n the absence of some catastrophic event . . . it makes no sense that a $520 million-dollar company would lose $425 million of its value in just seven months," the Professor essentially conceded that point in her deposition. *Id.* at 695. The court went on to note that the expert demonstrated a "lack of confidence in her own conclusion." *Id.* at 696 (citing to expert's deposition where she noted, *inter alia*, "I think that my valuation is wrong. I think I may have overstated the value."). The expert also admitted that she had never valued a company before. *Id.* at 697. The court ultimately rejected the plaintiff's experts because "their opinions are speculative and conjectural, . . . not based on sufficient facts or data . . . , they do not apply reliable principles and methods . . . , and they make no effort to account for major variables that one would expect to have an impact on their conclusions." *Id.* at 701. Nothing in the *Lippe* court's ruling provides any support for the Trustee's attempt to import stale valuation evidence here.

The CEVA Defendants correctly note that under the rule of retrojection, an expert can use valuations from different points in time if the expert applies appropriate methodologies and adjustments to the earlier or later valuations to tie them to the relevant metrics as they existed as of the date at issue.[83] The rule provides that "if a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates the absence of any substantial or radical changes in the assets or liabilities of the bankruptcy between the retrojection dates, the debtor is deemed to have been insolvent at all intermediate times." *In re Longview Aluminum, L.L.C.*, No. 03 B 12184, 2005 WL 3021173, at *5 (Bankr. N.D. Ill. July 14, 2005), *aff'd sub nom. In re McCook Metals, L.L.C.*, No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007), *aff'd sub nom. Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579 (7th Cir. 2008) (internal quotations and citations omitted). *See also In re TC Liquidations LLC,* 463 B.R. 257, 274 (Bankr. E.D.N.Y. 2011) ("Under retrojection, if it can be established that the debtor was insolvent at the beginning and end of a time period, then a court can find that a debtor was insolvent during the time period between those dates.") (citations omitted). However, there are limits to the application of the rule. The party seeking to use retrojection, must establish (1) the absence of any books and records that would assist him, or his expert, in ascertaining the debtor's financial condition, and (2) the absence of any radical or substantial change in the debtor's assets or liabilities between the retrojection dates. *Id.* at 275; *see also In re Jesup & Lamont, Inc.*, 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014) ("If a trustee shows that the debtor was insolvent at a time subsequent to the date of the alleged fraudulent transfer, the trustee must also show that the debtors' financial condition did not change during the interim period."). Here, there is evidence as to CEVA Group's valuation as of the date of the CEVA Restructuring. Indeed, in formulating

---

[83]    *See* Reply at 22.

his valuation, Mr. Maxwell relied on the Project Phelps forecasts as reasonable estimates of

future earnings.[84]  Moreover, the decline in the value of CEVA Group from 2012 to the first

quarter of 2013 is well documented and not disputed by the Trustee.  Thus, the rule of

retrojection is not applicable in this case.  Application of the second *Softel* factor favors the

CEVA Defendants.

  The third *Softel* factor is "the prejudice suffered by the opposing party as a result of

having to prepare to meet the new [evidence]."  *Softel*, 118 F.3d at 961.  The Trustee contends

that the CEVA Defendants will not be prejudiced if he is permitted to rely on the Record Value

Evidence on a stand-alone basis to prove CIL's damages because they have been well aware of

his intent to do so throughout the course of fact and expert discovery.[85]  He contends that the

CEVA Defendants not only have been privy to the Record Value Evidence through the broad

discovery exchanged in this case, but that they produced much of the evidence that he is relying

on.[86]  But that misses the point.  The prejudice to the CEVA Defendants is that in disclosing

CIL's alleged damages, the Trustee did not provide a computation of damages (either in the

disclosures or in Mr. Maxwell's reports) based on the Record Value Evidence.  To comply with

Rule 26(a), the Trustee was required to do so.  That is so even when the defendant provides the

documents on which the plaintiff relies in computing its damages.  *See, e.g.*, *Murray v. Town of

Stratford*, 2014 WL 3700982, at *9-10; *Agence France Presse v. Morel*, 293 F.R.D. at 684.  In

conducting their discovery in the case, the CEVA Defendants were not required to anticipate that

the Trustee would seek to rely on Record Value Evidence to prove CIL's damages at summary

---

[84] *See* "Undisputed Facts" (Ex. G to Reply to the Trustee's Response to CEVA Defendants' Statement of
Undisputed Facts Pursuant to Local Rule 7056-1(c)) ¶ 78 [ECF No. 180].

[85] *See* Opposition at 12.

[86] *See id.* at 12-13

judgment or at trial.  They were entitled to rely on the Trustee's disclosure with respect to the

damages allegedly suffered by CIL.  *See, e.g.*, *Pal v. N.Y. Univ.*, No. 06 Civ. 5892, 2008 WL

2627614, at *4 (S.D.N.Y. June 30, 2008) (finding that defendant failed to comply with Rule

26(a)'s mandate that it disclose potential witnesses where defendant simply provided plaintiff

with documents containing names of patients because "[plaintiff's] knowledge of the existence

of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is

fulfilled only if [defendant] informed [plaintiff] that it might call the witness in support of its

claims or defenses.") (citation omitted).  The Court credits the CEVA Defendants' assertion that

they will be prejudiced if the Court does not preclude the Trustee's use of the Record Value

Evidence to prove CIL's damages because they would have taken a broader approach to fact and

expert discovery had the Trustee included a damages computation based on the Record Value

Evidence in his Rule 26 disclosures.[87]  *Id.*  The Trustee also says that the CEVA Defendants will

not be prejudiced if he is permitted to utilize the Record Value Evidence to compute CIL's

damages, because in his report, Professor Shivdasani recognized that "the Trustee may rely on

various documents to support his claim that CEVA Group was worth €150 million to €300

---

[87]    To that end, the CEVA Defendants say that with respect to fact discovery, they would have questioned Mr. Maxwell and other fact witnesses, such as the Trustee and Stephen Freidheim, as to why each of these prior purported valuations were no longer indicative of CEVA Group's value or solvency at a later date, given, among other things, CEVA Group's rapidly declining performance.  They also say that they would have also questioned the authors of the Record Value Evidence during their depositions about those documents and whether this evidence was probative as to CEVA Group's value at the time of the CEVA Restructuring.  *See* Motion at 23.  As to expert discovery, they say that they did not have their expert evaluate the Record Value Evidence to explain why, in their view, the evidence was stale, incorrect or otherwise not indicative of any equity value as of the CEVA Restructuring, and that they also would have had the expert examine the content of other record value evidence not cited by the Trustee, that they say shows that the consensus in 2012 and early 2013 was that CEVA Group was indeed deeply insolvent.  *See id.*  They also say that had stand-alone theories and calculations based on the Record Value Evidence been timely disclosed by the Trustee, they would have directed their expert to consider information as to CEVA Group's performance and value after April 1, 2013 that may also have been probative of its value at the time of the CEVA Restructuring, and could have considered retaining an additional expert, with a different finance background, to challenge any such theories and calculations.  *See id.* at 22-23.

million more that its debt as of the CEVA Restructuring."[88]  But that statement was taken from Professor Shivdasani's initial report.  Mr. Maxwell did not include a damages calculation based on the Record Value Evidence in his report.  There was plainly no reason for Professor Shivdasani to consider, let alone address, that evidence in his rebuttal report since the Trustee disclosed that "[t]he detailed calculation of the Trustee's damages and the application of the valuation methodologies will be set forth in the Trustee's expert report."[89]  Application of the third *Softel* factor favors the CEVA Defendants.

The fourth *Softel* factor is whether there is a "possibility of a continuance" to cure any prejudice suffered by the moving party.  *Softel*, 118 F.3d at 961.  The Trustee says that application of that factor favors him because the CEVA Defendants do not need a continuance to seek discovery on "new" evidence because he did not fail to comply with his discovery obligations.[90]  He also contends that, in any event, a continuance would be available in this case if the Court reopened discovery, particularly because no trial date has been set herein.[91]  The Court finds no merit to either assertion.  First, as discussed above, the Trustee failed to comply with his disclosure obligations under Rule 26 because he did not produce a damages computation based on the Record Value Evidence.  Thus, any additional discovery would be on account of "new" evidence that the Trustee is seeking to use.  The CEVA Defendants correctly note that the Record Value Evidence consists of a number of valuations of the CEVA Group and value-related documents compiled by different parties using different methodologies and focusing on different periods of time.  The Court agrees that new discovery on those matters could require extensive

---

[88]    *See* Opposition at 13.

[89]    *See* Second Supplemental Disclosures at 4.

[90]    *See* Opposition at 13.

[91]    *Id.*

expert analysis and possibly additional fact discovery.  Thus, the CEVA Defendants reasonably contend that the introduction of that new evidence will likely spawn extensive and costly discovery.

The Trustee is correct that in some cases, the fact that the matter at issue is not trial ready supports the granting of a continuance in favor of permitting additional discovery.  *See, e.g.*, *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. at 162 ("With no trial date yet set, this Court sees no reason why a continuance would not be feasible here.").  In this case, however, the fact that a trial date has not been set does not support the Trustee's position.  Although this case is not trial ready, the Trustee has been on notice that the CEVA Defendants would seek summary judgment dismissing all counts that assume CEVA Group had value as of the CEVA Restructuring, and that they would do so based upon a single alleged error in Mr. Maxwell's expert report.  The CEVA Defendants made that motion reasonably acting in reliance upon the Trustee's computation of damages as disclosed in the First and Second Supplemental Disclosures and in Mr. Maxwell's expert valuation reports.  The parties have fully briefed their respective motions for summary judgment.  The Court finds that it is unreasonable at this stage to grant the Trustee a continuance.

The Court finds that application of the *Softel* factors supports the CEVA Defendants' claim for relief in the Motion.  In applying Rule 37, courts are reluctant to preclude a party from submitting evidence where it would lead to a harsh result and there are less drastic remedies available.  *See, e.g.*, *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. at 162 (declining to preclude evidence where "the stakes [were] high . . . as precluding plaintiffs from pursuing $12-plus million in damages would [be] a particularly severe result."); *D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, No. 03-1026, 2006 WL 1644742, at

*7 (D.N.J. June 8, 2006) (denying request to preclude damages report, finding that such sanction "would be severe and 'tantamount to summary judgment.'") (citations omitted). Here, the relief requested by the CEVA Defendants is narrowly drawn. They do not seek to preclude the Trustee from relying on the Record Value Evidence entirely or from bringing his damages claim as he disclosed it in the First and Second Supplemental Disclosures and as computed by Mr. Maxwell in his opening and rebuttal expert reports. Indeed, in the CEVA Summary Judgment Motion, the CEVA Defendants assume, *arguendo,* that Mr. Maxwell's conclusions on enterprise value are correct, but that he erred in computing the "equity hurdle." The Trustee was clear in his deposition testimony and his Rule 26 disclosures that he would rely on his expert testimony and disclosures in computing CIL's damages in this action. The Court finds that it is appropriate for the Trustee to be held to those representations. Accordingly, the Court precludes that Trustee from relying on the Record Value Evidence at summary judgment or, if necessary, at trial, to prove CIL's damages, except to the extent set forth in his Rule 26 disclosures and Mr. Maxwell's expert reports.

Control Value Evidence[92]

In the Second Amended Complaint, the Trustee maintains that even if CEVA Group was insolvent as of the CEVA Restructuring, CIL nonetheless was damaged by the restructuring. He says that CIL could have monetized its stock in CEVA Group for the benefit of its creditors irrespective of whether CEVA Group was solvent at the time of the CEVA Equity Transfer. He asserts that CIL was damaged by the CEVA Equity Transfer because it deprived CIL of the "sale, option and control" value of its interest in CEVA Group for no consideration. The CEVA

---

[92]    Much of the Court's analysis of the Motion as it relates to the Record Value Evidence is equally applicable to this discussion of the Control Value Evidence. That analysis is incorporated herein.

Defendants contend that in seeking that relief, the Trustee has introduced a new, previously undisclosed theory of damages. They argue that pursuant to Rule 37, the Court should preclude him from doing so because the Trustee did not allege those damages claims (or the underlying theory) in the Initial or Amended Complaints and neither the Trustee's Rule 26 disclosures nor Mr. Maxwell's reports include a computation of damages based upon the control, option or sale value of CIL's shares in CEVA Group.[93]

The Trustee denies that he is using the Second Amended Complaint to alter his theory of damages. First, he says that his "unwavering theory of damages" is that the estate is entitled to the value of the equity that was stripped from CIL via the CEVA Restructuring, and that he disclosed this theory of value in his Rule 26 disclosures.[94] He points to his Second Supplemental Disclosures in which he advised that he "seeks an award of damages, plus interest, costs and attorneys' fees based on, *inter alia,* the amount equal to the value of the CEVA equity which Defendants stripped from CIL via the CEVA Equity Transfer, along with any consequential damages suffered as a result of the defendants' actions."[95] He also asserts that he has been clear, from the outset of this action, that he seeks to recover the value of CIL's equity in CEVA Group immediately prior to the CEVA Restructuring, that the Second Amended Complaint is consistent with his damages theory, and that the added references in the Second Amended Complaint to the "control, option and sale value" of CIL's equity interest in CEVA Group "does not amount to a new theory of damages – rather it simply provides additional detail for the existing theory of damages."[96] The Trustee also maintains that their contentions to the contrary notwithstanding,

---

[93]    *See* Motion at 26.

[94]    *See* Opposition at 16.

[95]    *See* Second Supplemental Disclosures at 3.

[96]    Opposition at 17.

the CEVA Defendants have long been aware that he intends to offer evidence as to the control,

sale and option value of CIL's holdings in CEVA Group.  He asserts that the CEVA Defendants'

valuation expert was deposed about the subject, and that at the hearing on the motions to dismiss,

the CEVA Defendants' counsel acknowledged that the Trustee's damages include the control

value of CEVA Group's stock, and his counsel made a statement about the control and option

value of CEVA Group's stock that is tracked in the Second Amended Complaint.[97]  The Trustee

also contends that the option value of CIL's holdings in CEVA Group has been part of the

evidentiary record.  He says that the documents produced to the Trustee attributed positive

"option value" to CEVA Group's shares in excess of the internal net enterprise value of CEVA

Group itself, and Michael Jupiter, a senior Apollo employee and CEVA Group director who

directed the CEVA Restructuring testified at length in his deposition as to the option value

Apollo ascribed to CEVA Group and the methodological basis for doing so.[98]  Finally, he says

that there is nothing new about his assertion that damages are based upon the "sale value" of

CEVA Group.  He contends that the Amended Complaint alleged that CEVA Group had sale

value, which the CEVA Defendants and their advisor deliberately failed to consider,[99] and that

during oral arguments on the defendants' motions to dismiss the Amended Complaint, the

Trustee's counsel contended that "[t]here was no market test, meaning that nobody went out and

put CIL on the market and said let's see what we can get for it."[100]

---

[97]  *See id*. at 17-18 (citing 10/16/15 Hr'g Tr. at 23:13-16 [ECF No. 52]) (The CEVA Defendants' counsel speaking:
So that's exactly what they're arguing here, that CIL did not receive reasonably equivalent value for its consent,
because the stock had value, and they should have received something more to consent).

[98]  *See id.*

[99]  *See id*. at 18 (citing Amended Complaint ¶¶ 72, 82, 85, 123).

[100]  *See id.* (citing 10/16/15 Hr'g Tr. at 42:5-7).

The Court finds no merit to the Trustee's assertions. First, the Trustee does not allege in the Initial or Amended Complaints that CIL's equity stake in CEVA Group had intrinsic value, irrespective of CEVA Group's solvency, or seek damages predicated on that theory. Although the Trustee states in his Second Supplemental Disclosures that he seeks an award of damages "based on . . . the amount equal to the value of the CEVA equity which Defendants stripped from CIL via the CEVA Equity along with any consequential damages suffered as a result of the Defendants' action[,]" he does not mention anything about the control, option, or sale value of CIL's stock in CEVA Group, or provide a computation of such damages. Finally, Mr. Maxwell's reports do not mention the control, option or sale value of CIL's stockholdings in CEVA Group or contain a computation of damages predicated on such values. The Court attaches no weight to the Trustee's references to comments made by counsel at the hearing on the motions to dismiss the Amended Complaint. The CEVA Defendants' counsel was referring to the alleged positive equity value of CEVA Group, not the purported control, option, or sale value of its stock. Moreover, although the comments by Trustee's counsel appear to refer to the control, option, or sale value of CIL's equity interest in CEVA Group, those comments pre-date the submission of the Trustee's Second Supplemental Disclosures. As noted previously, the Trustee failed to make any reference to control, sale or option value or provide a damages computation based on that theory. The Trustee provided no support for his assertion that Professor Shivdasani was deposed about the control, option and sale value of CIL's stock in CEVA Group, and the record does not support that assertion. When the Trustee questioned Professor Shivdasani about the "control value" of the stock during his deposition, he stated that he did not specifically account for any "control premium" in performing his valuation.[101]

---

[101]    *See* Chapman Supplemental Decl. Ex. A (Excerpt of Shivdasani Dep. Tr., dated June 3, 2016), at 49:19-52:20.

Finally, the Court finds no merit to the Trustee's reliance on Michael Jupiter's deposition testimony. The testimony related exclusively to an Apollo internal "option model" valuation document that was premised on Apollo's determination that CEVA Group lacked equity value.[102] The Trustee did not reference this "option model" in his complaints, disclosures, expert reports, or any other materials.

The Trustee did not disclose a damages theory, and has never provided a computation of damages based upon the alleged control, option or sale value of CIL's stock in CEVA Group. As such, the Trustee is in violation of Rule 26(a), as the plain language of the statute mandates that such disclosure be made. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). *See also Agence France Pressse v. Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013); *Azure LLC v. Figueras Seating U.S.A., Inc.*, No. 12-23670-CV, 2014 WL 12512542, at *1 (S.D. Fla. Jan. 10, 2014). He is not "substantially justified" in contending otherwise. *See, e.g., Henrietta D. v. Giuliani*, No. 95 CV 0641, 2001 WL 1602114, at *5 (E.D.N.Y. Dec. 11, 2001) ("The test of substantial justification is satisfied if "there exists a genuine dispute concerning compliance.") (citation omitted). Moreover, the Trustee's failure to do so is not "harmless." The parties completed their fact and expert discovery based on the Trustee's representation in his Rule 26 disclosures that he is seeking to recover the alleged equity value of CIL's shares in an allegedly solvent entity. The Trustee made that disclosure in complying with this Court's Disclosure Order directing him to provide a computation of the damages he is seeking in this litigation. It was incumbent upon the Trustee to disclose the universe of the damages he is seeking in this action and provide a computation of such damages. The CEVA Defendants were entitled to rely on that disclosure in conducting their discovery. If the Trustee had properly disclosed this damage theory at that time,

---

[102]   *See* Chapman Supplemental Decl. Ex. B (Jupiter Dep. Tr., dated Jan. 12, 2016), at 191:2-192:25.

the CEVA Defendants would have had the opportunity to assess their discovery needs given that information. The Trustee's failure to do so has prejudiced them. As such, his violation of Rule 26 is not "harmless." *Lebada v. N.Y.C. Dep't of Educ.*, 2016 WL 626059, at *5 (noting that a failure to comply with Rule 26 is "harmless" when there is no prejudice to the party entitled to the disclosure). The CEVA Defendants have established grounds for relief under Rule 37 as it relates to the Trustee asserting a theory of damages based on the control, option or sale value of the CIL shares, and utilizing the Control Value Evidence to further that theory.

The Court now considers application of the *Softel* factors. The damage claim that the Trustee disclosed, and that Mr. Maxwell supports in his reports, is based on the Trustee's contention that CEVA Group was solvent at the time of the CEVA Restructuring. The record is clear that the Trustee has never provided a computation of CIL's alleged damages that assumes otherwise or that is based upon the sale, option or control value of its shares in CEVA Group, irrespective of the solvency of CEVA Group. The Trustee does not assert otherwise. Accordingly, application of the first *Softel* factor supports the CEVA Defendants' claim for relief. So does the application of the second *Softel* factor. The Control Value Evidence that the CEVA Defendants seek to preclude the Trustee from using in opposing the CEVA Summary Judgment Motion has no relevance to the Trustee's disclosed damages claim. In contrast to the Record Value Evidence, Mr. Maxwell did not consider the Control Value Evidence in formulating his opinion. That evidence is not important to, nor does it otherwise bear upon, Mr. Maxwell's enterprise valuation analysis of CEVA Group. Rather, it is relevant to a theory of damages not previously disclosed or quantified, and first articulated in the Second Amended Complaint. Application of the second *Softel* factor favors the CEVA Defendants. As already discussed, the CEVA Defendants have shown that they will be significantly prejudiced if they

must prepare to meet the Control Value Evidence in valuing the CEVA Group equity under a previously undisclosed valuation theory.  As such, application of the third *Softel* factor favors the CEVA Defendants.  Finally, a continuance is not appropriate here, for the same reasons it is not appropriate with respect to the Record Value Evidence.  The CEVA Defendants have reasonably relied on the Trustee's Rule 26 disclosure and the Maxwell expert reports in formulating their summary judgment motion.  It would be unreasonable to prevent them from proceeding with the motion, just as it would be burdensome to reopen discovery on the Trustee's new damages theory.

Application of the *Softel* factors supports the CEVA Defendants' request for relief under Rule 37.  The Court precludes the Trustee from relying on the Control Value Evidence, or a damages theory based upon the control, option and sale value of CIL's shares in CEVA Group, at summary judgment or, if necessary, at trial, to prove CIL's damages.  The Court finds that relief to be appropriate because it gives effect to the Trustee's Rule 26 disclosures and the damages theories set forth in Mr. Maxwell's reports.

The Addendum

In the cover letter accompanying the Addendum, the Trustee advised that he was producing the Addendum "pursuant to Fed. R. Civ. P. 26(a)(2)."  That rule speaks to the "Disclosure of Expert Testimony."  *See* Fed. R. Civ. P. 26(a)(2).  As relevant, Rule 26(a)(2)(E) mandates that a witness who provides an expert report, supplement that report "when required under Rule 26(e)."  Fed. R. Civ. P. 26(a)(2)(E).  Rule 26(a)(2) speaks to the disclosure of expert testimony.  *See* Fed. R. Civ. P. 26(a)(2).  In part, it mandates that an expert's report "contain a complete statement of all opinions to be expressed and the basis and reasons therefore."  Fed. R. Civ. P. 26(a)(2)(B).  For that reason, a party receiving an expert's report is entitled to assume

that the report reflects the expert's "full knowledge and complete opinions on the issues for

which his opinion has been sought." *Sandata Tech., Inc. v. Infocrossing, Inc*., No. 05 Civ.

09546, 2007 WL 4157163, at *4 (S.D.N.Y. Nov. 16, 2007).  Nonetheless, the rule accounts for

the fact that there will be situations in which a party that has made a disclosure under Rule 26(a)

must "supplement or correct" that disclosure.  Under Rule 26(e)(1)(A) a party must do so "in a

timely manner" if the party "learns that in some material respect the disclosure or response is

incomplete or incorrect and if the additional or corrective information has not otherwise been

made known to the other parties during the discovery process."  Fed. R. Civ. P. 26(e)(1)(A).  For

an expert whose report must be disclosed under Rule 26, "the party's duty to supplement extends

both to information included in the report and to information given during the expert's

deposition."  Fed. R. Civ. P. 26(e)(2).  Under Rule 26, an expert must supplement its report

"when the expert subsequently learns of information that was previously unknown or

unavailable, and the new information renders the earlier report incomplete or inaccurate." *Lewis

v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011).  That rule "imposes a *duty* on

[experts]; it grants them no *right* to produce information in a belated fashion." *Reid v. Lockheed

Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001).  The scope of the supplemental

disclosure permitted under Rule 26(e) is limited.  *See id.* ("Rule 26 does not, however, bestow

upon litigants unfettered freedom to rely on supplements produced after a court-imposed

deadline[.]").  The rule is not "a vehicle to permit a party to serve a deficient opening report and

then remedy the deficiency through the expedient of a 'supplemental' report." *Pergament v.

Tracey (In re Thilman)*, 557 B.R. 294, 303 (E.D.N.Y. Bankr. 2013) (quoting *Lidle v. Cirrus

Design Corp.,* No. 08 Civ. 1253, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009)).

Accordingly, "[c]ourts distinguish 'true supplementation' (e.g., correcting inadvertent errors of

omissions) from gamesmanship, and have repeatedly rejected attempts to avert summary

judgment by 'supplementing' an expert report with a 'new and improved' expert report."

*Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008). *See also*

*Coles v. Perry,* 217 F.R.D. 1, at *3 (D.D.C. 2003) ("[Rule 26(e)] does not grant a license to

supplement a previously filed expert report because a party wants to, but instead imposes an

obligation to supplement the report when a party discovers the information it has disclosed is

incomplete or incorrect."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F.

Supp. 2d 471, 481 (S.D.N.Y. 2009) (explaining that an expert may supplement its report to

correct errors in the report, provided it does so on a timely basis.).

The CEVA Defendants assert that the Court should strike the Addendum because it

constitutes a new report from Mr. Maxwell submitted by the Trustee after the close of expert

discovery.[103]  They say that in filing it, Mr. Maxwell was not responding to new evidence or

seeking to correct an inadvertent error or omission in his report or to change the analysis in his

report based upon newly learned facts – as is permitted under Rule 26(e).[104]  Rather, they say

that he filed the Addendum to raise a subjective and complex argument related to the calculation

of CEVA Group's enterprise value.[105]  Moreover, they assert that they will be prejudiced if the

Court permits the Trustee to utilize the Addendum because they did not have the opportunity to

---

[103]   *See* Motion at 28.  The Court notes that in the Trustee's Opposition and Cross–Motion for Summary Judgment
he argues that Mr. Maxwell's Addendum should be considered "properly part of the record" because the CEVA
Defendants never made a motion to strike."  Opposition at 40, n.133.  The Court disagrees.  The Court does not
construe the CEVA Defendants' failure to move to strike the Addendum while their motion to dismiss was pending
as their acquiescence to the Addendum being treated as part of the record.  Had the Court granted the CEVA
Defendants' motion to dismiss in its entirety, any such motion to strike would have been rendered moot.

[104]   *See* Motion at 29; Reply at 17.

[105]   *See* Reply at 17.

respond or depose Mr. Maxwell about the Addendum and his adjusted valuation.[106]  The Trustee

disputes those contentions.  He claims that he did not submit the Addendum to develop a new

idea or to improve upon Mr. Maxwell's report.[107]  Rather, he says that submitted it to correct a

calculation in Mr. Maxwell's original report, and the necessity of the correction became known

to Mr. Maxwell after he reviewed Professor Shivdasani's rebuttal report.[108]  The Trustee asserts

that in submitting the Addendum, he has provided advanced notice to the Trustee of Mr.

Maxwell's correction to his composite valuation range before trial.  He correctly notes that at

trial, Mr. Maxwell's testimony is not be limited to what is written in his opening and rebuttal

reports.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d at

482 (noting that Rule 26 "does not limit an expert's testimony simply to reading his report. . . .

The rule contemplates that the expert will supplement, elaborate upon, explain and subject

himself to cross-examination upon his report.") (internal quotations omitted).  He contends that

the Addendum provides advanced notice to the CEVA Defendants of Mr. Maxwell's corrected

calculations so that they are not sandbagged at trial.  *See, e.g., Sandata*, 2007 WL 4157163, at *3

("The purpose of the supplementation rule is to avoid ambush at trial and to assure that all

material information has been disclosed.").  In other words, the Trustee contends that rather than

serve to prejudice the CEVA Defendants, the Addendum functions precisely as Rule 26

contemplates—to *avoid* prejudice.

---

[106]   *See* Motion at 31.

[107]   *See* Opposition at 20.

[108]   *Id.* at 21.  Moreover, he says that to the extent that the CEVA Defendants disagree with Mr. Maxwell's
conclusions in the Addendum or disbelieve the justification for the Addendum provided by Mr. Maxwell, these are
questions of credibility that are reserved for the trier of fact and which the CEVA Defendants are free to explore on
cross-examination of Mr. Maxwell.

In considering those arguments, the Court finds *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471 to be instructive. A matter at issue there was the defendant's share of the market for "MTBE gasoline" in Queens County, New York. The defendant's expert produced a report that included a computation of the defendant's market share. In formulating his opinion on that issue, the plaintiff's expert ("Tallett") utilized gasoline sales reported by refiners and other "prime suppliers" on the U.S. Energy Information Administration's Form 782C. *Id*. at 475. His report did not include a computation of the defendant's market share. Rather, in his report, he critiqued the defendant's expert's methodologies, explained how he used the Form 782C data, and provided instructions on how to perform the market share calculation. *See id.* In doing so, he concluded that the defendant's experts understated the defendant's market share. The defendant deposed Tallett. During the deposition, Tallett admitted that in formulating his opinion on the defendant's market share: (i) he was mistaken about an important aspect of the Form 782C reporting protocol, (ii) that he had learned of his error just prior to the deposition, and (iii) that the impact of that error could significantly alter his market share analysis. *See id.* at 480-481. The defendant sought to strike Tallett's report arguing, among other things, that his testimony was unreliable because he fundamentally misunderstood the nature of the Form 782C data that he used in formulating his opinion. *Id.* In opposing the motion, the plaintiff submitted a declaration of Tallett (the "Tallett Declaration") in which Tallett stated, in substance, that after his deposition, he had reviewed his market share analyses in light of his corrected understanding of the significance of the data in Form 782C and concluded that his methodology was sound and that defendant's market share was approximately five times higher than the share calculated by the defendant's expert. This time he included a computation of the defendant's market share. *See id.* at 476, 481. The

defendant's argued that the Tallett Declaration must be struck because it was untimely and introduced "a host of new comparative calculations." *Id.* at 481. The district court rejected that contention, finding that the plaintiff had submitted the Tallett Declaration to correct an error in his expert report and that "[u]nder Rule 26 . . . an expert may supplement disclosures in a timely manner in order to correct errors." *Id.* In reaching that conclusion, the court noted that "[w]hen Tallett discovered an error in his work he double-checked it in a timely fashion and supplemented the basis for his conclusions without altering the results." The court found that "[Tallett's] actions were appropriate under the Federal Rules, his supplemental disclosure is proper, and [the defendant] suffered no harm, as [Tallet's] conclusions and proposed testimony remained unchanged." *Id.* at 481.

As noted, the CEVA Defendants deposed Mr. Maxwell. During that deposition, when asked whether he intended to seek to offer any opinions at trial that are not otherwise reflected in his expert and rebuttal reports,[109] Mr. Maxwell advised that one area of his analysis that he would consider changing were the capital expenditures to account for the CEVA Group's use of net and gross CapEx as reflected in footnotes to its financial statements.[110] He further testified

---

[109]  *See* Ex. I CEVA SMF (Maxwell Dep. Tr., dated May 26, 2016), at 8:20-23 (Q: As we sit here, do you have an intent to seek to offer any opinions at trial that are not otherwise reflected in [the expert report] or [the rebuttal report]?); *id.* 9:10-14 (Q: Sure. But based on the record as it exists today there is nothing that you can think of that is an opinion or an analysis that you intend to offer outside of what your presented in your two reports, correct?); *id.* at 10:11-16 (Q: . . . I'm just trying to establish that as of today you haven't concluded there are additional opinions or analyses that you intend to offer at trial?).

[110]  As relevant, Mr. Maxwell testified:

> The one facet of the analysis that occurs to me that I would consider as changing the analysis is the calculation of capital expenditures to take into account the company's perspective as reflected in its footnotes to financials and some of the modeling that was disclosed to us through the discovery process that was done by Apollo that relates to differentiating between gross capex and net capex and that might have some bearing on valuation. But that is the only thing sitting here today that comes to mind as a possible qualification.

*Id.* at 10:19-11:6.

54

that the issue arose after he served his rebuttal report[111] and that his additional investigation into those matters was indirectly related to materials in Professor Shivdasani's opening and rebuttal report.[112]  He said that his work on those matters was ongoing, and that he had not completed his analysis of whether to import the assumption of net CapEx, although he believed that it would have some bearing on the outcome of his analysis if he did.[113]  The CEVA Defendants did not question Mr. Maxwell about those matters.

---

[111]  *Id.* at 11:7-12.

[112]  *Id.* 11:13-22.  In elaborating on that testimony, Mr. Maxwell stated:

> I would simply observe that in reflecting on the points of view shared by the professor, I went back and reviewed as much of the materials as I had time to and in delving into as a function of the points raised by the professor, specifically as it related to the one methodology, discounted cash flows, I went back and reviewed carefully the cash flows and in particular cash flows around capital expenditures and in doing so reread the company's, specifically the F1 and the annuals that provided footnotes that qualify the difference between gross cap expenditures and net capital expenditures.

> On realizing that the company carried on its balance sheet a liability for financial leases, then I thought it was more appropriate to, in the discounted cash flow analysis, to use what the company calls net capital expenditures as opposed to gross capital expenditures.

> So as you ask me the question is there anything that I could think of the might qualify what I already proffered as a point of view on value, that is a possible qualification that if I were testifying in a trial I would incorporate in my comments and inevitable conclusion as to value.

*Id.* at 11:23-13:2.  Later in his deposition, in clarifying the testimony that he had given to that point in the deposition, he stated:

> I would like to go back to my comments.  You asked me a question if, if and if would the [€]106 million be extinguished.  And I would only qualify my answer to say that I raised one issue that we focused on in the last ten days that related to net capital expenditures.  And while we have not done the analysis, if we were to do the analysis the initial indication I have is that that would have a bearing on our conclusions as to value.

> So however the case proceeds, my answer to your question about what the impact is on the equity value to CIL and CEVA [Group] may or may not be based on the discussion on cash and the discussion on adjusting claims.  It could still find that there is value to the equity.  So I just wanted to make that qualification.

*Id.* at 252:25-253:19.

[113]  *Id*. at 13:3-9.

The CEVA Defendants were not "sandbagged" by the Trustee's submission of the Addendum.  The Trustee produced it less than a month after Mr. Maxwell was deposed.  In the Addendum, Mr. Maxwell did not alter his valuation methodologies or his conclusion that CEVA Group had substantial value as of March 31, 2013.  He addressed the issues relating to the use of gross/net CapEx in a DCF analysis that he testified to at his deposition.  In doing so, he corrected the error he thought he may have made in compiling his report, and which he discussed during his deposition.  The Court finds that the Addendum is a proper Rule 26(a) supplemental disclosure.  *See, e.g.*, *Wechsler v. Hunt Health Syst., Ltd.*, No. 94 Civ. 8294, 2003 WL 470330, at *7 n.5 (S.D.N.Y. Feb. 25, 2003) ("If, after [the deposition of plaintiff's expert] and plaintiff's receipt of the defendants' rebuttal report, plaintiff believes that he is under an obligation, pursuant to Rule 26(e), to supplement [his opening] report in light of the opinions and factual statements contained therein, the plaintiff has the right, and is in fact under a duty, to make such a supplementation.") (citing Fed. R. Civ. P. 26(e)).  Accordingly, the CEVA Defendants have not met their burden of establishing cause for relief under Rule 37(c), and the Court will not preclude the Trustee from using the Addendum.  *See, e.g.*, *Ward v. Nat'l Geographic Soc'y*, No. 99 CIV. 12385, 2002 WL 27777, at *1 (S.D.N.Y. Jan. 11, 2002) ("The party seeking to invoke the preclusion sanction has the burden of establishing that the opposing party's conduct violated one of these [disclosure] rules." (citing 7 MOORE'S FEDERAL PRACTICE § 37.60[2][a], at 37-117 (3d ed. 2000))).

<u>CONCLUSION</u>

Based on the foregoing, the Court grants the Motion as it relates to the Record Value

Evidence and the Control Value Evidence.  The Court denies the Motion as it relates to the

Addendum.

IT IS SO ORDERED.

Dated: New York, New York
       April 8, 2019                                          /s/ *James L. Garrity, Jr.*
                                                              United States Bankruptcy Judge