**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOT FOR PUBLICATION

----------------------------------------------------x
                         :

In re:                         :       Chapter 7
                          :

       CIL Limited,              :       Case No. 13-11272-JLG
                          :

              Debtor.     :
                          :
----------------------------------------------------x
                          :

Salvatore LaMonica, as Chapter 7 Trustee :
For CIL Limited,         :

                          :       Adv. Proc. No. 14-02442-JLG

             Plaintiff,   :
                          :

            v.            :
                          :

CEVA Group PLC, CEVA Holdings LLC, :
CEVA Logistics Finance B.V.,     :
Gareth Turner, and Mark Beith,    :
                          :

            Defendants.  :
                          :
----------------------------------------------------x

## <u>MEMORANDUM DECISION RESOLVING SUMMARY JUDGMENT MOTIONS</u>

## <u>A P P E A R A N C E S</u>:

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:   David M. Zensky
       Dean L. Chapman Jr.

*Counsel for Defendants CEVA Group Plc and CEVA Holdings LLC*

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
7 Times Square
New York, New York 10036
By:    Scott M. Berman
         Eric Seiler
         Jeffrey C. Fourmaux
         Alexander D. Levi

*Attorneys for Defendant Gareth Turner*


QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Richard I. Werder Jr.
         Corey Worcester
         Benjamin I. Finestone

*Attorneys for Chapter 7 Trustee, Salvatore LaMonica*

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

**Introduction**[1]

CIL Limited is the chapter 7 debtor herein ("CIL" or the "Debtor"). It is a Cayman Islands exempted holding company that is also subject to liquidation proceedings before the Grand Court of the Cayman Islands. In the spring of 2013, CIL was controlled by several investment funds managed by the private equity firm Apollo Global Management, LLC ("Apollo Global," and collectively with its subsidiaries, affiliates and managed entities, "Apollo"). At that time, CIL's sole asset was its direct and indirect ownership of 100% of the equity of CEVA Group plc ("CEVA" or "CEVA Group"), and its debt consisted overwhelmingly, if not exclusively, of certain unsecured payment-in-kind notes (the "PIK Notes") totaling at least €103 million.

CEVA Group is an English and Welsh public company that serves as a holding company for a number of operating companies that collectively conduct logistics and freight management business operations from approximately 1,000 locations in 160 countries (the "CEVA Enterprise"). In the spring of 2013, its secured and unsecured indebtedness totaled approximately €2.1 billion and €575 million, respectively. Franklin Advisors Inc. and Franklin Templeton Investment Corporation (collectively, "Franklin"), Apollo, and Capital Research Management, L.P. ("CapRe") were CEVA Group's largest creditors.

---

[1] Capitalized terms shall have the meanings ascribed to them herein or, to the extent they are not defined herein, in the Second Amended Complaint.

**The Restructuring**

In April 2013, CIL, as CEVA Group's sole shareholder, acquiesced to and participated in an out-of-court restructuring and recapitalization of CEVA Group (the "Restructuring")[2] that was overseen by its then directors, Gareth Turner ("Mr. Turner") and Mark Beith ("Mr. Beith," and together with Mr. Turner, the "Directors").  Briefly, the Restructuring called for CIL to authorize CEVA Group to issue new shares of its stock to a newly-formed Apollo affiliate and to use those shares to equitize nearly €1.1 billion of secured and unsecured indebtedness, including unsecured debt held by Apollo.  The Court previously determined that, the Restructuring was a single integrated five-part transaction that began on April 1, 2013, and closed on or after May 2, 2013, consisting of:

1. the "Recapitalization" (the new share issuance by CEVA pursuant to a Restructuring Support Agreement (the "CIL RSA")), substantially diluting CIL's ownership of CEVA Group);

2. the "CEVA Exchange Offer" (the exchange of new equity interests in CEVA Holdings with creditors holding more than €1.2 billion of CEVA Group's Second Lien Debt and Unsecured Debt);

3. the "CIL Exchange Offer" (consideration offered to holders of the PIK Notes (the "PIK Noteholders"));

4. the "Rights Offering" (€200 million of new money raised to provide CEVA Group with adequate capital to operate its business of which the Apollo Funds agreed to contribute €65 million); and

5. the "Franklin Financing Commitment" (providing further reduced interest expense and new money).[3]

---

[2] In his Second Amended Complaint, the Trustee refers to the Restructuring as the "CEVA Transaction." These terms are coextensive.

[3] *See Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Amended Complaint*, ECF No. 100 (the "Dismissal Decision"), at 87–88 (footnotes omitted)).  References to "ECF No.__" are to documents filed on the electronic docket for Case No. 14-02442.

The Recapitalization called for CIL to cause CEVA Group to issue new shares of its stock (the "New CEVA Shares") to CEVA Holdings LLC ("CEVA Holdings"), a newly formed Apollo entity (the "CEVA Equity Transfer"). On April 1, 2013, CIL caused CEVA Group to issue the New CEVA Shares to AP VI CEVA Holdings, L.P. ("AP VI CEVA Holdings"), an Apollo affiliate. CIL held the same number of shares in CEVA Group before and after the Restructuring. However, the effect of the transfer of the New CEVA Shares to AP VI CEVA Holdings was that the new shareholder held 99.99% of the CEVA Group stock, and that CIL's interest in CEVA Group was reduced to 0.01%.

On April 22, 2013 (the "Petition Date"), while the Restructuring was in process, three Cayman-based PIK Noteholders (the "Petitioning Creditors") filed an involuntary petition (the "Involuntary Petition") under chapter 7 of the Bankruptcy Code against CIL in this Court. The Restructuring closed thereafter. After the Petition Date, in furtherance of the Restructuring, AP VI CEVA Holdings sold the New CEVA Shares to CEVA Holdings, and the CEVA Defendants effectuated the remaining steps of the Restructuring—the CEVA and CIL Exchange Offers, the Rights Offering and the Franklin Financing Commitment. On May 14, 2013, the Court entered an order for relief against CIL. However, the automatic stay was effective as of the Petition Date— April 22, 2013.

**The Adversary Proceeding**

Salvatore LaMonica, Esq., is the court-appointed chapter 7 trustee of the CIL estate (the "Trustee"). He maintains that CIL was damaged by the Restructuring because its equity interest in the CEVA Group had value at the time of the CEVA Equity Transfer and CIL received nothing in consideration for the reduction of its ownership interest in CEVA Group from 100% to 0.01%. He says that CIL was stripped of its interests in CEVA Group at the behest of Apollo, who

allegedly conceived of and orchestrated the Restructuring, including the CEVA Equity Transfer. He maintains that through the issuance of the New CEVA Shares, Apollo sought to enhance its ownership interest in CEVA Group by "leapfrogging" the PIK Noteholders in the CEVA capital structure. He also contends that the Restructuring is void because it was completed in violation of the automatic stay. Finally, he maintains that CEVA Group or one of its controlled subsidiaries is holding nearly €14 million of cash that belongs to CIL (the "CIL Cash")[4] and has unjustifiably refused to return it to the Debtor's estate.

### The Complaint and Amended Complaint

In this adversary proceeding (the "Adversary Proceeding"), the Trustee seeks relief against the Directors, as well as CEVA Group, CEVA Holdings and a related company, CEVA Logistics Finance B.V. ("CEVA Finance," and collectively with CEVA Group and CEVA Holdings, the "CEVA Defendants," and with the Directors, the "Defendants"). The Trustee commenced this Adversary Proceeding by filing an eleven-count complaint (the "Original Complaint")[5] against the Defendants in the United States District Court for the Southern District of New York. Under the District Court's Amended Standing Order of Reference Re: Title 11, M10-468, No. 12 Misc. 32 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.), the District Court referred the proceeding to this Court. The CEVA Defendants and the Directors filed separate motions to dismiss many, but not all, of the claims asserted by the Trustee in the Original Complaint. In response, the Trustee filed an Amended Complaint against the Defendants (the "Amended Complaint").[6] The Amended

---

[4] The CIL Cash represents only a part of an intercompany claim, rather than specific or identifiable property. Nonetheless, for ease of refence, the Court will refer to the CIL Cash as a discrete category of assets.

[5] *Chapter 7 Trustee's Complaint for Fraudulent Transfer of the Debtor's Interests in CEVA Group PLC Related Tortious Acts and for Payment of Intercompany Claim*, ECF No. 1.

[6] *Chapter 7 Trustee's Amended Complaint for Fraudulent Transfer of Debtor's Interests in CEVA Group PLC, Related Tortious Acts, and Turnover of Property of the Estate*, ECF No. 21.

Complaint consists of nineteen claims for relief asserted against some or all of the CEVA Defendants and/or the Directors.[7]

### The Motions to Dismiss

The CEVA Defendants[8] and Directors[9] filed separate motions to dismiss all or select Counts of the Amended Complaint pursuant to Rules 12(b)(2) and (b)(6) of Federal Rules of Civil Procedure (the "Federal Rules")[10]; the Trustee opposed both motions.[11]    The Court granted the

---

[7] To summarize, those claims consist of:

A. The Trustee's claims against some or all of the CEVA Group, CEVA Holdings and the Directors to avoid the CEVA Equity Transfer and/or recover the value thereof: (i) as a fraudulent conveyance under state, federal and foreign law (Counts 1–3); (ii) as having been effectuated in violation of the automatic stay of section 362 of the Bankruptcy Code (Count 4); (iii) as an unauthorized post-petition transfer undersection 549 of the Bankruptcy Code (Count 5); and (iv) to compel the turnover of the New CEVA Shares as estate property under section 542 of the Bankruptcy Code (Count 6).

B. The Trustee's claims to recover damages from the Directors and all or some of the CEVA Defendants based upon: (i) the Directors' alleged breach of their fiduciary duties (Counts 7); (ii) the CEVA Defendants' alleged aiding and abetting, or otherwise assisting in, the breach of the fiduciary duties (Counts 8, 9 & 12).

C. The Trustee's claims to recover damages from CEVA Holdings based upon its alleged conversion of the New CEVA Shares (Count 10) or its alleged unjust enrichment in retaining the CEVA Equity Transfer (Count 11).

D. The Trustee's claims to recover from some or all of the CEVA Defendants: (i) the CIL Cash (Counts 13 & 17); (ii) damages based upon their alleged conversion of the CIL Cash (Count 14) or their alleged unjust enrichment in retaining the CIL Cash (Count 15); and (iii) damages for the alleged breach of their agreement to pay the CIL Cash to the Debtor (Count 16).

E. To the extent the CEVA Equity Transfer is avoided as a fraudulent conveyance, the Trustee seeks to disallow the claims of CEVA Group, CEVA Holdings and CEVA Finance under section 502(d) of the Bankruptcy Code (Count 18). The Trustee also seeks to equitably subordinate the claims of all Defendants pursuant to section 510(c) of the Bankruptcy Code (Count 19).

[8] *The CEVA Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint*, ECF No. 35; *The CEVA Defendants' Reply in Further Support of Their Motion to Dismiss the Amended Complaint*, ECF No. 48.

[9] *Memorandum of Law in Support of Motions to Dismiss by Defendants Gareth Turner and Mark Beith*, ECF No. 27; *Reply Memorandum of Law in Further Support of Motions to Dismiss by Defendants Gareth Turner and Mark Beith*, ECF No. 44.

[10] Federal Rules 12(b)(2) and (b)(6) are made applicable to this Adversary Proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[11] *Trustee's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint*, ECF No. 39.

motions, in part, and denied them, in part.[12]  The Directors were named defendants in Counts 4, 7, 12, and 19 of the Amended Complaint.  The Court dismissed all Counts against Mr. Beith and one of the Counts (Count 4) against Mr. Turner.  It dismissed fifteen Counts against some or all of the CEVA Defendants.  Notably, the Court dismissed Counts 1, 2, and 3 (collectively, the "Avoidance Claims"), against CEVA Group and CEVA Holdings, without leave to replead.[13]

The Trustee moved pursuant to Federal Rules 56 and 15[14] for limited reconsideration of the Dismissal Decision.  He sought leave to replead the Avoidance Claims and to file a second amended complaint (the "Reconsideration Motion").[15]  The Trustee argued that, in light of the Court's determination that the CEVA Equity Transfer was part of an integrated multi-step transaction, he could allege facts to show that the transaction was, on the whole, domestic in nature and thus subject to the Bankruptcy Code's avoidance provisions.  Though the Court did not address the merits of this theory, it concluded that the Trustee should have the opportunity to present it in an amended complaint.  Thus, over the CEVA Defendants' objection,[16] the Court granted the

---

[12] *See generally Dismissal Decision; Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Amended Complaint*, ECF No. 104 (the "Rule 12 Order").

[13] Dismissal Decision at 104.

[14] Federal Rules 56 and 15 are made applicable to this Adversary Proceeding by Bankruptcy Rules 7056 and 7015, respectively.

[15] *Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint*, ECF No. 107.

[16] *See CEVA Defendants' Memorandum of Law in Opposition to Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint*, ECF No. 110.  Turner joined the CEVA Defendants' Opposition to the Reconsideration Motion.  *See Defendant Gareth Turner's Joinder in the CEVA Defendants' Memorandum of Law in Opposition to Chapter 7 Trustee's Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint*, ECF No. 112.

Reconsideration Motion.[17]   Thereafter, the Trustee filed his Second Amended Complaint (the "Second Amended Complaint" or "SAC").[18]

### The Second Amended Complaint

The Trustee alleges that at the time of the CEVA Equity Transfer, CEVA Group had significant value, and that the Directors and Apollo knew as much.[19] As support, and without limitation, he asserts that at a September 12, 2012 meeting, the CIL board, after consultation with CEVA Group's executive committee, resolved that the CIL Class A shares were valued at a price of €50/share.[20] From that, he says that the implied value of the aggregate "Ordinary Shares" of CIL was almost €1.1 billion.[21] The Trustee contends that the CEVA Equity Transfer did not benefit CIL at all, because (i) CEVA Holdings gave no consideration to CIL in return for its receipt of the New CEVA Shares,[22] and (ii) the transfer left CIL insolvent, stripped of its assets and hundreds of millions of dollars of value.[23]

The Trustee denies that the CEVA Equity Transfer was an arms-length transaction.   He contends that Apollo devised and orchestrated the transfer for its benefit and to the detriment of the PIK Noteholders.[24] He maintains that Apollo was able to do so because CIL and CEVA Group

---

[17] *Notice of Proposed Order Granting Chapter 7 Trustees Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint*, ECF No. 129; *Order Granting Motion for Limited Reconsideration and Amendment of the Court's January 23, 2018 Order and for Leave to File a Second Amended Complaint*, ECF No. 134.

[18] *Chapter 7 Trustee's Second Amended Complaint for Fraudulent Transfer of Debtor's Interests in CEVA Group PLC, Related Tortious Acts, and Turnover of Property of the Estate*, ECF No. 141.

[19] SAC ¶¶ 68, 69, 96.

[20] SAC ¶¶ 70, 71.

[21] SAC ¶¶ 7, 72, 74.

[22] SAC ¶ 162.

[23] SAC ¶ 3.

[24] SAC ¶¶ 78, 160.

did not have conflict-free directors, and because, in any event, Apollo controlled CIL, the Directors, CEVA Group and CEVA Holdings. He alleges that the Directors were beholden to Apollo because each was employed by Apollo Global or an affiliate.[25] The Trustee complains that the Directors breached their fiduciary duties to CIL and CIL's creditors by working in bad faith, and in concert with Apollo, to misappropriate CIL's assets.[26] To that end, he asserts, among other things, that (i) the Directors retained Mintz, Levin, Cohn, Ferris, Govsky and Popeo P.C. ("Mintz Levin"), one of Apollo's regular outside counsel, to represent CIL in connection with the potential restructuring/recapitalization of CEVA Group, even though Mintz Levin was conflicted;[27] (ii) CIL consulted with the Cayman Islands law firm of Walkers on matters relating to the Directors' fiduciary duties to CIL, while Walkers had an actual and disqualifying conflict because it was acting for CEVA Group with respect to the restructuring/recapitalization that eventually became the CEVA Equity Transfer;[28] (iii) upon advice of counsel, the Directors treated an "ad hoc" call with CEVA Group's counsel as a CIL board meeting in order to create the appearance that they were independently evaluating the CEVA Equity Transfer when they in fact were not;[29] (iv) retained the Appleby law firm in the Cayman Islands, as CIL's Cayman Islands counsel to assist with the restructuring of CIL, but in response to Appleby's advice that the Directors had a serious conflict of interest, did nothing to cure their conflicts or to provide CIL with an independent director, officer or manager to exercise independent judgment with regard to the CEVA Equity

---

[25] SAC ¶¶ 31–32, 82.

[26] SAC ¶ 5.

[27] SAC ¶ 77.

[28] SAC ¶ 76.

[29] SAC ¶ 83.

Transfer;[30] and (v) took steps with their professionals to create sham evidence of having acted independently, when they had not.[31]

The Trustee also asserts that the Directors knew that they would be facing significant liability for misappropriating CIL's assets for Apollo's benefit and that the CEVA Equity Transfer would be unwound if their wrongdoing were exposed.[32]  He says that the Directors and Apollo took a number of steps in an effort to conceal their alleged wrongdoing and that the Directors deliberately employed secrecy and subterfuge for the specific purpose of hindering, delaying and defrauding CIL's creditors.[33]  He maintains that the Directors allegedly concealed the equity transfer from the PIK Noteholders, even as CIL and its counsel were meeting with holders of CEVA Group debt and securities, and that not only were the PIK Noteholders denied an opportunity to participate in the negotiation of the CIL RSA, but that they were not informed about the transaction until after it had been executed.[34]  He also claims that the Cayman Islands petition commencing the Cayman Islands insolvency proceedings was filed for the sole purpose of hindering, delaying and defrauding the PIK Noteholders.[35]  He also contends that the Directors' anonymized petition was meant to keep the petition secret.[36]

Finally, the Trustee maintains that after determining that they would authorize CIL to effect the CEVA Equity Transfer, but well in advance of the commencement of the Cayman Insolvency

---

[30] SAC ¶¶ 77, 86.

[31] SAC ¶ 136.

[32] SAC ¶ 6.

[33] SAC ¶ 5.

[34] SAC ¶ 161.

[35] SAC ¶¶ 21, 130–32, 141.

[36] SAC ¶ 141.

Proceedings, the Directors, with Apollo's assistance, retained Ernst & Young ("E&Y") to produce a report (the "E&Y Report") stating that CEVA Group's equity had no value.[37]  The Trustee contends that the E&Y Report was wholly lacking in diligence and independence, heavily influenced by Apollo's strategic design, and reverse-engineered to frustrate the ability of CIL and its creditors to obtain relief for the wrongs allegedly committed by the Defendants.[38]  He alleges that, among other things, in reviewing drafts of the E&Y Report, the Directors and CIL's professionals proposed modifications to the report in an effort to show that the CEVA Group equity had no value,[39] and that they instructed E&Y to use an EBITDA multiple that was well below the median multiple for comparable companies.[40]  The final E&Y Report concluded: "it is our conclusion that there is no basis to expect any equity value to CEVA [Group] for CIL in any available scenario."[41]  The Trustee contends that "[t]he Directors deliberately and in bad faith abandoned their fiduciary duties to CIL . . . [by] obtain[ing] the patently unreliable EY Report, after controlling and manipulating both the process of its creation and its ultimate conclusion, only to advance their individual interests of avoiding liability for their misconduct in causing the fraudulent transfer of CIL's shares in CEVA Group, and not for any legitimate business purpose."[42]

The Counts alleged in support of the Second Amended Complaint track the Counts alleged in the Amended Complaint.  Accordingly, the Second Amended Complaint contains certain causes

---

[37] SAC ¶¶ 126–27, 133.

[38] SAC ¶ 6.

[39] SAC ¶¶ 100–07.

[40] SAC ¶¶ 118–21.

[41] SAC ¶ 117.

[42] SAC ¶ 126.

of action and defendants that were dismissed from the Adversary Proceeding by the Dismissal
Decision and Rule 12 Order. The Trustee has included such dismissed claims and defendants *pro
forma* for purposes of preserving issues for any eventual appeal, but not to relitigate improperly
any matters disposed of by the Dismissal Decision and Rule 12 Order.[43]

The Second Amended Complaint annotates such claims and parties accordingly.
Moreover, the Trustee agreed to dismiss Count 6, without prejudice, to dismiss Count 12—only to
the extent of aiding and abetting fraud under New York State law as to all named Defendants—
without prejudice, and to dismiss Count 16 and Count 17, without prejudice.[44]

### The Motions

The CEVA Defendants and Mr. Turner each have filed a motion for summary judgment in
this Adversary Proceeding (collectively the "Motions"). The CEVA Defendants seek summary
judgment (the "CD Motion") dismissing Counts 1–5, 7–9, and 11–13 of the Second Amended
Complaint. They assert, as follows:

1. The Trustee cannot demonstrate that CEVA Group's equity had value at the
   time of the Restructuring; in turn, they are entitled to summary judgment
   dismissing Counts 1–3, 5, and 11–12, and dismissing any claim for damages
   under Counts 4 and 7–9 (the "Equity Value Dispute").

2. Even assuming, arguendo, that there is a triable issue over whether CEVA
   Group's equity had any value at the time of the Restructuring, they are
   entitled to summary judgment on equitable grounds as to the avoidance
   remedy sought by the Trustee because avoiding the Restructuring today
   would cause catastrophic damage to CEVA Group's business (the "Remedy
   Dispute").

3. The Trustee's claims for violations of the automatic stay (Count 4) and
   unauthorized post-petition transfers (Count 5) are predicated on the dilution

---

[43] *See* SAC at 9–10 n.7.

[44] *See* SAC ¶¶ 224, 276, 277.

of CIL's ownership interest in CEVA Group from 100% to 0.01%. Because that undisputedly occurred prior to the Petition Date, they are entitled to summary judgment dismissing Counts 4 and 5 (the "Counts 4 and 5 Dispute").

4. They are entitled to summary judgment dismissing the Trustee's claim for turnover of the CIL Cash under section 542 of the Bankruptcy Code (Count 13) because the ownership of that cash is hotly disputed by the CEVA Defendants on three distinct, bona fide bases that have been the subject of substantial fact and expert discovery (the "Count 13 Dispute").[45]

The Trustee opposes the CD Motion (the "Trustee Opp'n to CD MOL")[46] and simultaneously cross-moves (the "Cross-Motion") for summary judgment on Count 4 and Count 5 of the SAC. The CEVA Defendants filed a reply in further support of the CD Motion and in opposition to the Cross-Motion (the "CD Reply MOL").[47] The Trustee filed a reply in further support of the Cross-Motion (the "Trustee Reply MOL"). The Trustee submitted a reply in further support of the Cross-Motion (the "Trustee Reply MOL").[48]

Mr. Turner seeks summary judgment (the "Turner Motion") dismissing Counts 7, 12, and 19 of the Second Amended Complaint. In support, he asserts as follows:

A. The Trustee cannot establish entitlement to either legal or equitable relief on his breach of fiduciary duty claim (Count 7) (the "Count 7 Dispute").

B. Summary judgment is warranted on the civil conspiracy claim (Count 12) because under Cayman Islands law, damages is a required element of a civil conspiracy claim, and here, no reasonable trier of fact could find that CIL

---

[45] *See generally CEVA Defendants' Motion for Summary Judgment and Memorandum in Support of Their Motion for Summary Judgment*, ECF No. 151 (the "CD MOL").

[46] *Chapter 7 Trustee's Cross-Motion for Summary Judgment and Opposition to CEVA Defendants' Motion for Summary Judgment*, ECF No. 159 (the "Trustee Opp'n to CD MOL").

[47] *CEVA Defendants' Reply in Further Support of Their Motion for Summary Judgment and Memorandum in Opposition to the Trustee's Cross Motion for Summary Judgment*, ECF No. 179 (the "CD Reply MOL").

[48] *Chapter 7 Trustee's Reply in Further Support of His Cross-Motion for Summary Judgment and Sur-Reply in Further Opposition to CEVA Defendants' Motion for Summary Judgment.*

sustained any damages on account of the recapitalization because CIL's equity in CEVA Group indisputably had no value (the "Count 12 Dispute").

C.  Summary judgment is warranted on the equitable subordination claim (Count 19) because:

(i)  This Court should follow recent decisions from other New York federal courts and hold that damages is a necessary element of an equitable subordination claim. Under those authorities, the Trustee cannot maintain his equitable subordination claim because he cannot establish that CIL or its creditors were damaged since, again, CIL's equity in CEVA Group had no value.

(ii)  The breach of fiduciary duty claim against Mr. Turner must be dismissed, and therefore, there is no basis to find that Mr. Turner committed "inequitable conduct," as is required to support a claim for equitable subordination (the "Count 19 Dispute").[49]

The CEVA Defendants filed a partial joinder to the Turner Motion.[50] The Trustee opposes the motion (the "Trustee Opp'n to Turner MOL").[51] Mr. Turner filed a reply in further support of the Turner Motion (the "Turner Reply MOL").[52]

The Court heard arguments on the Motions and the Cross-Motion.[53] For the reasons set forth in detail herein, the Court resolves the Motions and the Cross-Motion as follows:

As to the CEVA Defendants:

---

[49] *Defendant Gareth Turner's Memorandum of Law in Support of His Motion for Summary Judgment*, ECF No. 152 ("Turner MOL").

[50] *See CEVA Defendants' Partial Joinder to Gareth Turner's Motion for Summary Judgment*, ECF No. 178 (the "CEVA Joinder"). In the CEVA Joinder, the CEVA Defendants agreed with and adopted Mr. Turner's arguments for dismissal of Count 12 (Civil Conspiracy) against them. Furthermore, they adopted Turner's arguments regarding Count 7 (Breach of Fiduciary Duty by the Directors under Cayman Islands Law) and argued that if the Court finds no breach of fiduciary duty by the Directors under Count 7, then Count 8 (Dishonestly Assisting or Procuring a Breach of Fiduciary Duties) and Count 9 (Aiding and Abetting Breach of Fiduciary Duties) against the CEVA Defendants must likewise fail.

[51] *Chapter 7 Trustee's Opposition to Defendant Gareth Turner's Motion for Summary Judgment*, ECF No. 201 ("Trustee Opp'n to Turner MOL").

[52] *Defendant Gareth Turner's Reply Memorandum of Law in Further Support of His Motion for Summary Judgment*, ECF No. 207 ("Turner Reply MOL").

[53] *See Sept. 26 Hr'g Tr.*, ECF No. 236.

(i)      The Court denies the CEVA Defendants' request for summary judgment dismissing Counts 1–3, 5 and 11–12, and the Trustee's claims for damages under Counts 4 and 7–9.

(ii)     The Court denies the CEVA Defendants' request for summary judgment fixing the equity hurdle at €2,993 million.

(iii)    The Court grants the CEVA Defendants' request for summary judgment dismissing Counts 4 and 5.

(iv)    The Court denies the CEVA Defendants' request for summary judgment precluding the Trustee from obtaining an avoidance remedy.

(v)     The Court grants the CEVA Defendants' request for summary judgment dismissing Count 13.

As to Mr. Turner:

(i)      The Court grants Mr. Turner's motion for summary judgment on Count 7 to the extent that he seeks to preclude an equitable compensation remedy based on a theory of substitutive compensation and to preclude a remedy of punitive damages. However, the Court otherwise denies his request for summary judgment dismissing Count 7.

(ii)     The Court denies Mr. Turner's request for summary judgment dismissing Counts 12 and 19.

As to the Trustee:

(i)      The Court denies the Trustee's request for summary judgment on Counts 4 and 5.

### **<u>Jurisdiction</u>**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## Legal Standard

Federal Rule 56 governs motions for summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In adjudicating a motion for summary judgment, a court does not resolve disputed issues of fact. Rather, it only considers whether there is a genuine issue of material fact to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (observing that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). In making that determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."). The Court must view the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

A genuine issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249; *see also Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012) ("A fact is material if it might affect the outcome of the suit under governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (quoting *Bessemer Tr. Co., N.A. v. Branin*, 618 F.3d 76, 86 (2d Cir. 2010))).

The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.

1995).  If the moving party meets that burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The court must draw reasonable inferences from admissible evidence in favor of the nonmoving party.  *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 2007).  To satisfy that burden, the nonmoving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).  "[M]ere denials or unsupported alternative explanations of its conduct" will not suffice.  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011); *see also Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))).  Accordingly, "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).  "After the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against it where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial." *In re Worldcom, Inc.*, 374 B.R. 94, 105 (Bankr. S.D.N.Y. 2007) (citing *Celotex*, 477 U.S. at 322).

Where there are competing motions for summary judgment, "each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-

8140, 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d

233, 236 (2d Cir. 1988)). The moving party's burden does not shift when cross-motions for

summary judgment are before the court. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d

167, 171 (D. Conn. 2001). Each side must demonstrate the absence of disputed issues of material

fact. Each party's motion "must be examined on its own merits, and in each case all reasonable

inferences must be drawn against the party whose motion is under consideration." *Morales v.

Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Thus, the non-moving party must still come

forward with "specific facts showing that there is a genuine issue for trial" in order to defeat a

properly supported summary judgment motion. *Anderson*, 477 U.S. at 256. A court need not enter

judgment for either party. *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023); *see

Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than

a claim by each side that it alone is entitled to summary judgment, and the making of such

inherently contradictory claims does not constitute an agreement that if one is rejected the other is

necessarily justified . . . .").

Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York (the

"Local Bankruptcy Rules") is applicable herein. Like Local Rule 56.1, its counterpart in the

district court, Local Bankruptcy Rule 7056-1 is intended "to streamline the consideration of

summary judgment motions by freeing [the bankruptcy] courts from the need to hunt through

voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d

62, 74 (2d Cir. 2001); *see also Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 564 n.1

(S.D.N.Y. 2013) (stating that Local Rule 56.1 "is designed to assist the Court by narrowing the

scope of the issues to be adjudicated and identifying the facts relevant and admissible to that

19

determination.").[54]   The rule mandates that all summary judgment motions include "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Bankruptcy Rule 7056-1(b).  In turn, the party opposing summary judgment must include in its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Local Bankruptcy Rule 7056-1(c).  If necessary and appropriate, that party can include "additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried."  *Id.*  The statements in support of, or in opposition to, a summary judgment motion "shall be followed by citations to evidence which would be admissible."  Local Bankruptcy Rule 7056-1(e); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (if the party opposing summary judgment disputes a fact, it must "support its position by citing to admissible evidence in the record" (citing Local Rule 56.1)). Indeed, courts will disregard purported denials of facts that are not supported by citations to admissible evidence in the record that create a genuine issue of material fact.  *See, e.g.*, *Baity v. Kralik*, 51 F. Supp. 3d 414, 419–21 (S.D.N.Y. 2014) (disregarding the plaintiff's responses to defendant's Rule 56.1 statement where the plaintiff failed to point to any evidence in the record that created a genuine issue of material fact); *Costello v. New York State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (same).

---

[54] Case law interpreting Local Rule 56.1 is relevant.  Local Bankruptcy Rules 7056-1(a)–(e) "are derived from Former Local Bankruptcy Rule 13(h) and are an adaptation of Civil Rule 56.1 of the Local District Rules." Local Bankruptcy Rules 7056-1 Comment (April 14, 2023); *see also MCI Worldcom Commc'n, Inc. v. Commc'n Network Int'l, Inc. (In re WorldCom, Inc.),* No. 02-13533, 2007 WL 1989262, at *7, n. 9 (Bankr. S.D.N.Y. July 9, 2007) (finding that case law applying Local Rule 56.1 is relevant and applicable to cases involving Local Bankruptcy Rule 7056-1 since the local rules "are an adaptation of the Local District Rules" (citing Local Bankruptcy Rule 7056-1 Comment)).

Pursuant to Local Bankruptcy Rule 7056-1(d), facts set forth in the movant's statement of material facts that are not specifically controverted by the opposing party, are "deemed admitted for purposes of the motion." *See* Local Bankruptcy Rule 7056-1(d); *see also Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 695–96 (Bankr. S.D.N.Y. 1998) (where party opposing summary judgment failed to controvert movant's 7056-1 statement of facts, movant's facts were deemed admitted and summary judgment was granted); *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014) ("If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.").

## The Statements of Undisputed Fact

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz*, 258 F.3d at 74. The same is true for the analogous Local Bankruptcy Rule 7056-1. The parties' responses to each other's statements of undisputed facts include contended disputes of material fact that are unsupported by any citation to admissible evidence, evidentiary objections on the admissibility of evidence, and the addition of facts that the responding party considers necessary to supplement undisputed statements. Such responses run afoul of Local Bankruptcy Rule 7056-1, which requires parties responding to each numbered paragraph who contend that a statement is disputed to offer a response supported by a "citation to evidence which would be admissible." Local Bankruptcy Rule 7056-1(c), (e). "The Local Rule does not contemplate a free-for-all of adding irrelevant facts and facts unnecessary to the proper adjudication of a summary judgment motion. Nor does it contemplate creating more or less than an admission or a denial of the truth of the allegation for the purposes of the motion. The Local Rule contemplates the factual statement deemed admitted unless specifically controverted and

supported by evidence which would be admissible at trial." *Emanuel v. Gap, Inc.*, No. 19-cv-03617, 2022 WL 3084317, at *4 (S.D.N.Y. Aug. 3, 2022).

The evidentiary objections interposed in the responses are ones that do not resolve whether a dispute is genuine. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) ("An objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue."). As noted, resolving whether a dispute is genuine is the purpose of Local Bankruptcy Rule 7056-1. Thus, to the extent that any party purports to dispute a fact contained in a statement or counterstatement on the sole basis of admissibility, the Court will consider that fact as undisputed so long as that fact is supported by a citation to evidence that could be presented in an admissible form at trial. *See Buckman v. Calyon Sec. (USA)*, 817 F. Supp. 2d 322, 328 n.42 (2d Cir. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); *Geoghan v. Long Island R.R.*, No. 06-cv-1435, 2009 WL 982451, at *6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").

Nonetheless, although the "the net result of both parties' deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the instant case to ensure that the claims receive thorough and just consideration," *Harriott v. Success Acad. Charter Sch.*, No. 22-cv-3037, 2024 WL 757478, at *1 (S.D.N.Y. Feb. 23, 2024), the Court will consider the numerous evidentiary objections that the parties have set forth in their responses to each other's statements and counterstatements below, and to the extent necessary, elsewhere in its decision.

**The CD Motion and Trustee Cross-Motion**

In support of the CD Motion, the CEVA Defendants submitted a statement of undisputed material facts (the "CD SMF") and three affidavits.[55]  In opposing the CD Motion and in support of the Cross-Motion, the Trustee responded to the CEVA Defendants' statement of undisputed material facts (the "Trustee Resp. to CD SMF"), submitted his own counterstatement of undisputed material acts and a declaration.[56]  The CEVA Defendants responded to the Trustee's counterstatement and replied to the Trustee's response to their statement of undisputed material facts.[57]

**CEVA Defendants' Statement**

***Admissibility Objections***

In his response to the CD SMF, the Trustee purports to dispute certain of the CEVA Defendants' statements, and to contest the relevance of certain statements and the admissibility of statements supported by affidavits.  The Court first considers the Trustee's evidentiary objections.

---

[55] *Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 in Support of CEVA Defendants' Motion for Summary Judgment*, ECF No. 138 (the "CD SMF"); *Declaration of Rubin McDougal in Support of the CEVA Defendants' Motion for Summary Judgment*, ECF No. 139 (the "McDougal Declaration" or "McDougal Decl."); *Declaration of Marvin Schlanger in Support of Defendants' Motion for Summary Judgment*, ECF No. 140 (the "Schlanger Declaration" or "Schlanger Decl."); *Supplemental Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 in Support of CEVA Defendants' Motion for Summary Judgment*, ECF No. 182 (the "CD Supplemental SMF"); (ix) *Supplemental Declaration of Marvin Schlanger in Support of Defendants' Motion for Summary Judgment*, ECF No. 183 (the "Schlanger Supp. Declaration" or "Schlanger Supp. Decl.").

[56] *Trustee's Response to CEVA Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1(c)*, ECF No. 154 ("Trustee Resp. to CD SMF"); *Trustee's Local Rule 7056-1 Counterstatement of Undisputed Facts in Support of Its Cross-Motion for Summary Judgment and Opposition to CEVA Defendants' Statement of Undisputed Material Facts*, ECF No. 157 ("Trustee-CD Counter SMF"); *Declaration of Julia M. Beskin in Support of Chapter 7 Trustee's Opposition to CEVA Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment*, ECF No. 160 ("Beskin-CD Declaration" or "Beskin-CD Decl.").

[57] *Reply to the Trustee's Response to CEVA Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1(c)*, ECF No. 180 (the "CD Reply to Trustee Resp. to CD SMF"); *CEVA Defendants' Response to the Trustee's Local Rule 7056-1 Counterstatement of Undisputed Facts in Support of Its Cross-Motion for Summary Judgment and Opposition to CEVA Defendants' Motion for Summary Judgment*, ECF No. 181 (the "CD Resp. to Trustee-CD Counter SMF").

Relevance[58]

The Trustee objects to a number of the CEVA Defendants' statements of fact on the grounds that the statements are "irrelevant" to the CD Motion. Specifically, the Trustee asserts:

> [T]he CEVA Defendants devote the first 48 paragraphs of their 56.1 Statement to statements concerning CEVA Group's financial condition during the period mid-2012 through 2013. These statements are irrelevant to their Motion, because the CEVA Defendants have asked this Court to disregard record evidence of value. Specifically, the CEVA Defendants have asked this Court to grant them summary judgment on Counts 1–3, 5 and 11–12, and any claim for damages under Counts 4 and 7–9, by considering *only* [Mr. Maxwell's] report . . . and to ignore the Trustee's record evidence as to CEVA's financial condition. *See* [CD MOL] at 1 ("the entire issue can be resolved by correcting for *one* simple error in the Trustee's valuation expert's report, *even assuming the accuracy of everything else*."). Having expressly asked the Court to ignore the Trustee's record evidence of value and look exclusively to Mr. Maxwell's treatment of €171 in available cash in evaluating whether CEVA Group's equity had value on the valuation date ([CD MOL] at 5, 21), the CEVA Defendants should not be permitted to proffer evidence of CEVA Group's financial condition.[59]

The Trustee also challenges the relevance of statements in the CD SMF describing the Petitioning Creditors' financial interests in the case and their role in filing the Involuntary Petition,[60] and statements relating to the CEVA Group's forwarding money to CIL for professional fees associated with the Restructuring.[61]

To be admissible, evidence must be relevant. Fed. R. Evid. 402. Evidence is relevant to a summary judgment motion if it has a tendency to make a fact more probable and that fact is "of consequence in determining the action." Fed. R. Evid. 401; *see also Patel v. Jani*, No. 12-cv-9376,

---

[58] The Court will refer to this discussion of the Trustee's objection to the CD SMF as the "Relevance Discussion."

[59] *See* Trustee Resp. to CD SMF at Introductory Statement., pp. 2-3; *see id.* ¶¶ 2, 3, 5, 6, 11–15, 17–23, 28–29, 35, 37–41, 45–46, 65, 71, 85–86.

[60] *See* Trustee Resp. to CD SMF ¶¶ 106–118.

[61] *See* Trustee Resp. to CD SMF ¶¶ 187–190.

2015 WL 5508304, at *1 (S.D.N.Y. Sept. 18, 2015) ("Evidence is relevant if it has a tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence." (citing Fed. R. Evid. 401)). Rule 402's "basic standard of relevance . . . is a liberal one." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). "Determinations of relevance are entrusted to the sound discretion of the district court." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 419 (S.D.N.Y. 2011) (citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)). "On a motion for summary judgment, barring substantial cause for excluding evidence on relevance grounds, a court should admit and consider the challenged exhibits and testimony." *Id.* (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)).

There is no merit to the Trustee's contention that facts related to CEVA Group's growing liquidity issues and poor performance in the year or so leading up to the Restructuring are irrelevant to the CD Motion. Those facts are admissible because they are material and relevant to the resolution of the Equity Value Dispute in the CD Motion. The CEVA Defendants have argued that, despite CEVA Group's growing undercapitalization and lack of liquidity, the Trustee's expert, Anders Maxwell ("Mr. Maxwell") improperly netted the cash in CEVA Group's bank account as of April 1, 2013, against its debt, rather than treating it as working capital necessary to operate the business. The evidence cited by the CEVA Defendants relating to the CEVA Group's financial performance in the period leading up to the Restructuring makes their contentions more probable. The statements relating to CEVA Group's transfers of funds to CIL for professional fees associated with the Restructuring are relevant to the turnover issues in Count 13 of the Second Amended Complaint. The Petitioning Creditors' financial interests in the case and their role in

filing the Involuntary Petition are relevant for purposes of the CD Motion and, in particular, the

Court's consideration of the issues relating to Counts 4 and 5 of the Second Amended Complaint.[62]

The Court finds no merit to the balance of the Trustee's objections to the relevance of the

statements in support of the CD SMF. Accordingly, the Court finds that there is not "substantial

cause" for excluding the remaining undisputed statements on relevance grounds.[63] *See Arista*

*Recs.*, 784 F. Supp. 2d at 419.

<u>Blanket Objections to Declarations</u>

The CEVA Defendants support approximately 62 paragraphs in the CD SMF with

references to the declarations of Rubin McDougal or Marvin Schlanger.[64] The Trustee objects to

the admission of those statements on the grounds that they are (i) opinion and *ipse dixit* that is

unsupported by citation to any record evidence; (ii) lacking foundation; (iii) hearsay; (iv) not based

on personal knowledge; (v) speculative; and/or (vi) otherwise inadmissible.[65] The Court finds no

---

[62] The Court may decide that the Petitioning Creditors' role in filing the Involuntary Petition is relevant at a later time for other purposes not presented in this summary judgment motion, including whether, if the CIL RSA is voidable, whether their action or inaction is relevant for deciding the issue of ratification.

[63] *See* CD SMF ¶¶ 2, 3, 5, 6, 11–15, 17–23, 28–29, 35, 37–41, 45–46, 65, 71, 85–86, 106–118, 187–190.

[64] *See* CD SMF ¶¶ 2, 4, 14, 16, 24, 28–29, 36 –39, 45, 47, 49, 92–101, 119, 124, 126, 128–133, 138, 145, 146–152, 155–163, 175, 177–183, 185–186, 188–189. *See McDougal Declaration*, ECF No. 139; *Schlanger Declaration*, ECF No. 140.

[65] The Trustee contends, as follows:

[T]he CEVA Defendants rely heavily on the declarations of Rubin McDougal and Marvin Schlanger submitted in support of their Motion, rather than record evidence. This is problematic because, as detailed in the specific responses below, in many instances Mr. McDougal and Mr. Schlanger's statements are (i) opinion and ipse dixit that is unsupported by citation to any record evidence; (ii) lack foundation; (iii) hearsay; (iv) not based on personal knowledge; (v) speculative; and/or (vi) otherwise inadmissible. To the extent that it is the case, the Trustee objects to the CEVA Defendants' efforts to rely upon the Declarations.

*See* Trustee Resp. to CD SMF at Introductory Statement at 3. *See, e.g.,* Trustee Resp. to CD SMF ¶ 2:

Disputed as the statement is not supported by admissible evidence. The CEVA Defendants cite only to paragraph 21 of the Schlanger Declaration in support of this paragraph, which in turn does not cite any evidence. As such, the CEVA Defendants rely merely on Mr. Schlanger's ipse dixit. "Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal

merit to this objection.  Moreover, in many places where the Trustee purports to dispute the accuracy of the statements, he does not cite to evidence that controverts those statements.  The Court finds that those statements are undisputed.[66]  Where the Trustee does cite to evidence in addition to challenging the declarations' admissibility, the Court considers whether that evidence supports the Trustee's challenge on a case-by-case basis.[67]

In part, Rule 56 states that "[a] party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including . . . affidavits or declarations."  Fed. R. Civ. P. 56(c).  Rule 56(c)(4) requires that affidavits or declarations used to support or oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Accordingly, "[a] court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" (quoting Fed. R. Civ. P. 56(c)(4))).

---

knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence." *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002); *see also In re WorldCom, Inc.*, 2007 WL 1989262, at *7.

[66] *See* Trustee Resp. to CD SMF ¶¶ 4, 14, 16, 28, 36–37, 39, 45, 47, 119, 124, 126, 128–33, 138, 145–52, 155–63, 175, 182–83, 185–86, 188–89. In certain sections, the Trustee cites only to an irrelevant opinion letter as evidence, which does not contest the accuracy of the statements it is meant to dispute. The Court likewise finds that those statements are undisputed. *See id.* ¶¶ 177–81. Further, in several places, the Trustee cites only to Beskin-CD Decl. Ex. 118, which is an email that only generally describes CEVA's new business generation as performing strongly. That email does not create a dispute as to any of the paragraphs for which it is cited. *See* Trustee Resp. to CD SMF ¶¶ 2, 24, 38. The Court finds that these statements are undisputed.

[67] *See* Trustee Resp. to CD SMF ¶¶ 2, 24, 29, 38, 49, 92, 101, 177–81.

Their respective testimony is not *ipse dixit*. The term *ipse dixit* means "he himself said it." It refers to "[s]omething asserted but not proved." *Ipse Dixit*, Black's Law Dictionary (9th ed. 2011). "[O]nce a motion for summary judgment has been made, the non-moving party must set forth specific factual allegations to avoid summary judgment in the movant's favor. Conclusory, *ipse dixit* assertions will not defeat a summary judgment motion." *Rosano v. United States*, 67 F. Supp. 2d 113, 118 (E.D.N.Y. 1999) (citing *Kurisoo v. Providence & Worcester R.R. Co.*, 68 F.3d 591, 594 (2d Cir. 1995); *Fahle v. Braslow*, 913 F. Supp. 145, 149 (E.D.N.Y. 1996); *W. World Ins. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). The CEVA Defendants do not rely on conclusory, *ipse dixit* assertions by Mr. Schlanger and Mr. McDougal.[68]

Moreover, their testimony is neither speculative nor, to the extent their testimony is material, hearsay. The CEVA Defendants have not demonstrated that either "lacks personal knowledge" of the matters they address in the declarations. It is settled that "an affiant is under no obligation to specify the source of his personal knowledge." *Bank of Am., N.A.* v. *Kamico, Inc.*, No. 11-cv-5255, 2012 WL 1449185, at *5 (S.D.N.Y. Apr. 24, 2012); *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009) (concluding that a former vice president's affidavit stating that it was made "[t]o my knowledge" was sufficient to establish that the vice president's affidavit could act as supporting evidence for a summary judgment motion). Rule 602 of the Federal Rules of Evidence, states, in part, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. The test in applying that rule is "whether a reasonable trier of fact could believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 764 (2d Cir. 1991); *see also Super Express USA Publ'g Corp. v. Spring Publ'g Corp.*, No.

---

[68] The Court will refer to this discussion of the Trustee's objection to the CD SMF as the "Ipse Dixit Discussion."

13-cv-2813, 2017 WL 1274058, at *6 (E.D.N.Y. Mar. 24, 2017) ("The test for admissibility of a summary judgment affidavit 'is whether a reasonable trier of fact could believe the witness had personal knowledge.'" (quoting *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012))).

Mr. Schlanger was a director of CEVA Holdings beginning in 2009 and was the CEO of CEVA Group from October 2012 until January 2014. He was the chairman of the CEVA board from February 2009 through May 8, 2018. He was also a director of CEVA AG, CEVA Holdings' successor. His declaration addresses, among other things, the Restructuring (including the issuance of the New CEVA Shares and CEVA Group's creditors' exchange of debt in CEVA Group in exchange for additional shares) and debt transactions CEVA Group has entered into in the years following the Restructuring.[69]

Mr. McDougal was the CFO of CEVA Group from June 2009 until August 2015. His declaration addresses, among other things, CEVA Group's declining financial condition and liquidity issues leading up to the Restructuring, the Restructuring, and the cash pooling arrangements administered by CEVA Finance that led to intercompany payables and receivables between CIL and CEVA Group and its affiliates (i.e., the facts related to the intercompany dispute).[70] The CEVA Defendants have clearly demonstrated the declarants' personal knowledge of the matters cited in support of the CD SMF and that a foundation could be laid at trial for their testimony on those facts. The Court overrules these objections.

---

[69] The CEVA Defendants submitted the Schlanger Supp. Declaration in further support of the CD Motion. The Trustee objects to the declaration as not timely. The Court overrules the objections.

[70] The Court will refer to this discussion of the Trustee's objection to the CD SMD as the "Hearsay Discussion."

In sum, the statements of fact in Mr. Schlager's and Mr. McDougal's declarations would be admissible as testimony, if testified to at trial. *See LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 905 (Bankr. S.D.N.Y. 1990) ("[T]he policy of Rule 56[(c)] is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." (citing 6 *Moore's Federal Practice* ¶ 56.22[1] (2d ed. 1988))); *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (noting that a summary judgment motion could cite deposition testimony, admissions, answers to interrogatories, and affidavits because, "when presented at trial," the evidence would be "in the form of testimony or other permissible method"). The Court overrules the Trustee's objections to the statements in the CD SMF that rely on the factual testimony in the declarations of Rubin McDougal and Marvin Schlanger.[71]

### *Contended Disputes of Material Fact*

The Trustee expressly concedes (or does not attempt to rebut) approximately 120 paragraphs of the CD SMF.[72] The Court treats those paragraphs as undisputed.[73] The CEVA Defendants contend that the Trustee purports to dispute more than 150 paragraphs of the CD SMF, but that most of those objections fail to comply with the requirements of Local Bankruptcy Rule 7056-1. They argue that to create the mere appearance of disputed material facts, the Trustee claims numerous "disputes" that do not actually raise genuine issues of material fact.[74] The Court agrees and will not consider contended disputes that are unsupported by citations to admissible

---

[71] The Court will refer to this discussion of the Trustee's objection to the CD SMF as the "Record Evidence Discussion."

[72] *See* CD Reply to Trustee Resp. to CD SMF at 2.

[73] *See* CD Reply to Trustee Resp. to CD SMF, Ex. A.

[74] *See* CD Reply to Trustee Resp. to CD SMF at 5–10.

evidence in the record that create a genuine issue of material fact. The Court considers two of those matters below.

Objection to Vagueness, Ambiguity, or Imprecision

The CEVA Defendants assert that the Trustee fails to support many purported disputed facts with citations to admissible evidence that controvert the CEVA Defendants' statements of fact. They contend that in the responses, the Trustee improperly includes arguments, immaterial facts, or equivocal statements such as "disputed as vague and ambiguous" or "imprecise."[75] As an example, they cite to paragraph 34 of the CD SMF. It states: "The Project Phelps model projected that CEVA Group's central headroom shortfall would exceed €100 million by September 2013 absent a restructuring." As relevant, the Trustee responded:

> Disputed as incomplete and inaccurate characterization of the Phelps model headroom projections. Defendants ignore that CEVA projected varying liquidity needs during the period April through December 2013—including some days when the projected shortfall was significantly less, and some days when positive liquidity was projected.[76]

As the Court has explained, responses to statements of material undisputed facts in support of a summary judgment motion that "proclaim factual assertions to be in dispute without identifying evidence in the record . . . thwart the basic purpose of [Rule 56]." Thus, they "do not function as denials, and will be deemed admissions of the stated fact." *Senno*, 812 F. Supp. 2d at 458 n.1 (citation omitted); *Baity*, 51 F. Supp. 3d at 418 ("Many of Plaintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in

---

[75] CD Reply to Trustee Resp. to CD SMF at 8–9. In support, the CEVA Defendants cite to the Trustee Resp. to CD SMF ¶¶ 2, 4, 9, 11, 14–15, 17–20, 24, 27–29, 31–34, 37–38, 40, 41, 45, 50– 53, 55–56, 60–62, 64–65, 68, 71, 77, 79, 80, 86, 89, 91–92, 98, 105, 113, 116, 120–124, 147, 159, 161, 164, 173, 176–183, 185–190.

[76] Trustee Resp. to CD SMF ¶ 34.

response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts.").

The Court overrules the Trustee's objection. Where the Trustee has failed to support his responses with citations to admissible evidence that contradict the CD SMF, the Court will treat those facts as undisputed.[77] Likewise, where the Trustee does cite to evidence in addition to challenging the declarations' admissibility, the Court considers whether that evidence supports the Trustee's challenge on a case-by-case basis.[78]

<u>Objection to Argument or Legal Conclusion</u>

The CEVA Defendants also complain that on numerous occasions, the Trustee incorrectly disputes a factual statement as an "argument" or "legal conclusion."[79] As an example, they cite to paragraph 151. It states: "First, an error was discovered related to the cash paid over by CEVA Group employees for CIL Stock under the LTIP." In his response, the Trustee states: "Disputed as legal conclusion whether there was an 'error . . . related to the cash paid over by CEVA Group employees for CIL stock under the LTIP.'" They dispute that contention. They maintain that it is a fact that the CEVA Group discovered an error under the LTIP, and not a legal conclusion.[80]

---

[77] CD SMF ¶¶ 4, 9, 14 27–29, 31–34, 37–38, 40, 41, 45, 50, 52–53, 61–62, 64, 68, 71, 80, 89, 91, 98, 113, 116, 124, 147, 159, 161, 164, 173, 182–83, 185–190. In several places, the Trustee cites only to Beskin-CD Decl. Ex. 118, which is an email that only generally describes CEVA's new business generation as performing strongly. That email does not create a dispute as to any of the paragraphs for which it is cited. *See* Trustee Resp. to CD SMF ¶¶ 17, 18, 19, 20, 24, 38.

The Court will refer to this discussion of the Trustee's objection to the CD SMF as the "Inaccurate/Incomplete Discussion."

[78] *See* Trustee Resp. to CD SMF ¶¶ 2, 11, 15, 24, 29, 33, 34, 38, 51, 55–56, 60, 65, 77, 79, 86, 92, 101, 105, 120–23, 176–81.

[79] CD Reply to Trustee Resp. to CD SMF at 9. In support, the CEVA Defendants cite to the Trustee Resp. to CD SMF ¶¶ 49, 93–100, 124, 150–152, 177.

[80] CD Reply to Trustee Resp. to CD SMF at 9.

On a summary judgment motion, the Court "is not bound to accept the legal conclusions which are intermixed with factual items." *Flagstaff Foodservice Corp. v. Consol. Foods Corp.* (*In re Flagstaff Foodservice Corp.*), 25 B.R. 844, 847 (Bankr. S.D.N.Y. 1982); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) (noting that "the Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement"); *Costello*, 783 F. Supp. 2d at 661 n.5 (disregarding responses to a Rule 56.1 statement that contained conclusory assertions or legal arguments).

The Court sustains the objection in part. It will disregard legal conclusions intermixed with facts and will treat facts that are not legal conclusions as undisputed.[81]

### Trustee's Counterstatement to CEVA's Statement

***Admissibility Objections***

<u>Materiality</u>

The CEVA Defendants make blanket objections that certain categories of facts put forth by the Trustee are immaterial to the summary judgment motions, including those facts relating to valuations prior to April 2013 and issues relating to Anil Shivdasani, Ph.D. ("Prof. Shivdasani"), the CEVA Defendants' expert. The Court has independently considered whether those facts are material on a case-by-case basis as necessary to resolve the pending motions. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant. . . . [P]arties should simply *argue* that the facts are not material.").

---

[81] The Court sustains the objection with respect to CD SMF ¶¶ 93–100. It overrules the objection with respect to CD SMF ¶¶ 49, 124, 150–52, 177.

<u>Objections to Emails Cited as Hearsay and Lacking Foundation</u>

The CEVA Defendants object to underlying emails cited in certain paragraphs as hearsay and lacking foundation. For example, in response to paragraph 140, the CEVA Defendants state, "The CEVA Defendants object to the underlying email cited in this paragraph as hearsay and lacking foundation."[82] The CEVA Defendants raise this objection to several other paragraphs as well.[83]

The Court will overrule these objections, in part. The Trustee generally offers these emails for reasons other than to establish the fact set out in the email. *See* Fed. R. Evid. 801(c). The Court will disregard those emails to the extent they are being offered otherwise.[84] The CEVA Defendants do not explain their foundation objections, but since "there is sufficient evidence of their authenticity for the court to consider these documents on this motion for summary judgment," *Com. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 60 (S.D.N.Y. 2003), and because the CEVA Defendants have not explained why the emails could not be authenticated at trial, the Court will overrule the objection.

***Contended Disputes of Material Fact***

<u>Facts Disputed in Full or in Part</u>

The CEVA Defendants dispute certain paragraphs in full or in part based on the evidence.[85] The Court will consider these objections on a case-by-case basis, and where the Court determines

---

[82] Trustee-CD Counter SMF ¶ 140; CD Resp. to Trustee-CD Counter SMF ¶ 140.

[83] Trustee-CD Counter SMF ¶¶ 141–44, 147; CD Resp. to Trustee-CD Counter SMF ¶¶ 141–44, 147.

[84] When resolving this category of objection, the Court will do so by using the shorthand "Email Hearsay Discussion."

[85] Trustee-CD Counter SMF ¶¶ 125–128, 149, 151–152; CD Resp. to Trustee-CD Counter SMF ¶¶ 125–28, 149, 151–52.

that there is a genuine dispute as to some part of a statement, but not another, the Court will treat only the part that is not subject to an objection as undisputed.

<u>Undisputed but Additional Context Provided</u>

The CEVA Defendants state that certain paragraphs are undisputed but provide additional context. For example, in response to paragraph 114, the CEVA Defendants state, "Undisputed, but the CEVA Defendants note that the same day CEVA Group allotted the shares to AP VI CEVA Holdings, L.P., which rendered AP VI CEVA Holdings, L.P. the 99.99% owner of CEVA Group."[86] The CEVA Defendants raise this response to several other paragraphs as well.[87] The Court considers these statements undisputed.

**The Turner Motion**

In support of the Turner Motion, Mr. Turner submitted a statement of undisputed material facts and three declarations.[88] In opposing the motion, the Trustee responded to Turner's statement of undisputed material facts, submitted his own counterstatement of undisputed material facts, and submitted two declarations.[89]

---

[86] Trustee-CD Counter SMF ¶ 114; CD Resp. to Trustee-CD Counter SMF ¶ 114.

[87] Trustee-CD Counter SMF ¶¶ 123, 146; CD Resp. to Trustee-CD Counter SMF ¶¶ 123, 146.

[88] *Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1(b) in Support of Defendant Gareth Turner's Motion for Summary Judgment*, ECF No. 146 ("Turner SMF"); *Declaration of Peter Julian Lord Millett*, ECF No. 147 ("Millett Declaration" or "Millett Decl."); *Transmittal Declaration of Alexander D. Levi, Esq. in Support of Defendant Gareth Turner's Motion for Summary Judgment*, ECF No. 148 ("Levi Declaration" or "Levi Decl."); *Reply Declaration of Lord Millett* ECF No. 208 ("Millett Reply Declaration" or "Millett Reply Decl.").

[89] *Trustee's Response to Defendant Gareth Turner's Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1(c)*, ECF No. 204 ("Trustee Resp. to Turner SMF"); *Trustee's Local Rule 7056-1 Counterstatement of Undisputed Facts in Support of Its Opposition to Defendant Turner's Statement of Undisputed Material Facts*, ECF No. 205 ("Trustee-Turner Counter SMF"); *Declaration of Julia M. Beskin in Support of the Chapter 7 Trustee's Opposition to Defendant Turner's Motion for Summary Judgment*, ECF No. 202 ("Beskin-Turner Declaration" or "Beskin-Turner Decl."); *Declaration of Marc Kish*, ECF No. 203 ("Kish Declaration" or "Kish Decl.").

*Mr. Turner's Statement*

The Trustee concedes that a number of the facts in Mr. Turner's statement are undisputed, and the Court considers them as such.[90]

<u>Admissibility Objections</u>

***Turner Relevance Discussion***

The Trustee objects to certain statements on the basis that they are irrelevant.[91]  In objecting to those statements as "irrelevant," the Trustee does not challenge the accuracy of the statements or point to evidence that controverts those statements.  The relevance objection does not deny or otherwise raise a genuine dispute as to those statements.  Accordingly, where the response to a paragraph in the Turner SMF is that the statement is "irrelevant," the Court will treat those statements as undisputed.  *See, e.g.*, *Buckman*, 817 F. Supp. 2d at 328 n.42; *Geoghan*, 2009 WL 982451, at *6.[92]

<u>Contended Disputes of Material Fact</u>

***Turner Inaccurate/Incomplete Discussion***

The Trustee objects to certain statements on the basis that they inaccurately and incompletely characterize the record.[93]   The thrust of these objections is that, while the statements they contest are not themselves inaccurate, those accurate statements should be read alongside certain other facts, in order to give a fully contextualized and complete view of the record.  Again, an argument is not a denial.  "The movant's statement of material facts 'will be deemed to be

---

[90] *See* Trustee Resp. to Turner SMF ¶¶ 2–9, 11–12, 14, 22–23, 26–35, 40, 42–43, 45, 60–63.

[91] *See, e.g.*, Trustee Resp. to Turner SMF ¶¶ 47, 52, 53, 54, 55, 56, 57, 58.

[92] The Court will refer to this discussion of the Trustee's objection to the Turner SMF as the "Turner Relevance Discussion."

[93] *See, e.g.*, Trustee Resp. to Turner SMF ¶¶ 1, 15, 16, 18, 19.

admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph' in the opposing party's Rule 56.1 statement and 'followed by citation to evidence.'" *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc.*, No. 06-cv-2142, 2007 WL 4302514, at *5 (S.D.N.Y. Dec. 7, 2007) (quoting S.D.N.Y. Loc. Rule 56.1(c)–(d)); *accord* Fed. R. Civ. P. 56(c)(1), (e)(2), (e)(4). The Court overrules all of the Trustee's objections based on the argument that an otherwise accurate fact inaccurately or incompletely characterizes the record because those objections do not dispute the accuracy of the fact at issue.[94]

Having resolved the objections each party made in respect to statements of fact, the Court now considers the merits of the Motions and Cross-Motion under the Federal Rule 56 summary judgment standard.

## The CD Motion

### The Equity Value Dispute

The CEVA Defendants argue that to prevail on Counts 1–3, 5 and 11–12 of the Second Amended Complaint, and on any claim for damages under Counts 4 and 7–9 of the Second Amended Complaint, the Trustee must prove that CEVA Group was solvent when it was restructured in April 2013. Otherwise, CIL's equity interest in CEVA Group had no value, and it was not deprived of anything as a consequence of the Restructuring.[95] The Trustee alleges that as of March 31, 2013, CEVA Group's equity had value of more than €1 billion.[96] In the CD Motion, as filed, the CEVA Defendants assert that they are entitled to summary judgment dismissing

---

[94] The Court will refer to this discussion of the Trustee's objection to the Turner SMF as the "Turner Inaccurate/Incomplete Discussion."

[95] CD MOL at 5.

[96] SAC ¶ 1.

Counts 1–3, 5 and 11–12, and the Trustee's claims for damages under Counts 4 and 7–9, because, in fact, the CEVA Group's equity had no value as of the Restructuring, and the Trustee cannot demonstrate that there is a material fact in dispute as to whether CEVA Group's equity had value at that time. The Trustee disputes those contentions. The Court considers those matters below.

The record reflects that from mid-2012 into 2013, CEVA Group's financial outlook declined due to, among other things, materially lower-than-forecasted earnings and a highly leveraged balance sheet.[97] CEVA Group generally tracked and forecasted both its true EBITDA and adjusted EBITDA.[98] In 2011, CEVA Group earned €321 million of adjusted EBITDA and actual EBITDA of €245 million.[99] At the beginning of 2012, CEVA Group forecast €380 million adjusted EBITDA for 2012.[100] As of June 30, 2012, CEVA Group's last twelve months ("LTM") adjusted EBITDA was €325 million.[101] CEVA Group's performance in the third and fourth quarter of 2012 declined relative both to 2011 and to the 2012 budgets.[102] By year-end 2012, CEVA

---

[97] *See* Schlanger Decl. ¶ 4; CD SMF ¶ 2. Trustee's objection overruled. *See supra*, Relevance Discussion; Record Evidence Discussion; Ipse Dixit Discussion.

[98] *See* McDougal Decl. ¶ 8; CD SMF ¶ 4. Adjusted EBITDA added back (i.e., disregarded) those expenses that arguably were non-recurring, and therefore was not indicative of CEVA Group's long-term earnings potential. CD SMF ¶ 4.

[99] McDougal Decl. ¶ 7; McDougal Decl., Ex. 5 (Final Adjusted Budget Spreadsheet); CD SMF ¶ 3. Trustee's objection overruled. *See supra*, Relevance Discussion.

[100] *See* McDougal Decl. ¶ 7; McDougal Decl., Ex. 5 (Final Adjusted Budget Spreadsheet); CD SMF ¶ 5. Trustee's objection overruled. *See supra*, Relevance Discussion.

[101] McDougal Decl. ¶ 15; McDougal Decl., Ex. 11 (September 12, 2012 LTIP Valuation); CD SMF ¶ 12. In September 2012, Rubin McDougal, CEVA Group's CFO, calculated the value of CIL Class A shares at €50 per share (the "2012 LTIP Valuation") solely for the purchase or redemption of CIL's Class A shares by new or departing CEVA Group employees, as provided for by CEVA Group's 2006 long term incentive program ("LTIP"). The 2012 LTIP Valuation was based on CEVA Group's LTM adjusted EBITDA of €325 million as of June 30, 2012, CEVA Group's "FC2" forecast of €329 million adjusted EBITDA for 2012 and forecasted 2013 adjusted EBITDA of €380 million. *See* CD SMF, Ex. H (McDougal Dep. Tr.) at 84:24–85:21 (explaining that "FC2" forecasts were forecasts performed at "the end of the second quarter, possibly the start of the third quarter.").

[102] McDougal Decl. ¶ 12; CD SMF ¶ 17. Trustee's objection overruled. *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion.

Group had earned €251 million of adjusted EBITDA and €173 million of actual EBITDA.[103] CEVA Group's adjusted EBITDA for the first quarter of 2013 declined by 46% as compared to the same quarter in 2012.[104]   In February 2013, CEVA Group's overall revenue declined 7.4% year-over-year, and EBITDA declined 53.6% year-over-year.[105]   By the time of the Restructuring, CEVA Group's LTM adjusted EBITDA had dropped to €207 million,[106] and its 2013 adjusted EBITDA forecast had declined to €280 million.[107]

CEVA Group measured its liquidity based on a metric referred to as "central headroom," which it defined as cash and committed credit facilities that were immediately available to the company's central treasury.[108]   CEVA Group adjusted its reported central headroom for certain cash balances that were inaccessible to the company's central treasury because, among other things, that cash (i) was held in joint ventures with other companies, (ii) was held in other countries with currency remittance limitations; or (iii) was held by local CEVA Group freight management stations for their operating expenses.   CEVA Group referred to the inaccessible cash as "trapped" or "local" cash.[109]

---

[103] McDougal Decl. ¶ 16; McDougal Decl., Ex. 1 at 20 (CEVA Group Plc's Annual Report 2012); CD SMF ¶ 18. Trustee's objection overruled.  *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion.

[104] McDougal Decl. ¶ 6; McDougal Decl., Ex. 3 at 2 (CEVA Group Plc CFO Report March 2013); McDougal Decl., Ex. 4 at 7 (CEVA Group's 2013 Q1 Interim Financial Statements); CD SMF ¶ 41.   Trustee's objection overruled.  *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion.

[105] McDougal Decl. ¶ 28; McDougal Decl., Ex. 20 (CEVA Logistics Flash Report February 2013); CD SMF ¶ 38.   Trustee's objection overruled.   *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion; Record Evidence Objection.

[106] McDougal Decl. ¶ 19; CD SMF ¶ 16.   Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[107] McDougal Decl. ¶ 19, Ex. 2 (Project Phelps Model); CD SMF ¶ 16.   Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[108] McDougal Decl. ¶ 20; CD SMF ¶¶ 25–26.

[109] McDougal Decl. ¶ 20; CD SMF ¶ 26.

In November 2012, CEVA Group projected 13-week central headroom, which reflected negative central headroom by January 4, 2013, absent a liquidity-gaining transaction, and central headroom of only €1 million by January 18, 2013, even with the benefit of a U.K. receivables transaction.[110]  From late December 2012 to mid-February 2013, CEVA Group management with assistance from Apollo created a set of financials referred to as the Project Phelps projections ("the Project Phelps Model").[111]  Those projections assumed a turnaround in CEVA Group's performance.[112]  The Project Phelps EBITDA forecasts assumed a successful out-of-court restructuring of CEVA Group's debt.[113]  The Project Phelps Model also projected that, absent a restructuring, CEVA Group would be completely out of liquidity by April 2013—with central headroom dipping to negative liquidity of €21 million in the middle of the month.[114]  The Project Phelps Model projected that CEVA Group's central headroom shortfall would exceed €100 million by September 2013 absent a restructuring (the "Projected Liquidity Shortfall").[115]  By the time of the Restructuring, CEVA Group was unable to make a €62 million interest payment (due April 1, 2013).

---

[110] McDougal Decl. ¶ 21; McDougal Decl., Ex. 17 at 32 (CEVA Group Board Meeting Presentation dated Nov. 8, 2012); CD SMF ¶ 27.  Trustee's objection overruled.  *See supra*, Inaccurate/Incomplete Discussion.

[111] McDougal Decl. ¶ 23; CD SMF ¶ 30.  The Trustee's objection does not create a genuine dispute of material fact and is overruled.

[112] McDougal Decl. ¶ 23; McDougal Decl., Ex. 2 (Project Phelps Model); CD SMF ¶ 31. Trustee's objection overruled.  *See supra*, Inaccurate/Incomplete Discussion.

[113] *See* McDougal Decl. ¶ 25; McDougal Decl., Ex. 18 at 14 (February 2012 Houlihan Lokey Discussion Materials); Schlanger Decl. Ex. 6 (Report to Bondholders) at Annex A p. 2 n.1; *see also* Ex. N (Mehta Dep. Tr.) at 109:17–22; *see also id.* at 110:9–17; CD SMF ¶ 32.  Trustee's objection overruled.  *See supra*, Inaccurate/Incomplete Discussion.

[114] McDougal Decl. ¶ 25; McDougal Decl., Ex. 2 (Project Phelps Model); CD SMF ¶ 33.  Trustee's objection overruled.  *See supra*, Inaccurate/Incomplete Discussion.

[115] McDougal Decl. ¶ 25; McDougal Decl., Ex. 2 (Project Phelps Model) at 24; McDougal Decl., Ex. 18 (February 2012 Houlihan Lokey Discussion Materials) at 24; CD SMF ¶ 34.  Trustee's objection overruled.  *See supra*, Inaccurate/Incomplete Discussion.

**The Expert Reports**

The CEVA Defendants' and Trustee's respective valuation analyses of the CEVA Group are supported by their retained experts.  The CEVA Defendants' expert is Prof. Shivdasani.[116]  In support of the CD Motion, they submitted his expert report (the "Shivdasani Report") and rebuttal report (the "Shivdasani Rebuttal Report").[117]  The Trustee's expert is Mr. Maxwell.[118]  In opposing the Motions, the Trustee submitted Mr. Maxwell's expert report (the "Maxwell Report"), rebuttal report (the "Maxwell Rebuttal Report"), and an addendum to the Maxwell Report (the "Maxwell Addendum").[119]

Both experts determined CEVA Group's valuation as of the time of the Restructuring by calculating the CEVA Group's enterprise value and deducting its net debt from that enterprise value.  The Court will refer to the net debt in that calculation as the "equity hurdle"; i.e., the amount of CEVA Group's liabilities as of the Restructuring that would have to be satisfied in full before the CIL equity could be deemed to have value.  There is no dispute that as of the Restructuring, CEVA Group had €284 million of cash and cash equivalents on its balance sheet (the "CEVA Cash").  The experts agree that in calculating the equity hurdle, it is appropriate to deduct CEVA Group's "excess cash" from CEVA Group's liabilities, and that "excess cash" is cash on its balance

---

[116] Prof. Shivdasani is the Wells Fargo Distinguished Professor and Director of the Wells Fargo Center for Corporate Finance at the Kenan-Flagler Business School of the University of North Carolina at Chapel Hill.  He received a PhD in finance from Ohio State University and a BA in economics with honors from University of New Dehli.  There is no challenge to his competency as an expert witness.

[117] The Shivdasani Report and Shivdasani Rebuttal Report are annexed as Exhibits 94 and 96, respectively, to the Beskin-CD Declaration.

[118] Mr. Maxwell is a Managing Director, Peter J. Solomon Company, L.P. There is no challenge to his competency as an expert witness.

[119] The Maxwell Report and Maxwell Rebuttal Report are annexed as Exhibits 93 and 106, respectively, to the Beskin-CD Declaration.  The Maxwell Addendum is annexed as Exhibit 98 to the Beskin-CD Declaration.  Mr. Maxwell valued CEVA Group as of Sunday, March 31, 2013, and Prof. Shivdasani valued the CEVA Group as of Monday, April 1, 2013.  However, "there was no material change in [CEVA Group] between March 31 and April 1, 2013." Maxwell Report. at 4 n.(a); Shivdasani Report at 2.

sheet that it does not require as working capital.[120]   Prof. Shivdasani and Mr. Maxwell offer

competing opinions on the value of CIL's equity interest in CEVA Group as of April 1, 2013.[121]

In doing so, they have very different views on the level of CEVA Group's excess cash and how to

account for the Projected Liquidity Shortfall.

### Mr. Maxwell

In calculating the equity hurdle, Mr. Maxwell determined that CEVA Group required €113

million of the CEVA Cash as working capital[122] and, accordingly, that CEVA Group had €171

million of "excess cash."   Mr. Maxwell subtracted the "excess cash" from CEVA Group's

liabilities in calculating the equity hurdle of €2,722 million (the "Maxwell Equity Hurdle").[123]   In

his calculation, Mr. Maxwell did not account for the Projected Liquidity Shortfall.

In assessing whether CIL's equity interest in CEVA had any value as of March 31, 2013,

Mr. Maxwell calculated two enterprise valuation ranges based upon (i) a discounted cash flow

analysis ("DCF"), and (ii) a comparable company analysis.   Mr. Maxwell weighted those

approaches at 60% and 40%, respectively, to determine a composite range of CEVA Group's

enterprise value.[124]

---

[120] At his deposition, Mr. Maxwell testified: "As a going concern . . . the company will be able to meet its obligations in the normal course. And therefore with no specified restriction on that $171 million that it should be taken into account in netting against debt."  Beskin-CD Decl., Ex. 97 at 235:2–17 (Maxwell Transcript); *see also* Beskin-CD Decl., Ex. 107 at 25:11–21 (Shivdasani Transcript).

[121] Maxwell Report at 4; Shivdasani Report at 2.  Mr. Maxwell valued CEVA Group as of Sunday, March 31, 2013, and Prof. Shivdasani valued CEVA Group as of Monday, April 1, 2013. However, "there was no material change in [CEVA Group] between March 31 and April 1, 2013."  Maxwell Report at 4, n.(a); Shivdasani Report at 2.

[122] The €113 million is comprised of Project Phelps' February 2013 projection for Trapped Cash (€70 million), Local Cash (€28 million) and Cash in Transit (€15 million).  *See* Maxwell Report at 23.

[123] In his opening report, Mr. Maxwell calculated the equity hurdle at €2,694 million, with an implied midpoint equity value of €134 million. *See* Maxwell Report at 23.  On rebuttal, Mr. Maxwell corrected this calculation to €2,722 million.  *See* Maxwell Rebuttal Report at 18.

[124] Maxwell Report at 4.

The Maxwell Report shows that as of March 31, 2013, CEVA had a total enterprise value range of €2,684 million to €2,973 million, with a midpoint enterprise value of €2,828 million.  Mr. Maxwell subtracted the €2,722 million Maxwell Equity Hurdle from the midpoint enterprise value in calculating the Maxwell midpoint equity value of €106 million.

After the CEVA Defendants submitted the Shivdasani Rebuttal Report and critiqued the Maxwell Report, Mr. Maxwell concluded that he needed to revise his calculation of CEVA Group's total enterprise value in his report to properly reflect the CEVA Group's cash accounting for capital expenditures.  Mr. Maxwell presented that calculation in the Maxwell Addendum.  It shows that as of March 31, 2013, CEVA Group had a total enterprise value range of €2,727 million to €3,017 million, with a midpoint enterprise value of €2,871 million."[125]  In the Maxwell Addendum, Mr. Maxwell adhered to his €2,722 million Maxwell Equity Hurdle and calculated the revised midpoint equity value of €149 million.[126]

### Prof. Shivdasani

Prof. Shivdasani determined that as of April 1, 2013, none of the CEVA Cash was "excess cash," as all of it was needed for "working capital" to keep the business running.  Moreover, he determined that in calculating CEVA Group's liabilities as of April 1, 2013, he had to account for the Projected Liquidity Shortfall, because the capital infusion in September 2013 to cover the shortfall necessarily would be senior to CIL's equity.[127]  In calculating the equity hurdle, he did

---

[125] Maxwell Addendum at 1.

[126] Maxwell Addendum at 1.

[127] He says that the Projected Liquidity Shortfall should be accounted for in the calculations of CEVA Group's Working Capital.  Shivdasani Report ¶ 19 (rebutting Mr. Maxwell's contention that the projected liquidity shortfall should not be accounted for in the calculations of CEVA Group's Working Capital).  The experts dispute the amount of CEVA Group's debt obligations relating to unfunded pensions, unamortized debt issuance cost, and minority interest. However, this dispute is not relevant for purposes of the Motion, as the CEVA Defendants have accepted Mr. Maxwell's claims hurdle for purposes of their Motion.  CD MOL 5–6 n.3.

not subtract any of the CEVA Cash from CEVA Group's liabilities, and to account for the projected shortfall, he added €100 million to the equity hurdle.[128]

Prof. Shivdasani applied several valuation methodologies in assessing CEVA Group's enterprise value.[129] In contrast to Mr. Maxwell, Prof. Shivdasani did not provide a range of values for each methodology or assign a composite value based upon the reliability of each methodology. Rather, he opined that "all three approaches . . . provide valuations for CEVA Group that are substantially less than €2,922 million, which is the amount required for there to properly have been value distributable to CEVA Group's equity holder, CIL"[130] (the "Shivdasani Equity Hurdle"). Prof. Shivdasani concluded that CIL's equity interest in CEVA Group had no value as of April 1, 2013.

Mr. Maxwell does not dispute the reasonableness of the Project Phelps Model or the fact that CEVA Group had a liquidity shortfall at the time of the Restructuring or that the liquidity deficit was projected to exceed €100 million by September 2013 in the absence of a restructuring. Moreover, Mr. Maxwell agrees that working capital (i.e., cash) required to meet operating expenses incurred to generate a company's EBITDA on which valuation as of the given date is based, should not be netted against debt to calculate equity value.

***Mr. Maxwell's Reports' Alleged Errors***

The CEVA Defendants contend that Mr. Maxwell's treatment of the €171 million as excess cash available to pay down debt or distribute to equity is wrong, as evidenced by his admissions,

---

[128] Shivdasani Report ¶ 72; Shivdasani Rebuttal Report ¶ 20 n. 24.

[129] Prof. Shivdasani utilized three valuation methods: the DCF analysis, the comparable company analysis, and the precedent transactions approach. Shivdasani Report ¶ 68.

[130] Shivdasani Report ¶ 11.

his prior testimony in other cases, valuation treatises and common sense.[131]  They maintain that given CEVA Group's Projected Liquidity Shortfall in the Spring of 2013, "it is axiomatic that any cash on CEVA Group's balance sheet on March 31, 2013 (the date of Maxwell's valuation) was needed working capital for the company and unavailable for distribution to stakeholders or to pay down debt."[132]  They argue that a "reasonable trier of fact" could not find that "a company that would cease operations without, among other things, an infusion of at least €100 million of *additional* cash to keep the lights on could, at the same time, use its last €171 million to pay down debt and yet somehow continue operations."[133]

In his deposition, Mr. Maxwell testified that if the Court were to determine that the Maxwell Equity Hurdle was understated by €106 million, accepting everything else in the Maxwell Report as correct, CEVA Group had no equity value at the time of the Restructuring.[134]  The CEVA Defendants say that the €171 million of cash should not be deducted from the equity hurdle, and that the €100 million of new capital needed at CEVA Group (i.e., to meet the Projected Liquidity Shortfall) must be added to the equity hurdle because anyone funding the shortfall would be senior to CIL's equity in the capital structure.  Accordingly, the CEVA Defendants argue that the €2,722 million Maxwell Equity Hurdle is incorrect as a matter of law and undisputed fact.[135]  They contend that the Court can, and should, determine on summary judgment that (i) the €171 million of cash is not "excess cash" and should not be deducted from the equity hurdle, and (ii) the €100

---

[131] CD MOL at 15.

[132] CD MOL at 6 ("Plain and simple, with an admitted looming liquidity deficit of €100 million, CEVA Group had no excess cash.").

[133] CD MOL at 6–7.

[134] *See* CD SMF, Ex. I at 211:10–19 (Maxwell Dep. Tr. dated May 26, 2016)).  The CEVA Defendants took Mr. Maxwell's deposition prior to the submission of the Maxwell Addendum.

[135] CD MOL at 5.

million of new capital needed at CEVA Group must be added to the equity hurdle, as that new capital would necessarily be senior to the CIL equity.[136]  They argue that the "corrected" equity hurdle is €2,993 million, and that it follows that even if the Court accepts the balance of the Maxwell Report, including the high end of his enterprise valuation in the report—€2,973 million— CIL's equity in CEVA Group had a negative equity value of €20 million.[137]

## Request for Summary Judgment on Question of CEVA Group's Solvency

The CEVA Defendants maintain that throughout the course of discovery, the Trustee's only theory of damages and only theory that anything of value was actually transferred has been based upon the claimed equity value of CIL's shares in an allegedly solvent CEVA Group, and that the Trustee is relying exclusively on Mr. Maxwell's expert opinion to make that showing.[138] They contend that once the Court "corrects" the Maxwell Equity Hurdle and determines that, accepting the balance of the Maxwell Report, CEVA Group was insolvent on March 31, 2013, and that its equity had no value, the Trustee is left with no other theory to prove damages or that CIL transferred anything of value.[139]  They assert that there is no alternative measure of damages and nothing to be resolved at trial if Mr. Maxwell is wrong about the equity hurdle.  They maintain that they are entitled to summary judgment on Counts 1–3, 5 and 11–12, and any claim for damages under Counts 4 and 7–9, all of which require a showing that CEVA Group's equity had value at the time it was restructured.[140]

---

[136] CD MOL at 17.

[137] CD MOL at 7.  In the Motion, the CEVA Defendants incorrectly assert that that at the high end of Mr. Maxwell's enterprise value, CIL's equity in CEVA Group had a negative equity value of €165 million.  That is the negative equity value at the midpoint of €2,828 million.

[138] CD MOL at 18.

[139] CD MOL at 18–19.

[140] CD MOL at 23.

The Trustee denies that the CEVA Defendants are entitled to summary judgment. He rejects their contention that CEVA Group was insolvent as of the Restructuring and maintains that the CIL stock had value and that the Restructuring damaged CIL's creditors.[141]  First, he contends that in making their argument, the CEVA Defendants ignore the Maxwell Addendum, which shows that at the high end of the valuation range (i.e., €3,017 million), CEVA Group had value— even if Mr. Maxwell treated the €171 million in cash as the CEVA Defendants advocate and did not subtract it from CEVA Group's debt in calculating the equity hurdle.[142]  Moreover, he contends that, in any event, valuation is a question of fact that can be proved by factual evidence, and that contemporaneous valuations in the record, ("Record Value Evidence"),[143] is more than sufficient to support a finding that CEVA Group had equity on the date that the Recapitalization began.[144] He says that the Record Value Evidence creates a genuine dispute of material fact even if there were no Maxwell Report.[145]  The Trustee asserts that the estate was damaged by the CEVA Equity Transfer because the value of the CEVA Group assets substantially exceeded its debts, the CIL stock had value, and CIL received nothing in return for the issuance of the New CEVA Shares to CEVA Holdings.[146]  In the complaint, as support for his damage claims, the Trustee alleges that "[r]egardless of whether CEVA Group's debts exceeded its enterprise value . . . CEVA Group's

---

[141] Trustee Opp'n to CD MOL at 20–21.

[142] Trustee Opp'n to CD MOL at 40–41.

[143] The Record Value Evidence at issue consists of the following internal and public documents relating to the value of CEVA Group compiled during the period of February of 2012 through January of 2013: (a) SEC Filings in May and August 2012; (b) Apollo's April 4, 2012 valuation of CEVA Group; (c) the CEVA Group BOD resolution dated September 12, 2012, valuing CIL's Class A shares; (d) "Morgan Stanley Discussion Materials" from January 2013; and (e) an email attachment that the Trustee alleges values CIL's shares as of January 31, 2013.  CD MOL 4, n.5.

[144] Trustee Opp'n to CD MOL at 21.

[145] Trustee Opp'n to CD MOL at 21.

[146] *See* SAC ¶¶ 1, 7, 123, 134, 191, 207.

equity had substantial value to CIL," and that "CIL's shares of CEVA [Group] could have been monetized by CIL, and the proceeds used to pay CIL's creditors."[147]  He contends that even if CEVA Group was insolvent at the time of the Restructuring, CIL nonetheless was damaged by the CEVA Equity Transfer, because that transaction deprived CIL of the sale, option and control value of CIL's interest in CEVA Group (the "Control Value") for no consideration.[148]

The Trustee asserts that even if the Court ignores the Record Value Evidence, summary judgment is not warranted because for the Court to "correct" the purported errors in the Maxwell Report, it must resolve a battle of the experts, and that the Court cannot do so in resolving the summary judgment motion.[149]  He contends that Mr. Maxwell and Prof. Shivdasani agree that only "excess cash" (not working capital) should be netted against debt to calculate equity value, but that they disagree on whether €171 million constitutes "excess cash."  They also disagree on whether it is appropriate to add €100 million to CEVA Group's equity hurdle to account for Projected Liquidity Shortfall.  The Trustee asserts that the CEVA Defendants' critique of Mr. Maxwell's analysis is incorrect on the merits and is simply a rehash of the arguments made by Prof. Shivdasani in the Shivdasani Rebuttal Report.[150]  He likens the valuation dispute to a thinly disguised "battle of the experts" that the Court cannot resolve on summary judgment.

---

[147] SAC ¶ 7k.

[148] SAC ¶¶ 7k, 65, 110–112.

[149] Trustee Opp'n to CD MOL at 21.

[150] Trustee Opp'n to CD MOL at 22.  *See, e.g.,* Shivdasani Rebuttal Report ¶ 20 (rebutting Mr. Maxwell's alleged "erroneous conclusion that CEVA had 'available cash' of €171 million" and arguing that CEVA "had no excess cash available to retire debt" and "needed a cash infusion of at least €100 million to fill its liquidity deficit").

**The Rule 37 Motion**

The CEVA Defendants challenge the Trustee's assertions.  Principally, they object to the Trustee's use of the Maxwell Addendum and the Record Value Evidence in support of his damage claims.[151]  They contend that the Court should strike the Maxwell Addendum as an untimely filed expert report and that the Trustee should be held to the opinions that Mr. Maxwell expressed in the Maxwell Report and Maxwell Rebuttal Report.[152]  They also argue that the Court should preclude the Trustee from seeking to prove the value of CIL's stock through an analysis of the Record Value Evidence separate and apart from Mr. Maxwell's analysis in the Maxwell Report and Maxwell Rebuttal Report, as something distinct from CEVA Group's enterprise value, because the Trustee did not previously introduce those theories in response to their Rule 26 disclosure obligations and they have never been the subject of fact or expert discovery.[153]  The Trustee disputes those contentions.[154]

After the CD Motion and Cross-Motion were fully submitted, the Court granted the CEVA Defendants' request to file a motion pursuant to Federal Rule 37 seeking an order of this Court (A) barring the Trustee from using the Maxwell Addendum, and (B) barring the Trustee (i) from using the Record Value Evidence to prove CEVA Group's equity value, separate and apart from Mr. Maxwell's damages conclusions; and (ii) from using evidence of CIL's Control Value (the "Control Value Evidence") to prove damages based on what they say is a new, previously undisclosed theory of damages predicated on the alleged control, option, or sale value of CIL's

---

[151] CD Reply MOL at 14, 17.

[152] CD Reply MOL at 14–15.

[153] CD Reply MOL at 17–18.

[154] Trustee Opp'n to CD MOL at 29–30.

stock in CEVA Group, irrespective of the group's solvency (the "Rule 37 Motion").[155]  The Trustee

opposed the motion.[156]

 The Court resolved the motion and entered an order granting it, in part, and denying it in

part (the "Rule 37 Order").[157]  The Court found that the CEVA Defendants had established grounds

under Rule 37(c)(1) to preclude the Trustee from using the Record Value Evidence and the Control

Value Evidence at summary judgment and, if necessary, at trial, to establish or support purported

damages theories and/or calculations not contained in the Trustee's Rule 26 disclosures and in Mr.

Maxwell's opening and rebuttal reports.[158]  However, the Court found that the CEVA Defendants

did not establish cause to so limit the Trustee's use of the Maxwell Addendum.[159]

 At a status conference, the Court announced its decision on the Rule 37 Motion and offered

the parties the opportunity to supplement their papers "in light" of the Court's anticipated ruling.

At that time, the Court directed the parties to meet and confer on a proposed schedule for their

supplemental briefing on the motions, if any.  By stipulation, the parties agreed to supplemental

briefing, if any, on the Motions and Cross-Motion.[160]   The CEVA Defendants and Trustee

---

[155] *CEVA Defendants' Memorandum of Law in Support of Their Motion for Rule 37 Preclusion Sanctions*, ECF No. 189.  In support of the motion, the CEVA Defendants filed the *Declaration of Dean L. Chapman, Jr. in Support of the CEVA Defendants' Motion for Rule 37 Preclusion Sanctions*, ECF No. 190. The CEVA Defendants also filed a reply to the Trustee's opposition to the motion.  *See CEVA Defendants' Reply in Further Support of Their Motion for Rule 37 Preclusion Sanctions*, ECF No. 213.  In support thereof, the CEVA Defendants filed the *Supplemental Declaration of Dean L. Chapman in Further Support of the CEVA Defendants' Motion for Rule 7 Preclusion Sanctions*, ECF No. 214.

[156] *See Trustee's Response in Opposition to the CEVA Defendants' Motion for Rule 37 Preclusion Sanctions*, ECF No. 200.

[157] *Memorandum Decision and Order Granting in Part and Denying in Part, CEVA Defendants' Motion for Rule 37 Preclusion Sanctions*, ECF No. 217.

[158] Rule 37 Order at 43, 49.

[159] Rule 37 Order at 49–56.

[160] *Stipulation and Scheduling Order*, ECF No. 219.

submitted letters[161] and memoranda of law[162] in support of their respective positions. Mr. Turner did not file a supplemental brief.

### The Supplemental Briefing

The Trustee Supplemental Brief includes twenty-five exhibits (fourteen of which are not in the summary judgment record).[163] The Trustee contends that it is industry standard to calculate enterprise value as (i) the value of operating assets' future cash flows plus (ii) the value of non-operating assets (such as cash), and that equity value is calculated as enterprise value (including the cash as an asset) minus debt.[164] The Trustee asserts that in addition to the arguments that he made in support of his summary judgment papers, the Motions fail because they require this Court to ignore the presence of at least €171 million in cash reserves held by CEVA Group, and that the Court should not do so for three reasons.

First, the Record Value Evidence that Mr. Maxwell considered in compiling his reports supports the finding that 100% of the CEVA Cash (i.e., €284 million) should have been considered as part of its enterprise value.[165] The Trustee says that in subtracting €171 million of "excess cash" from the gross debt in calculating the Maxwell Equity Hurdle, Mr. Maxwell took a "conservative valuation approach" because (i) leading valuation authorities support deducting 100% of cash on the balance sheet (whether or not the cash is "excess") from gross debt in calculating equity value,

---

[161] *See CEVA Defendants' May 8 Letter*, ECF No. 221; *Trustee May 9 Letter*, ECF No. 222; *Trustee May 14 Letter*, ECF No. 223.

[162] *Chapter 7 Trustee's Supplemental Brief in Support of His Summary Judgment Papers*, ECF No. 228 ("Trustee Supplemental Brief" or "Trustee Supp. Brief"); *CEVA Defendants' Reply in Response to the Trustee's Supplemental Brief in Support of His Summary Judgment Papers*, ECF No. 224 ("CD Reply to Trustee Supp. Brief").

[163] *Declaration of Julia M. Beskin in Support of Chapter 7 Trustee's Supplemental Brief in Support of His Summary Judgment Papers*, ECF No. 229 (the "Beskin-CD Supp. Decl.").

[164] Trustee Supp. Brief at 3.

[165] Trustee Supp. Brief at 3–4.

and (ii) the CEVA Group annual and quarterly reports that Mr. Maxwell considered in calculating his valuation support this more liberal methodology.[166]  The Trustee argues that because standard valuation methodology—and the record in this case—would have supported a more aggressive analysis (i.e., deducting €284 million—100% of the cash),  than the one Mr. Maxwell performed (i.e., deducting only the €171 million of "excess cash"), it demonstrates that Mr. Maxwell took a reasonable approach in his valuation analysis, and that the CEVA Defendants' disagreement with it is an issue for the trier of fact to resolve.[167]  He argues that the fact of this alternative valuation approach supports the notion that the Trustee's far more conservative approach is appropriate to present to the trier of fact.[168]

Second, he contends that the Record Value Evidence supports Mr. Maxwell's "conservative" calculation of excess cash because CEVA Group's own contemporaneous practices support  Mr. Maxwell's treatment of "excess cash" in his valuation, and that the Record Value Evidence does not contain any examples of contemporaneous valuations that removed all cash, as Prof. Shivdasani suggests.[169]  He says in that light, it follows that Mr. Maxwell's opinion is correct, and the Court can deny CEVA Defendants' motion on that ground alone.[170]  Alternatively, he asserts that, at a minimum,  the Court should not resolve a "battle of the experts" on valuation

---

[166] Trustee Supp. Brief at 1.

[167] Trustee Supp. Brief at 5.

[168] Trustee Supp. Brief at 5.

[169] Trustee Supp. Brief at 6.  As support, he says that E&Y and Morgan Stanley took the same approach in performing valuations for CEVA.  *Id.* (footnote omitted).  He also says that Rubin McDougal, CEVA Group's CFO testified that at the end of 2012, that there was approximately €132 million in trapped cash and €30 million in local cash.  *Id.* (footnote omitted).  He argues that the Record Value Evidence of CEVA Group's contemporaneous practices and the deposition testimony support Mr. Maxwell's analysis: after subtracting Trapped Cash, Local Cash, and Cash in Transit from all cash on hand, CEVA had an excess cash balance of approximately €171 million that was appropriately deducted from CEVA Group's gross debts.  *Id.* at 6–7 (footnotes omitted).

[170] Trustee Supp. Brief at 7.

methodology at summary judgment when the contemporaneous evidence concerning how the valuation should be performed favors the Trustee's position.[171]

Finally, he says that Prof. Shivdasani's calculation of a purported liquidity shortfall is improper because:

> (i)  assuming, arguendo, that the Projected Liquidation Shortfall exists, the CEVA Defendants are double counting that shortfall because they simultaneously contend that the €100 million is part of the working capital, (i.e., not "excess cash"), and that it must be added to the equity hurdle;[172]

> (ii)  Prof. Shivdasani's calculation of the purported €100 million "liquidity" shortfall was improper because, contrary to standard valuation practice, it deducts interest cash costs that cannot be considered costs as part of the unleveraged cash flows;[173] and

> (iii) Prof. Shivdasani's calculation of a purported "liquidity" shortfall was also improper because the evidence shows that CEVA Group had sufficient liquidity for operations, which is the relevant type of liquidity in this analysis.[174]

The CEVA Defendants assert that the Trustee Supplemental Brief is in effect his third summary judgment brief that "introduces fourteen new exhibits and a host of new arguments not related to the Rule 37 Order."[175]  They contend that the Court should disregard the Trustee's brief

---

[171] Trustee Supp. Brief at 7.

[172] He asserts that if, as the CEVA Defendants assert, CEVA Group's need for €100 million in additional liquidity would have prevented it from using its last €171 million to pay down debt, it follows that, if the €100 million is added to the equity hurdle, by definition, that cash would "excess cash." He argues that by using the need for €100 million of additional liquidity to both cancel out excess cash and increase the equity hurdle, the CEVA Defendants are improperly double-counting the impact of that cash in valuing CEVA.  Trustee Supp. Brief at 7–8.  In this light, he asserts that even accepting CEVA Group's purported "shortfall," it cannot be used to demonstrate that Maxwell understated the equity hurdle by €271 million.  *Id.* at 5.

[173] He says that the "liquidity shortfall" relates to the interest on debt required to support CEVA Group's capital structure, and that '[i]t is contrary to foundational and basic valuation practices and all corporate finance to *exclude* all interest cost from unleveraged cash flow analysis, id. at 5, and Shivdasani cites no authority to support his position." Trustee Supp. Brief at 8–9 (footnote omitted).

[174] Trustee Supp. Brief at 9–10 (footnotes omitted).

[175] CD Reply to Trustee Supp. Brief at 1.

because (i) it goes beyond what the Court authorized and what the parties consented to when they agreed to submit supplemental briefing, and (ii) it relies on Record Value Evidence in direct contravention of the Rule 37 Order.[176]  They also assert that the matters raised in the brief do not raise a triable issue of material fact.[177]

As explained, in the Rule 37 Motion, the CEVA Defendants sought to bar the Trustee from relying at summary judgment and, if necessary, at trial on any and all purported damages theories and calculations that are not part of the Trustee's Federal Rule 26 disclosures and the opening and rebuttal expert reports submitted by Mr. Maxwell.[178]  Specifically, they sought to bar the Trustee (i) from using Record Value Evidence to prove CEVA Group's equity value, separate and apart from Mr. Maxwell's damages conclusions, (ii) from asserting damages based on the alleged control, option or sale value of CIL's stock in CEVA Group, and using Control Value Evidence to prove those damages, and (iii) from using the Maxwell Addendum for any purpose.[179]  The Court rejected the CEVA Defendants' request for relief with respect to the Maxwell Addendum,[180] but granted the CEVA Defendants' request to preclude the Trustee from using the Record Value Evidence and Control Value Evidence.  The Court found that the CEVA Defendants:

> established grounds under Rule 37I(1) to preclude the Trustee from using the Record Value Evidence and the Control Value Evidence to establish or support purported damages theories and/or calculations not contained in the Trustee's Rule

---

[176] CD Reply to Trustee Supp. Brief at 2–6.

[177] CD Reply to Trustee Supp. Brief at 10.

[178] Rule 37 Motion at 1, 15–16.

[179] Rule 37 Order at 4.

[180] In substance, the Court found that the Maxwell Addendum was a proper supplemental disclosure under Rule 26(a), and, as such, the CEVA Defendants failed to meet their burden under Rule 37(c) to exclude the Addendum. *See* Rule 37 Order at 49–56.

26 disclosures and in Mr. Maxwell's opening and rebuttal reports at summary judgment and; if necessary, at trial.[181]

The Rule 37 Order is exclusionary in nature as it addresses what evidence the parties can and cannot rely on at summary judgment or at trial to prove their damages.  It bars the Trustee from relying on Record Value Evidence to prove CIL's damages, except to the extent set forth in his Rule 26 disclosures and Mr. Maxwell's expert reports. However, the order is clear that "[t]he Record Value Evidence is relevant to the matters at issue in the complaint."[182]  The Court found:

> Because Mr. Maxwell considered [the Record Value Evidence] in formulating his opinion, it will be given consideration by the trier of fact if it must determine the appropriate level of damages. Likewise, it will be available to assess the credibility of Professor Shivdasani, and may be probative on matters relating to the CEVA Defendants' liability for the wrongs alleged in the complaint.[183]

Accordingly, the Trustee can use the Record Value Evidence to explain Mr. Maxwell's valuation to the extent that he considered it, and to evaluate the credibility of Prof. Shivdasani, the CEVA Defendant's' expert.  However, he cannot rely on the Record Value Evidence to prove damages extraneous to the opinions of his expert.

In authorizing the parties to supplement their summary judgment papers, the Court afforded the parties the opportunity to focus their existing arguments on the existing materials in light of the Rule 37 Order.  The Court did not invite the parties to supplement their summary judgment papers by adding new legal and factual arguments.  That is what the Trustee purports to do in the

---

[181] Rule 37 Order at 4; *see also id.* at 26–43 (Record Value Evidence); 43–49 (Control Value Evidence).  The Court "preclude[d] th[e] Trustee from relying on the Record Value Evidence at summary judgment or, if necessary, at trial, to prove CIL's damages, except to the extent set forth in his Rule 26 disclosures and Mr. Maxwell's expert reports." *Id.* at 43.  The Court also "preclude[d] the Trustee from relying on the Control Value Evidence, or a damages theory based upon the control, option and sale value of CIL's shares in CEVA Group, at summary judgment or, if necessary, at trial, to prove CIL's damages." *Id.* at 49.

[182] Rule 37 Order at 34.

[183] Rule 37 Order at 34–35.

Trustee Supplemental Brief.  Moreover, he relies on alleged Record Value Evidence in direct

contravention of the Rule 37 Order, since he is using Record Value Evidence to make arguments

related to the calculation of damages not included in his expert reports.  As noted, in calculating

the Maxwell Equity Hurdle, Mr. Maxwell netted what he believes to be "excess cash" against

CEVA Group's debt.  The Trustee now says that Mr. Maxwell took a "conservative" approach,

and that the Record Value Evidence shows that he could have deducted all the CEVA Cash from

CEVA Group's debt in calculating the Maxwell Equity Hurdle.[184]  Mr. Maxwell did not rely on

any of the exhibits that the Trustee cites in support of that argument in calculating CEVA Group's

liabilities.[185]  The Trustee Supplemental Brief contravenes the Rule 37 Order.  The Court will not

consider it for any reason in this case.[186]

---

[184] Trustee Supp. Brief at 5–6.

[185] See Beskin-CD Supp. Decl., Exhibits 2–22.

[186] On May 7, 2019, the CEVA Defendants filed a letter with the Court (the "CD May 7 Letter").  *See May 7, 2019 Letter*, ECF No. 220.  In it, the CEVA Defendants focused on the scope of the record in the CD Motion and Cross-Motion, in light of the Court's Rule 37 Order.  They argued that "[a]s a consequence of the [Rule 37] Order, there is a substantial amount of material in the record that should not be considered by the Court or referred to by the parties."  *Id.*  They contended that the material "includes approximately 37 pages of the briefs, 230 paragraphs of the CEVA Defendants' Statement of Undisputed Material Fact and the Trustee's Counterstatement of Undisputed Material Fact (and the paragraphs responding to such statements), and 78 exhibits."  *Id.*  To "aid" the Court in identifying those pages, paragraphs, and documents, the CEVA Defendants annexed as Exhibit A to the letter, a list of the sentences, paragraphs, exhibits, and pages in the parties' respective summary judgment papers that they maintain discuss "(a) the Record Value Evidence and (b) other allegations in the Trustee's summary judgment papers that are relevant only to liability, not damages, and which were only included to buttress (or undermine) the Record Value Evidence."  *Id.*, Ex. A.  They maintained that the Court should not consider that material because "the CEVA Defendants have assumed liability for the purposes of summary judgment on the proper amount of liabilities at the time of the 2013 Restructuring . . . ."  *Id.*  On May 14, 2019, the Trustee filed a letter in response to the May 7 Letter.  *See May 14, 2019 Letter*, ECF No. 223 (the "Trustee May 14 Letter").  In it, the Trustee objected to the CEVA Defendants' request as seeking relief that "go[es] well beyond both this Court's Rule 37 Order and their own Rule 37 motion," but did not oppose the CEVA Defendants' request that this Court disregard portions of the Trustee's Cross-Motion.  The Trustee annexed a copy of Exhibit A to the May 7 letter annotated to indicate the portions of Exhibit A that, in his view, go beyond the scope of the Rule 37 Order.

The Court has reviewed the CD May 7 Letter, including Exhibit A, and the Trustee May 14 Letter.  The Court has reviewed the 37 pages of the briefs, 230 paragraphs of the CEVA Defendants' Statement of Undisputed Material Fact and the Trustee's Counterstatement of Undisputed Material Fact (and the paragraphs responding to such statements), and has done so in light of the Rule 37 Order.  In resolving the motions, the Court has considered the arguments and evidence submitted in support of the arguments to the extent that they do not run afoul of the Rule 37 Order.

**Request for Summary Judgment Fixing Equity Hurdle**

At the high end (i.e., €3,017 million), the total enterprise value for CEVA Group reflected in the Maxwell Addendum clears the Shivdasani Equity Hurdle (i.e., €2,993 million), however, the midpoint estimate (i.e., €2,871 million) would still fail to clear it.  Given the entry of the Rule 37 Order and the Court's determination that the Trustee is not barred from utilizing the Maxwell Addendum, the CEVA Defendants no longer seek summary judgment dismissing Counts 1–3, 5, and 11–12, and the Trustee's claims for damages under Counts 4 and 7–9.  Rather, they seek partial summary judgment fixing the equity hurdle at €2,993 million, in order to narrow the triable issues because only evidence showing CEVA Group had value in excess of the hurdle would be relevant.[187]

The CEVA Defendants contend the €2,772 million Maxwell Equity Hurdle is incorrect as a matter of law and undisputed fact.[188]  They say that Mr. Maxwell treated the €171 million of cash on CEVA Group's balance sheet as excess cash, that could be treated as additional value to CEVA Group, i.e., cash that was in excess of needed working capital and therefore available for paying down CEVA Group's debt.[189]  However, they contend that it is "self-evident" that the cash on the balance sheet of a company that needs an additional €100 million of capital, on top of whatever cash it had, to address a liquidity shortfall, is not "excess" but rather needed working

---

[187] CD Reply MOL at 5–6.

[188] CD MOL at 5.

[189] CD MOL at 5–6; *see* CD SMF ¶¶ 73–85.  The Trustee's objection to CD SMF ¶ 77 is sustained to the extent that it misstates the €2,822 million figure.  Otherwise, the Trustee's objections to CD SMF ¶¶ 73–85 are overruled. *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion.  CD SMF, Ex. I at 224:5–10 (Maxwell Dep. Tr. dated May 26, 2016).

capital to continue business operations.[190]  They argue that the Court should reject Mr. Maxwell's valuation, as a matter of fact and law.

First, they contend that the calculation of the Maxwell Equity Hurdle runs afoul of accepted methodology.[191]  They point to published treatises authored by leading valuation authorities as support for the propositions that (i) where cash is necessary for operations, such cash should not be deducted from the equity hurdle as the cash is not a source of additional value,[192] and (ii) "excess" cash is cash that is held above the company's target cash balances to support operations (the "Treatises").[193]  The cash on CEVA Group's balance sheet that Mr. Maxwell deducted from CEVA Group's debt was not invested, and was not earning a market return on invested capital; it was sitting in CEVA Group bank accounts earning a nominal rate of return.[194]  The CEVA Defendants argue that it is undisputed that the €171 million of cash on CEVA Group's balance sheet was not in excess of the cash balances needed to support operations, but rather was working capital that was necessary for operations; indeed, as of March 31, 2013, CEVA Group was €100 million short of its target cash balance, as demonstrated by the Project Phelps Model.[195]  Thus, the

---

[190]  CD MOL at 11; *see* McDougal Decl. ¶ 32.

[191]  CD MOL at 12.

[192]  CD MOL at 12 (citing Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset at 423 (3d ed. 2012)) ("If a firm needs cash for its operations—an operating cash balance— and this cash does not earn a fair market return you should consider cash part of working capital requirements rather than as a source of additional value.").

[193]  CD MOL at 12 (citing Tom Copeland et al., Valuation Methodologies at 160–61 (3d ed. 2000)).

[194]  *See* McDougal Decl. ¶ 32.

[195]  *See* CD SMF, Ex. I at 60:17–18 (Maxwell Dep. Tr. dated May 26, 2016) ("I'm aware that the company needed to raise 100 million euro"); *see also id.* at 59:5–10 ("Based on the cash flow forecast in the Phelps Model I agree that the company needed to raise 100 million euro to address a cash shortfall that was then projected at the end—sometime in the next two or three months."); *see generally* CD SMF ¶¶ 21–34, 73–85.  Trustee's objection overruled.  *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion; Record Evidence Discussion.

€171 million should have been treated as operating working capital and not subtracted from CEVA Group's debts in calculating the equity hurdle.

Next, the CEVA Defendants assert that the Court should not credit Mr. Maxwell's calculation of the Maxwell Equity Hurdle because, based on his work in *In re MES International, Inc.* ("*MES International*")[196] and *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)* ("*Lyondell*"),[197] it is clear that he is well aware that needed working capital should not be netted against a company's debt.[198] Further, they assert that, when asked at his deposition, Mr. Maxwell was unable to point to a single confirmed reorganization plan, court ruling or treatise to support netting that €171 million of needed cash against CEVA Group's debt.[199] They also note that he was not able to provide any explanation for how CEVA Group could have paid the €62 million interest payment due on its Second Lien and Senior Unsecured debt on April 1, 2013, (which

---

[196] *In re MES Int'l Inc.,* No. 09-14109 (Bankr. D. Del. 2009).

[197] Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), No. 09-10023 (Bankr. S.D.N.Y. 2009).

[198] CD MOL at 13–15.  The CEVA Defendants note that in *MES International*, Mr. Maxwell testified that a company's cash balances should not be included "as an additional asset or a value when coming up to a conclusion as to total enterprise value" where "the company's determination [is] that the balance of the cash was absolutely required in the operations." CD MOL at 11 (citing Hearing Transcript, *In re MES Int'l Inc.*, Case No. 09-141 (Bankr. Del Apr. 23, 2010), ECF No. 670 at 214:5–10).  They say that in *Lyondell,* Mr. Maxwell issued expert valuation reports and testified at trial that when calculating the equity hurdle, it is inappropriate to deduct cash the company believes is needed as working capital from the company's debt. CD MOL at 13 (citing CD SMF, Ex. Y at 26, 53 (Maxwell Expert Report dated Nov. 7, 2009); CD SMF, Ex. Z at 24, 48 (Maxwell Expert Report dated Feb. 28, 2011); CD SMF, Ex. AA (Trial Transcript, *In re Lyondell Chem Co.*, Adv. Pro. No. 09-01375 (Bankr. S.D.N.Y Oct. 31, 2016) at 1712:6–1713:7)).  They point out that Mr. Maxwell testified that it is "well established" that cash that is needed for working capital is restricted cash that should not be netted against the company's debt.  CD MOL at 14 (citing CD SMF, Ex. AA (Trial Transcript, *In re Lyondell Chem Co.*, Adv. Pro. No. 09-01375 (Bankr. S.D.N.Y Oct. 31, 2016) at 1712:6–1713:7).  They assert that in his analysis, in *Lyondell,* Mr. Maxwell reduced the cash on the debtor's balance sheet by the amount management determined was the minimum intraday cash requirement of $300 million before treating any cash as excess, and then netted just the remaining amount of cash ($144 million) against the company's debt in fixing the company's equity hurdle.  CD MOL at 14 (citing CD SMF, Ex. Z at 48 (Maxwell Report)). They maintain that the $300 million Mr. Maxwell deducted from cash on the balance sheet in *Lyondell* before finding there was excess cash to net against Lyondell's debt is the direct analogue to the €171 million here, but he inexplicably treats the €171 million as excess cash.  CD MOL at 14–15.

[199] CD MOL at 15 (citing CD SMF, Ex. I at 236:22–237:4 (Maxwell Dep. Tr. dated May 26, 2016)).

creditors waived in the Restructuring) if all €171 million of cash was used to pay down principal on March 31, 2013, in order to purportedly preserve value for equity.[200]

Finally, they assert that Mr. Maxwell valued CEVA Group based on earnings that presupposed the Restructuring, but in claiming value for CIL, he ignored the new capital CEVA Group needed to raise to generate those earnings.[201]  They contend that calculation flies in the face of the Delaware Bankruptcy Court bench ruling *In re Horsehead Holding Corp.*, No. 16-10287 (Bankr. D. Del. Sep. 2, 2016).  They cite that case in support of the proposition that where, as here, there is an admitted need for additional capital, rather than reduce the equity hurdle by the company's needed capital, the additional capital must be accounted for either by increasing the equity hurdle by the amount of new capital needed or by decreasing the enterprise valuation by that amount.[202]  They maintain that Mr. Maxwell's analysis runs afoul of that case because he valued CEVA Group based on earnings that presupposed the Restructuring,[203] but in claiming value for CIL, he ignored the new capital CEVA Group needed to raise to generate those earnings. Thus, despite admitting that CEVA Group needed €100 million of new capital, Mr. Maxwell made no attempt to adjust his equity hurdle (or enterprise valuation) to account for this liquidity

---

[200] CD MOL at 15 (citing CD SMF, Ex. I at 221:10–222:5 (Maxwell Dep. Tr. dated May 26, 2016)).

[201] CD MOL at 16.

[202] CD MOL at 15.  The CEVA Defendants explain that at the confirmation hearing in that case, the equity committee argued that there was distributable value to equity. They say that the bankruptcy court ruled that total claims equaled $650 million, and the company's valuation was $653 million, and noted that it might therefore appear that equity was "in the money, although barely." CD MOL at 16 (citing CD SMF, Ex. TT (Ruling on Confirmation Hearing, *In re Horsehead* Holding *Corp.*, Case No. 16-10287 (Bankr. Del. Sep. 2, 2016)) at 16:8–16.)  They contend that the Delaware Bankruptcy Court then held that the equity hurdle should be raised to at least $735 million because the company needed approximately $85 to $100 million of new capital, which the equity committee assumed in reaching its valuation, stating: "You simply cannot get to the equity committee's conclusion without that new money and it has to come from somewhere."  CD MOL at 16 (citing CD SMF, Ex. TT (Ruling on Confirmation Hearing, *In re Horsehead Holding Corp.*, Case No. 16-10287 (Bankr. Del. Sep. 2, 2016)) at 16:8–16).

[203]  *See* CD SMF ¶¶ 32, 73–85.   Trustee's objection overruled.   *See supra*, Relevance Discussion; Inaccurate/Incomplete Discussion.

deficit.[204]  They also assert that Mr. Maxwell would not opine as to where an investor of €100 million in new capital would ultimately fall in CEVA Group's capital structure, thereby evading the conclusion that such investor would necessarily be senior to CIL's equity in CEVA Group, but acknowledging that such investor would expect to receive a debt or equity claim in CEVA Group. They assert that the only rationale Mr. Maxwell provides for not adjusting his equity hurdle or enterprise valuation to account for the €100 million liquidity shortfall is that "this liquidity shortfall was projected . . . to be mitigated by the pending recapitalization." [205]

The Trustee says that the CEVA Defendants' citations to Mr. Maxwell's testimony in prior cases fail to discredit Mr. Maxwell's methodology, as they stand for the undisputed proposition that cash required for operations, i.e., working capital, should not be netted against debt.  Indeed, Mr. Maxwell testified in this case that working capital should not be netted against a company's debt.[206]  Moreover, he contends that Mr. Maxwell's valuation is consistent with his prior testimony in *MES International*.[207]  He also contends that Mr. Maxwell's testimony in *Lyondell* is inapposite because in that case, Mr. Maxwell netted "restricted cash, that is cash that was clearly identified

---

[204] CD MOL at 16; CD Reply at 13.

[205] CD MOL at 17 (citing Maxwell Report at 19; CD SMF, Ex. I (Maxwell Dep. Tr. dated May 26, 2016) at 80:12–81:10).

[206] Trustee Opp'n to CD MOL at 38 (citing Beskin-CD Decl., Ex. 97 (Maxwell Dep. Tr. dated May 26, 2016) at 212:15–213:10).

[207] The CEVA Defendants dispute that contention.  The Trustee says that in *MES International*, at the direction of the debtor, Mr. Maxwell assumed all cash on the balance sheet was needed working capital, and unlike this case, he did not perform any independent analysis as to whether certain cash on the balance sheet was appropriately categorized as "excess cash."  Trustee Opp'n to CD MOL at 38–39 (citing Mar. 19, 2010 GSI Expert Valuation Report, Beskin-CD Decl., Ex. 100 at 5;  May 25, 2010 GSI Updated Valuation Analysis, Ex. 101 at 4; *MES Int'l* Trial Tr., Ex. 76, at 214:6–10 (Mr. Maxwell testifying that it was the company—not him—that determined that "the balance of the cash was absolutely required for operations and therefore . . . it did not appear that it was appropriate to include any cash as an additional asset or a value when coming up to a conclusion as to total enterprise value.")).  The CEVA Defendants assert that *MES* is not distinguishable on that basis because Mr. Maxwell did not do an independent analysis here either; he accepted the Project Phelps figures from CEVA Group management as is. CD Reply MOL at 11 (citing Maxwell Report at 8, 12, 25, 27; May 26, 2016 Maxwell Dep. Tr., CD SMF, Ex. I at 73:18–24, 88:15–20). They contend that there is no distinction justifying Maxwell's acceptance of management's estimated working capital needs in *MES* but rejecting them in this case.  CD Reply MOL at 12.

by the company as required for working capital" against debt.[208]    In other words, for reasons specific to Lyondell's business operations (which resulted in large daily cash swings), Mr. Maxwell determined that the cash on the balance sheet in *Lyondell* was required for working capital, whereas the cash on CEVA's balance sheet is not.[209]    Finally, he says that the bench ruling in *Horsehead* is inapposite.    Principally, he argues that *Horsehead* does not stand for the proposition that, as a matter of law, an equity hurdle must be adjusted to account for a liquidity deficit.    Rather, the court rejected an assumption made by the equity committee's expert and ruled one expert more credible than the other.[210]    He argues that the decision was based on a finding of fact, not a conclusion of law.    The court did not cite or rely on a legal standard as to treatment of liquidity deficits.    He argues that *Horsehead* only serves to demonstrate that valuation is not an issue that can be resolved on summary judgment.

Based on the foregoing, the CEVA Defendants argue that the €2,722 million Maxwell Equity Hurdle is incorrect and that the Court should grant them partial summary judgment fixing the equity hurdle at €2,993 million, as a matter of law and undisputed fact.    They maintain that the Court should determine on summary judgment that (i) the €171 million of cash is not "excess cash"

---

[208] Trustee Opp'n to CD MOL at 39 (citing Nov. 15, 2016 *Lyondell* Trial Tr., Beskin-CD Decl., Ex. 109 at 1712:12–17).

[209] Trustee Opp'n to CD MOL at 39. The CEVA Defendants dispute that assertion. They say that daily cash needs versus monthly cash needs is a distinction without a difference. They assert that Mr. Maxwell acknowledges that CEVA Group had intra-month cash swings and that capital was needed to keep CEVA Group running throughout any given month. CD Reply MOL at 12–13 (citing Maxwell Report at 15 ("[I]t is clear that in early 2013 CEVA had a near-term liquidity shortfall based on projected intra-month daily working capital fluctuations including substantial semi-annual interest payment schedules on certain pre-existing debt to be exchanged subject to the 2013 Exchange.")). They argue that CEVA Group's operations depended on being able to sustain its business throughout the month; a mid-month liquidity crunch would result in CEVA Group suspending operations during the dates it could not make payroll or pay its vendors—thereby reducing the projected earnings that Mr. Maxwell relied on in valuing CEVA Group—or even worse, defaulting on its obligations as it did in April 2013, when it failed to make a €62 million cash interest payment on its debt. CD Reply MOL at 13.

[210] Trustee Opp'n to CD MOL at 40. The Trustee notes that in issuing its ruling, the court described it as "one of the most difficult decisions I've had to make in ten years on the bench and one of the closest calls that I've had to make." Trustee Opp'n to CD MOL at 40 (citing *Horsehead* Hearing Tr., Beskin-CD Decl., Ex. 108 at 7).

and should not be deducted from the equity hurdle, and (ii) the €100 million of new capital needed

at CEVA Group must be added to the equity hurdle, as that new capital would necessarily be senior

to the CIL equity.[211]   The Court disagrees that the determination of the equity hurdle is appropriate

for summary judgment.

The Court agrees with the Trustee that in resolving the dispute over the equity hurdle, the

*Horsehead* court did not establish a legal standard applicable in calculating the equity hurdle.   The

*Horsehead* court resolved a dispute among the experts regarding the calculation of the equity

hurdle.   Moreover, the CEVA Defendants misplace their reliance on the Treatises in support of the

motion.   Federal Rule of Evidence 803(18) "permits the reading into evidence of statements in

learned treatises, periodicals and pamphlets if '(A) the statement is called to the attention of an

expert witness on cross-examination or relied on by the expert on direct examination; and (B) the

publication is established as a reliable authority by the expert's admission or testimony, by another

expert's testimony, or by judicial notice.'''   *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp.2d 564,

572 (E.D.N.Y. 2013), *aff'd in part, dismissed in part on other grounds*, 594 F. App'x 723 (2d Cir.

2014) (summary order) (quoting Fed. R. Evid. 803(18)).   The party seeking to utilize a statement

from a treatise must meet both elements of the rule.  *Id.*   The CEVA Defendants have failed to do

so.   In formulating his opinion, Mr. Maxwell did not rely on the Treatises, let alone the statements

cited by the CEVA Defendants in those Treatises.   Accordingly, the statements are hearsay and

not admissible in support of the CD Motion.  *See Mugavero v. Arms Acres, Inc.*, No. 03-cv-5724,

2009 WL 1904548, at *6 (S.D.N.Y. July 1, 2009) (excluding statements from a treatise reasoning

---

[211] CD MOL at 17.

that Rule 803(18) "contemplates the admission of statements in treatises only through the testimony of an expert witness").

Finally, the Court finds that in seeking partial summary judgment, the CEVA Defendants are asking the Court to resolve a "battle of experts" on valuation methodology. Although they are not asking the Court to rely on Prof. Shivdasani's reports in support of their motion,[212] their critique of Mr. Maxwell's analysis is simply a rehash of the arguments made by Prof. Shivdasani in the Shivdasani Rebuttal Report.[213] Here, there are conflicting expert reports. In considering the CEVA Defendants' request for summary judgment, "[i]t is not for the court to decide which expert opinion is more persuasive." *Rand v. Volvo Fin. N. Am.*, No. 04-cv-00349, 2007 WL 1351751, at *3 (E.D.N.Y. May 8, 2007). Moreover, in focusing on Mr. Maxwell's testimony in *Lyondell* and *MES International*, the CEVA Defendants are plainly challenging his credibility. The Court cannot resolve that matter on summary judgment. *See Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment."); *see also Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012), *opinion clarified* (Feb. 21, 2012) ("In cases where credible expert reports conflict the case for summary judgment on the disputed issue is very weak." (citing *New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc. (In re Omnicom Grp., Inc. Sec. Litig.)*, 597 F.3d 501, 512 (2d Cir. 2010))). That issue is reserved for trial. *See Bethel v. U.S. ex rel. Veterans Admin. Med. Ctr. of Denver*, No. 05-CV-01336, 2007 WL

---

[212] CD Reply MOL at 5.

[213] *See, e.g.,* Shivdasani Rebuttal Report ¶ 20 (rebutting Mr. Maxwell's alleged "erroneous conclusion that CEVA had 'available cash' of €171 million" and arguing that CEVA "had no excess cash available to retire debt" and "needed a cash infusion of at least €100 million to fill its liquidity deficit").

1732791, at *6 (D. Colo. June 13, 2007) (observing that disclosure of experts' prior testimony allows opposing parties "to identify inconsistent positions taken in previous cases for use in cross-examination").    In reaching this determination, the Court disagrees with the CEVA Defendants' assertion that *Horsehead* establishes a legal principle applicable in calculating the equity hurdle.    The *Horsehead* court resolved a dispute among the experts over the size of the equity hurdle.

The Court denies the CEVA Defendants' request for summary judgment dismissing Counts 1–3, 5 and 11–12, and the Trustee's claims for damages under Counts 4 and 7–9.    The Court denies the CEVA Defendants' request for partial summary judgment fixing the equity hurdle at €2,993 million.

**The Remedy Dispute**

In Counts 1 and 2 of the SAC, the Trustee seeks to avoid the Restructuring as a fraudulent transfer under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, respectively.[214]    In Count 3, he seeks to avoid the Restructuring pursuant to sections 544(b) of the Bankruptcy Code as a fraudulent transfer under Cayman Law and other applicable laws.[215]    Under those Counts, pursuant to sections 548, 550(a) and 551 of the Bankruptcy Code (Counts 1 and 2), and sections 544(b) and 550 of the Bankruptcy Code (Count 3), the Trustee seeks a judgment against CEVA Group and CEVA Holdings (a) avoiding the Restructuring, or avoiding and preserving the transfer of the New CEVA Shares to CEVA Holdings; (b) directing that the Restructuring be set aside; (c) recovering the net value lost by CIL in the Restructuring for the benefit of CIL's estate and its creditors; and

---

[214] SAC ¶¶ 175–84 (Count 1), ¶¶ 180–84 (Count 2).

[215] SAC ¶¶ 196–13.

(d) awarding interest and fees, including attorney's fees.[216]  In Count 5, the Trustee seeks to avoid the Restructuring pursuant to section 549 of the Bankruptcy Code.[217]  He maintains that he is entitled to recover from CEVA Group and CEVA Holdings the CEVA equity lost by CIL, in the Restructuring or the value thereof, plus interest.[218]

While sections 544, 548 and 549 of the Bankruptcy Code address the power of the Court to avoid a transfer of estate property, section 550 "is a remedies section and defines the party from whom a trustee may seek to recover property that is fraudulently transferred or the value or proceeds of such property." *Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distrib., Inc.*), 379 B.R. 5, 19 (Bankr. E.D.N.Y. 2007). It states, as follows:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).[219]

The CEVA Defendants assert that assuming, arguendo, that the Trustee can prevail on one or more of his remaining claims, given the length of time that has lapsed since the Restructuring, equitable considerations weigh against awarding the remedy of avoidance of the Restructuring.[220]

---

[216] SAC ¶ 184 (Count 1), ¶ 195 (Count 2), ¶ 213 (Count 3).

[217] SAC ¶¶ 219–23.

[218] SAC ¶ 223.

[219] Not surprisingly, "[t]he trustee is entitled to only a single satisfaction under [§ 550(a)]."  11 U.S.C. § 550(d).

[220] CD Reply MOL at 44–46.

The CEVA Defendants argue that there is no genuine dispute that avoiding the Restructuring would be practically impossible to implement and inequitable at this stage, long after the Restructuring was completed.[221]    They say that they are entitled to summary judgment on the Trustee's proposed remedy of "avoidance" under section 550(a) which would seek to undo the CEVA Equity Transfer and associated Restructuring.[222]

It is settled that bankruptcy courts are "courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'"    *Young v. United States*, 535 U.S. 43, 50 (2002) (alteration in original) (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)).  The CEVA Defendants assert that under the circumstances, equitable considerations preclude the actual reversal of the Restructuring.  They maintain that in the bankruptcy context, pursuant to the doctrine of equitable mootness, courts routinely decline to intervene in cases when they could do so.[223]    Under Second Circuit precedent interpreting that doctrine, claims for relief that require modification of a substantially consummated plan are presumed equitably moot unless all five of the following factors (the "*Chateaugay* Factors") are shown:

(a) The court can still order some effective relief;

(b) Such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

---

[221] CD MOL 34–35. At the Hearing, they asserted, among other things, as follows:

And here, there would be no basis, we think, no reason in equity or at law, applying 550, to make . . . CEVA Holdings AG [] give back the shares of CEVA Group to CIL if it was more than was necessary to pay the creditors of CIL; just make them pay money.

Sept. 26 Hr'g Tr. at 155:2–18.

[222] CD MOL at 35–42; CD Reply MOL at 43–46.

[223] CD MOL at 36.

(c) Such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court;

(d) The parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and

(e) The [movant] pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Parker v. Motor Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 80 (S.D.N.Y. 2010) (citing *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 952–53 (2d Cir. 1993)). The CEVA Defendants acknowledge that equitable mootness usually applies in the appeal context where a reorganization has been approved by the Bankruptcy Court and has been substantially consummated.[224]  Still they say that the case law is instructive and that, in applying the *Chateaugay* Factors, the Court should grant summary judgment barring resort to the avoidance remedy.[225]

The Trustee objects to the motion.  First, he contends that summary judgment is not appropriate for remedies, as distinct from claims.[226]  He also asserts that, in any event, the Court should deny summary judgment because (i) equitable doctrines should be evaluated on the basis of a fully developed record, (ii) there are genuine disputes as to many of the material facts underlying the CEVA Defendants' arguments, and (iii) the equitable mootness doctrine should not preclude him from having a first opportunity to be heard on the issue of avoidance.[227]

---

[224] CD MOL at 37.

[225] CD MOL at 37.

[226] Trustee Opp'n to CD MOL at 54 n. 63.

[227] Trustee Opp'n to CD MOL at 54.

The Court first considers whether this aspect of the CD Motion can be resolved on summary judgment. In *County of Suffolk v. Amerada Hess Corp.* (*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*), 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007), the court held that a defendants' motion for partial summary judgment on the plaintiffs' claims for punitive damages was procedurally improper. The district court reasoned that a "claim is the 'legal theory under which relief is sought,'" while, in contrast, an award of punitive damages was a remedy. *Id.* at 664–66 (quoting *Nunley v. Kloehn*, 158 F.R.D. 614, 618 (E.D. Wis. 1994)). The court reasoned that partial summary judgment as to a particular remedy "is outside the contemplation of the Federal Rules," since they allow for partial summary judgment on claims, but not remedies. *Id.* at 666.

The court read the word "judgment" in Federal Rule 56 together with Rule 54(a), which defines "judgment" as "a decree and any order from which an appeal lies," and Rule 54(b), which addresses the entry of judgment on multiple claims or in actions involving multiple parties. *Id.* It reasoned that these rules "focus on *claims*, not the relief sought." *Id.* The *MTBE* court determined that the Federal Rules allow for partial summary judgment on one or more claims, but they do not provide for partial summary judgment on a specific remedy within a claim. *Id.*

The court in *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 306–09 (E.D.N.Y. 2010) disagreed with the reasoning in *MTBE*. The disagreement rested on the interpretation of the word "claim" in Federal Rule 56. The *Hamblin* court interpreted "claim" broadly to mean both a theory of liability and the remedies that flow from it. *Id.* at 307. It reasoned that a "claim" has two parts: the right and the remedy, and the remedy is useless without the right. *Id.* As support, the *Hamblin* court relied on Federal Rules 56(a) and (b), which expressly allowed a court to grant

summary judgment on "all or part of a claim." *Id.*[228]  Moreover, while the *MTBE* court relied on Federal Rule 56(c)(2)'s reference to the word "judgment" to conclude that partial summary judgment is improper, the *Hamblin* court disagreed. *Id.* at 307–08. It reasoned that Federal Rule 56(d) contemplates orders other than final judgments resulting from partial grants of summary judgment. *Id.*[229]

The *Hamblin* court also disagreed with the *MTBE* court's suggestion that Federal Rules 56 and 54(b) must be coextensive in scope. The *Hamblin* court thought that Federal Rule 56 was broader than Federal Rule 54(b), allowing partial summary judgment orders that are not eligible for Federal Rule 54(b) certification as final judgments. *Id.* at 308. Finally, the *Hamblin* court looked to precedent, noting that the Second Circuit has regularly reviewed partial summary judgment grants eliminating categories of damages on appeal from final judgments. *Id.*

The Court agrees with the *Hamblin* court that Federal Rule 56 is broad enough to permit summary judgment on a remedy. Its explicit allowance for summary judgment on "part of each

---

[228] In 2010, Rule 56 of the Federal Rules of Civil Procedure was amended, in part, to provide:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  The rule still allows a party to move for summary judgment on a claim or defense, or "part" of a claim or defense.  For that reason, the *Hamblin* court's interpretation of "claim" to mean theories of liability and the remedies that flow from them remains sound.

[229] A substantially similar provision is now located in Federal Rule of Civil Procedure 56(g):

> If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.

Fed. R. Civ. P. 56(g).

claim or defense" would be meaningless if its object were limited to theories of liability. A claim must be more than what entitles a claimant to relief, but also include the relief itself.

Equitable mootness is a "prudential doctrine under which the district court may dismiss a bankruptcy appeal 'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *R² Invs., LDC v. Charter Commc'ns, Inc.* (*In re Charter Commc'ns, Inc.*), 691 F.3d 476, 481 (2d Cir. 2012) (quoting *Off. Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Off. Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993)). "It was developed judicially 'in response to the particular problems presented by the consummation of plans of reorganization under Chapter 11,' in which 'the need for finality, and the need for third parties to rely on that finality,' is of paramount importance." *Beeman v. BGI Creditors' Liquidating Tr.* (*In re BGI, Inc.*), 772 F.3d 102, 107 (2d Cir. 2014) (quoting *TNB Fin., Inc. v. James F. Parker Interests (In re Grimland, Inc.)*, 243 F.3d 228, 231 & n. 4 (5th Cir. 2001)); *see also GLM DFW, Inc. v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.)*, 838 F. App'x 634, 636 (2d Cir. 2021) (summary order) ("The primary purpose of equitable mootness is to give courts a tool 'to avoid disturbing a reorganization plan once implemented.'" (quoting *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005))). The doctrine is "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Metromedia Fiber Network,* 416 F.3d at 144 (quoting *MAC Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002)).

As applied, courts have not limited the doctrine to appeals of confirmation orders. Some courts in the Second Circuit have applied the doctrine to chapter 11 liquidations. *See, e.g.*, *ACC*

*Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 367 B.R. 84, 96
(S.D.N.Y. 2007) (dismissing appeal as equitably moot in a Chapter 11 proceeding where the
"Debtors have been liquidated and effectively cease to exist").  Moreover, in unpublished summary
orders, the Second Circuit has approved its application to appeals of bankruptcy court orders
denying motions to convert chapter 11 reorganizations to chapter 7 liquidations, *see Papas v.
Residential Cap., LLC (In re Residential Cap., LLC)*, 560 F. App'x 100, 101 (2d Cir. 2014)
(summary order); approving settlement agreements related to a debtor's estate in a chapter 11
proceeding, *see Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp. (In re
Adelphia Commc'ns Corp.)*, 222 F. App'x 7, 8–9 (2d Cir. 2006); and ordering the sale of closely
held real estate corporations in a chapter 11 proceeding, *see Kassover v. Gibson (In re
Kassover)*, 98 F. App'x 30, 31–32 (2d Cir. 2004).

Section 550(a) is intended to "restore the estate to the condition it would have been in if
the transfer had never occurred."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568
B.R. 481, 486 (Bankr. S.D.N.Y. 2017); *see also Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*,
609 F.3d 1106, 1112 (10th Cir. 2010) ("Bankruptcy courts have consistently held that 11 U.S.C. §
550 is designed to restore the estate to the financial condition that would have existed had the
transfer never occurred." (quoting *Off. Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In
re TOUSA, Inc.)*, 422 B.R. 783, 881 (Bankr. S.D. Fla. 2009))).  However, "[t]he Bankruptcy Code
'provides no guidelines to aid the bankruptcy court in deciding when to permit recovery of the
value of the property [under section 550(a)(1)] rather than the property itself.'" *Tulis v. Gordos N.
Rest. Corp. (In re Gordos Rest. Corp.)*, 643 B.R. 1, 36 (Bankr. S.D.N.Y. 2022) (quoting 5 Collier
on Bankruptcy ¶ 550.02[3] (16th ed. 2022)).  Accordingly, "it is within the Court's discretion to
make such a determination."  *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165,

177 (Bankr S.D.N.Y. 1998); *see also Jones v. Brand Law Firm, P.A. (In re Belmonte)*, 931 F.3d

147, 152 (2d Cir. 2019) (explaining that "[t]he bankruptcy court has broad discretion in applying

§ 549's post-petition transfer avoidance provision as well as in ordering the return of transferred

property or its value pursuant to § 550").  In making that assessment, and in light of the restorative

purposes of the statute, courts consider the equities of each case to ensure that neither party

receives a windfall.  In doing so, courts consider post-transfer events that impact the value of the

asset transferred and the feasibility of restoring the fraudulently transferred asset.  *In re Gordos*

*Rest. Corp.*, 643 B.R at 36.  To date, no such analysis has been done in this case.

Equitable mootness is "'a judicial anomaly' because it creates an exception to courts'

'virtually unflagging obligation to exercise jurisdiction.'"  *In re Charter Commc'ns, Inc*., 691 F.3d

at 481 (quoting *Bank of N.Y. Tr. Co., NA v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber*

*Co.)*, 584 F.3d 229, 240 (5th Cir. 2009)). Despite its prudential nature, the doctrine is of limited,

not general, application.  In short, it "provides an analytical basis for dismissing certain appeals

from bankruptcy court orders."  *In re BGI, Inc.*, 772 F.3d at 107.  On those grounds, it is plainly

not applicable herein.  The Court sees no grounds for extending the doctrine to limit application

of section 550(a) in this case.

The Court denies the CEVA Defendants' request for summary judgment on the Trustee's

proposed remedy of "avoidance" in this Adversary Proceeding.

**The Counts 4 and 5 Dispute**

In Count 4 of the SAC, the Trustee purports to assert a claim for a violation of the automatic stay against CEVA Group, CEVA Holdings and the Directors.[230]  In support of that Count, the Trustee alleges that after the Petition Date, the Defendants continued to perform the Restructuring with actual knowledge that the Involuntary Petition had been filed, and that the Restructuring did not close until after the Petition Date.[231]  He asserts that, in accordance with the Court's Dismissal Decision that the CEVA Equity Transfer and the Restructuring are parts of a single and integrated transaction, the CEVA Equity Transfer is part of a transfer and transaction that was pursued after the Petition Date and did not close until after the Petition Date.[232]  The Trustee seeks an order (i) declaring that the Defendants violated the automatic stay; (ii) declaring that any action taken by the Defendants in violation of the automatic stay provisions of section 362 of the Bankruptcy Code are null and void *ab initio*, including the pursuit and closing of the Restructuring; and (iii) directing the Defendants to immediately take all actions necessary to restore CIL to the position it was in prior to the Restructuring, including, as may be appropriate, unwinding the transfer of CEVA Group's equity and/or awarding money damages to CIL.[233]

In Count 5, the Trustee purports to assert a claim against CEVA Group and CEVA Holdings for the Avoidance of Unauthorized Post-Petition Transfers.[234]  The gravamen of that claim is that the Restructuring was a post-petition transfer that was not authorized under the

---

[230] SAC ¶¶ 214–18.  The Court dismissed this claim against the Directors by the Dismissal Decision and Rule 12 Order.  The Trustee includes the Directors in this Count, *pro forma*, for the purpose of preserving the Trustee's rights to appeal from the Dismissal Decision and Rule 12 Order.  *See* SAC at 76 n.8.

[231] SAC ¶ 216.

[232] SAC ¶ 217.

[233] SAC ¶ 218.

[234] SAC ¶¶ 219–23.

Bankruptcy Code or by the Bankruptcy Court.[235]  The Trustee contends that to the extent the Restructuring is deemed to be a single integrated transaction as set forth in the Dismissal Decision, the Court should grant avoidance of the Restructuring pursuant to section 549 of the Bankruptcy Code and award the Trustee the CEVA equity lost by CIL in the Restructuring or the value thereof, plus interest running from the transfer date.[236]

In the CD Motion, the CEVA Defendants say that they are entitled to summary judgment dismissing Counts 4 and 5 because they did not make a make a post-petition transfer of, or otherwise interfere with, estate property.  They maintain that the act giving rise to those claims is CIL's consenting to the CEVA Equity Transfer and CEVA Group's subsequent issuance of new shares which diluted CIL's ownership in CEVA Group from 100% to 0.01%.  They say those actions took place prior to the Petition Date.[237]  Alternatively, they assert that those Counts are barred by the doctrine of laches.[238]  Without limitation, they contend that in April 2013, when the Petitioning Creditors filed the Involuntary Petition, they were well aware that CEVA Group intended to close the Restructuring in early May, but did nothing to try to stop it, and it would likely be impossible and, in any event, highly prejudicial to the CEVA Group and its other stakeholders, to unravel the Restructuring.[239]

The Trustee denies that the CEVA Defendants are entitled to summary judgment dismissing either Count on either ground.[240]  In his Cross-Motion, the Trustee contends that he is

---

[235] SAC ¶ 222.

[236] SAC ¶ 223.

[237] CD MOL at 23.

[238] CD MOL at 23.

[239] CD MOL at 23–24.

[240] Trustee Opp'n to CD MOL at 42–43, 50–53.

entitled to summary judgment on Counts 4 and 5 because each component of the Restructuring occurred, in whole or in part, after the imposition of the automatic stay on the Petition Date.[241]

The Court considers those matters below.

Based on the Project Phelps projections, and due to its capital needs, CEVA Group management determined that CEVA Group's only choice for survival was a financial restructuring.[242]  With the consent of its three largest creditors and its shareholder, they elected to undertake the Restructuring,[243] which the Court has found to be "an integrated, multistep transaction," consisting of a debt-for-equity exchange and related financial restructuring, as follows:

1. Recapitalization (the new share issuance by CEVA, substantially diluting CIL's ownership of CEVA Group);

2. CEVA Exchange Offer (the exchange of new equity interests in CEVA Holdings with creditors holding more than €1.2 billion of CEVA Group's Second Lien Debt and Unsecured Debt);

3. CIL Exchange Offer (consideration offered to the CIL PIK Noteholders);

4. Rights Offering (€200 million of new money raised to provide CEVA Group with adequate capital to operate its business of which the Apollo Funds agreed to contribute €65 million); and

5. Franklin Financing Commitment (providing further reduced interest expense and new money).[244]

Actions taken to effectuate the Restructuring occurred both before and after the Petition Date.  The actions prior to the Petition Date are, as follows:

---

[241] Trustee Opp'n to CD MOL at 43–44.

[242] McDougal Decl. ¶¶ 4, 31; CD SMF ¶ 49.

[243] Schlanger Decl. ¶ 5; CD SMF ¶ 50.

[244] Dismissal Decision at 87–88 (footnotes omitted).

- On April 1, 2013, CIL gave its consent to CEVA Group issuing 3,499,650,000 New CEVA Shares.[245]

- On April 16, 2013, AP VI CEVA Holdings, an Apollo-controlled intermediary company, submitted an application to CEVA Group for the New CEVA Shares.[246]

- On April 16, 2013, CEVA Group effectuated the CEVA Equity Transfer by allotting the New CEVA Shares to AP VI CEVA Holdings, rendering it the 99.99% owner of CEVA Group, and reducing CIL's shareholding interest in CEVA Group to 0.01%.[247]

The actions taken subsequent to the Petition Date are, as follows:

- On April 29, 2013, CEVA approved the resale of the New CEVA Shares from AP VI CEVA Holdings to CEVA Holdings.[248]

- On May 2, 2013, AP VI CEVA Holdings sold the New CEVA Shares to CEVA Holdings in a share purchase agreement dated May 2, 2013.[249]

- On or after May 2, 2013, the CEVA Exchange Offer and the Rights Offering occurred when CEVA Holdings issued its own shares in exchange for, among other things, CEVA's unsecured bonds and second lien bonds and new funds.[250]

---

[245] *See* CD SMF ¶ 55; Trustee Resp. to CD SMF ¶ 55 ("Undisputed that on April 1, 2013, CIL issued a written consent to the issuance of 3,499,650,000 new shares by CEVA Group."); Trustee-CD Counter SMF ¶ 113; Beskin-CD Decl. Ex. 66 (Apr. 1, 2013 CEVA Group Plc General Meeting Minutes and Resolutions) at CEVA0252906 (Special Resolution 3); CD Reply to Trustee Resp. to CD SMF, Ex. G ¶ 55.

[246] *See* CD SMF ¶ 59; Trustee-CD Counter SMF ¶ 114; Beskin-CD Declaration, Ex. 77 (Apr. 16, 2013 Application for Shares) at CEVA0040573.

[247] *See* CD SMF ¶¶ 59–60; Trustee Resp. to CD SMF ¶ 59 ("Undisputed" that "on April 16, 2013, AP VI CEVA Holdings, L.P. formally applied for the New [CEVA] Shares, and that same day, CEVA Group allotted the New [CEVA] Shares to AP VI CEVA Holdings, L.P., rendering it the 99.99% owner of CEVA Group."); CD Reply to Trustee Resp. SMF, Ex. G ¶¶ 59–60.

[248] Trustee-CD Counter SMF ¶ 115; Beskin-CD Decl., Ex. 78 (Apr. 29, 2013 Meeting Minutes) at CEVA0045967–68 (Transfer of Shares); *see also* CD SMF ¶ 63.

[249] *See* CD SMF ¶ 63; Trustee Resp. to CD SMF ¶ 63 ("Undisputed" that "AP VI CEVA Holdings, L.P. formally sold the New [CEVA] Shares to CEVA Holdings in a Share Purchase Agreement dated May 2, 2013."); CD Reply to Trustee Resp. to CD SMF, Ex. G ¶ 63; Trustee-CD Counter SMF ¶ 116.

[250] Trustee-CD Counter SMF ¶ 122; Beskin-CD Decl., Ex. 65 (CIL RSA § 2(c)) at -39348; CD SMF ¶ 64; Trustee-CD Counter SMF ¶¶ 123–25; Beskin-CD Decl., Ex. 79 (Apr. 30, 2013 Hr'g Tr.) at 10:18–11:6; CD SMF ¶¶ 63–64; Beskin-CD Decl., Ex. 69 (Offering Memorandum) at HL0000647.

- On or after May 2, 2013, and after consummation of the CEVA Exchange Offer, the CIL Exchange Offer occurred, wherein certain PIK Noteholders exchanged their PIK Notes for consideration.[251]

- On or after May 2, 2013, the Franklin Financing Commitment occurred, in which CEVA Group exchanged senior secured debt for new investment from Franklin.[252]

PIK Noteholders holding approximately €31 million of PIK Notes tendered their notes in the Restructuring.  Cyrus Capital Partners ("Cyrus") did not tender its PIK Notes and is the only major PIK Noteholder outstanding.[253]   On the Petition Date, the Petitioning Creditors, acting through their counsel, filed the Involuntary Petition which initiated the bankruptcy filing.[254]   The Petitioning Creditors are three investment funds affiliated with Cyrus.[255]

On April 23, 2013, the Petitioning Creditors filed a motion to expedite the determination of the Involuntary Petition or, in the alternative, to appoint an interim trustee (the "Motion to Expedite").[256]  On April 29, 2013, CIL responded to the Motion to Expedite.[257]  On April 30, 2013, the Court held the initial hearing in the chapter 7 case.  At the hearing, the Petitioning Creditors advised the Court that they had reached an agreement with the Debtor with respect to, among other things, the time for the Debtor to respond to the Involuntary Petition.

---

[251] Trustee-CD Counter SMF ¶¶ 126–27; Beskin-CD Decl., Ex. 65 (CIL RSA § 2(d)(2)) at CEVA0039349; *id.* at § 2(o)).

[252] Trustee-CD Counter SMF ¶ 128; Beskin-CD Decl., Ex. 81 (May 3, 2013 email from Franklin's Jonathan Belk to Franklin's Nital Mehta, et al. regarding the Franklin Financing Commitment).

[253] *See* CD SMF ¶ 110; Beskin-CD Decl. Ex. LL (Documentation Evidencing Exchange of PIK Debt by Funds Affiliated with Caspian Capital LP).

[254] *See Involuntary Petition*, ECF No. 1; CD SMF ¶ 106.

[255] *See Involuntary Petition*, ECF No. 1; CD SMF ¶ 106.

[256] *Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee*, Case No. 13-11272, ECF No. 6.

[257] *Response of CIL Limited to Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee*, Case No. 13-11272, ECF No. 12.

On May 6, 2013, CIL filed a notice that due to its provisional liquidation proceedings in the Cayman Islands and directive from the provisional liquidators in that proceeding, it was no longer authorized to participate in the chapter 7 case.[258]  Thus, CIL did not oppose the Involuntary Petition by its agreed-upon May 6, 2013 deadline and the Involuntary Petition was uncontested.

On May 7, 2013, the Petitioning Creditors filed a declaration by counsel requesting immediate entry of an order for relief pursuant to section 303(h) of the Bankruptcy Code and Bankruptcy Rule 1013(b).[259]  On May 10, 2013, the Petitioning Creditors filed a supplemental declaration by counsel.  On May 13, 2013, the Court held a hearing on the Involuntary Petition and on May 14, 2013, the Court entered an order for relief in the involuntary chapter 7 case granting the Involuntary Petition.[260]

On May 14, 2013, the United States Trustee appointed Salvatore LaMonica as the Trustee.[261]  On June 19, 2013, the Trustee filed an application to employ Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") as special counsel.[262]  On July 3, 2013, the Court approved the Trustee's application to retain Kasowitz.[263]

On March 28, 2018, the Trustee filed an application to employ Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as substitute special litigation counsel in connection with the

---

[258] *Notice Regarding May 13, 2013 Hearing*, Case No. 13-11272, ECF No. 21.

[259] *Declaration of David M. Friedman in Support of Immediate Entry of Order for Relief*, Case No. 13-11272, ECF No. 22.

[260] *Order for Relief in Involuntary Chapter 7 Case*, Case No. 13-11272, ECF No. 30.

[261] *Notice of Appointment of Trustee Salvatore LaMonica*, Case No. 13-11272, ECF No. 31.

[262] *Application to Employ Kasowitz, Benson, Torres & Friedman LLP as Special Counsel for the Trustee*, Case No. 13-11272, ECF No. 35.

[263] *Order Approving Employment of Kasowitz, Benson, Torres & Friedman LLP as Special Counsel for the Trustee*, Case No. 13-11272, ECF No. 36.

Adversary Proceeding.[264]  On April 4, 2018, the Court granted the application to employ Quinn Emanuel, as substitute special counsel.[265]

The filing of an involuntary petition in bankruptcy triggers the automatic stay. *See* 11 U.S.C. § 362(a) ("[A] *petition filed* under *section* 301, 302, or *303* of this title . . . *operates as a stay,* applicable to all entities . . . ."). Here, the automatic stay took effect on April 22, 2013. "The efficacy of the bankruptcy proceeding depends on the court's ability to control and marshal the assets of the debtor wherever located . . . ." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 474 B.R. 76, 82 (S.D.N.Y. 2012) (quoting *Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956, 961 (7th Cir.1996)).  Accordingly, section 362 of the Bankruptcy Code focuses on actions taken against a debtor or estate property post-petition by third parties.  Section 362(a)(3) is relevant herein.  It automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The object of the stay is limited to CIL's property, since the automatic stay generally only protects "the debtor, property of the debtor or property of the estate.  It does not protect non-debtor parties or their property." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 59, 65 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) (*quoting Gross Found., Inc. v. Goldner*, 12 Civ. 1496, 2012 WL 6021441, at *7 (E.D.N.Y. Dec. 4, 2012)); *see also Ames Dep't Stores, Inc. v. Lumbermens Mut. Cas. Co. (In re Ames Department Stores, Inc.)*, 542 B.R. 121, 153, n.144 (Bankr. S.D.N.Y. 2015) ("The purpose of section 362(a)(3) . . . is to protect the assets subject to the bankruptcy court's *in*

---

[264] *Application to Employ Quinn Emanuel Urquhart & Sullivan, LLP as Substitute Special Litigation Counsel*, Case No. 13-11272, ECF No. 207.

[265] *Order Approving Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Substitute Special Litigation Counsel for the Trustee*, Case No. 13-11272, ECF No. 210.

*rem* jurisdiction."). Actions taken in violation of the automatic stay are void *ab initio*. *See In re Heating Oil Partners, LP*, 422 F. App'x 15, 18 (2d Cir. 2011) (finding that a default judgment violated the stay and so was "void *ab initio*"); *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 88 (Bankr. S.D.N.Y. 2017) ("Actions taken in violation of the automatic stay are void.").

In contrast to section 362, section 549 of the Bankruptcy Code focuses on actions taken post-petition by the debtor, in favor of third parties. It "arms the trustee with the authority to avoid a postpetition transfer of property of the estate that is not authorized by the Bankruptcy Court or the Code." *First Conn. Consulting Group, Inc. v. Licata, (In re First Conn. Consulting Group, Inc.)*, AP No. 09-05010, 2023 WL 2752489, at *14 (Bankr. D. Conn. Mar. 31, 2023). "The purpose of section 549 is to allow the trustee to avoid those postpetition transfers which deplete the estate while providing limited protection to transferees who deal with the debtor." *Id.* (quoting *In re PSA, Inc*., 335 B.R. 580, 584 (Bankr. D. Del. 2005)).

Under Section 549, the Trustee may avoid a transfer of estate property that (1) occurs after the commencement of the case; and (2) that is not authorized by the court or the Bankruptcy Code. *Jones v. Brand (In re Belmonte)*, 551 B.R. 723, 732 (Bankr. E.D.N.Y. 2016) (citing 11 U.S.C. § 549(a)). The section "implements an important federal purpose: to ensure that disbursements from bankruptcy estates be made only as permitted by federal bankruptcy law." *In re Moon*, 385 B.R. 541, 551 (Bankr. S.D.N.Y. 2008). Accordingly, "Section 549 does not seek to augment the estate but, rather, to recover property that should never have left the estate." *In re Belmonte*, 551 B.R. at 726.

While section 549 addresses the avoidance of a post petition transfer, section 550 of the Bankruptcy Code provides for liability for the avoided transfer. As relevant, it provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders,

the value of such property, from . . . the initial transferee of such transfer or the entity for whose

benefit such transfer was made; or any immediate or mediate transferee of such initial transferee."

11 U.S.C. § 550(a).  An action under section 550(a) must be commenced by the earlier of one year

after the avoidance of the transfer on account of which recovery under section 550 is sought, or

the time the case is closed or dismissed.  11 U.S.C. ¶ 550(f).

***Automatic Stay Violation and Post-Petition Transfer***

The CEVA Defendants deny that they violated the automatic stay or conducted an

unauthorized post-petition transfer by closing the Restructuring after the Petition Date.  They say

that they are entitled to summary judgment dismissing Counts 4 and 5 because the dilution of

CIL's ownership interest in CEVA Group was final and complete as of April 16, 2013, and no

further interference with CIL's property occurred after that date.[266]  They assert that at all times

on and after April 16, 2013, CIL continued to hold the same 0.01% interest it held prior to the

Petition Date, and that to the extent that the Exchange Offer and Rights Offering were contingent

(i.e., not yet completed) as of April 1, 2013, it had no impact on the finality of the CEVA Equity

Transfer.[267]

The CEVA Defendants also contend that the sale of the New CEVA Shares after the

Petition Date by AP VI CEVA Holdings (a non-debtor entity) to CEVA Holdings (a non-debtor

entity) is irrelevant because it did not impact CIL or its property in any way.[268]

The Trustee denies that the CEVA Defendants are entitled to summary judgment on either

Count.  He says that he is entitled to summary judgment on Counts 4 and 5 because each

---

[266] *See* CD MOL at 23–25.

[267] CD MOL at 25.

[268] CD MOL at 25–26; CD Reply MOL at 30.

component of the Restructuring occurred in whole or in part, after the imposition of the automatic stay on April 22, 2013.[269]  The Trustee argues that, by its terms, the CIL RSA defines the first step of the Restructuring as the Recapitalization, and, in part, states that to accomplish the Restructuring, "CEVA shall be authorized to . . . issue 3,499,650,000 ordinary shares to [CEVA] Holdings."[270]  There is no dispute that on April 1, 2013, the Restructuring and the Recapitalization began when CEVA Group, CIL, Louis Cayman Second Holdco Limited ("Louis Cayman"), and CEVA Holdings executed the CIL RSA, and CIL passed a resolution approving the creation of the New CEVA Shares.[271]  The Trustee asserts that under the terms of the CIL RSA, CIL did not agree simply to dilute its ownership of CEVA Group.  It agreed that its ownership could be diluted by shares given to CEVA Holdings.[272]  He maintains that the "dilution transaction," i.e., the Recapitalization, was not complete until May 2, 2013—in violation of the automatic stay—when AP VI CEVA Holdings sold the New CEVA Shares to CEVA Holdings.[273]  Likewise, the remaining steps of the Restructuring—the CEVA and CIL Exchange Offers, the Rights Offering and the Franklin Financing Commitment—did not occur until after the Petition Date.[274]

He also argues that even if the Recapitalization were completed before the Petition Date, the CEVA Defendants incorrectly assert that the post-Recapitalization steps of the larger Restructuring could not and did not cause any further effect to CIL or its property and therefore

---

[269]  Trustee-CD Opp'n at 43–47.

[270] CIL RSA § 2(c).

[271]  Trustee-CD Counter SMF ¶ 113; Beskin-CD Decl. Ex. 66 (Apr. 1, 2013 CEVA Group Plc General Meeting Minutes and Resolutions).

[272] In part, the CIL RSA defines provides that CEVA "shareholders will give the directors of CEVA authority to issue all authorized shares other than the New Existing Shares to Holdings, such that CIL's and Louis Cayman's aggregate shareholdings in CEVA are reduced to 0.01%."  CIL RSA at 1 (Recitals)

[273] Trustee Resp. to CD MOL at 43–48.

[274] Trustee Resp. to CD MOL at 46.

were not in violation of the automatic stay.[275]  He assets that the CEVA Defendants were involved in each and every component of the Restructuring, as follows:

- To execute the Recapitalization, CEVA and CEVA Holdings signed the CIL RSA on April 1, 2013 and accepted an applications for the New CEVA Shares from AP VI CEVA Holdings on April 16, 2013.[276]  On April 29, 2013, after the Petition Date, CEVA approved the resale of the New CEVA Shares from AP VI CEVA Holdings to CEVA Holdings.[277]  On May 2, 2013, CEVA Holdings purchased the New CEVA Shares from AP VI CEVA Holdings,.[278]

- To execute the CEVA Exchange Offer and the Rights Offering, CEVA Holdings issued its own shares in exchange for, *inter alia*, CEVA Group's unsecured bonds and second lien bonds and new money investment.[279]

- To execute the CIL Exchange Offer, CEVA and CEVA Holdings "offer[ed] to exchange claims held by each holder of claims" for consideration.[280]

- Finally, to execute the Franklin Financing Commitment, CEVA exchanged senior secured debt for new investment from Franklin.[281]

The Trustee contends that the CEVA Defendants took affirmative steps to conclude the ongoing Restructuring after the Petition Date, and "act[ed] to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C.

---

[275] CD MOL at 23.

[276] Trustee-CD Counter SMF ¶¶ 109, 114; Beskin-CD Decl. Ex. 77 (Apr. 16, 2013 Application for Shares) at CEVA0040573.

[277] Trustee-CD Counter SMF ¶115; Beskin-CD Decl. Ex. 78 (Apr. 29, 2013 Meeting Minutes) at CEVA0045967–68 (Transfer of Shares); CD SMF ¶ 63.

[278] Trustee-CD Counter SMF ¶116; Beskin-CD Decl. Ex. 80 (May 2, 2013 Share Purchase Agreement) at CEVA0040582; *see also* CD SMF ¶63.

[279] Trustee-CD Counter SMF ¶ 122; CIL RSA § 2(c); CD SMF ¶ 64.

[280] Trustee-CD Counter SMF ¶ 126; CIL RSA § 2(d)(2).

[281] Trustee-CD Counter SMF ¶ 128; Beskin-CD Decl. Ex. 81 (May 3, 2013 email from Franklin's Jonathan Belk to Franklin's Nital Mehta, et al. regarding the Franklin Financing Commitment).

§ 362(a)(3).[282]  He asserts that the Court should find that the CEVA Defendants' completion of the Restructuring after the Petition Date was a deliberate act taken in violation of a stay that they knew to be in existence, and that he is entitled to avoid the transfer under section 549 of the Bankruptcy Code.[283]  He says that he is entitled to summary judgment on Counts 4 and 5, an award of damages for CEVA Defendants' willful violation of the automatic stay, and avoidance of the Restructuring.[284]

The Court disagrees with the Trustee's assertion that the CEVA Defendants violated the automatic stay because the Recapitalization did not become final until AP VI CEVA Holdings sold the New CEVA Shares to CEVA Holdings after the Petition Date.  The Restructuring contemplated the issuance of new shares by CEVA Group to CEVA Holdings, which would dilute CIL's ownership interest to 0.01%.  This dilution was completed on April 16, 2013, prior to the Petition Date, when the new shares were issued to AP VI CEVA Holdings,  reducing CIL's ownership percentage to 0.01%. The post-petition transfer of these shares among non-debtor entities—from AP VI CEVA Holdings to CEVA Holdings—did not affect CIL's property interest, because CIL's ownership percentage remained, as of that date, unchanged at 0.01%.  As a consequence, the Trustee's argument that the CIL RSA's requirement that the new shares be issued to CEVA Holdings meant that their shares were not diluted until they made their way to their ultimate recipient is beside the point.  The Trustee's focus on the identity of the ultimate recipient of the New CEVA Shares ignores that those shares already existed and were issued to AP VI CEVA Holdings before the Petition Date.

---

[282] Trustee Opp'n to CD MOL at 50.

[283] Trustee Opp'n to CD MOL at 45–46.

[284]  Trustee Opp'n to CD MOL at 46–47.

In resolving the motion to dismiss, the Court addressed the Trustee's claim that the Directors violated the automatic stay by facilitating the Restructuring.  The Court dismissed the automatic stay claim against the Directors.[285]  In doing so, the Court found that the Amended Complaint did not allege that the Directors took any action after the Petition Date in furtherance of the Restructuring.[286]  Instead, the Court noted that "CIL's component in the restructuring transaction was fully completed by April 1, 2013, when it executed the CIL RSA."[287]  But in so finding, the Court did not need to go further to decide whether actions taken after the Petition Date would necessarily have violated the automatic stay.  Rather, the basis of the decision, as it related to the Directors, was only that one could not violate the automatic stay before it was effective.  The Court made this point clear in its response to the Trustee's argument that if the CEVA Equity Transfer and CEVA Exchange Offer were determined to be parts of a single unified transaction that closed post-petition, then the Directors' pre-petition actions would have "facilitated and caused a post-petition transfer in violation of the automatic stay."[288]  The Court, rejecting this argument, found that such an argument "flies in the face of the plain language of section 362(a) that clearly provides that the automatic stay does not arise until the filing of a voluntary or involuntary bankruptcy petition."[289]  The Court analogized the situation to *In re Moss*, where the court held that actions "fully completed pre-petition" do not violate the automatic stay so long as the defendant took no post-petition actions in connection with them.[290]

---

[285] Dismissal Decision at 96.

[286] Dismissal Decision at 95.

[287] Dismissal Decision at 95.

[288] Dismissal Decision at 96.

[289] Dismissal Decision at 96 (citing 11 U.S.C. § 362(a)).

[290] Dismissal Decision at 96 (citing *In re Moss*, 270 B.R. 333, 343–44 (Bankr. W.D.N.Y. 2001)).

The Court's reasoning in dismissing the automatic stay claim against the Directors says little about the CEVA Defendants' actions. Unlike the Directors, the CEVA Defendants took actions *after* the petition date to effectuate the Restructuring, such as transferring the newly issued CEVA shares to CEVA Holdings and consummating the CEVA and CIL Exchange Offers. However, those actions did not violate the automatic stay because they did not affect CIL's interest in any property. CIL's ownership interest in CEVA Group was fully diluted prior to the filing of the Involuntary Petition when the new shares were issued to AP VI CEVA Holdings. The subsequent transfer of these shares to CEVA Holdings after the petition date had no effect on CIL's remaining 0.01% interest in CEVA Group. Even if the CIL RSA conditioned the effectiveness of other parts of the Restructuring on the recipient of the New CEVA Shares, the Trustee has not explained why the fact that the ultimate recipient took the shares post-petition means that the transfer of the New CEVA Shares, already issued and held by AP VI CEVA Holdings at the time of the filing of the Involuntary Petition, impacts estate property.

Because estate property was not transferred after the Petition Date, the Court grants summary judgment in favor of the CEVA Defendants on Counts 4 and 5 of the Second Amended Complaint. The Court denies the Trustee's Cross-Motion.

### *Laches*

The CEVA Defendants assert that even in the face of a stay violation or an unauthorized post-petition transfer, they are entitled to summary judgment dismissing Counts 4 and 5 because those Counts are barred by application of the doctrine of laches.[291] "'Laches is an equitable defense based on the . . . maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the

---

[291] CD MOL at 23, 27–28.

vigilant, not those who sleep on their rights).'  It bars a plaintiff's equitable claim where he is 'guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.'" *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (citation omitted) (first quoting *Stone v. Williams*, 873 F.2d 620, 623 (2d Cir. 1989); and then quoting *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979)).

The CEVA Defendants argue that in evaluating the laches defense, the Court should consider the actions (or inactions) of both the Petitioning Creditors and the Trustee.  They say that there is no meaningful distinction between them and that they are functional equivalents of one another because both are controlled and funded by Cyrus and were represented by the same counsel at all relevant times.[292]  The CEVA Defendants assert that after filing the Involuntary Petition, the Petitioning Creditors and Trustee deliberately decided not to file a motion to enforce the automatic stay or otherwise prevent CEVA Group from completing the Restructuring, and instead, allowed the transaction to close.  The CEVA Defendants label it as a "strategic decision *not* to seek to enjoin the transaction" that they implemented because they knew that enforcing the stay and obtaining an injunction would result in an immediate bankruptcy filing by CEVA Group.[293]  They assert that the Petitioning Creditors and the Trustee recognized that forcing CEVA Group to commence a bankruptcy case to consummate the Restructuring would have been value destructive, and would have resulted in no possibility of recovery by CIL.  They say that Cyrus instead wanted CEVA Group to restructure out of court so that it would have a solvent entity against which to

---

[292] CD Reply MOL at 38 (citing CD Reply to Trustee Resp. SMF, Ex. G ¶¶ 106–111 (undisputed that Petitioning Creditors are affiliated with Cyrus and held approximately €68 in PIK Notes outstanding, that both the Petitioning Creditors and Trustee were represented by Kasowitz, and that Cyrus is funding this litigation)).

[293] CD MOL at 28.

litigate their claims.[294]  In any event, the CEVA Defendants contend that the Petitioning Creditors and Trustee have unreasonably delayed in trying to stop the Restructuring and that the CEVA Group will suffer substantial prejudice if the Court avoids the Restructuring.  They say that they are entitled to summary judgment on Counts 4 and 5 on the grounds of laches.[295]

The Trustee rejects those contentions.  He says that the actions or inactions of the Petitioning Creditors are irrelevant to the laches analysis because they are not plaintiffs in this lawsuit, and since he was not appointed until June 2013, he could not possibly have had the standing to prevent the completion of the Restructuring.[296]  The Trustee also asserts that (i) laches cannot bar a claim for avoidance of the alleged unauthorized post-petition transfers because it is subject to a statute of limitations, (ii) the CEVA Defendants cannot establish that his claim for violation of the automatic stay was unreasonably delayed or that any delay by the Trustee prejudiced the CEVA Defendants, and (iii) even if the CEVA Defendants could establish the predicate of a laches defense, equity does not favor the application of laches in this case.[297]

The Court first considers whether Count 4 is barred by application of the doctrine of laches.  As a preliminary matter, the Court rejects the CEVA Defendants' contention that the Trustee is "controlled" by Cyrus.  The Trustee is an independent fiduciary appointed by the Court under the Bankruptcy Code.  As a matter of law and fact, the Trustee is not the functional equivalent of the Petitioning Creditors.  In evaluating the laches defense, the Court will not attribute the actions or inactions of the Petitioning Creditors to the Trustee.

---

[294] CD MOL at 28.

[295] CD MOL at 28.

[296] Trustee Opp'n to CD MOL at 51.

[297] Trustee Opp'n to CD MOL at 51.

A claim for violation of the automatic stay is susceptible to a defense of laches.  On this point, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 59 (S.D.N.Y. 2013), is instructive.  There, the issue was whether the trustee's almost four-year delay in seeking to declare a separate investor action void as violating the automatic stay was barred by laches.  *Id.* at 73.  The court explained that "[a] laches defense under federal law is established by showing (1) unreasonable delay by the claimant in bringing suit, and (2) prejudice resulting from that delay."  *Id.* at 74 (quoting *Perez v. Danbury Hosp.*, 347 F.3d 419, 426 (2d Cir. 2003)).  Applying this standard, the court found the trustee's stay application was "a textbook example of unreasonable delay" that "would be independently barred as untimely under the equitable doctrine of laches."  *Id.*  The court noted that the trustee "waited on the sidelines for nearly four years" to seek a stay "watching while the parties expended significant resources litigating the [separate] Action and attempting to seek an equitable resolution, including the filing of more than 1,000 docket entries in the case."  *Id.*  The court concluded that if the trustee believed the assets at issue were estate property, "he should have sought relief long ago rather than delaying more than four years only to file the Stay Application on the eve of settlement, resulting in enormous prejudice to the Injunction Defendants."  *Id.*

The Trustee delayed approximately 18 months in bringing this action.  During that period, the Trustee conducted Bankruptcy Rule 2004 discovery but otherwise took no action to stop or unwind the Restructuring.  The Restructuring was vital to CEVA Group's ability to continue to function as a going concern.[298]  As a consequence of the Restructuring, CEVA Group shed more than €1 billion in secured and unsecured debt, raised €171 million in cash, and slashed its ongoing

---

[298] *See* Schlanger Decl. ¶ 21; CD SMF ¶¶ 65, 92.

cash interest obligations.[299]   The CEVA Defendants assert that it is impossible to conceive how the Restructuring could now be declared "void" and CEVA Group returned to its former capital structure.  They maintain that the Trustee unreasonably delayed in in bringing this litigation.[300] The CEVA Defendants also contend that in the many years since the Restructuring they have operated their business in reliance on the Restructuring and that they will be severely prejudiced by the voidance of the Restructuring.[301]   The Trustee denies that he unreasonably delayed in bringing this action and contends that the CEVA Defendants cannot demonstrate that they were prejudiced by the purported delay and that the Court should not factor the length of the litigation in evaluating the defense.[302]   In any event, they contend that because the grant of summary judgment could deny them the benefits of pursuing an otherwise meritorious claim, the Court should exercise its discretion by denying summary judgment and resolving the issue at trial.  The Court agrees "that laches [would be] best considered based upon a fully developed record." *Cornell Rsch. Found., Inc. v. Hewlett-Packard Co.*, No. CIVA 501CV1974 NAM, 2007 WL 4349135, at *44 (N.D.N.Y. Jan. 31, 2007), *report and recommendation adopted sub nom. Cornell Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2007 WL 2791120 (N.D.N.Y. Sept. 24, 2007); *see also Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d at 427-28 (denying summary judgment based on laches and holding that "[a]s an equitable defense [laches] is also highly fact intensive and not typically amenable to summary judgment"); *United States v. Portrait of Wally, A Painting By Egon Schiele*, No. 99-cv-9940, 2002 WL 553532, at *22 (S.D.N.Y. Apr. 12, 2002) (holding that the "fact-intensive inquiry" required to properly consider a laches defense is "often not

---

[299] *See* Schlanger Decl. ¶ 15; SMF ¶¶ 93–94.

[300] CD MOL at 32–33; CD Reply MOL at 34.

[301] CD MOL at 32–34; CD Reply MOL at 35–36.

[302] Trustee Resp. to CD MOL at 53.

amenable to resolution on a motion for summary judgment"). For that reason, the Court denies summary judgment on laches to the extent it would be available on Count 4.

The Court now considers application of the laches doctrine to Count 5. In *Ivani Contracting*, the Second Circuit held that laches cannot bar a plaintiff's legal claims for damages under 42 U.S.C. § 1983, so long as those claims are timely filed within the applicable statute of limitations period. 103 F.3d at 260. In its ruling, the court noted the "prevailing rule" that "when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." *Id.* In Count 5, the Trustee seeks to avoid the Restructuring as an alleged unauthorized post-petition transfer pursuant to section 549 of the Bankruptcy Code. Claims under sections 549 and 550 are equitable in nature and do not give rise to a right to a jury trial under the Seventh Amendment. *See In re Belmonte*, 551 B.R. at 728–29. Section 549 prescribes a two-year statute of limitations, *see* 11 U.S.C.§ 549(d), while section 550 prescribes a one-year limitations period, *id.* § 550(f).[303]

In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014), the Supreme Court held that the equitable defense of laches cannot bar relief on a copyright infringement claim brought within the Copyright Act's three-year statute of limitations period in 17 U.S.C. § 507(b). . It held that courts are "not at liberty to jettison Congress' judgment on the timeliness of suit" when a claim is brought in the limitations period. *Id.*

---

[303] Specifically, that section provides:

(f) An action or proceeding under [11 U.S.C. § 550] may not be commenced after the earlier of—

(1) one year after the avoidance of the transfer on account of which recovery under this section is sought; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 550(f).

The issue there was whether laches could bar Petrella's copyright infringement claims, which sought both legal relief (monetary damages) and equitable relief (an injunction against future infringement and the disgorgement of profits), even though the claims were brought within the three-year statute of limitations. *Id.* at 674. The Court reasoned that laches "cannot be invoked to preclude adjudication of a claim for damages brought within the three-year window." *Id.* at 667. It explained that laches is a defense developed by courts of equity, and its "principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Id.* at 678 (quoting 1 D. Dobbs, Law of Remedies § 2.4(4), p. 104 (2d ed. 1993)). Still, the Supreme Court found that in "extraordinary circumstances," laches may bar equitable relief at the "very outset" of litigation. *Id.* at 667–68. The Supreme Court found that the circumstances of Petrella's case were not "sufficiently extraordinary to justify threshold dismissal" of all of the remedies she sought. *Id.* at 687. However, it noted that in determining the appropriate scope of equitable relief, the district court "may take account of [Petrella's] delay in commencing suit." *Id.*

Turning to Count 5, the Court must apply those principles to address the availability of laches as to section 549 of the Bankruptcy Code. The Supreme Court's reasoning in *Petrella* suggests that laches should not be applied to bar claims under section 549 that are brought within the statutory limitations period. *Cf. Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 655 B.R. 149, 181 (Bankr. S.D.N.Y. 2023) (applying *Petrella* and holding that laches did not bar a claim under section 550 of the Bankruptcy Code). Section 549(d) provides a two-year statute of limitations for avoidance actions, measured from the date of the transfer sought to be avoided. 11 U.S.C. § 549(d). Applying *Petrella*'s reasoning, the Court should not use laches, at least peremptorily, to "jettison Congress' judgment on the timeliness of suit" when a section 549

avoidance action is brought within the two-year limitations period.  *See Petrella*, 572 U.S. at 667.

Nonetheless, *Petrella* left open the possibility that laches could bar equitable relief at the outset of

a case in so-called "extraordinary circumstances."  *Id.* at 667–68.  In the context of a section 549

avoidance action, such extraordinary circumstances might exist where the trustee's delay in

bringing suit has caused significant prejudice to the transferee or third parties.  But as the Supreme

Court suggested, such a remedy, to the extent laches bars it, should be barred at the beginning of

a case, which is far from where the Court finds itself.

The Court denies the CEVA Defendants summary judgment on Count 5 on the grounds of

laches.

## The Count 13 Dispute

The Trustee contends the CIL Cash is property of CIL's estate that, as of February 28,

2013, totaled €13,991,263.58.  He asserts that, pursuant to section 542 of the Bankruptcy Code, he

is entitled to recover the cash for the benefit of the estate's creditors.[304]  The Trustee maintains

that, although Apollo owned most of CIL's equity, CIL sold and granted minority interests in its

equity from 2006 onward, and that because CIL did not generally maintain bank accounts, it gave

the cash proceeds from those sales to CEVA Group to hold.[305]  Generally, CEVA Group and its

subsidiaries and affiliates administered cash through CEVA Finance, which the Trustee describes

as "the inter-company bank for the multibillion dollar CEVA Enterprise."[306]  For a number of years

prior to the CEVA Equity Transfer, CEVA Group and its affiliates had recognized the CIL Cash

---

[304] SAC ¶¶ 267–68.

[305] SAC ¶ 171.

[306] SAC ¶ 171.

on their books and records, in varying amounts from time to time, as an asset of CIL.[307] Nonetheless, CEVA Finance, or such other CEVA Group affiliate(s) that may be in possession of the CIL Cash, has failed to return the CIL Cash to CIL, despite demand.[308]  He contends that CEVA Group and CEVA Holdings can cause CEVA Finance, or any other subsidiary that may be holding the CIL Cash, to release the CIL Cash to him.[309]  He argues that by failing to do so, CEVA Group and CEVA Holdings are benefitting themselves, Apollo and CEVA Holdings' other new equity holders at the expense of CIL and its creditors.[310]  He maintains that both prior and subsequent to the Petition Date, CEVA Finance has failed to release the CIL Cash, that CEVA Finance or its agent is in possession, custody or control of the CIL Cash, and that by reason of their direct or indirect control of CEVA Finance and the entire CEVA Enterprise, CEVA Group and CEVA Holdings possess and control the CIL Cash.[311]  The Trustee asserts that the CIL Cash "is of substantial value and benefit to CIL's estate and is property belonging to the CIL estate that may be used, sold or leased by the Trustee."[312]  He says that pursuant to section 542 of the Bankruptcy Code, the Court should enter an order directing CEVA Finance, CEVA Group, and CEVA Holdings immediately to pay and turn over to the Trustee the CIL Cash, and all proceeds, products and profits thereof, with interest.[313]

---

[307] SAC ¶ 172.

[308] SAC ¶ 173.

[309] SAC ¶ 173.

[310] SAC ¶ 173.

[311] SAC ¶¶ 264–66.

[312] SAC ¶ 267.

[313] SAC ¶ 268.

If a debtor fails to comply with its duty to surrender all property of the estate under section 541 of the Bankruptcy Code, section 542 authorizes the trustee or debtor in possession to demand that such property be turned over. *In re Burgio*, 441 B.R. 218, 220 (Bankr. W.D.N.Y. 2010); *In re Xiang Yong Gao*, No. 14-42722, 2017 WL 2544132, at *2 (Bankr. E.D.N.Y. June 12, 2017). The Trustee maintains that the CIL Cash at issue in Count 13 falls under section 542(a). Subject to certain exceptions that are inapplicable here, that section states:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

To prevail on a claim under section 542(a), the party seeking turnover must establish "(1) that the property is or was in the possession, custody or control of [another] entity during the pendency of the case, (2) that the property may be used . . . in accordance with § 363 or exempted by the debtor under § 522; and (3) that the property has more than inconsequential value or benefit to the estate." *In re McCaffrey*, No. 21-30891, 2023 WL 5612742, at *4 (Bankr. N.D.N.Y. Aug. 30, 2023) (quoting *Bailey v. Suhar (In re Bailey)*, 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008)); *see also Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442, 460 (Bankr. E.D.N.Y. 2018). A turnover action can only be brought by either a debtor in possession or a trustee. *DeFlora Lake Dev. Assocs., Inc. v. Hyde Park (In re DeFlora Lake Dev. Assocs., Inc.)*, 628 B.R. 189, 205 (Bankr. S.D.N.Y. 2021).

It is fundamental to a turnover claim that the subject property belongs to the estate. *O'Toole v. Otway (In re 78-80 St. Marks Place LLC)*, 648 B.R. 505, 519 (Bankr. S.D.N.Y. 2023); *Weiss-Wolf v. Isr. Disc. Bank Ltd. (In re Weiss-Wolf, Inc.)*, 60 B.R. 969, 975 (Bankr. S.D.N.Y.

96

1986); *see also Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 97

(Bankr. S.D.N.Y. 2016) ("Under section 542's first subsection, section 542(a), turnover of

property may be sought and obtained by what is in substance a federal right of replevin—a right

to recover the estate's property in kind, with the ability to get the value of the property as a

substitute."). The party seeking turnover bears the burden of proving, by a preponderance of the

evidence, that the property in question is property to the estate. *In re MF Glob. Inc.*, 531 B.R. 424,

432 (Bankr. S.D.N.Y. 2015); *Paloian v. Dordevic (In re Dordevic)*, 67 F.4th 372, 381-82 (7th Cir.

2023) (holding the preponderance standard is the correct standard for section 542 claims); *accord*

*Spradlin v. Khouri (In re Bruner)*, 561 B.R. 397, 403 (B.A.P. 6th Cir. 2017).

For section 542(a) to apply, there must be no dispute that the property that is the object of

the turnover claim is estate property. *Drivetrain, LLC v. Crown Fin., LLC (In re Abeinsa Holding*

*Inc.)*, 653 B.R. 713, 720 (D. Del. 2023) ("The party seeking turnover also must 'allege an

undisputed right to recover the claimed debt.'" (quoting *Am. Home Mortg. Corp. v. Showcase of*

*Agents, LLC (In re Am. Home Mortg. Holding)*, 458 B.R. 161, 169 (Bankr. D. Del. 2011))). A

turnover claim is generally not a vehicle "to adjudicate a debtor's underlying rights in property

when ownership of that property is in dispute." *Bank of Am., N.A. v. Veluchamy (In re Veluchamy)*,

879 F.3d 808, 816 (7th Cir. 2018); *see also Agnew v. United Leasing Corp.*, 680 F. App'x 149,

154 (4th Cir. 2017). Instead, turnover is a tool for "the collection rather than the creation,

recognition or liquidation of a matured debt." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 683

(S.D.N.Y. 2011) (quoting *Hassett v. BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748, 759

(S.D.N.Y. 1994)).

In assessing whether there is a bona fide dispute sufficient to defeat a turnover claim, the

bankruptcy court must "determine whether there is an objective basis for either a factual or a legal

dispute as to the validity of the debt." *Giuliano v. Fairfield Grp. Health Care Ctrs. Ltd. P'ship (In re Lexington Healthcare Grp., Inc.)*, 363 B.R. 713, 716 (Bankr. D. Del. 2007) (quoting *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).  A conclusory allegation that the property at issue is not estate property does not create a bona fide dispute as to the ownership of the property.  *E.g.*, *In re Interstate Commodities Inc.*, No. 20-11139, 2023 WL 8101269, at *8 (Bankr. N.D.N.Y. Nov. 21, 2023) (stating that without evidentiary support, a "bare assertion that [the] alleged loans are not property of the estate is insufficient to persuade the Court" that the alleged loans are not the "undisputed property of the estate"); *Welded Constr. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, 609 B.R. 101, 126 (Bankr. D. Del. 2019) (holding that turnover action is premature because ownership of the property was subject to a bona fide dispute); *Newman v. Tyberg (In re Steel Wheels Transp., LLC)*, No. 06-15377, 2011 WL 5900958, at *5 (Bankr. D.N.J. Oct. 28, 2011) (granting summary judgment for trustee on turnover claim because an unsupported belief that the property does not belong to the estate is not a legitimate dispute).

The CEVA Defendants assert that they are entitled to summary judgment dismissing Count 13 because, at a minimum, there is a legitimate dispute over CIL's rights to the CIL Cash. The Trustee disputes that contention.  The Court reviews the facts relevant to that contention.

Beginning in 2006, certain eligible CEVA Group management employees participating in CIL's LTIP purchased CIL stock at an agreed price both at the time the grant was awarded and upon vesting of the stock options.  At that time, CIL maintained its own bank account at a financial institution called Coutts.  It deposited the sale proceeds into that bank account.[314]  CEVA Finance functions as the in-house bank and clearinghouse for the larger CEVA Enterprise.[315]  More than

---

[314] McDougal Decl. ¶ 35; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 16:10–13

[315] McDougal Decl. ¶ 37; CD SMF ¶ 130.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

one hundred entities within the CEVA Enterprise participate in one of the four cash pools administered by CEVA Finance, resulting in thousands of monthly accounting entries, cash deposits, and transfers.[316]  In 2009, to simplify CEVA Group's internal banking structure, CIL closed its account at Coutts, and moved the cash into two of the CEVA Finance cash pools.[317]  CIL became a "participant" in separate cash pooling arrangements with Bank Mendes Gans ("BMG") and the Royal Bank of Scotland ("RBS"),[318] respectively.

A Logistics Cash Management Agreement ("LCMA") governed CIL's participation in the BMG cash pool.  Under that agreement, CEVA Finance opened a sub-account in CIL's name.[319]  CIL had no relationship with BMG.  It did not have title to the account and could not withdraw funds from the account.[320]  A positive balance in the LCMA constituted a payable from CEVA Finance to CIL, while a negative balance constituted a payable to CEVA Finance.  At the time of the Restructuring, CIL's BMG sub-account balance was negative, indicating a payable owed by CIL to CEVA Finance.[321]

The RBS cash pool is a "notional" cash pool; accordingly, actual sub-accounts do not exist.[322]  Thus, there is no documentation evidencing CIL's participation in the RBS cash pool. CEVA Finance created two "reference" accounts in CIL's name, with one denominated in euros

---

[316] *See* McDougal Decl. ¶ 37; CD SMF ¶ 131; CD Reply to Trustee Resp. SMF ¶ 131.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[317] *See* McDougal Decl. ¶ 36; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 19:7–20:10.

[318] *See* McDougal Decl. ¶ 38; CD SMF ¶¶ 134, 139.

[319] *See* McDougal Decl. ¶ 38; McDougal Decl., Ex. 21 (LCMA) § 2.1; CD SMF ¶ 135.

[320] *See* McDougal Decl. ¶ 38; CD SMF ¶ 137.

[321] *See* McDougal Decl. ¶ 38; CD SMF ¶ 138; CD SMF, Ex. GG (Beith Spreadsheet).  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion; Hearsay Discussion.  *See* CD Reply to Trustee Resp. SMF ¶ 138.

[322] *See* McDougal Decl. ¶ 39; McDougal Decl., Ex. 22 (RBS Cash Pool Agreement) at 3 (referring to the "Notional Pooling Arrangement"); CD SMF ¶ 140.

and the other in U.S. dollars.[323]  CEVA Finance held legal title to those accounts, and CIL had no ability to withdraw funds from the accounts.[324]  Over the course of CIL's participation in the BMG and RBS cash pools, CEVA Finance recorded hundreds of payables to and receivables from CIL.[325]  Those payables and receivables related to, among other things, (i) CEVA Group employee purchases of CIL stock, (ii) CEVA Group employee redemptions of CIL stock, (iii) stock option "recharge expenses," (iv) certain fees and expenses, including the Reimbursement Amounts (defined below) accruing under the Reimbursement Agreements among the CEVA Defendants and CIL, (v) legal settlements, and (vi) accrued interest.[326]  The net sum of all the amounts listed in the cash pools as payables to CIL and all the amounts listed as payables from CIL was approximately €14 million in CIL's favor as of year-end 2012.[327]

The CEVA Defendants assert that they are entitled to summary judgment dismissing Count 13 because there is a bona fide dispute over whether some or all of the CIL Cash is owed to CIL because:

> (i) The Reimbursement Amounts—which the Trustee contests—are disputed credits against the CIL Cash.[328]

---

[323] McDougal Decl. ¶ 39; McDougal Decl., Exs. 23–24 (Documents evidencing existence of reference accounts); SMF ¶ 141.

[324] McDougal Decl. ¶ 39; McDougal Decl., Ex. 22 (RBS Cash Pool Agreement); CD SMF ¶ 142.

[325] McDougal Decl. ¶ 40; McDougal Decl., Exs. 25–27 (documents evidencing payables and receivables in the BMG and RBS cash pools); CD SMF ¶ 144.

[326] McDougal Decl. ¶ 40; CD SMF ¶ 145; CD Reply to Trustee Resp. SMF ¶ 145.  Trustee's objection overruled. *See supra*, Ipse Dixit Discussion.

[327] McDougal Decl. ¶ 40; CD SMF ¶ 146; CD Reply to Trustee Resp. SMF ¶ 146.  Trustee's objection overruled. *See supra*, Ipse Dixit Discussion.

[328] CD MOL at 51–52.

(ii) CEVA Finance erroneously accounted for CEVA Group employee purchases of CIL stock as debt when they should have been accounted for as equity.[329]

(iii) CEVA Finance should have, but did not, reduce the stock option recharge expenses credited to CIL when the employee stock options failed to vest.[330]

The Trustee denies that the CEVA Defendants are entitled to summary judgment dismissing Count 13.  He argues that there is a genuine dispute of material fact over whether the parties have any "legitimate or bona fide dispute" over the CIL Cash because:

(i) The CEVA Defendants are not entitled to the offsets they claim on account of the Reimbursement Amounts but, in any event, each such offset is specifically provided for by section 542 of the Bankruptcy Code and does not render the turnover claim invalid.

(ii) Prior to the Restructuring, the CEVA Defendants repeatedly acknowledged that CEVA Finance owed an intercompany debt to CIL.  The CEVA Defendants cannot now claim to be entitled to keep the CIL Cash merely by raising *ex post facto* arguments for the sole purpose of avoiding this turnover claim. Moreover, the "disputes" raised by the CEVA Defendants are spurious on their merits because CEVA Finance properly accounted for both employee stock purchases and unvested stock options prior to the Restructuring.[331]

The Court considers those matters below.

### *Whether the Disputed Reimbursement Amounts Defeat the Turnover Claim*

The CEVA Group and CIL are party to three reimbursement agreements (the "Reimbursement Agreements") pursuant to which CEVA Group agreed to cover certain amounts of professional fees and expenses incurred by CIL in connection with the Restructuring.[332]  The

---

[329] CD MOL at 48–49.

[330] CD MOL at 49–51.

[331] *See* Trustee Opp'n to CD MOL at 59–60.

[332] McDougal Decl. ¶¶ 56–57.

CEVA Group's obligations under the Reimbursement Agreements aggregate $1,694,845 (the "Reimbursement Amounts").[333]    Each agreement contains the following language:

> Offset.  To the extent, if any, that amounts are presently due from any CEVA Entity to CIL on account of any debt or obligation of any nature, the delivery of Funds hereunder shall constitute (i) an irrevocable payment to CIL, in the amount of the Funds, on account of such obligations, which shall be applied by CIL in its discretion, and (ii) a corresponding reduction of such obligations owing from any CEVA Entity to CIL.[334]

The parties agree that the Reimbursement Agreements are enforceable contracts. They disagree whether amounts due under the Reimbursement Agreements (if any) give rise to bona fide disputes defeating the Trustee's claim for turnover.

The Trustee denies that there is an amount due and owing by CIL to the CEVA Defendants under the Reimbursement Agreements.[335]  He argues that the amounts advanced by CEVA Group under the Reimbursement Agreements that remain outstanding (if any) are an "offset" against the CIL Cash, but that it does not create a "dispute" that defeats the application of section 542 of the Bankruptcy Code.[336]

The CEVA Defendants contend that the intercompany claim demanded by the Trustee is the net of hundreds of intercompany payables and receivables between CIL and CEVA Group and its subsidiaries.  They say that the Reimbursement Amounts are one such payable, and thus tie

---

[333] The agreements are in the amounts of $425,000, $950,382, and $319,463, respectively.  *See* McDougal Decl. ¶ 56.

[334] *See* McDougal Decl., Exs. 46–48 (Reimbursement Agreements) ¶ 2.

[335] Trustee Opp'n to CD MOL at 67.

[336] Trustee Opp'n to CD MOL at 66–67.

directly to the amount of the turnover claim asserted by the Trustee.[337]  They maintain that in calculating the amount of the CIL Cash, they are entitled to apply the amounts due by CIL to them under the Reimbursement Agreements as a credit against that cash.   In that way, the Reimbursement Amounts are not a separate "offset" or "recoupment" but rather a component of the very debt the Trustee seeks to have turned over—one that is clearly disputed.[338] The CEVA Defendants maintain that the dispute over the Reimbursement Amount gives rise to a bona fide dispute with CIL that defeats the Trustee's claim for setoff in Count 13 under section 542 of the Bankruptcy Code.[339]

Under section 542(b) of the Bankruptcy Code, with certain irrelevant exceptions, an "entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order . . . shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.  11 U.S.C. ¶ 542(b).  The doctrine of setoff "allows mutual debts between a creditor and a debtor's estate to be set-off against one another."  *Lines v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 743 F. Supp. 176, 182 (S.D.N.Y. 1990).  The doctrine is codified at section 553 of the Bankruptcy Code.  It provides that, with certain enumerated exceptions, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553(a).

---

[337] CD Reply MOL at 56; McDougal Decl. ¶ 40; McDougal Decl., Ex. 25 (CIL BMG sub-account data); McDougal Decl., Ex. 26 (CIL USD RBS reference account data); McDougal Decl., Ex. 27 (CIL EUR RBS reference account data); CD SMF ¶¶ 144-46.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[338] CD MOL at 51–52; CD Reply MOL at 56.

[339] CD Reply MOL at 56.

The Reimbursement Agreements explicitly create a right of setoff against the CIL Cash. Because the Reimbursement Agreements are separate agreements that create a right of offset, they do not establish, as an independent ground, that there is a dispute as to the amount of the CIL Cash, i.e., the separate claim that would be offset. *In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2. The language of these contracts is clear that they are meant to be accounted for separately from the amount otherwise owed to CIL (i.e., the CIL Cash), and they explicitly create a right of setoff to that end. It is that right of setoff that the CEVA Defendants now assert, and they cannot use that setoff right to create a question as to the amount of the CIL Cash owed. *Id.*; *see In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400082, at *6–7 (Bankr. S.D.N.Y. June 15, 2006). "This situation falls squarely within section 542(b)." *In re Enron Corp.*, 2006 WL 2400082, at *7. The Reimbursement Agreements do not go to calculation of the CIL Cash—they explicitly create a right of setoff against the CIL Cash. The CEVA Defendants cannot frustrate the turnover claim solely by asserting this setoff right, however they might frame it. *Id.* Accordingly, any amount owed to the CEVA Defendants under the Reimbursement Agreements does not establish a dispute as to the amount of the CIL Cash sought in this turnover action.

### Whether the Dispute on the Debt's Validity is "Bona Fide"

The Trustee maintains that the CEVA Defendants repeatedly acknowledged both publicly and in private conversations that the intercompany cash was owned by CIL. He says that it was not until CEVA's annual report for 2012 (the "2012 Annual Report"), signed on May 2, 2013, that CEVA for the first time stated that "CEVA Group Plc has booked a payable *which is in dispute* to CEVA Investments Limited, amounting to €14 million at 31 December 2012 (2011: €13 million)."[340] He contends that even months after the 2012 Annual Report was issued, CEVA could

---

[340] Trustee-CD Counter SMF ¶ 148.

not articulate the source of the "dispute" it noted in its 2012 Annual Report.  He points to an

October 19, 2015 hearing in this case, in which CEVA's counsel told this Court—when discussing

the CIL Cash claim— that "the dispute exists" and "there [were] a lot of facts out there" regarding

the claim, but that CEVA was not able to provide any details regarding the dispute, its basis, or its

merits.[341]  The Trustee contends that the CEVA Defendants' inability to articulate grounds for

disputing CIL's title to the CIL Cash, coupled with their acknowledgements of CIL's ownership

of the CIL Cash, make clear that this present effort by CEVA to dispute the CIL Cash debt is

merely an attempt to avoid the Trustee's turnover claim.  In short, the Trustee asserts that the

CEVA Defendants did not assert their objection to the CIL Cash Claim until the time that the

Restructuring was negotiated, and thus that the objections are "ex post facto" disputes

"manufactured" for litigation.[342]

There is no question that CEVA publicly recognized its debt to CIL as undisputed in its

annual reports in 2009, 2010, and 2011.[343]  In addition, in its April 4, 2013 report to bondholders,

CEVA stated that "CEVA Group Plc has a payable to [CIL], amounting to €14 million at 31

December 2012 (2011: €13 million).  This relates to intercompany cash pooling arrangements and

is included within trade and other payables in the Consolidated Balance Sheet."[344]  Moreover, the

Trustee correctly notes that as they helped to plan the Restructuring, Christopher Russell of

---

[341] CD Resp. to Trustee-CD Counter SMF ¶ 149; Trustee-CD Counter SMF ¶ 149.

[342] Trustee Opp'n to CD MOL at 60–64.

[343] For example, the 2011 Annual Report states that "CEVA Group Plc has a payable to [CIL], amounting to €13 million at 31 December 2011 (2010: €13 million). This relates to intercompany cash pooling arrangements and is included within trade and other payables in the Consolidated Balance Sheet."  Trustee-CD Counter SMF ¶ 138; Beskin-CD Decl., Ex. 6 (2011 Annual Report) at CEVA0207709; *see also* Beskin-CD Decl., Ex. 3 (2009 Annual Report) at CEVA0207524; Beskin-CD Decl., Ex. 5 (2010 Annual Report) at CEVA0207618.

[344] Trustee-CD Counter SMF ¶ 146.

Appleby, CIL's Cayman Islands counsel,[345] and Rob McMahon of E&Y, CIL valuation advisors,[346] discussed the value and recoverability of CIL's intercompany debt without disputing CIL's ownership of that cash.

<u>Employee Stock Purchases</u>

The CEVA Defendants contend that CEVA mistakenly accounted for the cash paid by CEVA Group employees for CIL stock as debt, but not equity. There is no genuine dispute that this contention is accurate. Rubin McDougal was CEVA Group's CFO at the time of the Restructuring. He joined the company in 2009. Shortly thereafter, he noted that the CEVA Group was accounting for the cash paid over by CEVA Group employees for CIL stock as debt, not equity as it should have been. He asked the CEVA Group's treasurer to work with his team and the legal department to implement the change necessary to account for that cash as equity.[347] That task was

---

[345] In a February 26, 2013 e-mail, Mr. Russell advised his colleague Tony Heaver-Wren that, "[f]rom what Paul was saying, the [CIL Cash] claim is good in law, but poor on recoverability." Trustee-CD Counter SMF ¶ 140; Beskin-CD Decl., Ex. 35 (Feb. 26, 2013 email from Appleby's Tony Heaver-Wren to Appleby's Christopher Russell); *see also* Trustee-CD Counter SMF ¶141; Beskin-CD Decl., Ex. 40 (Mar. 1, 2013 email from Appleby's Christopher Russell to Paul Ricotta, et al.) at 2. On March 7, 2013, Russell advised that the "intercompany debt is an asset of CIL and is relevant to the value of its own shares." Trustee-CD Counter SMF ¶142; Beskin-DC Decl., Ex. 44 (Mar. 7, 2013 email from Appleby's Christopher Russell to Appleby's Tony Heaver-Wren, et al.) at 1. CEVA Defendants' evidentiary objection is overruled. *See supra*, Email Hearsay Discussion.

[346] On March 23, 2013, E&Y's Rob McMahon told Russell that he had "never seen any evidence to suggest why the intercompany amount is not a good claim[.] The 12.9 amount is net of setoff for all professional caost [sic] accrued to date." Trustee-CD Counter SMF ¶ 143; Beskin-DC Decl., Ex. 60 (Mar. 23, 2013 email from E&Y's McMahon to Appleby's Christopher Russell, et al.) The next day, McMahon told Appleby I don't think CEVa [sic] dispute the intercompany [debt] is owed [to CIL.] They just dispute that its actual cash of CILs in an account that CIL can draw[.] Why do you need to get into all of this with the court? Paul[] [Ricotta] said it is at best an unsecured claim[.] The account has arisen over a number of years by in part CEVa [sic] depositing CIls [sic] cash and various other intercompany charges[.] Trustee-CD Counter SMF ¶ 144; Beskin-CD Decl., Ex. 61 (Mar. 24, 2013 email from E&Y's McMahon to Appleby's Tony Heaver-Wren, et al.). On March 25, 2013, CEVA Logistics Iratxe Erausquin Posadas told CIL Director Mark Beith that "[a]s of the end of Feb," the "cash pool and LTIP recharge (together total[ed] €13,991,263.58)." Trustee-CD Counter SMF ¶ 145; Beskin-CD Decl., Ex. 62 (Mar. 25, 2013 email from CEVA Logistic's Iratxe Erausquin Posadas to Mark Beith). And on April 10, 2013, Tony Heaver-Wren of Appleby confirmed that, telling Mr. Beith and Mintz Levin that "as of 28 February 2013, CIL had a claim against the cash pool of €13,991,2l63.58." Trustee-CD Counter SMF ¶ 147; Beskin-CD Decl., Ex. 74 (Apr. 10, 2013 email from Appleby's Tony Heaver-Wren to Mark Beith, et al.). CEVA Defendants' evidentiary objection is overruled. *See supra*, Email Hearsay Discussion.

[347] McDougal Decl. ¶ 46; SMF ¶ 157; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 32:6–35:5; CD Reply to Trustee Resp. SMF ¶ 157.

not completed at that time.  Prior to the Restructuring, the interests of the CEVA Group and CIL were aligned, and they pursued the same ends through shared common management.[348]  However, when the CEVA Group began to negotiate its separation from CIL, it began to scrutinize its intercompany books and records.[349]  As part of that exercise, the CEVA Group reviewed the intercompany payables and receivables with CIL.[350]  It was only during the work around the Restructuring that Mr. McDougal realized for the first time that his request had never been implemented.[351]  On this point, the record does not support the Trustee's assertion that the CEVA Defendants have manufactured this dispute to defeat the turnover claim.[352]  Nor have they explained why the timing of such a realization would matter.

Whether a dispute is bona fide looks to whether there is "a factual or a legal dispute as to the validity of the debt."  *In re Lexington Healthcare Grp., Inc.*, 363 B.R. at 716 (citing *In re Busick*, 831 F.2d at 750).  In *In re Welded Constr., L.P.*, the Bankruptcy Court for the District of Delaware decided a motion to dismiss a turnover claim.  *In re Welded Constr., L.P.*, 609 B.R. at 125.  There, the debtor entered a contract with the defendant to construct a portion of a natural gas pipeline.  *Id.* at 107.  A dispute arose whether certain fees were billable under that contract, and the defendant withheld over $71 million in payments.  *Id.* at 109–10.  After the debtor filed for bankruptcy, it brought an adversary proceeding against the defendant asserting several claims,

---

[348] McDougal Decl. ¶ 41.

[349] McDougal Decl. ¶ 41.

[350] McDougal Decl. ¶ 42.

[351] McDougal Decl. ¶ 46; CD SMF ¶ 158; SMF, Ex. P (McDougal 30(b)(6) Tr.) at 28:3–13, 29:20–35:5, 59:23–61:6; CD Reply to Trustee Resp. SMF ¶ 158.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[352] The Court attaches no weight to the Trustee's critique of the CEVA Defendants' response to the Court's questions at oral argument relating to the basis of the CEVA Defendants' dispute regarding the CIL Cash.  *See* Trustee Opp'n to CD MOL at 62–63.  The Court never asked the CEVA Defendants' counsel to provide this information, and as the CEVA Defendants' counsel stated repeatedly during the hearing, at the motion to dismiss stage the Court must accept all facts pled as true, and thus any attempt to set forth the basis of the dispute would have been improper.

including one for turnover of those withheld funds under section 542 of the Bankruptcy Code. *Id.* at 107, 125. The court, noting that a turnover claim must allege an undisputed right to recover the claimed debt, reasoned that the ownership of the withheld funds was subject to a bona fide dispute between the parties over the proper interpretation of the contract. *Id.* at 125–26. For that reason, the court held the turnover claim was premature and dismissed it. *Id.*

A similar interpretive dispute exists here. The Trustee contends that CEVA Finance correctly accounted for employee purchases of CIL stock and the amount of the CIL Cash reflected in CEVA Finance's 2012 Annual Report is therefore accurate.[353] As support, he argues that (i) CEVA Finance's decision to account for employee purchases as debt, but not equity, was in compliance with CEVA's accounting policies and International Financial Reporting Standards ("IFRS"), and (ii) PwC accountants audited the accounts in 2006 and 2007 and accepted CEVA Finance's decision to account for employee purchases as debt.[354]

The IFRS does not address how CEVA Group should account for employee stock purchases, i.e., as debt or equity. Moreover, that CEVA Group's accountant accepted CEVA Group's treatment decision in 2006 and 2007 to account for employee stock purchases as debt, but not equity, does not respond to the CEVA Defendants' contention that CEVA Group made the decision in 2009 to account for the purchases as equity and did not discover until 2013 that the decision had not been implemented. The Court cannot credit the argument that there are no factual or legal disputes here, since the IFRS does not prescribe that CEVA Group was bound to treat the

---

[353] Trustee Opp'n to CD MOL at 65.

[354] Trustee-CD Counter SMF ¶ 151–53; Beskin-CD Decl., Ex. 4 (CIL Special Purpose Consolidated Financial Statements 2008) at ML_04612; Beskin-CD Decl., Ex. 2 (CIL Special Purpose Consolidated Financial Statements 2006) at ML_04472-73; Beskin-CD Decl., Ex. 95 (Rebuttal Report of Steven Brice) at 16–17, ¶¶ 3.2.12–13.

employee purchases as debt, and a decision to treat the purchases one way some years does not establish that is how CEVA Group intended to treat them thereafter.

### Stock Option Recharge Expenses

The CEVA Defendants contend that CEVA Group failed to properly account for stock option awards to CEVA Group employees that failed to vest due to employee departures, and CEVA Group's failure to achieve designated performance metrics. They maintain that the error it made is based upon a basic principle: it is inappropriate under both IFRS and CEVA Group's internal accounting policy to record an expense for stock options that will never vest.[355]

Under CIL's LTIP, CEVA Group employees received stock options to purchase CIL shares at future points in time.[356] There were three tranches of stock options: A, B, and C.[357] Tranche A options vested 20% per year over five years; Tranches B and C vested six months after certain performance conditions were met.[358] The CEVA Defendants contend that all tranches required that an employee remains employed at CEVA Group in order to vest.[359]

The IFRS accounting rules require that a company issuing stock options to employees in exchange for service record a corresponding expense.[360] To do so, CEVA Group retained a company called "Global Shares," which calculated the fair market value of the stock option awards

---

[355] CD MOL at 49; CD Reply MOL at 53. CEVA Group and CIL both prepared financial statements under IFRS. *See* McDougal Decl. ¶ 49; McDougal Decl., Ex. 1 (CEVA 2012 Annual Report); McDougal Decl., Ex. 30 (CIL 2006 Financial Statement).

[356] McDougal Decl. ¶ 50; McDougal Decl., Ex. 28 (LTIP) at art. V; McDougal Decl., Ex. 30 (CIL 2006 Financial Statement); CD SMF ¶ 168.

[357] McDougal Decl. ¶ 50; CD SMF ¶ 169.

[358] McDougal Decl. ¶ 50; McDougal Decl., Ex. 30 (CIL 2006 Financial Statement); CD SMF ¶ 170.

[359] McDougal Decl. ¶ 50.

[360] McDougal Decl. ¶ 51; CD SMF ¶ 172; CD SMF, Ex. T (Taub Report) ¶ 23.

in accordance with the Black-Scholes Merton model and prepared detailed annual expense spreadsheets reflecting the calculation.[361] CEVA Group then booked this expense and credited a "recharge payment" to CIL, in accordance with its own internal policy.[362] Over the course of the existence of the LTIP (i.e., from November 2006 through April 2013), approximately €15.8 million of these stock option recharge expenses accrued in favor of CIL.[363]

Many of these stock options never vested, which the CEVA Defendants attribute to CEVA Group's poor financial performance. The CEVA Defendants contend that the IFRS requires that if an award's vesting conditions are not met, the award is forfeited, and the associated expense booked by the employer should be reversed.[364] Such a reversal never happened.[365] The CEVA Defendants assert that the expense associated with any unvested Tranche A options should immediately have been reversed once an employee left the company prior to vesting, but that no such reversals were ever made, even though many employees left the company prior to vesting.[366] They contend that the same is true with respect to Tranche B and C options, with the added

---

[361] *See* McDougal Decl. ¶ 51; McDougal Decl., Ex. 38 (CEVA Internal Accounting Policy); McDougal Decl., Exs. 31–37 (Expense Spreadsheets for 2006-07, 2008, 2009, 2010, 2011, 2012, and 2013); CD SMF ¶ 173; CD Reply to Trustee Resp. SMF ¶ 173; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 36:11–37:22. Trustee's objection overruled. *See supra*, Ipse Dixit Discussion; Hearsay Discussion.

[362] McDougal Decl. ¶ 51; McDougal Decl., Ex. 38 (CEVA Internal Accounting Policy); McDougal Decl., Exs. 39–45 (Expense Receipts and/or Bank Statements evidencing payment of recharge expenses for 2006 and 2007, 2008, 2009, 2010, 2011, and 2012); CD SMF ¶ 174.

[363] McDougal Decl. ¶ 51; CD SMF ¶ 175; CD Reply to Trustee Resp. SMF ¶ 175; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 15:23–18:19; CD SMF, Ex. GG (Beith Spreadsheet). Trustee's objection overruled. *See supra*, Ipse Dixit Discussion.

[364] The Trustee's expert, Steven Brice, agrees with this conclusion. CD SMF, Ex. SS (Brice Dep. Tr.) at 63:9–64:21; *see* McDougal Decl. ¶ 52; CD SMF ¶ 176; SMF, Ex. T (Taub Report) ¶¶ 29–42.

[365] McDougal Decl. ¶ 52; CD SMF ¶ 177; CD SMF, Ex P (McDougal 30(b)(6) Tr.) at 28:20–29:4, 43:3–16, 47:19–49:12. The Trustee's objection to CD SMF ¶ 177 is overruled because the document on which he relies does not support his position.

[366] McDougal Decl. ¶ 52; CD SMF ¶¶ 178–79; CD SMF, Ex. T (Taub Report) ¶¶ 56–62; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 43:3–16, 45:6–24, 47:19–49:12. The Trustee's objection to CD SMF ¶¶ 178–79 is overruled because the document on which he relies does not support his position. Trustee's objection is also overruled to the extent it relies on the *ipse dixit* argument. *See supra*, Ipse Dixit Discussion.

requirement that the expense associated with these unvested options should also have been reversed when it became clear that the options would not vest due to the underlying performance conditions failing to occur.[367]  They argue that correcting for these alleged IFRS accounting errors (and a few other smaller errors that work in CIL's favor), the balance of the intercompany claims owed to CIL must be reduced by €10,147,528, exclusive of interest.

CEVA Group did not discover the accounting error until just prior to the Restructuring.[368]  As the dollar amounts were comparatively small relative to CEVA Group's nearly €3 billion in debt owed to outside creditors, CEVA Group could not devote the necessary resources to determine the exact amount and magnitude of the errors relating to the stock option recharge expenses.[369]  CEVA Group simply indicated that the claim amount was "disputed" and chose to perform the particular calculations at a later time.[370]

The Trustee contends that there are two flaws with the CEVA Defendants' assertion that CEVA Group failed to properly account for the stock option recharge expenses.  He contends that the argument that "[a]ll tranches required that the employee remains employed at CEVA Group in order to vest" is refuted by the language of the vesting agreements, which state that vesting rights were service- and performance-based and did not require continued employment.[371]  However, this

---

[367] McDougal Decl. ¶ 52; CD SMF ¶ 180; CD Reply to Trustee Resp. SMF ¶ 180; CD SMF, Ex. T (Taub Report) ¶¶ 63–69.  The Trustee's objection to CD SMF ¶¶ 178–79 is overruled because the document on which he relies does not support his position.  Trustee's objection is also overruled to the extent it relies on the *ipse dixit* argument.  *See supra*, Ipse Dixit Discussion.

[368] CD SMF ¶ 183.

[369] McDougal Decl. ¶ 54; CD SMF ¶¶ 183, 185; CD Reply to Trustee Resp. SMF ¶¶ 183, 185; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 28:3–13, 29:20–32:5, 51:23–24:24.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[370] McDougal Decl. ¶ 54; CD SMF ¶ 186.  Trustee's objection overruled.  *See supra*, Ipse Dixit Discussion.

[371] Trustee Opp'n to CD MOL at 65.

position directly contradicts Mr. McDougal's testimony that continued employment was required for vesting.[372]  Moreover, the record reflects that the three tranches of stock options are service-based, and both the CEVA Defendants' and the Trustee's IFRS expert agreed that continued employment was a vesting requirement.[373]

Second, the Trustee maintains that contrary to the CEVA Defendants' assertion, IFRS requirements do not state that an award is forfeited, with the associated expense reversed, if that award does not vest.  He contends that the IFRS addresses the treatment of vesting conditions, but does not address how a *failure* of vesting conditions for stock options should be accounted for between parent and subsidiary corporations.[374]  He maintains that CEVA accounted for employee stock options at the fair value as of the grant date for employee services received, with no subsequent adjustment to reflect any nonmarket service and performance conditions.[375]  As such, CEVA's method of accounting for unvested employee stock options did not violate the IFRS.[376] As support, he notes that PwC accountants audited CEVA's accounts in 2006 and 2007 and accepted CEVA Finance's accounting of employee stock options.[377]  Thus, he says that the alleged disputes regarding accounting for the CIL Cash are neither legitimate nor bona fide.

---

[372] McDougal Decl. ¶ 50 ("All tranches required that the employee remained employed at CEVA in order to vest.").

[373] Trustee-CD Counter SMF ¶ 154; CD SMF, Ex. T (Taub Report) ¶¶ 20; 22; CD SMF, Ex. U (Brice Report) ¶ 1.2.1, Appendix 1.2; CD SMF, Ex. SS (Brice Dep. Tr.) at 61:11–15; 62:8–16.

[374] Trustee Opp'n to CD MOL at 66.

[375] Trustee Opp'n to CD MOL at 66.

[376] Trustee Opp'n to CD MOL at 66 (citing Beskin-CD Decl., Ex. 95 (Rebuttal Report of Steven Brice) at 5, ¶ 1.4.2(b)).

[377] *See* Beskin-CD Decl., Ex. 2 (CIL Special Purpose Consolidated Financial Statements 2006) at ML_04472–73; *see also* Beskin-CD Decl., Ex. 95 (Rebuttal Report of Steven Brice) at 5, ¶ 1.4.3.

Fundamentally, the record reflects that the recharge expense issue is a highly technical one that has long been in dispute. CIL was aware that CEVA Group was concerned about this issue in March 2013.[378] Mr. Beith testified during his deposition that, at the time of the Restructuring, CEVA Group had objected to both the total amount of the CIL Cash, as well as specific components thereof, including how those components had built up over time and whether they were appropriate.[379] All of the witnesses with knowledge of this issue have testified that CEVA Group disputed that the intercompany claim was due during negotiations over the Restructuring. The Restructuring offering documents themselves repeatedly and consistently stated that the intercompany claim was disputed.[380]

There is no clear resolution to the dispute. Both parties retained experts on IFRS accounting, and each expert submitted expert reports and sat for a full day of depositions.[381] The

---

[378] CD SMF ¶ 184; CD Reply to Trustee Resp. SMF ¶ 184; CD SMF, Ex. HH (March 25, 2013 Beith email). The Trustee's objection is overruled because the statement is not offered for the truth of the matter asserted, and the evidence contains facts that are expected to be the subject of witness testimony.

[379] CD SMF, Ex. M (Beith Tr.) at 167:1–170:16. The CEVA Group has disputed the CIL Cash Claim since prior to the 2013 Restructuring and throughout this lawsuit. *See* CD SMF, Ex. M (Beith Tr.) at 167:1–170:16 (CEVA Group disputed the entire amount and also objected to specific items within that total amount); CD SMF, Ex. O (Jupiter Tr.) at 274:21–25 (CEVA Group disputed the claim); CD SMF, Ex. Q (Parker Tr.) at 111:25–112:9 (it was a "massive mistake" that the intercompany was listed as a payable on CEVA Group's financial statements); CD SMF, Ex. R (Ricotta Tr.) at 67:20–68:2 (CEVA Group disputed the entire amount and also objected to specific items within that total amount), 69:5–20 (CEVA Group took the position that the cash that had been deposited with CEVA Group constituted an account receivable and was not just being held in trust or a bailment); CD SMF, Ex. G (Schlanger Tr.) at 308:8–18 (there were concerns and questions about the accounting that led to the booking of the cash as a payable that needed to be sorted out by the accountants and the auditors); and CD SMF, Ex. S (Turner Tr.) at 173:22–174:14 (CEVA Group rejected that the intercompany claim ever existed and rejected that it was a valid claim).

[380] *See* Schlanger Decl., Ex. 5 (Offering Memorandum) at iii, 43, 53, 147 ("CEVA vigorously disputes this assertion (as to both validity and amount), and believes that, for a variety of reasons, CIL is entitled to receive no value on account of the CIL Intercompany Claim"), Schlanger Decl., Ex. 6 (Report to Bondholders) at 12 (same). The Court finds no merit to the Trustee's contention that the CEVA Defendants never disputed the Intercompany Claim until the close of the Restructuring on May 2, 2013. *See* Trustee Opp'n to CD MOL at 62 (claiming that the Report to Bondholders acknowledged that the Intercompany Claim was payable to CIL and that the CEVA Defendants did not disclose the dispute until filing their 2012 Annual Report on May 2, 2013).

[381] The CEVA Defendants retained Scott Taub, a managing director at Financial Reporting Services. He is a former Arthur Anderson partner and former acting Chief Accountant for the Securities Exchange Commission who served for six years as a member of the IRRS Interpretations Committee. He submitted an expert report. *See* CD

experts agree that, under IFRS and CEVA Group's internal accounting policy, the underlying CEVA Group expenses must be reduced based upon so-called "forfeitures"—i.e., the failure of stock options issued to any one or more CEVA Group employees to vest.[382]    It is undisputed that CEVA Group never did so.[383]    The parties and their experts disagree, however, as to whether the corresponding recharge payment made by the CEVA Group to CIL must also be reduced accordingly.[384]    The Trustee's expert believes that the recharge payment need not be updated.    The CEVA Defendants contend that the recharge payment must be reduced, and that their position is justified under the IFRS.    They also maintain that the position is in direct violation of the clear and unequivocal language in the CEVA Group accounting manual directing that the recharge payment exactly offset the recharge expense.[385]    The CEVA Defendants assert that any other result would be absurd, leading to CEVA Group paying CIL more than the value of the stock option expenses granted to its employees.    They assert that is the precise scenario the Trustee advocates.[386]

---

SMF, Ex. T (Taub Report).    The Trustee retained Steven Brice, a partner at Mazars LLP.    He submitted an expert rebuttal report.    *See* CD SMF, Ex. U (Brice Report).    There are no challenges to the qualifications of the experts.

[382] The Trustee's expert Steven Brice agrees with this conclusion.    *See* CD SMF, Ex SS (Brice Dep. Tr.) at 63:9–64:21; CD SMF, Ex. U (Brice Report) ¶ 3.4.2; *see also* McDougal Decl. ¶ 52; CD SMF ¶ 176; CD SMF, Ex T (Taub Report) ¶¶ 29–42.

[383] McDougal Decl. ¶ 52; CD SMF ¶¶ 177–81; CD SMF, Ex. P (McDougal 30(b)(6) Tr.) at 28:20–29:4, 43:3–16, 45:6–24, 47:19–49:12; CD SMF, Ex. T (Taub Report) ¶¶ 56–69.    The Trustee's objection to CD SMF ¶¶ 177-81 is overruled because the document on which he relies does not support his position.    Trustee's objection is also overruled to the extent it relies on the *ipse dixit* argument.    *See supra*, Ipse Dixit Discussion.

[384] *Compare* CD SMF, Ex. T (Taub Report) ¶¶ 45–50 *with* CD SMF, Ex. U (Brice Report) § 4.

[385] *See* CD SMF, Ex. T (Taub Report) ¶¶ 45–50; McDougal Decl. ¶ 53; McDougal Decl., Ex. 38 (CEVA Group Internal Accounting Policy) § 10.4.8 at 20.

[386] They also contend that there is no merit to the Trustee's assertion that PricewaterhouseCoopers ("PwC") "accepted CEVA Finance's accounting of employee stock options." Trustee Opp'n to CD MOL. at 66.    They say this claim is totally unsupported. The only evidence the Trustee cites in support of it is (i) a statement that PwC audited CIL's 2006 financial statement and (ii) a statement from his expert noting that PwC audited CIL's financial statements. The fact that PwC (which was not the subject of discovery in this action) audited CIL's financial statements is not particularly probative given that no one disputes that CIL's accounting policy was correct; the issue that gives rise to the instant dispute is the improper *implementation* of that policy, and there is no evidence whatsoever that PwC reviewed and signed off on CIL or CEVA Group's stock option accounting.

The Court's role in deciding whether to dismiss the turnover claim does not call for it to weigh into the "battle of the experts" on the proper treatment of the recharge expenses. Its role is only to decide whether there is a bona fide dispute, and there plainly is. In particular, the Court finds that there are bona fide disputes as to (i) whether CEVA Group correctly accounted for employee purchases of stock, and (ii) whether CEVA Group improperly failed to account for stock option awards to employees that did not vest, each of which affects calculation of the CIL Cash.[387] Because a bona fide dispute exists as to whether some or all of the CIL Cash is property of the estate, the CEVA Defendants are entitled to summary judgment dismissing the Trustee's claim for turnover. *See In re CIS Corp.*, 172 B.R. at 760 (determining that a trustee cannot state a claim for turnover of property whose ownership is subject to a legitimate dispute); *In re Lexington Healthcare Grp.*, 363 B.R. at 717 ("Because a dispute exists about whether the security deposit is property of the estate, this Court concludes that the Trustee cannot state a claim for turnover."); *In re Welded Constr., L.P.*, 609 B.R. at 126 ("[B]ecause the ownership of the funds in question is subject to a bona fide dispute, the action for turnover is simply premature and thus is dismissed.").

Accordingly, the Court grants the CEVA Defendants' motion for summary judgment on Count 13 and dismisses the Trustee's claim for turnover.

---

[387] As discussed above, the Court rejects the CEVA Defendants' alternative argument that the rights of setoff purportedly established by the Reimbursement Agreements support a dispute as to the calculation of the CIL Cash.

## The Turner Motion

### The Count 7 Dispute

The Trustee says that the Directors owed fiduciary duties to CIL and that those duties also ran to CIL's creditors because CIL was insolvent, near-insolvent, of doubtful solvency, or because the contemplated CEVA Equity Transfer would jeopardize CIL's solvency.[388]

He contends that the Directors were under a strict duty to avoid situations where their duties to CIL and its creditors were in potential conflict with their own interests or their duties to others.[389] He says that they breached that duty because:

(i) The Directors were employees of Apollo, and they had an actual conflict between their duties to CIL and CIL's creditors and their interest in or duty to Apollo.[390]

(ii) The Directors' personal assets were invested in one or more Apollo funds that were creditors of CEVA Group and participated in the Restructuring and, therefore, the Directors personally benefitted from the Restructuring and had an actual conflict between their duties to CIL, CIL's creditors, and their own personal financial interests.[391]

The Trustee asserts that because CIL is unable to repay the PIK Notes, the Directors knew or should have known that they would be subject to investigation and obvious targets of claims by liquidators. He says that it follows that their duty to CIL and its creditors was in conflict with their

---

[388] SAC ¶¶ 226–27.  The Trustee asserts that the Directors' fiduciary duties included a duty of loyalty and fidelity, a duty to act in CIL's best interests, and a duty to avoid situations in which the Director had an interest which conflicts, or which might conflict, with the Director's duties to CIL.  SAC ¶ 226.  He also says that each Director was bound to exercise his powers as a Director only for the purposes for which they were conferred and not for any improper or collateral purpose, to disclose personal interests in contracts and transactions involving CIL, and not to misapply or cause to be misapplied any assets or property of CIL.  SAC ¶ 226.

[389] SAC ¶ 228.

[390] SAC ¶ 229.  The Trustee contends that Apollo had a direct financial interest in the recapitalization or reorganization of CEVA Group and in the Restructuring because Apollo-related entities were creditors of CEVA Group and were able to participate in the Restructuring. SAC ¶ 229.

[391] SAC ¶ 230.

interest in protecting themselves against claims.[392]  The Trustee argues that the Directors failed to relieve their conflicts of interest, and that each Director breached his fiduciary duties to CIL by allowing himself to be placed into, and remain in, a position of conflict.[393]  Moreover, he says that the Directors acted dishonestly, that each Director expressly or impliedly authorized the misconduct of the other, and that each Defendant had notice that the Directors were in breach of their duties to CIL at the time the Restructuring was formulated, prepared, authorized, and performed.[394]

The Trustee seeks two forms of relief against the Directors.  He asserts that by reason of the Directors' conflicts and the Defendants' knowledge of such conflicts and dishonest conduct, all losses occasioned to CIL by the Restructuring and any other actions of the Directors relating thereto are recoverable from each of the Directors, including, without limitation, the value of CIL's ownership of CEVA Group's shares that was lost through the Restructuring.[395]  He seeks entry of a judgment for damages against the Directors in an amount to be proved at trial, including the value of CIL's ownership of 100% of CEVA Group, the CIL Cash, and punitive damages.[396]  The Trustee also seeks a declaration that by reason of Directors' conflicts and the Defendants'

---

[392] SAC ¶ 231.

[393] SAC ¶ 232.  He alleges that the Directors repeatedly put their own personal interests and the interests of Apollo and CEVA Holdings ahead of the interests of CIL and CIL's creditors; breached their duties of loyalty and fidelity to CIL and CIL's creditors; acted other than in the *bona fide* best interests of CIL and CIL's creditors; failed to avoid situations in which their interests did conflict or might have conflicted with their duties to CIL and CIL's creditors; exercised their powers as Directors for improper purposes; failed to disclose all personal interests in contracts and transactions involving CIL; and misapplied, or caused to be misapplied, the assets or property of CIL.  SAC ¶ 233.

[394] SAC ¶¶ 234, 235.

[395] SAC ¶ 237.

[396] SAC ¶¶ C, F, at 88.

knowledge of such conflicts, CIL's authorization of and participation in the Restructuring is void.[397]

Mr. Turner contends that the Court should grant summary judgment dismissing Count 7 because the Trustee is barred from maintaining a breach of fiduciary duty claim against the Directors based on their alleged conflicts of interest and from avoiding the Recapitalization (or any other part of the Restructuring) on that basis, because the Directors declared their interests in the manner prescribed by CIL's Articles of Association.[398]  In addition, he contends that because CIL was not injured by the Recapitalization, the Trustee is not entitled to recover damages or equitable compensation under Cayman Islands law,[399] nor, under Cayman Islands law, is he entitled to recover punitive damages.[400]  Finally, he argues that having accepted the benefits of the CIL RSA and having failed to timely repudiate it, the Trustee is barred from rescinding the CIL RSA and thus, cannot avoid any step of the Restructuring.[401]  The Trustee denies those contentions.

The Court considers these matters below.

## Choice of Law

As a preliminary matter, the Court must determine which law applies to Count 7.  "Absent any significant federal bankruptcy policy, a bankruptcy court applies the choice-of-law rules of the forum state." *In re Sears Holdings Corp.*, No. 18-23538, 2023 WL 3470475, at *4 n.3 (Bankr. S.D.N.Y. May 15, 2023) (citing *In re Tyson*, 433 B.R. 68, 97 (S.D.N.Y. 2010)); *see also Halperin*

---

[397] SAC ¶ 236.

[398] Turner MOL at 27–32.

[399] Turner Reply MOL at 8.

[400] Turner MOL at 26.

[401] Turner MOL at 32–35.

*v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 692 (Bankr.

S.D.N.Y. 2022) ("Where no significant policy calling for the imposition of federal choice of law

rules exists, bankruptcy courts must apply the choice of law rules of the forum state, here the

choice of law rules of New York.").  The Court will apply New York's choice-of-law rules.

New York adheres to the internal affairs doctrine.  *Marcus v. Lincolnshire Mgmt., Inc.*, 409

F. Supp. 2d 474, 481 (S.D.N.Y. 2006).  "Under the New York choice of law rules, the internal

affairs of a corporation are governed by the law of the state of incorporation."  *Hilton Head*

*Holdings b.v. v. Peck*, No. 11-cv-7768, 2012 WL 613729, at *6 (S.D.N.Y. Feb. 23, 2012).  A

corporation's "internal affairs" are "matters peculiar to the relationships among or between the

corporation and its current officers, directors, and shareholders."  *Edgar v. MITE Corp.*, 457 U.S.

624, 645 (1982).  "The internal affairs doctrine is a conflict of laws principle which recognizes

that only one State should have the authority to regulate a corporation's internal affairs . . . because

otherwise a corporation could be faced with conflicting demands."  *Id.*; *see also Tyco Int'l, Ltd. v.*

*Kozlowski*, 756 F. Supp. 2d 553, 560 (S.D.N.Y. 2010) ("The internal affairs doctrine posits that a

state has an interest in applying its laws uniformly to issues relating to 'the organic structure or

internal administration of a corporation' incorporated in that state." (quoting Restatement (Second)

of Conflict of Laws § 309 cmt. C (Am. L. Inst. 1971))).  "Under the generally-recognized choice-

of-law rule, questions relating to the internal affairs of corporations are decided in accordance with

the law of the place of incorporation."  *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81

F.3d 1224, 1234 (2d Cir. 1996).

The parties agree, and the Court finds, that in applying that doctrine, Cayman Islands law

governs the breach of fiduciary duty claim against Mr. Turner.  *See Marino v. Grupo Mundial*

*Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) ("New York applies the internal affairs

doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims.").

In support of their respective arguments regarding the application of Cayman Islands law, the Trustee and Mr. Turner rely on the declaration testimony of Mr. Marc Kish[402] and Lord Peter J. Millett,[403] respectively.[404]   "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1;[405] *see also Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) ("Determination of a foreign country's law is an issue of law."); *Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.*, 108 F. Supp. 2d 349, 351 n.2 (S.D.N.Y. 2000) ("Under Fed.R.Civ.P. 44.1, questions of foreign law are questions of law, not fact, and [a court] may consider any relevant evidence of foreign law, whether or not it comports with the Federal Rules of Evidence."), *aff'd sub nom. Ecoban Fin. Ltd. v. Altos Hornos de Mexico, S.A. de C.V.*, 2 F. App'x 80 (2d Cir. 2001) (summary order).  Since determining foreign law is a matter of law for the Court to resolve, "[d]isagreement among legal experts on content, applicability, or

---

[402] *See Kish Declaration*, ECF No. 203.  Mr. Kish is a partner at the law firm Ogier, Head of Insolvency for the Caribbean and Asia regions, and is based in the firm's Cayman Islands office.  Kish Decl. ¶ 2.  He earned degrees from Oxford University, completed the Legal Practice Course at the College of Law in London, and was admitted to the Bar in England and Wales in 2003 and to the Bar in the Cayman Islands in 2008, where he has practiced continuously since.  *Id.* ¶¶ 3–4.

[403] *See Millett Declaration*, ECF No. 147; *Millett Reply Declaration*, ECF No. 208.  Lord Millett was called to the Bar of England and Wales in 1958 and practiced as a barrister from 1958 to 1986.  Millett Decl. ¶ 3.1.  He served as a Judge of the High Court of Justice, Chancery Division from 1986 to 1994, and was appointed to the English Court of Appeal in 1994.  *Id.* ¶¶ 3.2–3.3.  From 1998 to 2004, Lord Millett served as a member of the Appellate Committee of the House of Lords and on the Judicial Committee of the Privy Council, in addition to serving as a non-permanent member of the Court of Final Appeal in Hong Kong from 2000 to 2017.  *Id.* ¶¶ 3.4–3.5.

[404] There are no challenges to the experts' qualifications.

[405] Federal Rule of Civil Procedure 44.1 is made applicable in this Adversary Proceeding by Bankruptcy Rule 9017.

interpretation of foreign law . . . does not create genuine issues of material fact." *Petersen Energia Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739, 2023 WL 2746022, at *4 (S.D.N.Y. Mar. 31, 2023) (quoting *Rutgerswerke AG v. Abex Corp.*, No. 93-cv-2914, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2020)).   Accordingly, the Court may resolve the parties' disputes on issues of Cayman Islands law.  *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, No. 21-11255, 2023 WL 2603865, at *5 (Bankr. S.D.N.Y. Mar. 15, 2023) (noting that "disputed issues of foreign law may properly be resolved at the summary judgment stage"). When considering such foreign law expert declarations, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed."  *Itar-Tass Russian News*, 153 F.3d at 92; *see also Faggionato v. Lerner*, 500 F. Supp. 2d 237, 244–48 (S.D.N.Y. 2007) (accepting the conclusions of one of two opposing French law experts because it is the "'persuasive force of the opinions' expressed that is conclusive under Rule 44.1" (quoting *Itar-Tass Russian News*, 153 F.3d at 92)); *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 300 (Bankr. S.D.N.Y. 2018) (same).  A "court may reject even uncontradicted expert testimony and reach its own decisions on the basis of [an] independent examination of foreign legal authorities."  *Guidi v. Inter-Continental Hotels Corp.*, No. 95-cv-9006, 2003 WL 1907901, at *2 (S.D.N.Y. Apr. 16, 2003) (quoting *Rutgerswerke*, 2002 WL 1203836, at *16).

**Duties of Directors**

The CIL RSA documented CIL's role in the Restructuring, and the consideration it and the PIK Noteholders would receive thereunder.[406]  The CIL RSA required CIL to take certain steps to authorize the Recapitalization, which would support the proposed exchange offers.   In particular,

---

[406] The executed CIL RSA is annexed as Exhibit 21 to the Levi Declaration.  *See* Levi Decl., Ex. 21 (the executed CIL RSA); Turner SMF ¶ 26.

it obligated CIL to appoint a corporate representative to attend a meeting of CEVA Group shareholders, at which he or she would approve shareholder resolutions authorizing CEVA Group to (i) immediately amend CEVA Group's memorandum of association (and other corporate documents) "to allow CEVA [Group] to alter its authorized share capital and share classes in order to effect the Recapitalization;" and (ii) issue new ordinary shares to CEVA Holdings.[407]  The CIL RSA also required CIL (i) to cause Louis Cayman to vote its one share in CEVA Group in favor of the shareholder resolutions authorizing CEVA Group to amend its memorandum of association and issue new CEVA Group shares to CEVA Holdings;[408] and (ii) to commence a liquidation proceeding in the Grand Court of the Cayman Islands.[409]

At the April 1, 2013 CIL board meeting (the "April 1, 2013 Board Meeting"), Messrs. Turner and Beith, as CIL's only directors, voted to appoint a corporate representative to attend the CEVA shareholders meeting and approve shareholder resolutions that authorized CEVA to amend its corporate documents to cause the Recapitalization.  Mr. Turner and Mr. Beith were also both employed by Apollo while serving as the sole two Directors on the CIL board.[410]  Both Directors likewise had personal assets invested in Apollo funds that owned CEVA debt and securities during their time on the CIL board.[411]  The Trustee maintains that the Directors were conflicted and that the actions they took at the April 1 meeting violated their fiduciary duties to act in good faith in the interests of CIL.

---

[407] CIL RSA §§ 2(c), 3(a); Turner SMF ¶ 27.

[408] CIL RSA § 3(b); Turner SMF ¶ 28.

[409] CIL RSA §§ 2(g), 3(d); Turner SMF ¶ 29.

[410] Trustee-Turner Counter SMF ¶ 5.

[411] Trustee-Turner Counter SMF ¶ 5.

The experts agree that under Cayman Islands law, a director of a Cayman Islands company owes fiduciary duties only to the company on whose board he or she sits—not to its shareholders or creditors.[412]  They also agree that a solvent company's "best interests" are usually the same as its shareholders',[413] and when a Cayman Islands company is insolvent or nearly so, its best interests usually equate to those of its creditors.[414]  This means that when a company is insolvent or nearly so, its directors' duties to act in the best interests of the company mean acting for the best interests of its creditors.[415]  They concur that Cayman Islands law imposes a common law duty upon directors to avoid conflicts between their duties to their company and their personal interests, and that the company may avoid a transaction that is approved by a conflicted director.[416]

CIL's governing documents consist of an Amended and Restated Memorandum of Association of CEVA Investments Limited, adopted as of February 21, 2007,[417] and an accompanying Amended and Restated Articles of Association of CEVA Investments Limited, adopted as of February 21, 2007 (the "CIL Articles of Association").[418]  Among other things, the CIL Articles of Association set forth the powers and duties of directors of CIL, and prescribe rules and procedures for board meetings and voting by directors.[419]  Mr. Turner maintains that by

---

[412] Millett Decl. ¶¶ 11–12; Kish Decl. ¶ 13.

[413] Millett Decl. ¶ 13.1; Kish Decl. ¶ 14.

[414] Millett Decl. ¶ 13.1; Kish Decl. ¶ 14.

[415] Millett Decl. ¶¶ 13.2, 20; Kish Decl. ¶¶ 14–15.

[416] Millett Decl. ¶ 25; Kish Decl. ¶ 16.

[417] *See* Levi Decl., Ex. 7 at Apollo_2004_00021350–51.

[418] The CIL Articles of Association are annexed as part of Exhibit 7 to the Levi Declaration.  *See* Levi Decl., Ex. 7 at Apollo_2004_00021354–72 (the "CIL Articles of Association"); Turner SMF ¶ 6.

[419] *See* CIL Articles of Association, arts. 74–110 (at Apollo_2004_00021363–68); Turner SMF ¶ 7.

application of Articles 100[420] and 101[421] of the CIL Articles of Association, together with the Cayman Islands law, the Trustee is precluded from maintaining a breach of fiduciary duty claim against him predicated on alleged conflicts of interest or duty, and from avoiding the Recapitalization or any other part of the Restructuring on that basis.[422]

Article 100 requires a director "who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company" to declare the nature of his or her interest at a meeting of the directors.[423] Under Article 100, a director may fulfill his or her duty of disclosure—and thus vote on a transaction in which he or she is in a position of conflict—by providing a "general notice" to the board "to the effect that he [or she] is a member of any specified

---

[420] *See* CIL Articles of Association, art. 100 (at Apollo_2004_00021366–67) ("Article 100"); Turner SMF ¶ 8. Article 100 states as follows:

> A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Board of Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

[421] *See* CIL Articles of Association, art. 101 (at Apollo_2004_00021367) ("Article 101"); Turner SMF ¶ 8. Article 101 states as follows:

> A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

[422] Turner MOL at 30.

[423] *See* Article 100.

company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm."[424]  After making the applicable disclosure, a director is authorized to vote in respect of any transaction "notwithstanding that he [or she] may be interested therein," have his or her vote counted, and be considered towards a quorum.[425]  By application of Article 101, when the disclosure called for under Article 100 is made, "[no] such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, [shall] be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised . . . ."[426]

Articles 100 and 101 are valid and enforceable as a matter of Cayman Islands law.[427] Together, the effect of Articles 100 and 101 is to authorize CIL's directors, upon providing the "general notice" prescribed by Article 100, to approve a transaction in which they are in a position of conflict (or potential conflict), without the conflict resulting in either CIL being able to unwind the transaction, or the directors being liable for breach of fiduciary duty.[428]

The minutes of the April 1, 2013 Board Meeting (the "April 1, 2013 Board Minutes") reflect that before the CIL board passed the board resolutions at issue, Mr. Turner declared that (i) he was a director and shareholder in several companies associated with Apollo, and (ii) he identified those companies in a written document appended as Schedule 1 to the April 1, 2013

---

[424] *Id.*

[425] *Id.*

[426] *See* Article 101.

[427] Millett Decl. ¶ 26.

[428] Millett Decl. ¶ 27.

Board Minutes.[429]   At that meeting, before passing the board resolutions at issue, Mr. Beith

declared that (i) he held interests in and/or was a member of certain entities related to Apollo, and

(ii) provided a written list of those entities that was appended as Schedule 2 to the April 1, 2013

Board Minutes.[430]   Mr. Turner and Mr. Beith also disclosed that certain of the entities in which

they were interested were "creditors of CEVA [Group], and therefore able to participate in the

2013 Restructuring offer CEVA [Group] intends to present to certain of its creditors."[431]

Mr. Turner asserts that those undisputed facts show that the Directors made the disclosures

required by Article 100 at the April 1, 2013 Board Meeting before voting to cause CIL to enter

into the CIL RSA and appoint a corporate representative to attend and vote at a CEVA Group

shareholder meeting.  He contends that through these declarations, the Directors fully satisfied

their obligations under Article 100 of the CIL Articles of Association to give a "general notice . . .

to the effect that he [or she] is a member of any specified company or firm and is to be regarded

as interested in any contract which may thereafter be made with that company or firm."[432]  He says

that as a matter of Cayman Islands law, he cannot be held liable for breach of fiduciary duty based

on the allegation that he (or Mr. Beith) voted to cause CIL to enter into the CIL RSA (or passed

other board resolutions) while in a position of conflict and that no aspect of the Restructuring,

---

[429] The April 1, 2013 Board Minutes are annexed as Exhibit 20 to the Levi Declaration.  *See* Levi Decl., Ex. 20 at ML_01631.  *See* April 1, 2013 Board Minutes, Schedule 1 at ML_02017–18; Turner SMF ¶ 37.  Trustee's objection overruled.  *See supra*, Turner Inaccurate/Incomplete Discussion.

[430] April 1, 2013 Board Minutes, Schedule 2 at ML_02020; Turner SMF ¶ 38.  Trustee's objection overruled.  *See supra*, Turner Inaccurate/Incomplete Discussion.

[431] April 1, 2013 Board Minutes, Schedule 1 at ML_02018, Schedule 2 at ML_02020; Turner SMF ¶ 39.  Trustee's objection overruled.  *See supra*, Turner Inaccurate/Incomplete Discussion.

[432] *See* Article 100.

126

including the Recapitalization, can be undone on that basis.[433]  He argues that the Court should grant him summary judgment dismissing Count 7.

The Trustee says Mr. Turner's argument fails because (i) the conflict notice that Mr. Turner provided was deficient under the standards required by CIL's Articles of Association; (ii) even if the notice had been sufficient, the CIL board was entirely conflicted and, as such, not competent under Cayman Islands law to accept such a notice; and (iii) even if the notice was sufficient and properly accepted, Mr. Turner nonetheless violated his fiduciary duty to act in good faith in the interests of CIL.[434]  The Court considers those matters below.

### *Whether Turner's Notice of His Conflict Was Deficient*

The Trustee contends that Mr. Turner's notice to the CIL board of his conflicts was deficient because he did not properly disclose his interest as an employee of Apollo and as a shareholder directly affected by Apollo's economic performance.[435]  He contends that having failed to fulfill the obligations of the CIL Articles of Association, under Cayman Islands law, Mr. Turner, a conflicted Director, could not cast an effective vote regarding the Restructuring.[436] Effectively, the Trustee contends that Article 100 of the CIL Articles of Association mandates that Directors disclose every type of interest they held in Apollo-related entities involved in the Restructuring, including employment.   The Trustee cites no authority for this interpretation, and in his declaration, Mr. Kish did not speak to that issue.

---

[433] Turner MOL 30–31.

[434] Trustee Opp'n to Turner MOL at 25.

[435] Trustee-Turner Counter SMF ¶ 5; Ex. 39 (Mar. 15, 2013 email from C. Russell of Appleby to P. Ricotta of Mintz Levin) at -00010651–52.

[436] *See* Kish Decl. ¶¶ 22–23.

Mr. Turner contends that the plain language of Article 100 belies that argument. Article 100 provides that directors must disclose a conflict when they are "interested in a contract or proposed contract." In such a case, the directors must "declare the nature of their interest." Lord Millett opined that, "[t]aken in isolation, these words would be apt to require a separate declaration of CIL's directors' status as employees of Apollo entities . . . [because] the interests/duties of an employee are *prima facie* different in character from those of a director and/or shareholder . . . ."[437] However, the Directors were not required to make such a declaration. As Lord Millett noted, "the second sentence of the Article then specifies the form of disclosure which will be deemed a sufficient declaration of interest in respect of any relevant contract."[438] Specifically, the second sentence of Article 100 provides, "[a] general notice given to the Board of Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made."[439] Therefore, Article 100 "modifies the position from that which it would be under the general law, by stipulating that a general notification that a director is a member—i.e., a shareholder—of a counterparty shall be deemed to be sufficient notice of any interest in a contract with that counterparty."[440] Article 100 goes no further in requiring that such a "general notice" needs to include a disclosure that a director is an "employee" to satisfy the disclosure requirements. Accordingly, "provided the directors of CIL gave a general notice that they were members . . . of a counterparty, as provided in the second sentence of Article 100, they would, as a matter of Cayman Islands law, have given

---

[437] Millett Reply Decl. ¶ 10.2.

[438] Millett Reply Decl. ¶ 10.3.

[439] Turner SMF ¶ 8; *see also* Article 100.

[440] Millett Reply Decl. ¶ 10.4.

sufficient disclosure to preclude any action against them for breach of the 'no conflict' duty, and for avoidance of the transaction they approved. No further disclosure of specific interests was required."[441]

The Trustee disagrees with Mr. Turner and Lord Millett's interpretation of Article 100. The Court understands the Trustee to read the second sentence of Article 100 as a free-standing provision that requires a member of CIL's board to disclose a membership interest separate from whatever disclosure might be required by the first sentence.[442] At the hearing, the Trustee argued that "the second sentence [in Article 100] only relates to a disclosure as to membership."[443] The Trustee's position seems to be that if the Court were to accept Mr. Turner and Lord Millett's interpretation of Article 100, an absurd outcome would result: one who is not a member of CIL could satisfy Article 100's disclosure obligations by inaccurately declaring oneself a member.[444]

---

[441] Millett Reply Decl. ¶ 10.5.

[442] The Trustee also disputes Lord Millett's expert testimony because he was "not sure that [the Cayman Islands legal experts] reviewed any [of the disclosure] documents at all. Given that they're opining on Cayman law, I'm not sure that either expert actually saw the documents here, so they're sort of opining on what a general disclosure might have said, as opposed to what this general disclosure said." Sept. 26 Hr'g Tr. at 136:1–6. However, whether the experts reviewed the disclosures at issue is immaterial to the analysis of their propriety. It is the Court's function to determine whether the Directors' disclosures were sufficient under the CIL Articles of Association.

[443] Sept. 26 Hr'g Tr. at 136:19–20.

[444] The Trustee offered two hypotheticals to illustrate this point, as follows:

> [W]hen E&Y was first retained, it was actually contemplated that they would become independent directors—they would have had to disclose the nature of their interest, which is they audit . . . Apollo entities. . . . It has nothing to do with membership. It would be truly bizarre if what that sentence is supposed to mean is if E&Y said, I'm a member of this entity, then I'm interested. But they're not in any way a member.

Sept. 26 Hr'g Tr. at 136:21–137:6.

> Similarly, let's suppose that the husband of a principal of Apollo was added to the board of CIL. They would have to disclose . . . the nature of their interest. The nature of their interest is that they're an immediate family member of someone who stands to benefit from the transaction. It's not that they themselves are a member, and it would be bizarre if the second sentence, which only discusses a disclosure about a member interest, somehow said that you don't need to actually say, I'm the wife, and it's sufficient to say, I'm a member.

Sept. 26 Hr'g Tr. at 137:8–17.

The Court finds no merit to these contentions.  The Court finds that Article 100 required only a general notice that Directors were members in a transaction with a counterparty to satisfy their disclosure obligations, and such a modification of their common law fiduciary duties is consonant with Cayman Islands law.

The record demonstrates that, at the April 1, 2013 Board Meeting, Mr. Turner disclosed that he was a director and shareholder in a number of companies associated with Apollo, which were identified in a list attached as Schedule 1 to the April 1, 2013 Board Minutes.[445]    That schedule shows that Mr. Turner disclosed, that in addition to his position as a director of CIL, he was a director and shareholder of various companies affiliated with Apollo Global Management, LLC ("AGM") and Apollo Management VI, L.P. ("Apollo Management VI"), including AGM and AP VI CEVA Holdings.

AGM and AP VI CEVA Holdings are two of the four Apollo Funds which agreed to support an exchange of €1.2 billion of CEVA Group debt for equity in CEVA Holdings. Specifically, AP VI CEVA Holdings is an intermediary which purchased the New CEVA Shares from CIL and then sold the New CEVA Shares to CEVA Holdings on May 2, 2013.[446]

---

[445] The Court disagrees that Mr. Turner and Lord Millett's interpretation of the first and second sentences of Article 100 supports those hypotheticals.  The second sentence of Article 100 merely says that it is "sufficient"—or read in its obvious context, discloses enough to meet the disclosure requirements of the first sentence—to declare that one is interested because one is a member of the specified company.  That does not mean, as the Trustee argues, that someone who is not a member could inaccurately say that they are a member and thereby satisfy their disclosure requirements under Article 100.  The only way such an interpretation could be possible is by ignoring the implied condition of the second sentence that one could provide a general notice that one is a member only if one is a member.  .

[445] April 1, 2013 Board Minutes, Schedule 1 at ML_02017–18; Turner SMF ¶ 37. Trustee's objection overruled. *See supra*, Turner Inaccurate/Incomplete Discussion.

[446] Trustee Resp. to Turner SMF ¶ 39 (citing Trustee-Turner Counter SMF ¶ 100; Ex. 55 (Apr. 16, 2013 Application for Shares) at -0040573; Trustee-Turner Counter SMF ¶101; Ex. 56 (Apr. 29, 2013 Meeting Minutes) at -0045967–68 (Transfer of Shares); Trustee-Turner Counter SMF ¶ 102; Ex. 58 (May 2, 2013 Share Purchase Agreement) at -0040582)).

The record also demonstrates that Mr. Beith disclosed at the April 1, 2013 Board Meeting that he held interests in or was a member of certain entities related to Apollo, which were set forth in a list attached as Schedule 2 to the April 1, 2013 Board Minutes.[447]   Schedule 2 shows that Mr. Beith disclosed, in addition to serving as director of CIL and Louis Cayman , that he was an investor/member or otherwise has an interest in multiple Apollo-related entities, including AGM and AP VI CEVA Holdings.[448]   The Directors also each declared that certain of the entities in which they were interested were "invested in AP VI CEVA Holdings, L.P., Autumnleaf LP and/or Autumnleaf S.a.r.l, each of which is a creditor in CEVA, and therefore able to participate in the restructuring offer CEVA intends to present to certain of its creditors "[449]

By disclosing that they were directors and held interests in companies associated with Apollo, as reflected by Schedule 1 and Schedule 2 to the April 1, 2013 Board Minutes, the Directors disclosed that they held membership interests in the Apollo-related entities.  By disclosing those direct interests in the form prescribed by the second sentence of Article 100, they put the CIL board on notice that they were "to be regarded as interested" in the transaction.  The Court finds that the Directors' notices satisfied the requirements of Article 100 of the CIL Articles of Association.

---

[447] April 1, 2013 Board Minutes, Schedule 2 at ML_02020; Turner SMF ¶ 38.  Trustee's objection overruled.  *See supra*, Turner Inaccurate/Incomplete Discussion.

[448] Trustee Resp. to Turner SMF ¶ 39.

[449] Trustee Resp. to Turner SMF ¶ 39; Trustee-Turner Counter SMF ¶ 100; Ex. 55 (Apr. 16, 2013 Application for Shares) at -0040573; Trustee-Turner Counter SMF ¶ 101; Ex. 56 (Apr. 29, 2013 Meeting Minutes) at -0045967–68 (Transfer of Shares); Trustee-Turner Counter SMF ¶ 102; Ex. 58 (May 2, 2013 Share Purchase Agreement) at -0040582.

The Trustee's responsive statement of facts thus demonstrates that it is *undisputed* that the Directors disclosed that AP VI CEVA Holdings is a creditor in CEVA.  Moreover, the Trustee disputes "any inference or legal conclusion that the CIL Directors['] statement was sufficient to insulate them from liability or prevent the avoidance of the 2013 Restructuring."  Trustee Resp. to Turner SMF ¶ 39.  In turn, there is no *factual* dispute which prevents the Court from finding that the Directors' disclosures were sufficient to satisfy Articles 100 and 101.

***Whether the Entirely Conflicted CIL Board Could Accept Mr. Turner's Disclosures***

In the time leading up to and during the Restructuring, CIL's only other director was Mr. Beith, and like Mr. Turner, Mr. Beith lacked independence because he was senior director at Apollo and had investments in Apollo. The Trustee asserts that because Mr. Beith was not independent, under Cayman Islands law, "the CIL Board was not competent to accept any disclosure as to Turner's conflicts" because both of the directors on CIL's board "lacked independence."[450] He does not reference either binding or persuasive authority as support for that contention, although he notes that a practice of appointing one or more independent directors to boards has developed in the Cayman Islands, which "guards against a perception of conflict arising [such] that [the director] has the potential to undermine the proper corporate governance of the company."[451] Instead, he contends that, in arguing to the contrary, Mr. Turner misplaces his reliance on *Neptune (Vehicle Washing Equip.) Ltd. v. Fitzgerald*, [1996] CH 274 (Eng.).

In *Neptune*, the English High Court held that a director could effectively disclose a conflict of interest, even if he or she was the sole director on a board. [1996] CH 274 at 281–84. Lord Millett relied on the decision in concluding that "a group of directors who all had an interest in a particular transaction could give proper disclosure of that interest to one another."[452] He opined that, "[b]y parity of reasoning, a group of directors who all had an interest in a particular transaction could give proper disclosure of that interest to one another." In reaching that conclusion, Lord Millett's "firm opinion" of *Neptune* was that "its analysis is correct as a matter of both English and

---

[450] Trustee Opp'n to Turner MOL at 27; *see also id.* at 28.

[451] Kish Decl. ¶ 18.

[452] Millett Decl. ¶ 28.

Cayman Islands law. Therefore, [he] consider[ed] it highly likely that the Cayman Islands Courts would adopt [*Neptune*'s] analysis."[453]

Mr. Kish and Lord Millett agree that an English High Court decision is persuasive authority on Cayman Islands law.[454] Still, the Trustee says that Lord Millet's conclusion that the English case law is "highly likely" to be accepted is insufficient grounds for accepting his opinion; he asserts that *Neptune* "has not been applied in the Cayman Islands."[455] While it may be true that *Neptune* has not been applied by a Cayman Islands court, as Mr. Kish conceded, there is "no reason to doubt that *Neptune* is good law in England and Wales, or that the principle for which it is authority in England might one day be accepted into Cayman Islands law."[456]

Despite the so-asserted "increasingly common practice" in the Cayman Islands of appointing independent directors to a board, apparently as inconsistent with the holding of *Neptune*, that observation does not defeat the argument.[457] Mr. Kish does not say that Cayman Islands law requires boards to have independent directors, or to appoint committees of independent directors for board decisions to be valid. Nor does he contend that *Neptune*'s acceptance in the Cayman Islands depends on this supposed emerging practice in the Cayman Islands. Moreover, Mr. Kish does not claim that it is currently uncommon for Cayman Islands boards to be composed entirely of conflicted directors, let alone that it was uncommon as of April 1, 2013, when the Directors voted to authorize the Recapitalization.[458]

---

[453] Millett Decl. ¶ 28.

[454] Millett Decl. ¶ 10; Kish Decl. ¶ 10.

[455] Trustee Opp'n to Turner MOL at 27–28.

[456] Kish Decl. ¶ 21.

[457] Kish Decl. ¶ 19.

[458] Kish Decl. ¶ 19.

Mr. Kish's reliance on local practice regarding conflicted boards does not address the key inquiry that the Court must make when determining what corporate practices Cayman Islands law permits: how Cayman Islands law would treat the transaction. Only Lord Millett has done so. Given *Neptune*'s persuasive value and its holding that a sole board member can fulfill disclosure requirements by making whatever disclosure that company's articles require to oneself, the Court expects that under Cayman Islands law, a company's two sole conflicted board members could likewise satisfy their disclosure requirements by making the disclosures to each other. For that reason, CIL's entirely conflicted board could accept the disclosures.

### *Whether Mr. Turner Acted in the Best Interest of CIL*

The experts agree, and the Court finds, that even if the CIL board could immunize itself for breach of fiduciary duties resulting from Mr. Turner's conflicts of interest, under Cayman Islands law, a director is still obligated to act in good faith in the best interests of the company after declaring a conflict.[459] A director's duties are not limited to avoiding conflicts. Under Cayman Islands law, where the subject company is insolvent, its best interests generally equate to those of its creditors.[460] Moreover, "the director of a solvent company may not disregard the interests of the creditors altogether; for example, he is under a duty not to exercise his discretion to enter into a transaction that he knows or suspects would render the company unable to pay its debts as they fall due."[461]

The Trustee contends that, the Trustee's assertions notwithstanding, his breach of fiduciary duty claim is not based solely on an undeclared conflict. The Trustee alleges that Mr. Turner

---

[459] Millett Decl. ¶ 27; Kish Decl. ¶ 17.

[460] Kish Decl. ¶ 15; Millett Decl. ¶ 13.1.

[461] Kish Decl. ¶ 14.

consented to the CEVA Equity Transfer based on insufficient and unverified information, including an E&Y Report that was manipulated and unreliable.[462]  He argues that even if Mr. Turner was immunized for breaches of fiduciary duty based upon his relationship with Apollo, under Cayman Islands law he would still be subject to a breach of fiduciary duty claim based on his failure to act in a manner that he believed to be in the best interest of CIL.[463]  He says that the Court should deny summary judgment because questions of fact remain as to Mr. Turner's good faith in acting in the best interests of CIL.[464]

Mr. Turner says that he is entitled to summary judgment dismissing Count 7 and that the Trustee's invocation of disputed facts regarding whether Mr. Turner acted in good faith as a bar to summary judgment "is a red herring."[465]  He contends that the Trustee's argument rests on his contention that Mr. Turner "consented to the CEVA Equity Transfer based on insufficient and unverified information," and that, if CIL's equity interest in CEVA Group was in fact worthless at the time of the Recapitalization, it would make no difference if Mr. Turner acted on "insufficient and unverified" information.[466]  He says that "[a]dditional information would have led to the same conclusion about the value of CEVA Group's equity."[467]  He also contends that the Trustee has not seriously advanced the position that, even if CIL suffered no harm through the Restructuring, Mr. Turner still breached his fiduciary duties by acting without enough information.[468]

---

[462] *See, e.g.*, SAC ¶¶ 125–26.

[463] Trustee Opp'n to Turner MOL at 28.

[464] Trustee Opp'n to Turner MOL at 29.

[465] Turner Reply MOL at 17 n.51.

[466] Turner Reply MOL at 17 n.51.

[467] Turner Reply MOL at 17 n.51.

[468] Turner Reply MOL at 17 n.51.

Mr. Turner's argument on summary judgment depends on the premise that CEVA Group was worthless at the time of the Recapitalization.  However, for reasons explained above, the Court cannot find that it was.  Moreover, Mr. Turner points to no record evidence demonstrating that his consent was the product of good faith.  And whatever inferences could be drawn about the circumstances behind his decision, "[c]ertainly, a party's good faith, which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment."  *Bear, Stearns Funding v. Interface Grp.-Nevada*, 361 F. Supp. 2d 283, 294 (S.D.N.Y. 2005) (quoting *Coan v. Est. of Chapin*, 549 N.Y.S.2d 16 (App. Div. 1989)).

Mr. Turner has not met his burden of "show[ing] that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56, with regard to whether he acted in the best interests of CIL in executing his fiduciary duties.  Accordingly, the Court denies his request for summary judgment dismissing the Trustee's breach of fiduciary duty claim against him.

## Remedies

### *Equitable Compensation*

The Trustee argues that even in the "absence of an actionable loss," Cayman Islands law would permit an equitable compensation remedy for breach of fiduciary duty.[469]  This is not so, at least in a way relevant to the Trustee's claims.

Under Cayman Islands law, equitable compensation is a remedy "to put a wronged party into the position he would have been in had the tainted transaction not been tainted or had been transacted properly.  Such an award is properly regarded as restitutionary or quasi-restitutionary

---

[469] Trustee Opp'n to Turner MOL at 24.

in nature, since rescission of a tainted transaction itself is generally regarded as a restitutionary or

quasi-restitutionary remedy . . . ."  *AB Jr. v. MB*, [2013] 1 C.I.L.R. 114 (Cayman Is.).

    The Trustee attributes his position that an actionable loss is not necessary for an equitable

compensation remedy to Mr. Kish.  Specifically, he refers to Mr. Kish's discussion of the Court

of Appeal for England and Wales's decision in *Interactive Technology Corp Ltd v. Ferster*.[470]  In

his declaration, Mr. Kish explains that *Interactive Technology* may be "instructive" and quotes an

excerpt of the decision, apparently to support the proposition that equitable compensation is not

limited to compensation for losses:

> Equitable compensation is apt to include a payment made to restore to a claimant
> the value of assets or funds removed without authority by a trustee or other
> fiduciary, such as a director.  It may also include reparation for losses suffered by
> the claimant, such as in this case any tax penalties and interest resulting from the
> payment of the unauthorised remuneration. But, it is not restricted to reparation for
> losses . . . .

Kish Declaration ¶ 38 (quoting *Interactive Tech. Corp. v. Ferster*, [2018] EWCA (Civ) 1594, ¶ 18

(Eng.)).  In apparent contradiction, Mr. Kish elsewhere explains that he "agree[s] with the views

of Lord Millett at paragraphs 29 to 32 of his declaration that actual loss must have been suffered

by a plaintiff before equitable compensation or damages are available for a breach of fiduciary

duty."  *Id.* ¶ 34.

    As Lord Millett explained, Cayman Islands law appears to support the proposition that an

actual loss is necessary for an equitable compensation remedy.  As Lord Millett explained, in the

"decision of the Cayman Islands Grand Court in *AB & Another v MB & Others* [2013] CILR 1,"

"[t]he analysis of equitable compensation by the parties, and by the court, all proceeded on the

---

[470] The Trustee incorrectly identifies the case as one decided in the Cayman Islands.

basis that equitable compensation would only be ordered if and to the extent that the existence of

a relevant loss could be established.  It stands as just one example of the Grand Court approaching

the issue of equitable compensation in the manner which I regard as being obviously correct . . . ."

Millett Declaration ¶ 32.

As *Interactive Technology* illustrates, the Trustee's position that an equitable compensation

remedy may be awarded in the absence of an "actionable loss" appears to be a misapplication of

*Interactive Technology*'s discussion of a particular type of equitable compensation.  There are two

types of equitable compensation that are meant to address different harms.  The first, sometimes

called "substitutive compensation" is where "trust property has been misapplied in an unauthorised

transaction, and the amount claimed is the objective value of the property which the trustees should

be able to produce."  *Interactive Tech. Corp. v. Ferster*, [2018] EWCA (Civ) 1594, ¶ 17 (Eng.)

(quoting David Hayton et al., *Underhill and Hayton: Law Relating to Trusts and Trustees* ¶ 87.11

(19th ed. 2016)).  The second, sometimes called "reparative compensation," is a remedy addressing

the circumstance where "trustees have carelessly mismanaged trust property, but they lie more

generally wherever a trustee has harmed his beneficiaries by committing a breach of duty."  *Id.*

To clarify this distinction, the court in *Interactive Technology* cited to a decision authored

by Lord Millett in *Libertarian Invs. Ltd v. Hall*, where he described the substitutive compensation

as "not compensation for loss but restitutionary or restorative" and "measured by the objective

value of the property lost determined at the date when the account is taken and with the full benefit

of hindsight."  *Id.* ¶ 19 (quoting *Libertarian Invs. Ltd. v. Hall*, [2014] 1 H.K.C. 368 ¶ 168 (H.K.)).

In contrast, reparative compensation is "akin to the payment of damages as compensation for loss."

*Id.* ¶ 20 (quoting *Libertarian Invs. Ltd. v. Hall*, [2014] 1 H.K.C. 368 ¶ 170 (H.K.)).  Thus, in

*Interactive Techology*, where a company sued its former director for causing it to make

138

14-02442-jlg    Doc 287    Filed 04/18/24    Entered 04/18/24 20:45:05    Main Document
Pg 139 of 150

unauthorized payments to him in excess of his salary, *id.* ¶¶ 1–2, the court of appeal held that the company could obtain equitable compensation from the director for the unauthorized payments, since to the extent the lower court's limitation on damages "necessarily referr[ed] to compensation for loss, as a result of the general meaning or ambit of that remedy, [it] was . . . wrong," *id.* ¶ 21.

As *Interactive Technology* makes clear, the Trustee is correct that a "loss" was not a prerequisite to an equitable compensation remedy in that case. Yet, it also makes clear that without a loss, a company would be entitled only to a remedy of substitutive compensation. As relevant here, substitutive compensation would depend on assets having been "removed without authority by a trustee or other fiduciary, such as a director." *Id.* ¶ 18. There is no triable issue of whether Mr. Turner's took assets or funds from CIL in breach of his fiduciary duties. Therefore, Mr. Turner is entitled to summary judgment dismissing the substitutive compensation component of the equitable compensation remedy. However, he is not entitled to summary judgment dismissing the part of the equitable compensation remedy that seeks reparative compensation predicated on the loss of value in the CIL stock given the existence of a genuine dispute whether he breached his fiduciary duty to CIL and, assuming he did breach so, whether CIL suffered a loss because of the breach.

### Legal Damages

Mr. Turner asserts that the Trustee's legal claim for damages based on his alleged breach of his fiduciary duties to CIL fails because at the time of the Recapitalization, CIL's equity interest in CEVA Group had no value, and therefore, CIL suffered no harm as a result of the Recapitalization.[471]

---

[471] Turner MOL at 25–27.

The Trustee's claim for recovery against Mr. Turner is based on the monetary injury that CIL allegedly suffered when its ownership interest in CEVA Group was diluted through the Recapitalization. Mr. Turner says that he is entitled to summary judgment dismissing that claim because at the time of the Recapitalization, CIL's equity interest in CEVA Group had no value and, therefore, CIL suffered no harm and was not injured by the Recapitalization.[472] In support of his position, Mr. Turner adopts the CEVA Defendants' argument that, as a matter of law, the Trustee cannot demonstrate that CIL's equity interest in CEVA Group had any value at the time of the Recapitalization.[473] However, for the reasons previously discussed, there are material issues of disputed fact as to CEVA Group's value as of the Recapitalization. Accordingly, the Court denies summary judgment dismissing the Trustee's claim against Mr. Turner for compensatory damages.

### Punitive Damages

Mr. Turner asserts that the Trustee's legal claim for damages based on his alleged breach of his fiduciary duties to CIL fails because Cayman Islands law would not allow the Trustee to recover punitive damages for breach of fiduciary duties.[474] The Court agrees. Cayman Islands law does not provide for an award of punitive damages for a company director's breach of fiduciary duties.[475] Accordingly, the Court grants Mr. Turner summary judgment dismissing the Trustee's claim for punitive damages.

---

[472] Turner MOL at 25.

[473] Turner MOL at 25–26 (citing CD MOL at 4–23).

[474] Turner MOL at 25.

[475] Millett Decl. ¶ 33.

*Rescission*

Mr. Turner argues that to unwind the Recapitalization based on a breach of fiduciary duty, the Trustee would first need to rescind the CIL RSA.[476]  He says that under New York law, a party that fails to promptly repudiate a contract is deemed to have ratified it and is bound by the contract. He maintains that the Trustee has not repudiated the CIL RSA and, for that reason, he cannot rescind it.[477]

The Trustee contends that the doctrine of repudiation is irrelevant to this case.  He maintains that under Cayman Islands law, if a director enters into a contract in breach of his fiduciary duties, that contract is without effect.[478]  He explains that he is "not trying to void the [CIL] RSA . . . under New York law which is what governs the [CIL] RSA,"[479] but instead, that he seeks a declaration that the CIL RSA "is void *ab initio*" under Cayman Islands law and, as such, "the repudiation doctrine simply never comes into play."[480]

The Trustee is correct.  Because Count 7 does not seek to rescind the CIL RSA, no party's alleged inaction is relevant to Mr. Turner's motion for summary judgment on that count.  "A void

---

[476] Turner MOL at 32.

[477] Turner MOL at 32 (citing *BH Sutton Mezz LLC v. Sutton 58 Assocs. LLC (In re BH Sutton Mezz LLC)*, No. 16-01187, 2016 WL 8352445, at *15 (Bankr. S.D.N.Y. Dec. 1, 2016); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, No. 15-CV-4971, 2016 WL 344980, at *3 n.1 (S.D.N.Y. Jan. 27, 2016), *aff'd*, 681 F. App'x 64 (2d Cir. 2017); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 541 B.R. 551, 572–73 (S.D.N.Y. 2015); *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 CIV. 3231, 1998 WL 167330, at *26 (S.D.N.Y. Apr. 8, 1998)).

[478] Sept. 26 Hr'g Tr. at 139:5–7.

[479] Sept. 26 Hr'g Tr. at 138:11–12.

[480] Sept. 26 Hr'g Tr. at 139:14–16.  Under the standard for rescission under New York law "a plaintiff may obtain rescission—in lieu of actual damages—when a breach of contract is either 'material and willful' or 'so substantial and fundamental' that it 'strongly tend[s] to defeat' the purpose of the contract."  *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998)); *see also Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910) ("[Recission] is permitted for failure of consideration . . . [and] for repudiation of the contract or an essential part thereof and for such a breach as substantially defeats its purpose.").  Since the Trustee is seeking a declaration that the CIL RSA was never valid, there the Trustee's claim, if correct, leaves no contract to rescind.

contract produces no legal obligation." *Stevenson v. Tyco Int'l (US) Inc.*, No. 04-cv-4037, 2006 WL 2827635, at \*6 (S.D.N.Y. Sept. 29, 2006) (citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 31 (2d Cir. 2001)); *see also Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-CV-7742, 2021 WL 4478622, at \*10 (S.D.N.Y. Sept. 30, 2021) ("Rescission—and, accordingly, rescissory damages, which are a substitute for rescission . . . is not a remedy for a void contract, because irrespective of whether the contract is rescinded, it has no legal effect." (citations omitted)). If the Trustee is correct that the CIL RSA is void, it follows that any delay in seeking to avoid it would be irrelevant, since the CIL RSA would never have been effective, leaving nothing to repudiate.

Nor does Mr. Turner explain why the contract is not, as the Trustee contends, one that is void and not voidable. The parties' experts agree that, under Cayman Islands law, breaches of certain fiduciary duties will allow a company to avoid a contract:

> [A] transaction approved by a director in a position of conflict is . . . liable to be avoided by the company . . . . Therefore, in circumstances where the articles of association of a company do not provide for a "notice of conflict" procedure to permit directors to vote in favour of a transaction where they have an interest, a director's vote will not be effective regarding such a transaction.
>
> Similarly, if the company's articles do have a conflict procedure, but the director does not correctly follow this procedure (for example, by not effectively disclosing the nature of the conflict), then again the director's vote will not be effective.[481]

The experts' testimony implies that they believe that, under Cayman Islands law, a company *may* avoid a conflicted transaction. However, their testimony does not address whether the elective nature of such avoidance means that the transaction is either void or voidable under Cayman

---

[481] Kish Decl. ¶¶ 22–23; Millett Decl. ¶ 24 ("[F]or a director to procure his company to enter into a contract when he is in a position of conflict results in the director breaching duties owed to the company, and the company alone. It necessarily follows that it is only the company which is entitled to seek relief in respect of such breach of duty (including, in an otherwise appropriate case, by avoiding the relevant contract).").

Islands law, and critically, whether breaches of fiduciary duty other than one resulting from a director's conflicts would give rise to a void transaction. The latter question is particularly important given the Directors' satisfaction of the conflict procedures under the CIL Articles of Association. However, the issue is not before the Court as neither party seeks summary judgment that the Restructuring is void or voidable.

**The Count 12 Dispute**

In Count 12, the Trustee purports to assert a claim of conspiracy under Cayman Islands law against Mr. Turner. In support of that claim, the Trustee asserts that "[t]he Defendants, or some of them, intentionally and improperly combined to injure CIL and its creditors by unlawfully stripping CIL of the equity value of CEVA Group and wrongfully transferring those rights to CEVA Holdings."[482] He contends that each of the Defendants (i) "had knowledge that other Defendants were engaged in unlawfully stripping CIL of the equity value of CEVA Group and wrongfully transferring those rights to CEVA Holdings through the CEVA Equity Transfer," and (ii) "each of the Defendants provided substantial assistance in carrying out the CEVA Equity Transfer."[483] He says that he is "entitled to judgment against the Defendants in an amount to be proved at trial, including, without limitation, the value of CIL's ownership of CEVA Group's shares."[484]

Mr. Turner contends, and the Court finds, that under Cayman Islands law, an actual pecuniary or financial loss is a necessary element of a claim for civil conspiracy. Accordingly, to prevail on his claim for civil conspiracy, the Trustee must show that CIL suffered actionable

---

[482] SAC ¶ 256.

[483] SAC ¶ 257.

[484] SAC ¶ 258.

damages.[485]  Mr. Turner contends that, as a matter of law, he is entitled to summary judgment dismissing Count 12 because, as a matter of law, CIL's equity in CEVA Group was worthless when the Recapitalization began and, therefore, the Trustee cannot raise a genuine dispute of fact as to whether CIL suffered any damages.[486]

The Trustee disputes that contention.  Under Cayman Islands law, a loss in the share value of a holding company in its subsidiaries will qualify as actionable loss to support a claim of conspiracy by the holding company where the reduction in value was caused by the alleged breach of fiduciary duty and was foreseeable at the time of the alleged breach.[487]  The Trustee maintains that the Record Value Evidence and Mr. Maxwell's export report show that there remains a dispute as to whether CIL's equity in CEVA Group was worthless at the time of the Recapitalization, and for that reason, Mr. Turner is not entitled to summary judgment dismissing Count 12.[488]

The Court has determined that the Record Value Evidence is inadmissible to prove the value of CIL's interest in CEVA Group.  It has also determined that CEVA Group has not demonstrated that, as a matter of law, that interest had no value as of the Recapitalization, or at any other time.  Mr. Turner has not demonstrated that, as a matter of law, CIL did not suffer an actual pecuniary or financial loss.  Accordingly, the Court denies Mr. Turner's request for summary judgment dismissing Count 12.

---

[485]  Millett Decl. ¶¶ 37–40 (explaining that Cayman Island courts would follow English law in requiring "actionable damage" to maintain a conspiracy claim).

[486]  Turner MOL at 37; *see also* Turner Reply MOL at 27 ("[T]he Trustee does not dispute that damages are a necessary element of a claim for civil conspiracy under Cayman Islands law. . . . [T]he Trustee cannot demonstrate that CIL suffered any damages, and . . . cannot sustain a Cayman Islands law civil conspiracy claim.").

[487]  Kish Decl. ¶ 36(a).

[488]  Trustee Opp'n to Turner MOL at 23.

144

**The Count 19 Dispute**

In Count 19, the Trustee seeks a judgment "[d]isallowing and/or subordinating any and all claims that any Defendant holds against the Debtor and its estate."[489]  He says he is entitled to such relief because the Defendants "engaged in and benefitted from inequitable conduct . . . that has resulted in injury to the Debtor and its other creditors and conferred an unfair advantage upon the Defendants."[490]  He maintains that the alleged inequitable conduct "resulted in harm to the Debtor and its entire creditor body, as a result of which innocent creditors are less likely to recover the full amounts due to them."[491]  He contends that "[u]nder principals [sic] of equitable subordination, in equity and good conscience, all claims that have been or may be asserted against the Debtor by . . . any of the Defendants in any capacity should be disallowed or subordinated for purposes of distribution pursuant to section 510(c)(1) and 105(a) of the Bankruptcy Code."[492]  He says that "no Defendant's claim, if paid at all, [should be] paid ahead of the claim of any other creditor,"[493] and that "[e]quitable subordination or disallowance as requested [in the SAC] is consistent with the provisions and purposes of the Bankruptcy Code."[494]

Bankruptcy courts "are essentially courts of equity, and their proceedings inherently proceedings in equity." *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934).  They have "the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 308 (1939).  The doctrine

---

[489] SAC ¶ I at 88.

[490] SAC ¶ 282.

[491] SAC ¶ 282.

[492] SAC ¶ 283.

[493] SAC ¶ 283.

[494] SAC ¶ 284.

of equitable subordination "empowers the bankruptcy court to consider whether 'notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share *pro rata* with the other claimants of equal status.'" *Mishkin v. Siclari* (*In re Adler, Coleman Clearing Corp.*), 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).   The doctrine does not permit the disallowance of claims; it is limited to reordering priorities. *See Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 610–11 (Bankr. S.D.N.Y. 1998) ("Equitable subordination . . . merely postpones payment but does not disallow the claim. . . .   It is an alternative remedy to monetary recovery from the wrongdoing claimant."). Equitable subordination is an "extraordinary remedy that is to be used sparingly." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) (quoting *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008)).

Section 510(c) codifies that doctrine.  As relevant, it authorizes a court to, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1).  In determining whether to apply equitable subordination, courts in this district have adopted the three-part test articulated in *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692 (5th Cir. 1977).  *See, e.g.*, *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002); *In re Aéropostale, Inc.*, 555 B.R. 369, 397 (Bankr S.D.N.Y. 2016).  The three factors of the *Mobile Steel* test are: "(i) [t]he claimant must have engaged in some type of inequitable conduct; (ii) [t]he misconduct must have resulted in injury to the creditors of the

bankrupt or conferred an unfair advantage on the claimant; [and] (iii) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *Mobile Steel*, 563 F.2d at 699–700 (citations omitted).[495]

In applying the first prong of the *Mobile Steel* test, "inequitable conduct" includes "(i) fraud, illegality or breach of fiduciary or other legally recognized duties; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a mere instrumentality or alter ego to benefit another." *In re Hydrogen*, 431 B.R. at 361 (citations omitted); *see also Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006) ("[I]nequitable conduct encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience.  It includes a secret or open fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double-dealing.").

Under the second prong of that test, courts examine whether the alleged misconduct caused injury to creditors or conferred an unfair advantage on the defendant-claimant.  *In re Hydrogen*, 431 B.R. at 360.  Courts also consider harm to the debtor under this prong.  *See LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 349 (Bankr. S.D.N.Y. 2014) ("Once inequitable conduct has been found, the Court must next determine whether the claimant's conduct caused injury to the debtor or its creditors. . . .").  However, equitable

---

[495] The third prong of the *Mobile Steel* test is effectively defunct since the Bankruptcy Code explicitly provides for equitable subordination under section 510(c).  *See Off. Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 360–61 (Bankr. S.D.N.Y. 2010). As that court explained, "[t]he third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act—under which *In re Mobile Steel Co.* was decided—did not."  *Id.; see also  In re 80 Nassau Assocs.*, 169 B.R.at 841 ("[S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot.") (citation omitted).

subordination is remedial, not penal.  *In re 80 Nassau Assocs.*, 169 B.R. at 840.  It "should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct."  *Enron Corp. v. Springfield Assocs. L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (quoting *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 327 (D. Del. 2003)); *see also Off. Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P.* (*In re AppliedTheory Corp.)*, 345 B.R. 56, 59 (S.D.N.Y. 2006) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors."), *aff'd,* 493 F.3d 82 (2d Cir. 2007).  For that reason, in applying the *Mobile Steel* test, some courts require that both injury *and* an unfair advantage to the claimant be shown.  *BH Sutton Mezz LLC)*, 2016 WL 8352445, at *31; *see also In re LightSquared*, 511 B.R. at 347 n.152.  "Requiring injury is appropriate considering the nature of equitable subordination, which is 'a remedial measure designed to offset harm' and 'is not penal in nature.'"  *In re Aéropostale, Inc*., 555 B.R at 398 (quoting *In re LightSquared Inc.*, 511 B.R. at 349).

Mr. Turner argues that the Court should grant summary judgment dismissing Count 19 because the Trustee cannot satisfy two essential elements of the claim.[496]  The Trustee disputes that contention.  Mr. Turner says that the Trustee cannot establish that CIL or its creditors suffered an injury from his alleged misconduct, because "no reasonable trier of fact could find that CIL's equity stake in CEVA Group had value at the time of the Recapitalization."[497]  However, as previously discussed, CEVA Group has not demonstrated that, as a matter of law, CIL's equity stake had no value as of the Recapitalization, or at any other time.  Therefore, Mr. Turner has not

---

[496] Turner MOL at 38–39.

[497] Turner MOL at 38.

established that, as a matter of law, CIL and its creditors suffered no injury. Second, Mr. Turner argues that the Trustee cannot establish that he engaged in any "inequitable conduct."[498] He contends that the only potential basis for finding inequitable conduct is the Trustee's breach of fiduciary duty claim.[499] He says that ground is not available because he is entitled to summary judgment dismissing the breach of fiduciary duty claim.[500] However, the Court has denied Mr. Turner summary judgment dismissing that claim.

Mr. Turner has not demonstrated as a matter of fact and law that he did not engage in inequitable conduct and that CIL's creditors were not injured by his alleged misconduct. Accordingly, the Court denies summary judgment dismissing Count 19.

## Conclusion

Based upon the foregoing, the Court finds and determines as follows:

As to the CEVA Defendants:

(i)    The Court denies the CEVA Defendants' request for summary judgment dismissing Counts 1–3, 5 and 11–12, and the Trustee's claims for damages under Counts 4 and 7–9.

(ii)    The Court denies the CEVA Defendants' request for summary judgment fixing the equity hurdle at €2,993 million.

(iii)    The Court grants the CEVA Defendants' request for summary judgment dismissing Counts 4 and 5.

(iv)    The Court denies the CEVA Defendants' request for summary judgment precluding the Trustee from obtaining an avoidance remedy.

---

[498] Turner MOL at 39.

[499] Turner MOL at 39.

[500] Turner MOL at 39.

(v)     The Court grants the CEVA Defendants' request for summary judgment dismissing Count 13.

As to Mr. Turner:

(i)     The Court grants Mr. Turner's motion for summary judgment on Count 7 to the extent that he seeks to preclude an equitable compensation remedy based on a theory of substitutive compensation and to preclude a remedy of punitive damages.  However, the Court otherwise denies his request for summary judgment dismissing Count 7.

(ii)    The Court denies Mr. Turner's request for summary judgment dismissing Counts 12 and 19.

As to the Trustee:

(i)     The Court denies the Trustee's request for summary judgment on Counts 4 and 5.

SUBMIT AN ORDER.

Dated: April 18, 2024
       New York, New York

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge